UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


Reiyn Keohane,

       Plaintiff,

v.                                         Case No. 4:16-cv-511

Julie Jones,
*in her official capacity as*
Secretary of the Florida Department of Corrections,

Trung Van Le,
*in his official capacity as*
Chief Health Officer of the Desoto Annex,

Teresita Dieguez,
*in her official capacity as*
Medical Director of Everglades Correctional Institution,

Francisco Acosta,
*in his official capacity as*
Warden of Everglades Correctional Institution,

       Defendants.

_____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Reiyn Keohane ("Plaintiff"), by and through undersigned counsel, asserts the following claim against Defendants Julie Jones, Secretary of the Florida Department of Corrections, in her official capacity; Trung Van Le, Chief Health Officer of the Desoto Annex, in his official capacity; Teresita Dieguez, Medical Director of Everglades Correctional Institution, in her official capacity; and Francisco Acosta, Warden of Everglades Correctional Institution, in his official capacity.

## INTRODUCTION

1.      Plaintiff is a transgender woman who is currently in the custody of the Florida Department of Correction ("DOC") and is being denied medically necessary treatment for her Gender Dysphoria. Plaintiff brings this action to compel Defendants (collectively, "the DOC") to treat her serious medical need consistent with its constitutional obligations under the Eighth Amendment to the United States Constitution.

2.      This action seeks declaratory and injunctive relief to redress the DOC's violation of her constitutional rights.

## JURISDICTION AND VENUE

3.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for violations of civil rights under the Eighth Amendment to the United States Constitution.

4.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights).

5.     Venue is proper in the Northern District of Florida under 28 U.S.C. § 1391(b) because the DOC resides in this district.

## PARTIES

6.     Plaintiff is 22 years old, is currently serving a fifteen (15) year sentence in the custody of the DOC, and is currently incarcerated at Everglades Correction Institution ("Everglades CI") in Miami, Florida.

7.     Defendant Julie Jones ("Jones") is sued in her official capacity as the Secretary of the DOC.   Jones "is responsible for planning, coordinating, and managing the corrections system of the state." Fla. Stat. § 20.315(3).  Jones "shall ensure that the programs and services of the department are administered in accordance with state and federal laws, rules, and regulations, with established program standards, and consistent with legislative intent." *Id.* Jones is also responsible for enforcement of the DOC's Procedure Number 602.053, Specific Procedure (2)(a)5., the "freeze-frame" policy that is challenged in this lawsuit and that is discussed further below.

8.     Dr. Trung Van Le, M.D. ("Le") is sued in his official capacity as the Chief Health Officer at the DOC's Desoto Annex.  Le denied Plaintiff's request for treatment for her Gender Dysphoria even though he knew that such treatment was

medically necessary and that Plaintiff was at substantial risk of serious harm if she did not receive it.

9.      Dr. Teresita Dieguez, M.D ("Dieguez") is sued in her official capacity as the Medical Director at the DOC's Everglades Correctional Institution. Dieguez denied Plaintiff's request for treatment for her Gender Dysphoria even though Dieguez knew that such treatment was medically necessary and that Plaintiff was at substantial risk of serious harm if she did not receive it.

10.     Francisco Acosta ("Acosta") is sued in his official capacity as the Warden at the DOC's Everglades Correctional Institution. Along with the other named defendants, Acosta will respond to any injunctive relief ordered by the Court.

## GENERAL ALLEGATIONS

### A.      Gender Dysphoria

11.     "Gender identity" is a well-established medical concept, referring to a person's internal sense of their own gender. All human beings develop this elemental conviction of belonging to a particular gender.

12.     Gender identity is innate and immutable.

13.     Typically, people who are designated female at birth based on their external anatomy identify as girls or women, and people who are designated male at birth identify as boys or men.

14.     For transgender individuals, however, one's gender identity differs from the sex assigned to them at birth. Transgender men are men who were assigned "female" at birth but have a male gender identity. Transgender women are women who were assigned "male" at birth but have a female gender identity.

15.     The medical diagnosis for the incongruence between one's gender identity and one's sex assigned at birth and the clinical distress resulting from this incongruence is Gender Dysphoria (previously known as Gender Identity Disorder).

16.     Gender Dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5") and International Classification of Diseases-10 ("ICD-10").[1]

_____

[1] The DSM-5 describes the criteria as follows:

Gender Dysphoria in Adolescents and Adults 302.85 (F64.1)

A.      A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

    1.      A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

    2.      A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender

17.    If left untreated, Gender Dysphoria can lead to serious medical problems, including clinically significant psychological distress, dysfunction, debilitating depression, and, for some people without access to appropriate medical care and treatment, self-harm, suicidality, and death.

18.    Leading medical and mental-health professional groups—including the American Medical Association, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Congress of Obstetricians and Gynecologists, the Endocrine Society,

---

(or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

3.    A strong desire for the primary and/or secondary sex characteristics of the other gender.

4.    A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5.    A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6.    A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B.    The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

DSM-5 at 452-53.

the National Association of Social Workers, and the World Professional Association for Transgender Health—all agree that Gender Dysphoria is a serious medical condition, and that treatment for Gender Dysphoria is medically necessary for many transgender people.

19.     The accepted standards of care for treating Gender Dysphoria are published by the World Professional Association for Transgender Health ("WPATH"), a professional association dedicated to establishing the standards for treating Gender Dysphoria.

20.     The WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care") identify clinical guidance for health professionals to assist with safe and effective care for individuals with Gender Dysphoria. The current version of the Standards of Care—Version 7—was released in September 2011.[2]

21.     The WPATH Standards of Care are recognized by the leading medical and mental-health professional groups as the authoritative standards for treating Gender Dysphoria.

---

[2] Eli Coleman et al., Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, 13 Int'l J. of Transgenderism 165 (2011),
http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1351&pk_association_webpage=3926 (visited Aug. 15, 2016).

22.   The Standards of Care apply equally to inmates, and expressly state:

Health care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community. . . . All elements of assessment and treatment as described in the SOC can be provided to people living in institutions. Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care.[3]

23.   The National Commission on Correctional Healthcare ("NCCHC") recommends that the medical management of prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the WPATH Standards of Care.[4]

24.   Under the WPATH Standards of Care, treatment for Gender Dysphoria is designed to help individuals live congruently with their gender identity and thus eliminate the clinically significant distress.  Treatment protocols include socially transitioning (dressing, grooming, and presenting oneself to others in accordance with one's gender identity), hormone therapy, and surgeries. The

---

[3] *Id.* at 206-07.

[4] NCCHC Policy Statement, Transgender Health Care in Correctional Settings (October 18, 2009; reaffirmed with revision April 2015), http://www.ncchc.org/transgender-health-care-in-correctional-settings (visited Aug. 15, 2016) (footnote omitted).

particular course of medical treatment varies based on the individualized needs of the person.

**B.**     **Plaintiff's Gender Dysphoria**

25.     Plaintiff is a transgender woman who is currently 22 years old.

26.     Plaintiff has known that she has a female gender identity since age 12.

27.     At age 13 (around November 27, 2007), Plaintiff began seeing a psychiatrist, Omar Rieche, M.D., of Fort Myers, along with a therapist in Dr. Rieche's practice, MaryAnn Rocco, LCSW. From age 14 on, with the support of these professionals, Plaintiff always wore female-typical cosmetics, clothing, and hairstyles.

28.     At age 16 (around March 2010), Plaintiff was diagnosed with Gender Identity Disorder (now known as Gender Dysphoria).

29.     At age 17 (around June 2011), Plaintiff legally changed her name from a traditionally male name to her current name to bring her legal name into conformity with her gender identity. Even before her legal name change, Plaintiff went by "Reiyn" among all of her friends.

30.     Dr. Rieche referred Plaintiff to a pediatric endocrinologist, Dr. Cayce T. Jehaimi, M.D., of Fort Myers.  In early August 2013, at age 19, Plaintiff began hormone therapy—Estrace (estradiol) and Aldactone (spironolactone)—under the

care of Dr. Jehaimi. This treatment included estrogen and suppressed her production of testosterone.

**C.**     **Plaintiff's Incarceration and Denial of Medically Necessary Care**

31.     Around September 22, 2013, Plaintiff was charged with attempted second-degree murder and was taken into the custody of the Lee County Jail.

32.     At the Lee County Jail, Plaintiff requested to continue her hormone therapy, but the Lee County Jail refused.

33.     In July 2014, Plaintiff accepted a plea deal of 15 years, understanding that she would be returned to her hormone therapy after being transferred to DOC custody. Maintaining her hormone therapy was of the utmost importance to Plaintiff and was the motivating factor in her acceptance of the plea.

34.     On July 17, 2014, Plaintiff was committed to the custody of the DOC. She began her commitment at the South Florida Reception Center.

35.     Although numerous DOC medical and mental-health officials recognize Plaintiff's diagnosis, they have not provided her with treatment for her Gender Dysphoria. Her diagnosis has been recognized by numerous DOC psychiatrists, psychologists, mental-health specialists, and other medical and mental-health officials, including Dr. Jose Bermudez, psychologist; Dr. Arnice Johnson, psychologist; Dr. C. Perez (Christina Perez-Santana), psychologist; Dr.

Judy Sicilia, psychologist; Dr. Michael McClure, psychiatrist; Dr. Lissette Selem, psychiatrist; Dr. Mohammed Yousuf, psychiatrist; Sonele Baute, mental-health specialist; Dr. R. Gonzalez, mental-health specialist; Stuart Stuthers, mental-health specialist; A. Therrien, mental-health specialist; Duane Cunningham, Psych. ARNP (Psychiatric Advanced Registered Nurse Practitioner); and Andre Rivero-Guevara, physician assistant.

36.    Plaintiff repeatedly requested treatment for her Gender Dysphoria. From the first conversations Plaintiff had with DOC officials concerning her need for treatment, Plaintiff made clear both her need for hormone therapy and her need to be able to live as female in all aspects of life—including dressing and grooming (including growing her hair)—as she did prior to her incarceration. Through to the present day, in nearly all conversations Plaintiff has had with mental-health and medical officials at the DOC in which her transgender status and need for treatment for Gender Dysphoria were discussed, Plaintiff raised both her need for hormone therapy and her need to access female dressing and grooming standards. Plaintiff made repeated requests to mental-health and medical officials that she be provided comprehensive, medically necessary treatment for Gender Dysphoria, including hormone therapy and the ability to dress and groom in accordance with female grooming standards. These requests were denied.  Plaintiff describes some of these interactions below.

37.    At the South Florida Reception Center, Plaintiff filed an informal grievance on August 11, 2014 (Request No. 08-060-14), stating:

> I need my hormone therapy resumed. I had it as a result of a legitimate, documented diagnosis and prescription when I was arrested and was then unjustly denied this treatment while in Lee County Jail. This treatment is absolutely necessary to my ability to mentally function. Without it I consider self-harm and suicide every single day. It is the only thing that matters in my life in this moment – that I have been taken off of such critical medication is cruel and unusual punishment in that it causes needless suffering. This is not an issue that is any way complicated – I need the medication. I was wrongfully refused treatment in a way which is irresponsible, discriminatory, and unconstitutional, and continue to be refused in the same manner by the DoC. The answer should be both obvious and simple – stop refusing to give me my prescription medication before I have to take any legal action.

38.    This informal grievance was "returned" on August 21, 2014, on the grounds that the DOC needed to obtain Plaintiff's outside medical records. The response stated:

> I met with you on 08/21/14 and discussed inmate orientation procedure 601.210 regarding your aforementioned complaints. As discussed the next step in the process is to obtain previous/existing health information from your provider. You signed a Release of Information on 08/21/14 consenting to this action. My team will confer with your provider and obtain health information to channel to our provider to review and determine the best course of action.

39.    The following day, medical records documenting Plaintiff's diagnosis of Gender Identity Disorder and her prescription for hormone therapy (estradiol and spironolactone) were sent to and received by the DOC.

40.    On August 26, 2014, Plaintiff was transferred to the Desoto Annex (together with the Desoto Work Camp, "Desoto CI").

41.    On September 1, 2014, Plaintiff filed another informal grievance requesting again that she be placed back on hormone therapy. This request was denied the next day on the grounds that Plaintiff had allegedly canceled an appointment with Dr. Jehaimi the previous year.

42.    In another informal grievance filed September 12, 2014, Plaintiff explained that she was unable to show up for the appointment because she was in jail at the time.

43.    Despite this explanation, on September 24, 2014, Plaintiff received a denial of the September 12, 2014 informal grievance, signed by "H. Greig, RN, D.O.N." (Helen Greig, Director of Nursing), which states that "you will not be placed on hormonal therapy while incarcerated in the Florida State Dept. of Corrections. If you are having mental health concerns, please write a request to our Mental Health Dept. for an appointment to be seen."

44.    A September 8, 2014, healthcare note signed by Ms. Greig states that Plaintiff "was not on treatment when [s]he Arrived in the State Dept of Corrections, will not be placed back on treatment. Instructed to seek Mental Health Services as needed."

45.    A September 28, 2014, healthcare note signed by Defendant Le states, "Received medical records from DR Cayce Jehaimi. Pt. Keohane was seen by DR Jehaimi on 8-14-13 for 'wanting to be a female[,]' sex change. Pt was [prescribed] Estradiol, spironolactone but pt refused [follow up with] DR Jehaimi."

46.    On September 30, 2014, Plaintiff was sent to the Desoto Work Camp.

47.    On October 6, 2014, Plaintiff filed an appeal (No. 14-6-33110) of the informal grievances filed on September 1 and 12, 2014. In that appeal, Plaintiff states:

> I am transgender and was receiving Hormone Replacement Therapy when I was arrested (Sept 23 2013). I have not rec[ei]ved it since. I have provided medical records that prove I was receiving this treatment, but the DeSoto medical staff refuses to give me this prescribed medication. The first denial was given on the grounds that "you canceled your appointment in November 2013". They are unable to provide documented proof that I canceled – it was canceled because I was in jail, not of my own accord. I wrote them again so that they may correct this, as it may have been a mistake. (see attached) The second denial (attached) is a flagrant example of their willful indifference to the needless suffering I face every day. I have been fighting to get my treatment back for this entire year – the only reason I have not received it since 2013 is because the state has refused to give it to me the entire time I have been in custody. This is not and never was a voluntary denial. . . .

48.    On October 10, 2014, Plaintiff was sent back to the Desoto Annex.

49.    Around October 14-17, 2014, while in administrative confinement, Plaintiff attempted to hang herself because of the DOC's refusal to provide her with transition-related care.

50.    In the discharge summary concerning Plaintiff's administrative confinement, Gender Identity Disorder is listed as a discharge diagnosis. The signatories of this discharge summary, including the diagnosis of Gender Identity Disorder, included Stuart Stuthers, a Mental Health Specialist; Defendant Le; and Dr. Judy Sicilia, a psychologist performing duties at both Desoto CI and Charlotte CI.

51.    Upon information and belief, in addition to signing his name on the discharge summary diagnosing Plaintiff with Gender Identity Disorder, Mr. Stuthers personally told Plaintiff that if he had to diagnose her, he would agree with the diagnosis of Gender Identity Disorder. Upon information and belief, in addition to signing her name on the discharge summary diagnosing Plaintiff with Gender Identity Disorder, Dr. Sicilia also told Plaintiff, both at Desoto CI and Charlotte CI, that she agreed with the diagnosis of Gender Identity Disorder.

52.    On October 21, 2014, Plaintiff's appeal (No. 14-6-33110) of the informal grievances filed on September 1 and 12, 2014, was returned without action on the grounds that "[y]ou did not provide this office with a copy of the formal grievance filed at the institutional level as required by rule or the reason you provided for by-passing that level of the grievance procedure is not acceptable."

53.    On October 31, 2014, Plaintiff filed a formal grievance with the warden at the Desoto Annex. In that grievance (Grievance No. 1411-564-003), Plaintiff explained that it was cruel and unusual punishment for the DOC to deny her the medication that she needed. She stated:

> I have a legal right to receive it . . . . since I have documented proof that I was receiving it. To deny it is to cause depression and suicidal tendencies, which I must face on a daily basis. Statistically speaking, transgendered people literally have the highest suicide rate of any group of people – there is no counseling that can ever substitute for the medical treatment that I require. My mind violently rejects my own body, telling me that it is wrong, that parts of me are missing – to suggest that I receive counseling only is to do nothing to treat this at all. No amount of counseling can ever make who I am on this most fundamental level change . . . . .This treatment is literally necessary for me to have a future – there is no possible chance that I could endure the absolute agony of waking up every day to my own body forcing me to hate myself, to the point where I struggle not to hurt or kill myself every day, getting by only on the hope that it will not always be like this. To take my medication from me is to force this misery upon me – hormone therapy is necessary for me to live on a daily basis, and to complete my time in a positive and productive manner. I would like to use my time to better myself, and I try to, but this is the most important thing that can possibly be done to improve my future. Without it, I have no will to have a future at all – one where I can go on hating myself forever and ever, where I can never be truly happy no matter what I do, is not a future worth having at all. This is, essentially, the reasoning as to why it is cruel and unusual punishment – a basis in reality to better understand why the law is supposed to protect my right to my hormone therapy.

54.    A healthcare note dated November 19, 2014, and signed by "S. Peterson, HSA [(Health Service Administrator)]" of Desoto CI states that "at this time there is no consideration to restart your hormone replacement therapy."

55.    On November 20, 2014, the formal grievance (Grievance No. 1411-564-003) was denied by Defendant Le, who stated:

> UPON REVIEW OF YOUR MEDICAL RECORDS RECEIVED FROM DR. CAYCE JEHAIMI, YOU HAD CANCELLED YOUR LAST APPOINTMENT IN NOVEMBER OF 2013 WITH NO FURTHER SCHEDULED APPOINTMENTS. DR. JEHAIMI THEN NOTED THAT YOUR PRESCRIPTION FOR THE HORMONE REPLACEMENT THERAPY WOULD BE SUSPENDED AS IT WOULD BE DANGEROUS TO CONTINUE WITHOUT ANY CLOSE ENDOCRINE SUPERVISION. AT THIS TIME THERE IS NO CONSIDERATION TO RESTART YOUR HORMONE REPLACEMENT THERAPY. YOU ARE CURRENTLY BEING SEEN BY OUR MENTAL HEALTH STAFF WITH AN INDIVIDUALIZED SERVICE PLAN IN PLACE IN ORDER TO PROVIDE YOU A MEANS TO DISCUSS YOUR PROBLEMS WITH A MENTAL HEALTH PROFESSIONAL. IF YOU HAVE FURTHER CONCERNS OR QUESTIONS, YOU MAY ACCESS SICK-CALL AND ADDRESS THEM WITH THE HEALTH CARE STAFF. ALSO, AT ANY TIME YOU MAY SEEK MENTAL HEALTH SERVICES AND OUR STAFF WILL RESPOND AS PROMPTLY AS POSSIBLE TO YOUR REQUESTS.

56.    In her appeal of the denial of Grievance No. 1411-564-003 to the DOC Secretary (appeal labeled as Grievance No. 14-6-39574) dated December 3, 2014, Plaintiff explained that she did not cancel her appointment with Dr. Jehaimi, but rather she did not attend her appointment because she was in jail. Specifically, she wrote:

> I am transgender, and was receiving Hormone Replacement Therapy at the time of my arrest; Sept. 23rd, 2013. The medication I was receiving was Spironolact, and also Estradiol; the dosages are in my medical records but I do not remember, and the staff has declined to tell me the exact amounts. According to statute 3.48 of the Inmate Rights Handbook, a transgender inmate who was receiving Hormone

Therapy is supposed to continue receiving hormone therapy. The staff at the Desoto Annex are well acquainted with the records that prove I was rec[ei]ving treatment for hormone therapy, but refuse to reinstate this medication; by statute 3.48 this can be grounds for cruel and unusual punishment, as it demonstrates willful indifference to a very serious medical and psychological condition that <u>cannot</u> be treated with counseling alone. The reason given by the DeSoto staff is invalid; I did not cancel my appointment, as I was incarcerated in Lee County Jail and was unable to make any such cancellation. There is no documentation which I have signed which would negate this treatment – in fact the only documentation is of my struggle to have this treatment which has been unlawfully suspended restored . . . . It is absolutely necessary to me that I have my treatment restored to me; it is a severe breach of the constitutional ban on cruel and unusual punishment to refuse a treatment plan that was determined to be necessary by a team of doctors prior to my incarceration solely on the basis of being arrested; the necessity of this treatment has not changed in the past year, and it never will – I will always need it. Therefore the burden of providing close endocrine supervision to accompany the treatment falls to the DoC. There is no lawful way for my treatment to be denied; this means that the DoC must provide all parts of this hormone therapy, as it is cruel and unusual punishment to forbid it, and the fact that it requires close supervision is neither here nor there; the burden of care falls to the DoC and it is wholly unconstitutional to deny treatment solely because the DoC does not want to pay for it. Please see to it that this unconstitutional denial of treatment is not allowed to continue.

57. On December 9, 2014, Plaintiff filed a grievance directed to Dr.

Sicilia, stating:

I would like to schedule an appointment to discuss the psychological necessity of myself dressing as a female, and the availability of a pass for this way of dressing. I have, for the past 6 years consecutively, always dressed in a way that presents me as female in appearance through the use of padded bras, etc. For me, this is a necessary facet of my life, and deeply ingrained in my personality. In the treatment of a trangendered person, this behavio[r] is not only encouraged, but required as a prerequisite for the prescription of hormone replacement

therapy [and] sexual reassignment surgery – I have lived my entire life past the age of 13 as female, and it is extremely detrimental to my mental health to forbid this practi[c]e; it is also well documented as a legitimate and proper treatment for a person who is transgender. As I am transgender, I should rec[ei]ve a pass to allow me to continue this behavior for my wellbeing. This is part of who I am – it is not the place of the DoC to try to change the fact that I am transgender. That is not able to be changed. It is the job of the government to accommodate the needs of all persons in their care.

58.    The response, dated December 11, 2014, states: "You have been scheduled for an interview with Dr. Sicilia."

59.    On January 8, 2015, Plaintiff cut her scrotum with a razor, creating a 3cm laceration. A healthcare note dated January 8, 2015, and signed by M. Stewart, RN, and Defendant Le notes Plaintiff's desire "to keep cutting [her]self," and they "strongly recommended mental health to refer [her] to psychiatrist." Plaintiff specifically told the officials that the reason she attempted self-castration was because of their failure to provide her with treatment for her Gender Dysphoria.

60.    On January 13, 2015, Plaintiff was transferred from the Desoto Annex to Charlotte CI. Plaintiff's "Health Information Transfer / Arrival Summary" for the transfer notes that she was on a "mental health hold" pending her transfer, that she had a self-inflicted scrotal laceration, and that she wanted "gender change / hormonal therapy."

61.    Upon information and belief, Plaintiff was transferred to Charlotte CI because she had engaged in genital mutilation and had indicated that she would do it again. She regularly met with mental-health staff at Charlotte CI, and the main topic of discussion in those meetings was her transgender status and need for medical treatment.

62.    On January 23, 2015, the DOC denied Plaintiff's appeal (Grievance No. 14-6-39574), with no reason given other than an affirmation of the response from Defendant Le on November 20, 2014. Plaintiff did not receive this appeal denial until March 2015.

63.    On February 6, 2015, Plaintiff was transferred from Charlotte CI to Dade CI.

64.    On April 9, 2015, Plaintiff was transferred from Dade CI to the Charlotte County Jail. She had been charged with tampering with a security device following events that occurred during her stay at Charlotte CI. After a jury trial in December 2015, Plaintiff was acquitted and was sent back to Dade CI on December 16, 2015.

65.    On December 29, 2015, Plaintiff filed a formal grievance directed to the "chief medical officer" at Dade CI (Grievance No. 1601-463-009), stating:

> I suffer from Gender Dysphoria, a recognized neurological condition in which a person's gender identity is not consistent with the biologically assigned sex. The standard treatment is as follows: 1) the patient must be able to live and dress as the gender with which they

identify[,] 2) hormone therapy, 3) gender confirmation surgeries [and] procedures[.] [F]ailure to provide full treatment for this medical issue is unconstitutional, in violation of the 8th amendment. This is a serious medical need that has been properly diagnosed and brought to the attention of medical staff numerous times. To continue the refusal of any and all treatment is unacceptable and unconscionable, with no excuse – my symptoms include severe depression, anxiety, fatigue, and eating disorders. Additionally, other symptoms that can occur are self-injury, rage, addiction, and suicide, in the most severe instances. Furthermore, I suffer from an extremely low testosterone count, which compounds my symptoms and would also be remedied by the hormone therapy part of treatment. Further denial of treatment will constitute willful negligence to my medical needs.

66.    On December 31, 2015, Plaintiff filed an informal grievance (No. 463-1601-0062) at Dade CI, stating:

On 12-16-15, when I arrived at Dade CI TCU, I had 2 personal sports bras and 3 set of female undergarments that were confiscated unjustly and removed from my property as contraband. I am a transgender female and am not comfortable wearing male underwear—it is discrimination on the basis of sex or gender to force a person to act in a certain way because of their sex, and therefore it is unconstitutional for me to be forced to wear men's underwear. There is no valid safety concern as the female underwear is made of the same materials as the male sort and is the same as the underwear issued in female prisons, where it clearly cannot be a safety concern; therefore the basis for it being confiscated was "disciplinary", in that I am classified as male and must therefore do what males "are supposed to do." This is unconstitutional in nature, and I request that either my personal clothing be returned or that proper female underwear be issued in its place.

67.    On January 5, 2016, this informal grievance (No. 463-1601-0062) was denied in an unsigned response that contains the stamp of the Assistant Warden of

Programs and states: "[a]t a male institution only T-Shirts, Boxers, Pants, and Blue Shirts are authorized. Any other clothing is unauthorized."

68.    On January 19, 2016, Dr. Carmelo Berrios, M.D., medical director of Dade CI, denied Plaintiff's formal grievance from December 29, 2015 (Grievance No. 1601-463-009), *see supra* paragraph 65, stating:

> Your formal grievance has been received and reviewed. You will be called out to sign a release of information for the endocrinologist that was seeing you before incarceration to obtain the medical records to get the full history of treatment. Once records are received Dr. Berrios will review and determine the necessary treatment plan.

69.    On February 11, 2016, Plaintiff was transferred from Dade CI to the South Florida Reception Center.

70.    On February 18, 2016, Plaintiff was transferred from the South Florida Reception Center to Everglades CI, where she remains today. At the initial mental-health meeting following her arrival at Everglades CI, Plaintiff was informed that her medical records had not arrived.

71.    On February 19, 2016, Plaintiff was scheduled to see a psychiatrist at Everglades CI, but this was canceled because her medical records were still not available.  She was asked to return to the psychiatrist on February 22, 2016, but her medical records were still not available. At an appointment with Plaintiff's counselor on February 23, 2016, Plaintiff's medical records were still not available.

72.    Around February 29, 2016, Plaintiff met with Defendant Dieguez, medical director of Everglades CI. Plaintiff had at the time, and continues to have, a copy of all of her medical records documenting her Gender Dysphoria. When Dieguez told Plaintiff that she needed Plaintiff's medical records documenting her Gender Dysphoria, Plaintiff had them with her and offered to provide them immediately. Dieguez refused to review these records. Plaintiff also informed Dieguez that records documenting her Gender Dysphoria were already in her green medical file, which itself was also in the room. Dieguez refused to look at those records as well. Dieguez refused to discuss Plaintiff's transgender status with her. Instead, Dieguez told Plaintiff, "you are only here so I can determine the state of your genitals."

73.    Before the meeting with Dieguez, Plaintiff had been housed alone at Everglades CI. After the meeting with Dieguez, Plaintiff was assigned a roommate. The housing sergeant told Plaintiff that this was because "medical" said that she is not transgender.

74.    Around March 15, 2016, Plaintiff met again with Dieguez, who informed Plaintiff that Dieguez could not do anything further for Plaintiff regarding her request for treatment for Gender Dysphoria, that all she could do is refer Plaintiff to the mental-health department. Dr. Dieguez also told Plaintiff that she would refer her to the regional medical director.

75.    Around March 21, 2016, Plaintiff met with Andre Rivero-Guevara, a physician assistant in the mental-health department of Everglades CI. Mr. Rivero-Guevara told Plaintiff that he agreed with the diagnosis of Gender Dysphoria and recommended hormone therapy, but he said that Plaintiff's symptoms could only be treated by the medical department. He thus referred the matter back to the medical department. The following day, Plaintiff met with her mental-health counselor, Sonele Baute, Mental Health Specialist, who agreed with the diagnosis and the appropriateness of hormone therapy for Plaintiff. Ms. Baute told Plaintiff that a meeting between the medical and mental-health departments would take place on March 24, 2016, to discuss the issue. That same week, a psychologist at Everglades CI, Dr. Arnice Johnson, also told Plaintiff that she agreed with the diagnosis and the appropriateness of hormone therapy for Plaintiff.

76.    On May 4, 2016, Plaintiff filed a formal grievance (Grievance No. 1605-401-009) directed to the "chief medical officer" at Everglades CI, stating:

> I am transgender, with a formal diagnosis of Gender Identity Disorder by Dr[.] Omar Rieche, and was prescribed Hormone Replacement therapy through him and one Dr[.] Cayce Jehaimi for this condition. Specifically, I was prescribed Estradiol [and] Spironolactone, and rec[ei]ved both prior to my incarceration. While incarcerated, I have not rec[ei]ved this treatment, or any treatment whatsoever for my Gender Identity Disorder, despite the fact that it has been clearly established in my medical records and confirmed as my diagnosis by psychiatric doctors Arnise Johnson [and] Andre Rivera at this institution. This is a violation of the 8th amendment, which prohibits cruel and unusual punishment by means of willful negligence towards a person's medical needs, and a violation of Federal Inmate Rights

Statute 3.48 which specifically names Gender Identity Disorder as a medical condition requiring treatment, and states that a person who was rec[ei]ving Hormone Replacement therapy for Gender Identity Disorder must have that treatment continued while incarcerated. I experience severe depression, fatigue, anxiety, body-image disorders, fear, eating disorders, persecution, a constant state of unease, and self-harming behaviors, including a history of genital mutilation, as a result of this lack of treatment. The standard treatment, which I require, is as follows; 1) the ability to live as the gender I identity as (female) in all aspects of life[;] 2) Hormone therapy (aforementioned)[;] 3) Gender-confirmation Surgery[.] Continued failure to provide all of the above constitutes a willful indifference to the constant, daily suffering I experience, and is a clear violation of my 8th amendment right to rec[ei]ve medical care.

77.   On May 18, 2016, Defendant Dieguez denied this grievance (Grievance No. 1605-401-009), stating:

Your request for administrative review has been received, reviewed and evaluated. In order to be diagnosed for Gender Dysphoria treatment evaluations of your pre-incarceration treatment records including but not limited to: a. hormone therapy; b. completed or in-process surgical procedures; c. life experiences consistent with the inmate's gender identity; and d. mental health history. [*sic*] Please submit a request to medical records to sign an authorization ("Consent and Authorization for Use and Disclosure Inspection and Release of Confidential Information," DC4-711B) for the release of information for all pertinent outside medical and mental health records related to your Gender Dysphoria. Based on the above information, your grievance is DENIED.

78.   Plaintiff has signed the referenced release form for the DOC at least twice. One such release form is dated 8/21/14. Another, signed while Plaintiff was at Dade CI, is dated 1/7/16. Before signing that release, Plaintiff was told by a record custodian at Dade CI that the DOC already had the relevant records but that

she needed to sign the release again so that the DOC could continue to access them.

79.    On May 24, 2016, Plaintiff filed an appeal of the denial of Grievance No. 1605-401-009 to the DOC Secretary (appeal labeled as Grievance No. 16-6-23873), stating:

> I am transgender and face serious, needless suffering on a daily basis. The reason given for denial of medical treatment (that I must submit my medical records) is blatant and false. All of my relevant medical history has already been submitted to the staff of ECI, and I have also previously signed this release of medical records. My records show that I was formally diagnosed with Gender Identity Disorder, and as the result of that I had begun hormone therapy. This diagnosis has also been confirmed by the mental health staff at this facility. Considering that I have this diagnosis as well as very clear records that show I was prescribed hormone therapy and had lived as female for the majority of my life, this denial is based on no actual issue, and therefore is a case of willful indifference to my serious medical need for treatment. The treatment I require is as follows: 1. The ability to live as the gender I identify as (female)[;] 2. Hormone therapy[;] 3. Gender-confirmation Surgery. By not providing the necessary treatment, I am subjected to extreme discomfort, fear, depressions, fatigue, body image issues. As the records prove I was diagnosed and began treatment, this facility is in violation of Federal Inmate's Rights Statute 3.48, and in violation of the 8th amendment right not to be punished in a cruel or unusual manner. Refusal to provide medical treatment is a clear violation of both of these laws, as it is an obvious case of willful indifference.

80.    Plaintiff's appeal was "returned without action" on July 1, 2016. The response states:

> Appeal Returned without Action: Your administrative appeal has been received and found to be in non-compliance with Rule 33-103, Inmate Grievance Procedure. This grievance presents the same issue as

grievance log #14-6-39574 [i.e., an appeal filed from the Desoto Annex that was denied on January 23, 2015, *see supra* paragraph 62]. Per Rule 33-103.014(1)(q), grievances may be returned to the inmate without further processing if the inmate has filed more than one appeal of a grievance. Records reviewed indicate that you are still being followed by mental health. Based on the above information, your appeal is returned without action.

**D.   Exhaustion**

81.   Plaintiff has fully exhausted her administrative remedies.  She has done so at least twice.

82.   The January 23, 2015, denial of an appeal from Desoto CI concerning Plaintiff's need for treatment for her gender dysphoria constitutes exhaustion. *See supra* paragraph 62.

83.   Plaintiff's appeal from Everglades that concerned her need for treatment for her gender dysphoria and that was "returned without action" on July 1, 2016, constitutes exhaustion. *See supra* paragraph 80.

84.   In an email to the undersigned Plaintiff's counsel on July 1, 2016, the Bureau Chief of the DOC's Bureau of Policy Management and Inmate Appeals, Alan McManus, indicated that "your client has exhausted all administrative remedies."

**E.   The DOC's Policy Concerning Treatment of Gender Dysphoria**

85.    Pursuant to the DOC's Procedure Number 602.053, Specific Procedure (2)(a)5., "Inmates who have undergone treatment for GD will be maintained only at the level of change that existed at the time they were received by the Department."

86.    Under this "freeze-frame" policy, the medical care of inmates with Gender Dysphoria is determined not by their current medical needs but rather by specific treatment they received or did not receive in the past, and such inmates are denied certain treatments despite the medical need for such treatments.

## COUNT I

### Denial of Medically Necessary Care
### in Violation of the Eighth Amendment to the United States Constitution

87.    Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs of this complaint.

88.    Plaintiff is a transgender woman with Gender Dysphoria, a serious medical condition.

89.    DOC officials, including Le and Dieguez, are aware that Plaintiff has Gender Dysphoria and was receiving hormone therapy and expressing her female gender in all aspects of her life under the care of a doctor prior to her incarceration.

90.     It is medically necessary for Plaintiff to live as female, to once again receive hormone therapy, and to receive all other treatment for Gender Dysphoria deemed medically necessary by a qualified provider.

91.     DOC officials, including Le and Dieguez, nevertheless have refused to provide Plaintiff with hormone therapy or to recommend that she be permitted access to female clothing and grooming standards. This refusal is not based on a medical judgment concerning Plaintiff's medical needs.

92.     As a result of being denied access to female clothing and grooming standards and of being cut off from and denied hormone therapy by DOC officials, including Le and Dieguez, Plaintiff has suffered severe psychological distress and physical harm, including a suicide attempt and an attempt to self-castrate.

93.     DOC officials, including Le and Dieguez, are aware that Plaintiff is seeking hormone therapy and access to female clothing and grooming standards to treat her Gender Dysphoria; that proper, necessary medical care for Plaintiff's Gender Dysphoria includes allowing her to live as female and providing her with hormone therapy; and that the denial of this needed medical care is causing serious harm to Plaintiff. Yet they continue to deny her the care.

94.     This denial of treatment constitutes deliberate indifference to a serious medical need in violation of the Eighth Amendment.

95.    DOC Procedure Number 602.053, Specific Procedure (2)(a)5, limits treatment for Gender Dysphoria to pre-incarceration treatment regardless of the individual's medical needs. Jones is responsible for the enforcement of this policy.

96.    To the extent this policy is the reason DOC officials have refused to provide hormone therapy to Plaintiff (despite the fact that she had been on hormone therapy prior to incarceration), it also constitutes deliberate indifference to a serious medical need in violation of the Eighth Amendment.

97.    At all relevant times, Defendants and other DOC officials were acting under color of state law.

## PRAYER FOR RELIEF

98.    Plaintiff respectfully requests that this Court:

(a)    Declare that the DOC is denying Plaintiff medically necessary treatment for Gender Dysphoria in violation of the Eighth Amendment to the United States Constitution;

(b)    Enter a permanent injunction directing the DOC to provide to Plaintiff hormone therapy, access to female clothing and grooming standards, and all other treatment for Gender Dysphoria deemed medically necessary by a qualified professional in the treatment of the condition;

(c)    Enter a permanent injunction enjoining the DOC from enforcing its rule limiting treatment for Gender Dysphoria to treatment

provided prior to incarceration (Procedure 602.053, Specific Procedure 2(a)5.);

       (d)    Direct the entry of judgment for Plaintiff against Defendants for nominal damages of $1;

       (e)    Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from Defendants, pursuant to 42 U.S.C. § 1988; and

       (f)    Award all other relief that this Court deems just and proper.

Date: August 15, 2016                Respectfully submitted,

**/s/ Daniel B. Tilley**
**Daniel B. Tilley**
Florida Bar No. 102882
**Nancy G. Abudu**
Florida Bar No. 111881
ACLU Foundation of Florida
4500 Biscayne Blvd., Suite 340
Miami, FL 33137
(786) 363-2714
dtilley@aclufl.org
nabudu@aclufl.org

**Matthew D. Grosack**
Florida Bar No. 073811
DLA Piper LLP (US)
200 S. Biscayne Boulevard, Suite 2500
Miami, Florida 33131
(305) 423-8554
matthew.grosack@dlapiper.com

**Leslie Cooper***
ACLU Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2627
LCooper@aclu.org
*Admitted to the N.D. Fla.

ATTORNEYS FOR PLAINTIFFS