# GEORGE R. BROWN, M.D., DFAPA
## Professor of Psychiatry, East Tennessee State University
## 549 Miller Hollow Road
## Bluff City, TN  37618

January 31, 2017

Re: Reiyn Keohane, Case No. 4:16-cv-511-MW-CAS

## Rebuttal to Defense Expert Report of Dr. Levine

I have been asked to provide a focused rebuttal report in response to the report submitted by Dr. Levine on 6 January 2017.

Before addressing specific issues, I would like to first comment on the first 8 pages of his report, which seem to be mostly a transcription of what Reiyn Keohane (RK) is reported to have said to him during his interview, coupled with information that he gleaned from the limited set of records he stated he reviewed. From his documentation, it is unclear if he reviewed the same quantity of records I had access to. Nonetheless, I generally agree with the factual information he reports from his interview, i.e. that RK was consistent in her reporting of events to him and to me.  I do not see any inconsistencies in the history that she reported to him and to me.  I do, however, disagree with three components of his *interpretation* of her presentation.  He stated in his abbreviated mental status exam that she presented "without feminine mannerisms" and "without a range of affective intensity."  RK clearly presents with feminine mannerisms, most notable in the use of her long hands/wrists during speaking, and in the lilt of her head when speaking.  Her gait is decidedly feminine as well, based on norms in our society (it is unclear if Dr. Levine examined her gait).  Likewise, RK displayed affective range not only in my interview but apparently in the interview with Dr. Levine, who quotes her using exclamation marks on more than one occasion (see page 3, page 4, for example). Finally, Dr. Levine reported that RK presented to him as socially phobic, which is definitely not consistent with her presentation during my examination.

Dr. Levine appears to believe it is either difficult, inappropriate or otherwise inconsistent to use female pronouns for a person with a longstanding transgender identity, female name change, and female breasts.  He calls

1

this the "Pronoun Problem" and uses terms such as "obvious retrospective falsification" and apologizes in advance if his "concerted effort to refer to the inmate with female pronouns" is unsuccessful. He was quite unsuccessful in these concerted efforts, as he manages to mispronoun RK on at least 7 occasions, sometimes even mixing both male and female pronouns in the same sentence (see page 6, paragraph 4). I make a point of this because anyone who works extensively with transgender people should be well aware of the importance of consistent pronoun use and the psychological pain and disrespect that most transgender people report experiencing when preferred pronouns are not utilized. His statements appear to disregard this well-known clinical reality, and I take exception to his characterization of pronouns as either a "problem" or something to be callously disregarded when interacting with patients, be they cis-gender (someone whose gender identity is the same as their sex of assignment at birth) or transgender.

Dr. Levine, throughout his idiosyncratic expert report, does not make it clear whether or not:

1. He agrees with the diagnosis of Gender Dysphoria for RK.
2. He believes RK has *any* psychiatric diagnoses (he does not include a diagnostic assessment, which is quite peculiar for an expert report).
3. He thinks transgender identity exists at all, or in the case of RK specifically.
4. He believes "medical necessity," a well-accepted term, applies to the treatment of Gender Dysphoria or any psychiatric disorders.
5. He feels it is appropriate for RK to be receiving cross-sex hormones (CSH).
6. He is an expert in security matters in the prison setting.

I will address each of these issues, as they are important in the overall conclusion that Dr. Levine makes, which is that he *agrees* with my opinion that RK should be permitted to grow her hair beyond what is permitted for male inmates and have access to female undergarments, but he disagrees that these things are "medically necessary." He is entirely silent on the issue of CSH, which is not the focus of his report, and in any event has already been provided to RK for many months subsequent to the initiation of litigation on this issue.

2

1. Dr. Levine does not provide a diagnostic assessment in his report, which is quite odd for a psychiatric report in modern times. He does not specifically state that RK has Gender Dysphoria as a diagnosis, although he allows "The fact that Reiyn is on hormones means that others have diagnosed the inmate as having met the DSM-5 criteria." Clearly, RK has a diagnosis of Gender Dysphoria, which is long-standing. This is recognized in numerous assessments by FDOC clinicians and two professionals outside the FDOC prior to incarceration. It puzzles me why Dr. Levine attributes the formal diagnosis to others and fails to offer his own opinion as to this diagnosis.

2. As noted above, Dr. Levine does not provide an expert report with a diagnostic assessment, so it is unclear if he believes RK has *any* psychiatric diagnoses. He does discuss what she does *not* have, on page 10 ("not mentally ill in terms of evidence of psychosis, bipolar disorder, or autism…"), and comments on her character (by which I assume he means "personality" in more modern parlance) on page 10 as well, but at the end of this report, the reader is left wanting in regard to his opinion as to whether RK has any psychiatric diagnosis meritorious of treatment considerations.

3. Possibly a corollary to 1 above is the question as to whether Dr. Levine is questioning the existence of transgender identity in general, or in the case of RK specifically. For example, on page 10, he describes RK as having a "stubborn persistence with the trans identity" as though having a transgender identity is akin to having a juvenile fascination with becoming a fireman. All people have a gender identity of one type or another, and it is somewhat nonsensical to describe a person as being stubborn or persistent in having their own identity. If a cis-gender man were to be challenged or questioned about his masculine gender identity, it is my experience that the response would be at least as persistent, consistent, and forceful. RK clearly has a consolidated transgender identity, as a transgender woman, and that has been the case for many years. It is not unusual for persons with Gender Dysphoria to have a consolidated, persistent gender identity that is different from their sex of assignment at birth, as is the case for RK.

Dr. Levine further describes RK as having "a fixed belief that she is a woman," which in psychiatric parlance is tantamount to labeling a patient as delusional. The concept of Gender Dysphoria representing a subtype of

3

delusions fell from professional favor at least 30 years ago in recognition of the fact that persons with Gender Dysphoria are not delusional or psychotic in their understanding of their identities as fundamentally not matching their sex of assignment at birth.

4. Dr. Levine appears to coin a new term, not found anywhere in the medical literature, as a substitution for the well-accepted and commonly used term "medical necessity." He substitutes "psychologically helpful or psychologically pleasing to the inmate." Using this new jargon, he agrees with my summary opinions. Nonetheless, I would take issue with his dismissiveness regarding the medical necessity of female grooming standards and access to female undergarments.

Dr. Levine appears to be suggesting that the term "medical necessity" does not apply to treatment for psychiatric conditions. On page 11, he states "Gender Dysphoria is a psychiatric condition. Using the term medical necessity puts experts into an uncomfortable position"; and "[t]he employment of the term medical necessity is useful for diseases such as: prostate cancer, asthma, and fractured tibias." There is no basis for carving out the treatment of psychiatric diagnoses such as schizophrenia, bipolar disorder, major depression, and gender dysphoria from the meaning of medical necessity under his definition of the term or any standard definition of the term. For example on Medicare.gov, the US government defines "medically necessary" as "health-care services or supplies needed to prevent, diagnose, or treat an illness, injury, condition, disease, or its symptoms and that meet accepted standards of medicine." Medicare, Medicaid, TriCare and other government-funded health care services as well as private insurers include treatment for numerous psychiatric disorders within their coverage based on medical necessity. Indeed, the Federal Bureau of Prisons provides transition-related care for gender dysphoric inmates based on medical necessity (see Transgender Offender Manual, U.S. Department of Justice, Federal Bureau of Prisons, Program Statement Number 5200.04; Patient Care, U.S. Department of Justice, Federal Bureau of Prisons, Program Statement Number 6031.04).

It is possible that Dr. Levine did not mean to say treatment of *no* psychiatric disorder can be medically necessary, but rather, that treatment of *Gender Dysphoria* specifically cannot be medically necessary. On p. 11, he says: "The employment of the term medical necessity . . . is  . . . confusing for this culturally young, complex psychological state of suffering calling

4

Gender Dysphoria." There is no basis for such an exception. Gender Dysphoria is a well-established diagnosis with established protocols for individualized treatments which, if not provided, can result in serious harm to the patient.

Dr. Levine contends that hair length "is not a medical issue. Nor is wearing women's underwear"(p. 11). His use of cancer as an example where medical necessity applies is particularly instructive to refute this assertion. Women with breast cancer, for example, have been treated with breast prostheses, special undergarments (mastectomy bras and camis), and wigs or hair prostheses for years as medically necessary treatments associated with the breast cancer diagnosis. Post-mastectomy care has been federally approved since 1998. While Dr. Levine argues "there is nothing medically necessary about hair length" many women experience psychological harm due to self-esteem, dignity, and identity issues associated with hair loss resulting from treatment. Patients with Gender Dysphoria grapple with important issues of self-esteem, dignity, and identity as well. For many patients with treatment-induced alopecia (hair loss) and for many patients with Gender Dysphoria, the presence of hair and its length may, in fact, be medically necessary. TriCare, another government insurance program, pays the full cost of a wig for any patient with hair loss due to treatment for any malignancy, not limited to breast cancer.

While I can agree with Dr. Levine insofar as allowing RK to grow her hair beyond what is permitted for male inmates and providing female undergarments is "compassionate" and "psychologically helpful" for RK, and that she would be "vulnerable to acute decompensation" if denied access to female undergarments and grooming standards (page 10), I strongly disagree with him in his assertion that they are not medically necessary for this inmate.

5. Dr. Levine does not comment upon whether CSH treatment is either medically necessary or psychologically helpful for RK now, or in the past when such access was inappropriately denied and delayed by two years. Perhaps he was not asked to opine on this important matter. I will not similarly refrain: CSH is a medically necessary treatment for RK now and into the foreseeable future.

6. Dr. Levine has much to say regarding his professional opinions on prison security and safety concerns. He informs us that "Prison officials have the

responsibility to ensure the safety of inmates." While this statement is far from controversial, he makes numerous references in his report, including in his recommendations, to safety and security concerns. For example, on pages 9 and 11, he discusses the risk of rape as her body feminizes[1] and whether another inmate can keep her safe. These relate to security issues, not medical issues. In reviewing his CV, I was unable to see any evidence for training or credentials that would render him an expert on such matters. I certainly do not fancy myself to be an expert in such issues even though I have significant experience evaluating prisoners with Gender Dysphoria and have worked as a psychiatrist in two prisons.

Finally, it is unclear to me why Dr. Levine discussed his perceived outcomes of some Gender Dysphoria treatments, to include sex reassignment surgery (a treatment that is not a subject of the current litigation), with RK in his interview, with the implication in his reporting of this conversation that treatments for Gender Dysphoria are commonly associated with negative outcomes. He lists "feeling inauthentic in either role in the future; post SRS suicide, depression; vocational disability; difficulty finding a lasting love relationship" as among those, with no apparent discussion of the known positive psychological and social outcomes associated with individualized treatments for properly diagnosed persons with Gender Dysphoria, following established standards of care, or the well-documented serious harm when such treatment is denied. There is no evidence that such adverse outcomes resulting from treatment for Gender Dysphoria are comment. It is rare, indeed, for patients who have been diagnosed and treated by experienced clinicians to suffer "post SRS suicide," for example, and it is more likely that gender dysphoric patients who are appropriate for SRS and denied access to this treatment will have a negative outcome, to include autocastration, depression, and possible suicide. I have never had a patient that I evaluated and/or treated over the past three decades obtain SRS and voice regrets about that decision, let alone try to harm themselves after having had SRS. While it is the case that patients who transition (to include name change, initiation of CSH, social/public transition to another gender role and appearance) occasionally decide to "reverse" their transition (hence the requirements in the WPATH SOC for a minimum of one year of living in the congruent

---

[1] It is not clear why he is raising this issue since RK is already on hormones that are feminizing her body and my understanding is that the defendants are not contending that such treatment should cease.

6

gender role, full time, prior to obtaining referrals for SRS), this is an uncommon occurrence for those who transition in adolescence (postpubertally) or later and exhibit persistent, and consistent, transgender identification. RK has already experienced challenges associated with social transition and in spite of the bullying and rejections before incarceration and the major difficulties she has experienced expressing her transgender identity openly in the prison setting, she is steadfast in her determination to live her felt gender as her authentic self. It is highly unlikely, in my view, that at this point she will "change her mind" about her gender identity and suddenly decide to embrace boxer shorts, short hair, and the other accoutrements of the male gender identity and role. Denial of access to medically necessary treatments for RK's well-diagnosed Gender Dysphoria is much more likely to result in serious, negative medical and mental health outcomes than providing the requested treatments.

In summary, Dr. Levine fundamentally agrees with my opinion that RK be permitted to grow her hair beyond the standard for male inmates and to access female undergarments approved for any other female inmate in the FDOC. In reaching those same conclusions, he utilizes a line of reasoning with which I disagree.


Respectfully Submitted by:

George R. Brown, MD, DFAPA
Professor and Associate Chairman for Veterans Affairs
East Tennessee State University
Johnson City, TN

Clinical Professor of Psychiatry
University of North Texas
Fort Worth, TX