# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION


Reiyn Keohane,

        Plaintiff,

v.                                Case No. 4:16-cv-511-MW-CAS

Julie Jones,
*in her official capacity as*
Secretary of the Florida Department
of Corrections,

        Defendant.

_____

## **Plaintiff's Response to Defendant's Motion for Summary Judgment**

Plaintiff, by and through undersigned counsel, responds in opposition to Defendant Julie Jones's (the "DOC's") Motion for Summary Judgment and accompanying memorandum and exhibits ("Motion"), ECF 123-125. The DOC's motion rests on the fundamental misstatement of material facts and mischaracterization of law.

Contrary to the DOC's assertion, Plaintiff's prison medical and mental-health providers never determined that access to female undergarments and grooming standards are not medically necessary to address her gender dysphoria. Her treatment team never assessed Plaintiff's need for such access because they

understood it to be precluded by the DOC's clothing and grooming standards, regardless of need and regardless of the potential consequences.[1] This case is not about a disagreement with the medical judgment of Plaintiffs' prison medical providers; it is a challenge to a blanket rule that precludes a particular form of treatment no matter the harm to an inmate's health. Plaintiff has a serious medical need to be able to wear female undergarments and groom as a woman in order to socially transition in accordance with the community standards for treating gender dysphoria. The inability to do so has already resulted in multiple suicide attempts and an attempt at self-surgery. And outside experts on both sides agree that if her hopes of achieving relief through this lawsuit are dashed, she is at risk of future suffering.

As for the DOC's legal argument, it incorrectly suggests that court decisions denying challenges to prison grooming restrictions for reasons unrelated to medical need govern this case. The law is clear that blanket rules barring access to

---

[1] After Plaintiff filed this lawsuit, an evaluation was performed by a doctor outside of her treatment team for purposes of defending this litigation. But as discussed below, that doctor had so little information about Plaintiff and so little knowledge of the community standards for treating gender dysphoria that his conclusions cannot be credited.

particular forms of treatment without assessing the individual inmate's needs can constitute deliberate indifference to a serious medical need.

Summary judgment for the DOC should be denied.

## I. Summary-Judgment Standard

As this Court has stated:

> Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact. A fact is "material" if it might affect the outcome of the case under the governing substantive law. A dispute is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.

> All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.

*Kelly v. Davis*, No. 3:10-cv-392-MW/EMT, 2015 WL 12030513, at *2 (N.D. Fla. Jan. 14, 2015) (quotations and citations omitted).

## II. Statement of Facts

Plaintiff is a transgender woman currently housed at Jefferson Correctional Institution ("Jefferson CI"), a men's facility. *See* ECF 125-9 (listing her current

facility as Jefferson CI). Plaintiff has known she has female gender identity since age 12. Keohane Decl. (ECF 3-1) at 2 ¶ 3. At age 13, Plaintiff began seeing a psychiatrist, Omar Rieche, along with a therapist in Dr. Rieche's practice. *Id.* ¶ 4. At age 16, Plaintiff was diagnosed with gender identity disorder. *Id.* ¶ 5. At age 17, Plaintiff legally changed her name from a traditionally male name to her current name. *Id.* ¶ 6. Dr. Rieche referred Plaintiff to a pediatric endocrinologist, Cayce T. Jehaimi. *Id.* ¶ 7. In early August 2013, at age 19, Plaintiff began hormone therapy under the care of Dr. Jehaimi. *Id.*

On September 22, 2013, Plaintiff was charged with attempted second-degree murder. *Id.* ¶ 8. The Lee County Jail refused Plaintiff's requests to continue her hormone therapy. *Id.* In July 2014, Plaintiff accepted a plea deal of 15 years. *Id.* On July 17, 2014, Plaintiff began her commitment with the DOC at the South Florida Reception Center ("SFRC"). *Id.* at 3 ¶ 9.

Plaintiff has been requesting treatment for her gender dysphoria since shortly after her arrival at the SFRC. *Id.* ¶ 10. From the first conversations Plaintiff had with DOC and DOC-contracted officials concerning her need for treatment, Plaintiff made clear both her need for hormone therapy and her need to be able to live as female in the DOC. *Id.* She filed numerous grievances to this effect, but

these were repeatedly denied. *See id.* at 3-12 ¶¶ 11-16, 19-23, 26, 29-32, 38-39, 41-42; *see also* Plaintiff's Motion for Preliminary Injunction (ECF 3) at 7-18; ECF 3-6 (pre-litigation grievances).

Around October 14-17, 2014, while in administrative confinement, Plaintiff attempted to hang herself because of the DOC's refusal to provide her with transition-related care. *See* Keohane Decl. (ECF 3-1) at 5 ¶ 17; 10/17/14 Discharge Summary for Inpatient Mental Health Care (ECF 3-10). On January 8, 2015, after female undergarments were confiscated from her, Plaintiff cut her scrotum with a razor, creating a three-centimeter-deep laceration. Keohane Decl. (ECF 33-3) ¶ 5; 1/8/15 Healthcare Note (ECF 33-1) (Plaintiff's self-report: "I'm upset because officer asked me to take off my bras, I cut my testicle"; notes self-inflicted 3cm-deep laceration of scrotum); 1/13/15 Transfer Summary for Inpatient Mental Health Care (ECF 129-24) ("The inmate was placed on SHOS from open population after conflict with security staff over stuffing his breast area to mimic breasts. The inmate was sent back to the dorm and also told to get a haircut. Upon return to the dorm, the inmate cut the base of his testicles."); 1/8/15 Emergency Room Record (ECF 3-11).

More than two years after Plaintiff's requests for treatment for her gender dysphoria began, this lawsuit was filed on August 15, 2016. *See* Complaint (ECF 1). Within seventeen days—on September 2, 2016, Plaintiff had seen an endocrinologist and was back on hormone therapy. *See* Hernandez Decl. (ECF 24-1) at 1-2 ¶ 5. And in the month after that—on October 14, 2016—the "freeze-frame" policy that prevented Plaintiff from having her hormones re-initiated in prison was struck from the DOC's security policy. *Compare* ECF 3-15 (freeze-frame policy) ("Inmates who have undergone treatment for GD will be maintained only at the level of change that existed at the time they were received by the Department.") *with* ECF 129-22 (current Procedure 602.053) at 6 (not containing this sentence).[2]

Around September 13, 2016, Plaintiff's hair was forcibly cut to less than a quarter inch all around. *See* Keohane Decl. (ECF 33-3) at 4 ¶ 6. As a result, Plaintiff could not stand to look at herself in the mirror and punched the mirror several times, causing her hand to swell up; Plaintiff very strongly considered

---

[2] Although Plaintiff had in fact been on hormones prior to entering DOC custody, she was not on them immediately before entering DOC custody because they were not provided while she was in the Lee County Jail, *see* Keohane Decl. (ECF 3-1) at 2 ¶ 8.

many ways to hurt or kill herself. *See id.* at 5 ¶ 7. She wrote a grievance about this experience. *See id.* ¶ 8.

In February and March 2017, Plaintiff submitted additional grievances concerning her need for social transition as well as mismanagement of her hormone medication. *See* ECF 129-23 (selected grievances submitted after filing of lawsuit).

In April 2017, en route to Jefferson CI, Plaintiff was transferred to the SFRC. *See* Keohane Decl. (ECF 105-1) at 1 ¶ 2. For three days, she did not receive her hormone medication, and her hair was forcibly cut even though she had had it trimmed at Everglades CI before she left so that it would not be in violation. *See id.* at 2-4 ¶¶ 4-9. She twice attempted suicide during her stay at the SFRC. *See id.* at 2, 3 ¶¶ 4, 8.

In May 2017, Plaintiff was issued a bra. *See* ECF 125-9 (grievance-appeal denial).

The DOC continues to deny Plaintiff access to female grooming standards (including the ability to grow her hair) and women's underpants.

### III. <u>Legal Argument</u>

> A. *A genuine dispute of material fact exists as to whether the DOC has been deliberately indifferent to Plaintiff's serous medical need.*

"A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Under the Eighth Amendment's "evolving standards of decency," in a medical-necessity case "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

> **1. A genuine dispute of material fact exists as to whether Plaintiff has a serious medical need to access female undergarments and grooming standards. ("Objective" Prong)**

Although the DOC concedes that "[t]he case law is clear that gender dysphoria constitutes a serious medical need," Motion (ECF 124) at 13, it continues to maintain that claims by inmates with gender dysphoria for access to cross-gender clothing and grooming standards are—categorically—not cognizable under the Eighth Amendment, *id.* at 12 ("It is well established, however, that restrictions on a prisoner's hair, clothing, or grooming standards are not sufficiently serious deprivations to trigger Eighth Amendment protections.").[3] But

_____

[3] Although the DOC does not address Plaintiff's claim for nominal damages

the cases relied on by the DOC do not assess Eighth Amendment claims for access to medical care.[4] These courts did not evaluate whether access to female clothing or grooming standards for prisoners with gender dysphoria constituted medically necessary treatment. Indeed, many of the cases did not even involve transgender

---

and her arguments from the motion-to-dismiss briefing concerning voluntary cessation of the denial of hormone therapy, the DOC also did not label its Motion a "partial" motion for summary judgment, and so Plaintiff assumes that the DOC's Motion is intended to encompass those claims as well. Plaintiff relies on her earlier briefing on those issues. ECF 26 (response to former defendant Dieguez and Le's motion to dismiss) at 3-10. That the freeze-frame policy has been formally repealed does not resolve concerns about the timing of the change. *Cf. id.* at 5-6.

[4] Only one of the litany of cases cited by the DOC addresses a claim for access to makeup in the context of an Eighth Amendment medical-necessity claim. *See* Motion (ECF 124) at 21 n.3 (citing *Arnold v. Wilson*, 2014 WL 7345755 at *3, 7 (E.D. Va. Dec. 23, 2014)). In *Arnold*, however, the court considered only one variant of the deliberate-indifference standard and found no deliberate indifference where the prison had implemented the WPATH standards. 2014 WL 7345755 at *6. Here, the DOC does not even purport to follow community standards for treating gender dysphoria. *See* 30(b)(6) Dep. (Whalen) (ECF 129-16) at 179 ("Q. Are the WPATH standards of care implemented in the Department of Corrections? A. Not at this time."). And while the *Arnold* court relied on the familiar rule that a simple disagreement between an inmate and a prison medical provider is not alone sufficient to establish an Eighth Amendment violation, *id.*, in this case, Plaintiff's treatment team did not make any judgment about the need for female undergarments and grooming standards because they understood that to be prohibited by DOC policy, *see infra* pp. 15-17.

prisoners,[5] and the ones that did either addressed clothing and grooming claims outside of the Eighth Amendment—for example, First Amendment or Equal Protection claims[6]—or Eighth Amendment claims where clothing and grooming standards were not part of medical-necessity analyses.[7] Here, however, the issue is the denial of medically necessary care.

---

[5] *LaBranch v. Terhune*, 192 F. App'x 653-54 (9th Cir. 2006); *Larkin v. Reynolds*, 39 F.3d 1192, 1994 WL 624355, at *2 (10th Cir. 1994) (Table); *Blake v. Pryse*, 444 F.2d 218, 219 (8th Cir. 1971); *Taylor v. Gandy*, No. 11-cv-27, 2012 WL 6062058, at *4 (S.D. Ala. Nov. 15, 2012); *Casey v. Hall*, No. 2:11-cv-588-FTM-29SPC, 2011 WL 5583941, at *2 (M.D. Fla. Nov. 16, 2011); *Star v. Gramley*, 815 F. Supp. 276, 278 & n.2, 279 (C.D. Ill. 1993); *Jones v. Warden of Stateville Corr. Ctr.*, 918 F. Supp. 1142, 1145-46 (N.D. Ill. 1995).

[6] *Hood v. Dep't of Children & Families*, No. 2:12-CV-637-FTM-29, 2014 WL 757914, at *8 (M.D. Fla. Feb. 26, 2014); *Smith v. Hayman*, No. 09-cv-2602, 2010 WL 9488822, at *12-13 (D.N.J. Feb. 19, 2010).

[7] *Praylor v. Texas Dep't of Criminal Justice*, 430 F.3d 1208, 1208-09 (5th Cir. 2005), involved an Eighth Amendment claim, and the court denied the plaintiff's motion for a preliminary injunction seeking "hormone therapy and brassieres," but the court's medical-necessity analysis addressed only hormone therapy. In *Long v. Nix*, 877 F. Supp. 1358, 1365 (S.D. Iowa 1995), the court held that the inmate did not have a serious medical need for treatment for gender identity disorder, and thus the court did not address whether access to female clothing or grooming standards was medically necessary. In *DeBlasio v. Johnson*, 128 F. Supp. 2d 315, 325 (E.D. Va. 2000), and *Murray v. U.S. Bureau of Prisons*, 106 F.3d 401, 1997 WL 34677, at *2-3 (6th Cir. 1997) (Table), the Eighth Amendment claims related to grooming were not about medical care.

Moreover, the DOC ignores the cases coming out the other way. In *Konitzer v. Frank*, 711 F. Supp. 2d 874, 908 (E.D. Wis. 2010), which involved a transgender prisoner's medical-necessity claim for access to female clothing and grooming standards, the court denied the prison's motion for summary judgment, holding that "a reasonable jury could find that the defendants were deliberately indifferent to [the inmate's] serious medical need when they failed to provide . . . the real-life experience . . . ."[8] *See also Soneeya v. Spencer*, 851 F. Supp. 2d 228, 246, 248 (D. Mass. 2012) (recognizing transgender inmate's medical need for female undergarments and female canteen items such as cosmetics).

In any event, it does not matter whether another court has held that the particular medical treatment sought by Plaintiff here was or was not deemed medically necessary *for someone else*. Plaintiff has offered evidence demonstrating that access to female clothing and grooming standards are medically necessary *for her*. That alone defeats summary judgment for the DOC.

Plaintiff has a serious medical need to socially transition, which involves living in accordance with one's gender identity and includes dressing and

---

[8] The "real-life experience" is a term used to refer to the social-transition component of treatment for gender dysphoria. *See* Levine Dep. (ECF 129-9) at 16.

grooming accordingly, *see* Brown Dep. (ECF 129-4) at 101:6-9, 106:17 – 107:1;
Levine Dep. (ECF 129-9) at 67:14-18. Plaintiffs' expert witnesses explained that
social transition is a part of accepted treatment for gender dysphoria. Brown Dep.
(ECF 129-4) at 101:6-9; Gorton Dep. (ECF 129-6) at 134:22 – 135:4; Brown
Report (ECF 105-2) at 24; Gorton Report (ECF 105-3) at 6. This is recognized by
the endocrinologist who is currently treating Plaintiff, Angueira Dep. (ECF 129-2)
at 18:3-6; prison medical and mental-health providers, *see* Johnson Dep. (ECF
129-7) at 52:8 – 53:3; Rivero Dep. (ECF 129-11) at 23:8-15 (but prison is not the
"best setting"); Baute Dep. (ECF 129-3) at 17:4-8; Santeiro Dep. (Vol. I) (ECF
129-12) at 43:13-15; and the DOC's expert, Dr. Levine, Levine Dep. (ECF 129-9)
at 167:21 – 168:1.

Plaintiff has already attempted suicide and otherwise engaged in self harm in
prison after female undergarments were confiscated and she was made to have her
hair cut short. *See supra* pp. 5-6; *accord* Gorton Report (ECF 105-3) at 11 (in
hanging attempt, Plaintiff "aimed to cut off blood flow from her brain while
allowing herself to breathe because she feared that if she couldn't breathe, the
drive to do so would cause her to free herself with her hands"). As Plaintiff's
expert psychiatrist expert Dr. George Brown made clear in his report, Plaintiff "has

a serious medical need to access female grooming standards and female undergarments and canteen items available to other female inmates," and "[f]ailure to provide access to female grooming standards and female undergarments and canteen items will likely result in serious, dangerous, potentially life-threatening, medical and mental health outcomes for RK." Brown Report (ECF 105-2) at 28. Concordantly, Plaintiff's expert physician Dr. Ryan Nicholas Gorton stated in his report:

> It is medically necessary for Reiyn to be able to access female clothing and grooming standards in order to be able to effect social transition and live in accordance with her female gender identity. In particular, she needs to be able to wear female undergarments and grow her hair. The inability to do so is preventing her from living and presenting herself—and seeing herself—as a woman, which is a critically important part of treatment for Gender Dysphoria under accepted medical protocols. Being required to wear male boxer shorts and having her hair forcibly cut in a very short, masculine style has caused her severe distress—even prompting her to attempt self-surgery to remove her testicles. This is consistent with the scientific literature and clinical experience documenting that for individuals with Gender Dysphoria, being prevented from transitioning and living in accordance with their gender identity can lead to significant emotional distress and self-harm, including suicide and self-surgery.

> …

> Reiyn is currently coping with the denial of access to female clothing and grooming standards and surviving based on the expectation that her lawsuit will get her the relief she is seeking in the near future. If that does not happen, or if her hopes are dashed by a ruling against

her, I believe the risk of her falling back into severe distress and resorting to self-surgery or suicide is very high.

Gorton Report (ECF 105-3) at 16-17.

Even the DOC's expert Dr. Stephen Levine acknowledged that it could be psychiatrically or psychologically helpful to have access to female undergarments and grooming standards, including longer hair. Levine Report (ECF 105-4) at 11 (PDF p.16); Levine Dep. (ECF 129-9) at 88:12-14, 110. Dr. Levine also opined that if Plaintiff is denied access to the hair length and clothing that she is seeking, she could be vulnerable to "acute decompensation," Levine Dep. (ECF 129-9) at 89:24 – 90:3, and would have "a suicidal ideation and crisis," *id.* at 165. Dr. Levine disagrees with the use of the term "medically necessary" to refer to social transition (including accessing female undergarments and grooming standards) because his understanding of that term is limited to things that physically affect the body and require a doctor to prescribe it.[9] Levine Dep. (ECF 129-9) at 105-108.[10]

---

[9] The meaning of "medically necessary" in Eighth Amendment jurisprudence is not so circumscribed. *See, e.g.*, *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990).

[10] Indeed, the Massachusetts Department of Corrections Gender Identity Disorder program, which Dr. Levine recommended the creation of and which he consults with, Levine Dep. (ECF 129-9) at 31-34, provides inmates with gender

The endocrinologist currently treating Plaintiff also stated that if Plaintiff is not permitted to grow her hair out or access female undergarments, there is a risk she could self-harm again. Angueira Dep. (ECF 129-2) at 32:17-22.

The DOC claims that "Plaintiff's medical team at FDOC does not believe that permitting plaintiff to grow longer hair or wear female clothing . . . are medically necessary for the treatment of plaintiff's gender dysphoria at this time." Motion (ECF 124) at 9-10. But Plaintiffs' treatment team—Dr. Johnson, Ms. Baute, and Mr. Rivero—never evaluated her need for access to female clothing and grooming standards because they understood that was not something that would be permitted, regardless of Plaintiff's needs because of the DOC's clothing and grooming policies:

Ms. Baute: *See* Baute Dep. (ECF 129-3) at 66:9-18 ("[Q] Did you ever make an assessment whether plaintiff has a treatment need to access female undergarments? A. No. Q. And is that because of DOC policy prohibiting that? A. Yes. Q. And is that the same with respect to her request to grow her hair longer

---

dysphoria access to female undergarments and grooming standards and supplies. *Id.* at 34, 50-52, 134-35; *see also* Massachusetts DOC GID (ECF 129-25) at 12 (PDF p.14).

than is permitted in male institutions? A. Yes."); *id.* at 52 ("Security" would handle requests for social transition); *id.* at 65 ("I don't think there's a medical pass for social transition."); *id.* at 39 ("The rules in prison would not allow her to express herself as a female in a male institution.").

Mr. Rivero: *See* Rivero Dep. (ECF 129-11) at 73:4-11 (discussed access to female underpants and bra, but "it is out of our hands, that we understand, but there's nothing we can do. . . . I cannot make that decision."); *id.* at 45:2 – 47:7 (only "medical" can give passes; if transgender female inmate was at serious risk of suicide if not permitted hair-length exception, he would place her on self-harm observation status; "I cannot do anything for the hair length.").

Dr. Johnson: *See* Johnson Dep. (ECF 129-7) at 95-96 ("Q. And if DOC policy prohibits [social transition], then it shouldn't be considered? A. If DOC prohibits it, the mental health team will provide support and guidance and counsel and psychotherapy and support around what the client is allowed to have. . . . Q. But if social transitioning isn't permitted by DOC policy, it can't be considered as a treatment, correct? A. I guess. That's -- I guess."); *id.* at 98 ("[Q.] [L]et's say X inmate has a need for medical – for access to female grooming standards or undergarments, that person wouldn't be allowed to have it under DOC policy; is

that correct? A. Yes. MR. DESAI: Object to form. MR. REID: Join. A. Yes. From

my understanding they would not be able to have those things."); *id.* at 116: ("Q.

But the team never made a -- your team treating Reiyn never made an assessment

of whether this would help Reiyn address her gender dysphoria because the prison

policy takes it off the table, right? A. We've talked about how prison policy, our

rub against what Reiyn says what he/she wants. . . . This is what she wants, but this

is what DOC says she can have. How do we help her?").[11]

     After litigation commenced, Wexford lawyers brought in Dr. Jose Santeiro

to assess Plaintiff's need for access to female clothing and grooming standards.

Santeiro Dep. (Vol. II) (ECF 129-13) at 12 (request for evaluation came from

---

[11] The treatment team also lacked the competence to assess treatment needs for gender dysphoria. *See, e.g.*, Rivero Dep. (ECF 129-11) at 79 ("[Q] Would you ever recommend or say that a transgender inmate should be permitted to grow shoulder length hair? MR. DESAI: Form. A. Why would I do that? BY MR. TILLEY: Q. For example, if you felt that it was important to treat their gender dysphoria. A. I don't know."); *id.* at 22-23 (not familiar with WPATH standards); Johnson Dep. (ECF 129-7) at 103-04 ("Q. Do you think Reiyn generally has a need for access to female undergarments and grooming standards to treat her GD? . . . A. I don't know if I can make a determination about need in that respect, no. Me, personally, as a clinician in this respect, no."). The same is true of medical staff who saw Plaintiff or reviewed her records. *See* Hernandez Dep. (ECF 42-1) at 46 (not familiar with the standards of care); Dieguez Dep. (ECF 40-1) at 42, 49 ("[m]ore or less" familiar with the standards of care; "not sure how serious" gender dysphoria is).

counsel); Santeiro Dep. (Vol. I) (ECF 129-12) at 64 (had no involvement in her care before or after his evaluation). Dr. Santeiro, who was not part of Plaintiff's treatment team and whose role is limited to managing psychiatric medication (which Plaintiff is not on), Santeiro Dep. (Vol. I) (ECF 129-12) at 21:7-9, was asked to do the evaluation because Plaintiff's treating psychologist, Dr. Johnson, refused to do it, *id.* at 68. Dr. Santeiro purports to have concluded that Plaintiff has no medical need for female undergarments or grooming standards, but this conclusion cannot be credited for a number of reasons.

First, Dr. Santeiro lacks the qualifications to assess treatment for gender dysphoria. Not only was he unaware of the protocols for the treatment of gender dysphoria, he was unaware that such protocols even exist. Santeiro Dep. (Vol. I) (ECF 129-12) at 44:25 – 45:7. Plaintiff's treating endocrinologist commented to Wexford's regional medical director for the region covering Everglades CI, Dr. Marlene Hernandez, that he was surprised to hear that the prison psychiatrist said access to female undergarments and grooming standards weren't necessary. Angueira Dep. (ECF 129-2) at 19:15 – 20:1.

Second, his conclusion of lack of "medical need" was based solely on (1) his understanding that the term medical need only related to physical-health needs, not

mental-health needs (which as a matter of law, can be medically necessary[12]),

Santeiro Dep. (Vol. I) (ECF 129-12) at 91:2-10, 93:1-4; and (2) his assessment that

Plaintiff was not in immediate distress and had only mild stress at times, *e.g.*,

Santeiro Dec. (ECF 45-1) at 2 ¶¶ 5, 8-9; Santeiro Dep. (Vol. I) (ECF 129-12) at

98:2-3. But Dr. Santeiro only had limited information about Plaintiff when he

evaluated her. He didn't read most of her medical records (only portions related to

psychiatric medication, which she wasn't receiving). Santeiro Dep. (Vol. I) (ECF

129-12) at 80:20 – 83:1. He wasn't aware that she had past suicide attempts in

prison. *Id.* at 83:7-17. During his evaluation, he didn't even ask Plaintiff how it

affected her to be denied access to female clothing and grooming standards—he

said it was barely discussed. *Id.* at 116:25 – 117:9 ("Q. When you met with her, did

you talk to her about the impact of having her hair cut? A. No, didn't bring it up at

all. So I didn't, like I said, I didn't open that can of worms. She did not bring it up,

didn't discuss any of that with me. Q. Well, I thought you said she's the one who

told you she was seeking access to female hair and clothing standards. A. Yeah,

briefly at the beginning. Never brought it up again."); Santeiro Dep. (Vol. II) (ECF

129-13) at 31 ("Q. Did you ask her how it -- how she feels having to wear male

---

[12] *See, e.g.*, *Greason*, 891 F.2d at 834.

boxer shorts? A. No. Q. Did you ask her how it feels having to keep a short haircut? A. No."); 52-53 ("Q. But you didn't talk to her, right, about how it affects her to not be able to have female undergarments and grooming standards, right? MR. DESAI: Form. A. No, but he did mention that he was quite content at the time. He said that in his own words, that he was happy with the way things were going and he learned to make the best of things. So I saw no immediate need or any urgency in those matters.").

Finally, although Dr. Santeiro says the treatment team concurred in his conclusions regarding Plaintiff, he didn't have any meaningful discussion with them. Santeiro Dep. (Vol. I) (ECF 129-12) at 12-16 (only spoke for 1-2 minutes with two of the three members of the treatment team; he never discussed with Dr. Johnson; Baute and Rivero indicated agreement only by nodding head rather than speaking); *but see* Baute Dep. (ECF 129-3) at 53 "(Q. Did Dr. Santeiro make an assessment about whether plaintiff needed social transition? A. I have no idea. Q. Are you aware of discussions with others about Dr. Santeiro's assessment of plaintiff? A. No. Q. Were you ever a part of discussions about Dr. Santeiro's assessment of plaintiff? A. No, um-um."); Rivero Dep. (ECF 129-11) at 49-50

("[Q.] And so do you know if Dr. Santeiro made any final determination with respect to plaintiff's request for social transition? A. No, I don't know.").

Construing this evidence in favor of Plaintiff, as this Court must do, the DOC is not entitled to summary judgment as to Plaintiff's claimed medical need.

## 2. A genuine dispute of material fact exists as to the deliberate-indifference standard's "subjective" prong.

The DOC cites case law for the proposition that establishing deliberate indifference requires that relevant officials be "informed" or otherwise actually know that without the sought-after treatment, the inmate would be placed at substantial risk of suffering serious harm. Motion (ECF 124) at 14 (citing *Chatham v. Adcock*, 334 F. App'x 281, 289 (11th Cir. 2009)). That is certainly one way to satisfy the deliberate-indifference standard.[13] An inmate can also establish

---

[13] *Chatham* itself was a damages cases involving defendants sued both in their official and individual capacities, *see Chatham v. Adcock*, No. 3:05-cv-127-JTC, 2007 WL 2904117, at *1 n.1 (N.D. Ga. Sept. 28, 2007) (noting claim for injunctive relief was moot because the plaintiff was no longer incarcerated). It says nothing about an institution's historical indifference in an injunctive-relief case. *See LaMarca v. Turner*, 995 F.2d 1526, 1542 (11th Cir. 1993) (in case involving—in relevant part—injunctive-relief claim against current warden sued in his official capacity, rejecting current warden's argument—in the court's words—"that the court should have focused on his deliberate indifference, instead of the institution's historical indifference").

deliberate indifference—without explicitly identifying specific knowledge on the part of a particular person concerning a particular risk—in a number of other ways, including by showing (1) that the denial of care was not based on a medical judgment about the individual's needs but rather a blanket policy against the provision  of particular treatment, or (2) that the providers lacked competence to provide the treatment or assess the need for treatment, or that the treatment is otherwise not provided in accordance with community standards. *See infra* pp. 22-29.[14]

          i.    *Blanket prohibition against providing the requested treatment*

The Eighth Amendment requires that prisoners be provided with adequate medical care "based on an individualized assessment of an inmate's medical needs in light of relevant medical considerations." *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 242 (D. Mass. 2012).  Given this need for individualized assessment, blanket bans on certain forms of medical treatment regardless of medical need violate the

---

[14] Contrary to the DOC's assertion, Motion (ECF 124) at 15, expert testimony *is* relevant to assessing deliberate indifference in these contexts because it hinges on questions of what care is appropriate and who is qualified to make that determination.

Eighth Amendment. *See, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1063, 1068 (9th Cir. 2014) (holding that the "blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy that one eye is good enough for prison inmates is the paradigm of deliberate indifference") (quotation marks omitted); *Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005) (denial of hepatitis C treatment to a prisoner based on a policy that a particular drug could not be administered to inmates with recent history of substance abuse could constitute deliberate indifference if relied upon without consideration of individual medical need); *Mahan v. Plymouth Cty. House of Corr.*, 64 F.3d 14, 18 & n.6 (1st Cir. 1995) (suggesting that "inflexible" application of prescription policy may violate Eighth Amendment); *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 & n.32 (3d Cir. 1987) (by virtue of a blanket policy, "the County denies to a class of inmates the type of individualized treatment normally associated with the provision of adequate medical care"); *Jorden v. Farrier*, 788 F.2d 1347, 1348-49 (8th Cir. 1986) (citing with approval case holding that application of prison medication policies must be instituted in manner that allows individualized assessments of need); *see also Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (deliberate indifference can be established by

showing that "necessary medical treatment has been delayed for non-medical reasons").

This principle encompasses treatment for gender dysphoria: as numerous courts have recognized, automatic exclusions of certain forms of treatment for gender dysphoria violate the Eighth Amendment. *See Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011) (state law that barred hormone therapy and gender-confirming surgery as possible treatments for prisoners with gender identity disorder facially violated the Eighth Amendment); *De'lonta v. Angelone* (*De'lonta I*), 330 F.3d 630, 634-35 (4th Cir. 2003) (prisoner with gender identity disorder stated a claim for deliberate indifference where the Department of Corrections withheld hormone therapy pursuant to a categorical policy against providing such treatment rather than based on individualized medical judgment); *see also Allard v. Gomez*, 9 F. App'x 793, 795 (9th Cir. 2001); *Soneeya*, 851 F. Supp. 2d at 249, 253; *Houston v. Trella*, No. 2:04-cv-1393, 2006 WL 2772748, at *8 (D.N.J. Sept. 22, 2006); *Barrett v. Coplan*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003); *Brooks v. Berg*, 270 F. Supp. 2d 302, 312 (N.D.N.Y. 2003), *vacated in part on other grounds*, 289 F. Supp. 2d 286 (N.D.N.Y. 2003).

Here, through its clothing and grooming policies, the DOC has a blanket ban on inmates in male facilities being permitted to dress and groom in accordance with their female gender identity pursuant to the accepted protocols for treating gender dysphoria. The DOC's grooming policy imposes no limits on hair length in female facilities but requires that inmates in male facilities have their hair above the ear and collar and of uniform length. *See* Fla. Admin. Code r. 33-602.101(4) ("Male inmates shall have their hair cut short to medium uniform length at all times with no part of the ear or collar covered.").[15] The hair-length policy provides for no medical exception. *See id.* Similarly, the DOC's clothing policy does not permit female bras or underpants for inmates in male facilities, and it does not provide for a medical exception. *See* Fla. Admin. Code r. 33-602.101(2)(a)1., 2., 4.c. In practice, the DOC permits inmates in male facilities to have bras if they are needed for physical support, but the DOC does not permit them for mental-health

---

[15] Moreover, despite the contrary contention by the DOC, the policy does not permit Plaintiff or any other inmate at a male facility to have a more feminine hairstyle even within the strict length limits of the DOC grooming policy. *See* 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 203-08 (204, 205: can't be "styled"; 208: "certainly if [a transgender female inmate's haircut] separated that inmate and accentuated a female -- more of a female look, then that could certainly pose some concerns for security and the safety of that inmate who's being housed at a male facility with other male inmates, and making themselves stand out and to look more as a female could certainly be problematic).

needs. 30(b)(6) Dep. (Reimers) (ECF 129-1) at 81:16 – 82:2; 30(b)(6) Dep. (Whalen) (ECF 129-1) at 181:18-20. Makeup is similarly permitted in female facilities and prohibited in male facilities, and there is no medical exception. *See* 30(b)(6) Dep. (Reimers) (ECF 129-1) at 77-81 (Director of Health Services testified that access to longer hair, women's underpants, bras (other than for physical support) and makeup are security issues, not medical issues).

The individuals responsible for Plaintiff's care at Everglades CI understood that they had no authority to make exceptions to DOC policy to allow Plaintiff to obtain female undergarments or access female grooming standards. *See supra* pp. 15-17. The regional medical director for Wexford in the region covering Everglades CI, Dr. Marlene Hernandez, also acknowledged the inability to get medical exceptions to the DOC's clothing and grooming policies. Hernandez Dec. (ECF 24-1) at 2 ¶ 8 ("At no time was I authorized to enforce or make an exception to any Department of Corrections policy."); Hernandez Dep. (ECF 42-1) at 32:18-33:6 ("it's up to security" whether to grant an exception to DOC policy).[16]

---

[16] Even Dr. Santeiro, who was brought in to evaluate Plaintiff for purposes of defending this litigation, stated that he is "not authorized to enforce or make an exception to the [FDOC's policies on hair and clothing standards]." Santeiro Dec. (ECF 45-1) at 2 ¶ 9; *see also* Santeiro Dep. (Vol. II) (ECF 129-13) at 59, 60

Moreover, even if a psychologist or therapist did believe they could request an exception to the grooming and clothing standards for a gender dysphoric patient who has a need to socially transition, Dr. Timothy Whalen, the DOC's Chief Clinical Officer, Whalen Dep. (ECF 129-16) at 8, who would have the final decision, 30(b)(6) Dep. (Whalen) (ECF 129-1) at 112-13, made clear he would not grant it. *See* 30(b)(6) Dep. (Whalen) (ECF 129-1) at 106-112, 118-119; *see also* Whalen Dep. (ECF 129-16) at 30:15-23 (exceptions for hair length and female clothing "would be an extremely tough sell" for him.

> ii. *Lack of competent providers and failure to meet community standards*

Deliberate indifference can also be found by showing that the providers were simply not competent to provide the care, *Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991) (Eighth Amendment violation "could well be present if the care received by the prisoners, when measured against general professional standards, rose to such a level of gross incompetence that it manifested deliberate indifference"), or that an inmate has been "denied access to medical personnel capable of evaluating the need for treatment," *Ancata v. Prison Health Servs., Inc.*,

---

(there's no such thing as a psychological pass).

769 F.2d 700, 704 (11th Cir. 1985) (quotations omitted); *see also Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989) ("[P]rison officials have an obligation to take action or to inform *competent* authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care.") (emphasis added).

The Eighth Amendment guarantees medical care "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *United States v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987); *see also Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001) (Medical treatment may not "so deviate from the applicable standard of care as to evidence a physician's deliberate indifference.").

The well-accepted standards for treatment of gender dysphoria include social transition, which involves living in accordance with one's gender identity by, among other things, dressing and grooming accordingly. *See* Brown Dep. (ECF 129-4) at 101:6-9; Gorton Dep. (ECF 129-6) at 134:22 – 135:4; Brown Report (ECF 105-2) at 24; Gorton Report (ECF 105-3) at 6; Angueira Dep. (ECF 129-2) at 18:3-5; Johnson Dep. (ECF 129-7) at 52:8 – 53:3; Rivero Dep. (ECF 129-11) at 23:8-15; Baute Dep. (ECF 129-3) at 17:4-8; Santeiro Dep. (Vol. I) (ECF 129-12) at 43:13-15; Levine Dep. (ECF 129-9) at 167:21 – 168:1.

The DOC does not even purport to follow the community standards of care for gender dysphoria. *See* 30(b)(6) Dep. (Whalen) (ECF 129-16) at 179 ("Q. Are the WPATH standards of care implemented in the Department of Corrections? A. Not at this time."); Santeiro Dep. (Vol. I) (ECF 129-12) at 99-100 (recognized that social transition is part of treatment for gender dysphoria and "very appropriate" in the community but "not as easy" in prison); Baute Dep. (ECF 129-3) at 19-20 ("Q. Sure. Are the WPATH standards of care applicable in prisons? A. There are rules in the prison systems that don't allow for social transition.").

In addition, some members of the treatment team simply lacked any significant knowledge of community standards for treating gender dysphoria. *See supra* note 11.

\*       \*       \*

Because Plaintiff's evidence shows that the DOC bans access to female clothing and grooming standards for the treatment of gender dysphoria regardless of the patient's needs, and fails to provide treatment in accordance with community standards, genuine issues of material fact exist as whether the DOC has violated the deliberate-indifference standard. Summary judgment should therefore be denied.

*B. The DOC's asserted security concerns do not permit denial of Plaintiff's medically necessary treatment, and in any event genuine disputes of material fact exist as to the validity of those concerns.*

The DOC cites to various security concerns to defend its refusal to allow Plaintiff to access female undergarments and grooming standards. These security rationales seem beside the point given that the DOC, through 30(b)(6) testimony, stated that if there were a medical need for female undergarments and grooming standards, it would be provided. 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 218-221, 225, 227, 230-31; *see also* Upchurch Dep. (ECF 129-15) at 60-62, 70-71 (if access to female undergarments and grooming standards were determined to be medically necessary, then "we have to make it happen"); Reimers Dep. (ECF 129-10) at 43:6-12.[17] Indeed, the DOC has represented in other litigation that security concerns do *not* justify denial of medical care under the Eighth Amendment. *See* ECF 33-5, Reply Brief of Appellant Florida Department of Corrections, *Watkins v.*

---

[17] As such, all of the work conducted in this case around security matters—the four depositions (Upchurch, Subia, and Kirkland twice), the two expert reports and two rebuttal reports, Mr. Kirkland's declaration, and the briefing—has been wholly irrelevant. It is astonishing that the DOC continues to assert security rationales that its own security experts contend would not stop the provision of care that Plaintiff seeks.

*Sec'y, Fla. Dep't of Corrs.*, No. 15-15543, at 10 (11th Cir. May 12, 2016) (contending that security concerns justify denying individualized religious diets, distinguishing therapeutic diets, "which are inherently different"; "Because therapeutic diets are medically necessary, deprivation of such diets is prohibited by the Eighth Amendment.").

Summary judgment for the DOC is entirely inappropriate on this basis. Nevertheless, because the DOC continues to assert security justifications for the denial of the requested treatment, Plaintiff will provide additional reasons why they fail both legally and factually.

### 1. Security concerns do not inform medical-necessity analysis.

Simply put, security concerns do not absolve a prison from the obligation to provide constitutionally adequate care to an inmate. *See, e.g.*, *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1194 (N.D. Cal. 2015) (in order granting preliminary injunction and directing prison officials to provide gender-confirming surgery to transgender inmate, court rejected argument that security concerns "override [inmate's] interest in receiving constitutionally adequate care."), *appeal dismissed and remanded*, 802 F.3d 1090 (9th Cir. 2015). The Supreme Court has explicitly

rejected the application of the deferential *Turner v. Safley*, 428 U.S. 78 (1987), "reasonably related" standard to Eighth Amendment claims. *Johnson v. California*, 543 U.S. 499, 511 (2005). In explaining its reasoning, the Court cited Justice (then Judge) Kennedy's decision in *Spain v. Procunier*, 600 F.2d 189, 193-94 (9th Cir. 1979), which stated that "[m]echanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary."

### 2. Genuine disputes of material fact exist as to the legitimacy of the DOC's proffered security concerns.

Even if the Court were to deem the purported security risks to be relevant to Plaintiff's Eighth Amendment claim, the concerns are not persuasive. Here, relying solely on generalized concerns, the DOC has not demonstrated that allowing Plaintiff—a transgender woman who wears a bra and is receiving hormone therapy that has caused her to develop breasts and will further feminize her appearance over time[18]—to have a longer feminine hairstyle, wear women's underpants, or use makeup that female inmates are permitted to use would cause the security

---

[18] *See* Brown Report (ECF 105-2) at 15; Gorton Report (ECF 105-3) at 6 Angueira Dep. (ECF 129-2) at 30-31.

problems they assert, based on an analysis of her specific circumstances. *See Soneeya*, 851 F. Supp. 2d at 251 (in rejecting security-based defenses to denial of treatment of Gender Dysphoria, court explained that there must be "a good faith security review, which takes into account [the inmate's] individual history of incarceration and present circumstances").

The DOC does not state in its Motion which security rationales it is relying on, but Plaintiff will address the purported concerns raised in discovery. To the extent the concern is that permitting Plaintiff to grow her hair will make her a sexual object and put her in danger, Upchurch Dep. (ECF 129-15) at 47, 61, that is belied by the fact that they are giving her hormones, which feminize her appearance. *See* Brown Report (ECF 105-2) at 15 (describing Plaintiff's self-reported physical changes so far); Gorton Report (ECF 105-3) at 6 (for transgender women, hormones therapy "results in development of female secondary sex characteristics such as breast development, redistribution of body fat to a more female distribution, decreased muscle mass, decreased density and speed of growth of body hair, softening of skin and changes in sebum production and odor, changes in mood, decreased testicular size and decreased sperm production, emotional and subtle neuropsychological changes); Angueira Dep. (ECF 129-2) at 30-31

(hormone therapy will provide "better figure, less body hair, breast development"); *see also* Subia Rebuttal (ECF 129-19) at 2 ("And since she is already on hormones and thus will continue to have an increasingly feminized appearance, including developed breasts, the suggestion that long hair and using female undergarments will create a security concern seems absurd."). Moreover, as Plaintiff herself has experienced, transgender women are targeted for sexual abuse even without access to female clothing and grooming standards. *See* Keohane Dep. (ECF 129-8) at 119 (roommate forced her to give him handjob and threatened her with knife); Subia Rebuttal (ECF 129-19) at 2 ("The safety incident involving Plaintiff referenced in Mr. Upchurch's report occurred without the provision of the care the Plaintiff is requesting, so it is not clear how denying that care will somehow make whatever threat that does exist go away."). And as the DOC's own witnesses make clear, if Plaintiff is provided the care that she needs, the DOC is fully capable of providing for her safety (and the safety of other transgender inmates, as other, even larger, systems do). *See* 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 252 (apart from segregation of the inmate, the means the DOC has to protect that inmate include "overall security" ("[s]taffing, observations, checks, video monitoring equipment"), presence of staff, institutional transfer, different housing placement

within the facility, or the segregation of another inmate); Upchurch Dep. (ECF 129-15) at 135 (institutional transfer is "very effective"); *see also* Subia Dep. (ECF 129-14) at 123-25 (hypothesized concerns did not come to fruition).

To the extent the concern is about extending "preferential treatment" to an inmate, Upchurch Dep. (ECF 129-15) at 62, 121; Kirkland Dep. (ECF 37-1) at 24, 34-35, 40, 43, 47, 53; Kirkland Decl. (ECF 23-2) at 3 ¶ 10, it is difficult to take that concern seriously, to the extent it is suggested as a reason to deny medically necessary care. Plaintiff is attaching an exhibit (ECF 129-21) that is a snapshot of "special passes or medical considerations" at Everglades CI on a particular day last fall. The document is literally 112 pages of unequal treatment *at just one institution*. It lays out ways that various inmates constantly receive special treatment based on their medical needs. *See* 30(b)(6) Dep. (Whalen) (ECF 129-1) at 129-45. No doubt many inmates working outside in the hot sun would love sunglasses and straw hats, but only some inmates are permitted to have them. *See id.* at 130, 135, 136. And no doubt many inmates would prefer not to work at all, or would prefer not having to push, pull, or lift more than a certain weight, or would prefer a cotton blanket rather than a wool blanket, or would prefer a special diet— but only certain inmates are permitted these things. *See id.* at 135, 137-38, 139-41,

142. It is not clear why male inmates would be jealous that a transgender female inmate with breasts would have access to female underpants and makeup. And to the extent others want longer hair too, the DOC offers no reason why that jealously would be different than any of the other forms of "preferential" treatment that the DOC provides to countless other inmates every day. Mr. Upchurch himself admitted that problems could arise if an inmate is jealous that another inmate is receiving a religious diet that is more desirable, Upchurch Dep. (ECF 129-15) at 76-77, yet the DOC does not have a policy that permits all—or no—inmates to have religious diets, *see* Kirkland Dep. (ECF 37-1) at 63:22-25 (inmates must meet religious criteria in order to receive kosher meal).

To the extent the concern is about Plaintiff voluntarily having sex with others and those relationships causing inter-inmate strife, *see* Upchurch Dep. (ECF 129-15) at 93-94, it is not clear how this has anything to do with whether Plaintiff is permitted to access female clothing and grooming standards.

Mr. Upchurch also talks about the problem of hiding contraband in one's hair and the burden of searching everyone's hair, *see* Upchurch Dep. (ECF 129-15) at 109-111, but this case is not a challenge to the hair-length policy as a general matter. It is a simple request for a medical exception for one inmate. To the extent

that the concern is that *Plaintiff* will hide contraband in her hair—which has never been suggested at any time in this litigation by any witness or DOC counsel—the staff burden is the burden of searching *a single inmate*. And even if all transgender female inmates were permitted access to female clothing and grooming standards, that would involve only approximately 15 inmates (by the DOC's own count, 30(b)(6) Dep. (Reimers) (ECF 129-1) at 66) out of a total of approximately 98,000, *see* http://www.dc.state.fl.us/about.html—or 0.015% of the inmate population.[19]

The concern about the ability to identify inmates quickly, Upchurch Dep. (ECF 129-15) at 119-120, is similarly defused by the fact that Plaintiff is not challenging the hair-length policy as a general matter. In fact, Mr. Upchurch himself disclaimed reliance on this rationale if hair-length exceptions were only permitted for transgender women with a medical need. *See* Upchurch Dep. (ECF 129-15) at 120:15 – 121:2. Moreover, female inmates are not required to stick with

_____

[19] Although Plaintiff does not challenge the hair-length rule as a general matter, she notes that many prisons, including the largest prison system in the country—the Federal Bureau of Prisons—do not restrict hair-length. *See* Subia Rebuttal (ECF 129-19) at 3; 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 217; Upchurch Dep. (ECF 129-15) at 8-9, 77 (a "good number of [DOCs] don't restrict [hair length]," including Ohio and Utah); *see also* BOP Program Statement, Grooming at 1,2, https://www.bop.gov/policy/progstat/5230_005.pdf, BOP Transgender Offender Manual at 11, https://www.bop.gov/policy/progstat/5200.04.pdf (clothing policy).

one hair length—if Plaintiff or any other female inmate changes their hair, a new

ID is issued. Kirkland Dep. (ECF 37-1) at 30 (if female inmate with short hair

grew it to her shoulders, new ID card would be issued "[i]f it drastically changed

her appearance").

Any concern about using long hair to signal gang affiliation, Kirkland Dep.

(ECF 37-1) at 23-26, is also irrelevant, because this is not a challenge to the hair-

length policy as a general matter, and there is no assertion that Plaintiff has been,

is, or ever will be in a gang. Moreover, there are far less restrictive grooming

policies that can prevent this problem. *See* Subia Dep. (ECF 129-14) at 155-56.

As to female underpants in particular, the DOC recognizes that they don't

pose much of a security issue because inmates are supposed to keep their

undergarments covered. *See* 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 223:24 –

224:3.

Finally, to avoid all of these asserted security issues, the DOC could simply

put Plaintiff in a female facility. *See* 30(b)(6) Dep. (Prisk) (ECF 129-1) at 26-27

(housing placements of transgender inmates not based just on genitals; determined

on a case-by-case basis based on the safety of the inmate and other inmates; a

transgender female inmate could be placed at a female facility)[20]; *cf. also* 28 C.F.R. § 115.42(e) (concerning housing placement, "[a] transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration.").

## IV.   <u>Conclusion</u>

For the reasons above, the DOC's Motion for Summary Judgment (ECF 123-125) should be denied.


<u>Date</u>: Monday, June 19, 2017


<u>Rule 7.1(F) Certificate on Word Count</u>: The Court has permitted Plaintiff to file this response with up to 9,000 words. ECF 127. This document contains 8,745 words, including the headings, footnotes, and quotations, and excluding the case style and signature block.

---

[20] To the extent there is an asserted concern about sexual conduct, sexual abuse, or pregnancy in a women's prison, Plaintiff's treating endocrinologist, Dr. Angueira, testified that hormone therapy diminishes erections and ejaculation because very little testosterone is present; over time—about six months, or in some cases up to a year—if the hormone therapy is working correctly, there is a complete suppression of testicular functioning that would prevent an individual from having an erection. *See* Angueira Dep. (ECF 129-2) at 35-36.

Respectfully submitted,

**/s/ Daniel B. Tilley**
**Daniel B. Tilley**
Florida Bar No. 102882
**Nancy G. Abudu**
Florida Bar No. 111881
ACLU Foundation of Florida
4343 West Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
nabudu@aclufl.org

**Leslie Cooper***
ACLU Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2627
LCooper@aclu.org
*Admitted to the N.D. Fla.

**ATTORNEYS FOR PLAINTIFFS**

**Matthew D. Grosack**
Florida Bar No. 073811
DLA Piper LLP (US)
200 S. Biscayne Boulevard, Suite 2500
Miami, Florida 33131
(305) 423-8554
matthew.grosack@dlapiper.com

**Elizabeth C. Akins****
DLA Piper LLP (US)
1201 W. Peachtree Street, NW
Suite 2800
Atlanta, Georgia 30309
(404) 736-7812
liza.akins@dlapiper.com
**Admitted pro hac vice