IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


REIYN KEOHANE,

    Plaintiff,

v.                               CASE NO. 4:16-cv-511

JULIE L. JONES, in her official
capacity as Secretary of the
Florida Department of Corrections,

    Defendant.




DEPOSITION

OF

DR. GEORGE R. BROWN, MD, DFAPA

(Taken April 25, 2017)




_____

*FLETCHER   COURT   REPORTING*

*Telephone:*
*Post Office Box 7003*         *(423) 914-2554*
*Kingsport, TN  37664*       *(423) 392-0333*

<u>APPEARANCES</u>:

*Attorney for Plaintiff*:    LESLIE COOPER, ESQUIRE
                             Senior Staff Attorney
                             American Civil Liberties Union
                             125 Broad Street, 18th Floor
                             New York, New York  10004
                             212/549-2584


*Attorney for Defendant*:    KIRKLAND E. REID, ESQUIRE
                             Attorney at Law
                             JONES WALKER LLP
                             11 North Water Street
                             Suite 1200
                             Mobile, Alabama  36602
                             251/439-7513

## TABLE OF CONTENTS

**PAGE NO.**

TITLE PAGES ---------------------------------------- 1-2

INDEX OF EXHIBITS ------------------------------- 4

CAPTION ------------------------------------------- 5

DIRECT EXAMINATION - KIRKLAND E. REID, ESQ. ------ 6-141

CROSS-EXAMINATION - LESLIE COOPER, ESQ. ---------- 141-144

CERTIFICATE OF WITNESS ------------------------- 145

EXHIBITS ---------------------------------------- 146-147

REPORTER'S CERTIFICATION ----------------------- 148

<u>**INDEX OF EXHIBITS**</u>

<u>**DEPOSITION OF DR. GEORGE R. BROWN**</u>

**DEFENDANT'S EXHIBIT 3:  Expert Report of Dr. George R. Brown, MD, DFAPA, executed on January 13, 2017, concerning Reiyn Keohane.**

**(Ref. Page 14)**

**DEFENDANT'S EXHIBIT 4:  Rebuttal to Defense Expert Report of Dr. Levine regarding Reiyn Keohane.**

**(Ref. Page 134)**

## CAPTION

This deposition of DR. GEORGE R. BROWN was taken at
the DoubleTree by Hilton Hotel, 211 Mockingbird Lane,
Johnson City, Tennessee, on April 25, 2017, commencing at
10:02 a.m., pursuant to Notice of Deposition.  The witness
was duly sworn by Mildred Anne Fletcher, Notary Public at
Large for the State of Tennessee.  The following attorneys
were present for the taking of the deposition:  LESLIE
COOPER, ESQ., Counsel for Plaintiff; and KIRKLAND E. REID,
ESQ., Counsel for Defendant.

It is agreed that this deposition may be recorded
electronically and transcribed to typewriting by Mildred
Anne Fletcher.  The signature of the witness was not
waived.

It is further agreed that this deposition was taken
for the purpose of discovery, for use at trial, or for such
other purposes as authorized or permitted under applicable
law and *Federal Rules of Civil Procedure*.  It is subject
only to those objections for incompetency, irrelevancy, and
immateriality.

All formalities as to caption, certificate, notice,
and method of transmission are expressly waived.

1    **DR. GEORGE R. BROWN, the deponent, after first being**

2    **duly sworn, testified as follows:**

3                              **DIRECT EXAMINATION**

4    **BY KIRKLAND E. REID, ESQ.:**

5    **Q.   Dr. Brown, my name is Kirk Reid, and I represent**

6    **the Florida Department of Corrections in this lawsuit.  And**

7    **I am sure you understand that you are here today to give a**

8    **deposition in the lawsuit of *Keohane v. Jones* pending in**

9    **the Northern District of Florida.**

10   **A.   Yes, I do.**

11   **Q.   And what did you do, if anything, to prepare for**

12   **this deposition?**

13   **A.   I actually have a list of 12 documents that I**

14   **reviewed within the last five days for that, and they are**

15   **listed here.**

16   **Q.   Do you wish to mark that as an exhibit, or do you**

17   **wish to just read that into the record?**

18   **A.   I would rather read it into the record.**

19   **Q.   That's fine.**

20   **A.   My handwriting may not be legible otherwise.**

21   **Q.   I understand.**

22   **A.   Reviewed in the last five days:  First, I**

23   **reviewed the Keohane declaration from 2017.  I reviewed my**

24   **updated --**

25   **Q.   You can stop there.  Which declaration are you**

1  referring to?

2       A.   It's dated 4/17/17.

3       Q.   Okay.

4       A.   I reviewed my updated CV, which was updated on

5  4/22/17, a copy of which you probably don't have.

6       Q.   I do not.  Will you get a copy of that to your

7  counsel and then provide --

8       A.   I have done that already.

9       Q.   Okay.  Thank you.

10           MS. COOPER:  We will get you that.

11      A.   My declaration, my rebuttal report from 1/27/17,

12  Dr. Gorton's declaration, Mr. Subia's security report,

13  Dr. Levine's report dated 1/17, Dr. Baker-Hargrove's report

14  from 10/6/16, Keohane's declaration from 10/6/16,

15  Dr. Santeiro's declaration from 10/17, the complaint dated

16  in August of '16, and the NCCHC 2015 position statement.

17  And, actually, there is a 13th item that I am adding to my

18  list that I neglected to put on the list, which is the

19  WPATH medical necessity statement updated 21 December '16,

20  another document you may or may not have.

21      Q.   Now, Dr. Brown, some of those were listed on your

22  report, your expert report, and some were not.  And those

23  that were not, I would just ask that you get to Leslie or

24  Daniel and they can supplement the report or at least the

25  document's reviewed portion and then just send that to me.

1                    MS. COOPER:  Sure.

2                    MR. REID:  Okay, thanks.

3        A.   I actually already have done that.

4        Q.   Okay, great.  So it will make it very easy for

5  Daniel and/or Leslie to just forward that one to me.

6        Did you, other than looking and reviewing the

7  documents that we just went over, did you talk to anyone in

8  preparation for this deposition?

9        A.   Yes.

10       Q.   Okay.  Who would that be?

11       A.   Counsel to my left.

12       Q.   Ms. Cooper?

13       A.   Correct.

14       Q.   Okay.  Anyone else other than your counsel?

15       A.   No.

16       Q.   Okay.  No one at the college, no colleagues; no

17  one else?

18       A.   No.

19       Q.   Okay.

20       A.   No, that is correct.

21       Q.   And since you have been deposed before, I

22  appreciate you mentioning that, but we will try to not talk

23  over one another, though I confess to being sometimes bad

24  about talking over you.  So if I do, I apologize.  So we

25  will verbalize our answers for the reporter.  Also, Doctor,

1  you know all of this already.  If you need a break at any

2  time, just please let me know, and we will take one.  I

3  typically like to take a break about every hour or so,

4  since it's more a humane thing to do.  But if you want to

5  before, just let me know and we will take one.  Okay?

6  **A.** Okay.

7  **Q.** And if you do not understand a question that I

8  ask, please tell me you don't understand the question, and

9  I will try my best to rephrase the question.  And if you do

10 answer and don't ask me to rephrase, I will just assume you

11 understand what I am asking.  Is that fair?

12 **A.** Agreed.

13 **Q.** Okay.  When were you initially retained in this

14 lawsuit?

15 **A.** I would have to refer to records for the exact

16 date, but it was in 2016.

17 **Q.** Had you heard of the plaintiff prior to your

18 retention as an expert?

19 **A.** No, I had not.

20 **Q.** Okay.  Do you know how you were retained, meaning

21 more specifically, who contacted you initially?

22 **A.** I'm fairly certain that Ms. Cooper contacted me

23 by e-mail initially regarding the case.

24 **Q.** And do you know why Ms. Cooper contacted you?

25 **A.** I know what she told me.

1      Q.   What I am getting at is, do you know why she

2 contacted you and not some other person?

3      A.   Well, first of all, I don't know if she did or

4 did not contact other people, and I can't opine what was in

5 her mind as to why she called me, but she said that she was

6 calling because I might know something about the subject

7 matter of this case -- of cases like this.

8      Q.   And the subject matter of the case, how was that

9 described to you?

10      A.   A prisoner case with somebody with gender

11 dysphoria who was allegedly not getting access to medically

12 necessary care.  I believe at that time, hormones and other

13 issues were mentioned in kind of a brief synopsis overview

14 description of the case, and by hormones, I mean cross-sex

15 hormones.

16      Q.   If I say "hormones," "hormone therapy," "hormone

17 treatment," can we agree that what I am referring to is

18 what your are referring to as "cross-hormone therapy"?

19      A.   Cross-sex hormone therapy.

20      Q.   Cross-sex hormones?

21      A.   Yes.

22      Q.   I think you defined that as "CSH" in your report?

23      A.   Correct.

24      Q.   So if I say "hormones" shorthand, can we agree we

25 are talking about the same thing?

1        **A.    Fair enough.**

2        **Q.    Okay.  Because I assure you I will do that.  So**

3    **just so we know we are on the same page.  And at the time**

4    **you were retained, the provision of hormone therapy or**

5    **hormones was not being provided.  That was your**

6    **understanding?**

7        **A.    Correct.**

8        **Q.    Okay.  And is it your understanding today that it**

9    **is being provided?**

10       **A.    My understanding today, based on the records I**

11   **have received, is that some type of cross-sex hormone**

12   **intervention has been supplied on an intermittent basis,**

13   **and I don't know what the current regimen is.**

14       **Q.    When was the last date on the records that you**

15   **did review related specifically to the hormone treatment?**

16       **A.    I will first remind us both that that is not one**

17   **of the things on my list of what I reviewed in the last**

18   **five days.  So I would have to look specifically at the**

19   **records to answer that, but I believe it was somewhere in**

20   **late 2016, but that's -- that's a guess.  It's in my**

21   **report.**

22       **Q.    And it would have been prior to the date of your**

23   **report?**

24       **A.    Correct.**

25       **Q.    And you have not reviewed any further records**

1   relating specifically to the provision of hormone

2   treatments for the plaintiff after the date of your expert

3   report?

4       A.   That's correct.  And the records that I had

5   available to me at the time of my report were not current

6   to the time of my report either.

7       Q.   Have you ever previously been retained as an

8   expert in any case involving the ACLU?

9       A.   I'm sorry.  I couldn't hear.

10      Q.   Have you been retained in any previous case that

11  involved, as counsel in the case, the ACLU?

12      A.   Yes, I have.

13      Q.   Which case or cases was or were those?

14      A.   Okay.  Again, working from memory without my CV

15  in front of me, but all the cases that I have been involved

16  with are on my CV.  Let's see.  The case of *Ophelia*

17  *De'Lonta* in Virginia, the initial case was involved -- I

18  was involved with the ACLU on that case.  Let's see.  The

19  name escapes me, but there was another case I was involved

20  with the ACLU with a Mr. Knight, and the plaintiff's name

21  escapes me, but again, if I were able to refresh my memory

22  by looking at my list of cases, I would be more accurate

23  for you.

24      A.   And in the cases, any cases that you worked on

25  involving the ACLU, you listed in the CV portion of your

1    report?

2        A.   Yes.  It's actually a section entitled, "Forensic

3    Activities," and it has a list of all the cases I have been

4    involved with.

5        Q.   Did those cases, the ACLU cases, did they involve

6    transgender issues?

7        A.   In terms of the --

8        Q.   The lawsuit.

9        A.   -- litigation issues, were they around

10   transgender health?  Yes.

11       Q.   Okay.  Did any of those lawsuits involve prisons?

12       A.   Yes.

13       Q.   Which ones involve transgender health issues and

14   prisons?

15       A.   The *Ophelia De'Lonta* case in Virginia is one.

16   And, again, I could be much more accurate with this if I

17   could look at the names of the cases.

18       Q.   Sure.  Yeah, I'm not trying to -- hold on one

19   second.

20            MS. COOPER:  I am so sorry.

21            MR. REID:  No, go ahead.  We'll take a

22       break.

23            *** OFF THE RECORD ***

24   DIRECT EXAMINATION (CONTINUED)

25   BY MR. REID:

1              MR. REID:  Let's mark as Defendant's

2     3 -- and, Leslie, I think we had 1 and 2 for

3     Mr. Subia's deposition --

4              MS. COOPER:  Okay.

5              MR. REID:  -- which is Dr. Brown's Expert

6     Report.  Here is a copy for you, Doctor.  I will just

7     keep this one for you as a clean copy.

8              (DEFENDANT'S EXHIBIT 3:  Expert Report of

9              Dr. George R. Brown, MD, DFAPA, executed on

10             January 13, 2017, concerning Reiyn Keohane;

11             marked by the court reporter.)

12    BY MR. REID:

13        Q.   Tell me where we need to go in your Expert Report

14    to help you with the cases involving the ACLU transgender

15    issues and the prisons.

16        A.   Okay.  On my CV that is now updated that you have

17    in this record, it's on page 10.

18        Q.   Okay.

19        A.   It begins on page 10.  At the top it says,

20    "Forensic Psychiatry Activities."  And I don't have my

21    cases listed by funding source.  Actually, I have never

22    seen anyone do that, so I am working from memory on this

23    list of cases as to who was the retainer.  Let's see.  But

24    *De'Lonta*, as I have mentioned, which is No. 14 on the list.

25    Let's see.  If I am not mistaken, the *Fields Sundstrom*, the

-14-

1    Wisconsin Department of Corrections case, I am fairly

2    certain the ACLU is involved in that one.  It's actually

3    difficult for me to remember who the funding sources were.

4    I work with attorneys and where they came from wasn't all

5    that relevant to me.

6         Q.   That's understandable and quite all right.  How

7    about, if you recall, DLA Piper as a law firm that may have

8    retained you in any of these cases?

9         A.   That name does not sound familiar.

10        Q.   Have you ever spoken in this litigation, *Keohane*

11   litigation, with anyone from the law firm DLA Piper?

12        A.   I don't recall ever speaking to anybody from

13   DLA Piper unless they didn't identify themselves as being

14   from there.

15        Q.   Okay.  Let's look, leaving aside the funding

16   source or who retained you on a couple of these.  Did the

17   *Ophelia De'Lonta* case, that involved transgender issues,

18   you said?

19        A.   Correct.  And there were actually two cases, not

20   one.

21        Q.   I see one on page 11, which is No. 39.

22        A.   Right.  And then if you go back to page --

23        Q.   And then on page 10, there is one that's No. 14.

24        A.   Correct.

25        Q.   Those are different cases?

1      A.   Different cases, same inmate, and different

2 sponsors.

3      Q.   Let's go to the first case, which is a 2003 case.

4 No. 14 on your list.  What was (1), the case about in your

5 words; and (2), your expert opinion in that case?

6      A.   Okay.  This is a case that goes back to 2003, so

7 I'll rely on my best memory from 14 years ago.

8      Q.   I understand.

9      A.   But as I recall, I was contacted by Victor

10 Glasberg from the ACLU regarding this particular inmate who

11 was allegedly transsexual in the Virginia Department of

12 Corrections and was not being allowed access to medically

13 necessary care in the form of cross-sex hormones.

14      Q.   Did you give only a deposition in that case, as

15 well as an expert report, or did you testify at any trial

16 in that case?

17      A.   I did not testify in trial.  My understanding is

18 the state settled the case, and she got access to hormones

19 as did all other similarly situated transsexual inmates in

20 the entire state of Virginia.

21      Q.   Are you using the terms "transsexual" and

22 "transgender" in any distinguishing way?

23      A.   Yes.

24      Q.   Please distinguish those two terms for us.

25      A.   Okay.  Transgender is not a diagnosis.  It's not

1    a symptom complex.  It's an overarching umbrella term for

2    all people who experience some level of incongruence

3    between their sex of assignment at birth and their

4    perceived or felt gender, gender role, and/or expression.

5    So as such, transsexuals are a subset of people who would

6    self-identify as transgender; and conversely, or

7    contrariwise, transgender is not a subset of people who are

8    transsexual.

9        Q.   Explain how a transsexual is exactly a subset of

10   transgender.

11       A.   Okay.  Under the much larger population of people

12   who identify as transgender, there is a subset of people

13   who have gender dysphoria as a set of symptoms, some of

14   whom have gender dysphoria as a formal diagnosis, and

15   within those people, the term "transsexual" has been

16   historically applied to those with the most severe level of

17   incongruence between their sex of assignment at birth and

18   their felt or expressed gender identity.

19       Q.   And the *De'Lonta* case involved transsexual -- a

20   transsexual inmate?

21       A.   Right.  At the time the diagnostic term would

22   have been gender identity disorder in DSM-III-R or III.

23       Q.   Did that case involve anything other than the

24   provision of hormones, or hormone therapy?

25       A.   Boy, reaching back 14 years, I can't recall

1   whether there were additional sub-issues, but to the best

2   of my recollection, that was the primary issue.  There may

3   have been others.

4        Q.   Okay.  You don't recall if hair length, access to

5   makeup, and things like that were involved in that case?

6        A.   I frankly don't recall.  I recall the second case

7   much more clearly.

8        Q.   Okay.  Let's just talk about that case then, and

9   that's *De'Lonta v. Clarke*, at page 11 of your CV.  And it

10  says, "consultant and expert opinion by affidavit to

11  plaintiff."  Was that also -- were you also retained in

12  that case by the ACLU?

13       A.   I actually don't recall who those attorneys

14  worked for.  Maybe I should add this to my list of funding

15  sources, but actually no one has asked me these questions

16  before.

17       Q.   The same plaintiff as the prior case we were just

18  discussing?

19       A.   Same plaintiff but definitely different

20  attorneys.

21       Q.   Okay.  And different issues?

22       A.   Different issues.

23       Q.   Okay.  What were the issues in the *De'Lonta* --

24       A.   II.

25       Q.   II?

1        A.   Fair enough.  So between De'Lonta I, which was

2   the case that established her access to medically necessary

3   cross-sex hormones as well as other inmates in Virginia, as

4   I mentioned.  And De'Lonta II, she also had obtained access

5   to female canteen items including makeup, underwear, female

6   undergarments, and a choice of hair lengths.  But the issue

7   in De'Lonta II was whether or not she qualified for

8   additional treatment for her gender identity disorder, now

9   called gender dysphoria, in the form of sex reassignment

10  surgery.

11       Q.   And do you know the result of that case?

12       A.   I can tell you what I was told.

13       Q.   Please.

14       A.   After I interviewed the inmate and provided a

15  very detailed and lengthy expert report affidavit, within a

16  week of the Virginia Department of Corrections receiving my

17  report, the inmate was, I would say, miraculously paroled.

18  And the reason I say "miraculously paroled," is she had

19  described to me all of her prior efforts to be paroled and

20  was turned down for 35 consecutive years with the reasoning

21  being that the heinousness of her crime was not something

22  that she could change by any activities or course work or

23  behavior in prison.  But for some reason, a week after they

24  received my report, she obtained parole and she is a free

25  woman.

1      Q.   How long had she served?

2      A.   35 years, approximately.

3      Q.   Do you know what this was for?

4      A.   Armed robbery.

5      Q.   Do you know when she was due to be paroled?

6      A.   She had been, according to what she told me --

7  she had been eligible for parole every year for a number of

8  years.

9      Q.   And she had a more than 35-year sentence for

10 armed robbery?

11     A.   Correct.

12     Q.   And she is out today?

13     A.   That's my understanding.

14     Q.   You did not give a deposition in that case; only

15 the report?

16     A.   Correct.

17     Q.   There are two other cases that -- or one case

18 that is mentioned twice:  the *Kosilek* case that's listed on

19 pages 10 and 11 of your CV as well.  One is dated 2002,

20 although your testimony is dated 2001.  That's No. 5.  The

21 No. 37, it is listed as 2012 through present, and that's

22 referred to as Kosilek or is it Kosilek?

23     A.   I have heard it pronounced both ways.

24     Q.   Which one should we say?

25     A.   Either one.

-20-

1      Q.   Okay.  We'll say Kosilek II is on page 11 at

2   No. 37.  Going back to the first one, is this the same

3   case, or are these like the *De'Lonta* cases?  Are they two

4   separate cases?

5      A.   There's some analogies.  They're separate cases

6   with the same inmate in Massachusetts, but separate

7   litigation issues.

8      Q.   Okay.  Can we take the first one, No. 5?

9      A.   Yes.

10     Q.   What were the issues in the Kosilek I?

11     A.   The primary issue in that case, again,

12  remembering back to the fact that I gave my expert witness

13  trial testimony in 2001, so this is memory of 16 years ago.

14  The primary issue was access to cross-sex hormones and

15  whether they were necessary and whether there was

16  constitutional Eighth Amendment violations on the part of

17  the Department of Corrections in Massachusetts with respect

18  to the medical management of Michelle Kosilek.

19     Q.   And do you recall the result of that case?  Since

20  it is reported, it is what it is, but do you recall off the

21  top of your head?

22     A.   It's a very long decision that is a matter of

23  public record, but in summary, to the best of my

24  recollection, several things were found on the part of the

25  District Court Judge:  (1) that gender identity disorder

1   was in fact a serious medical need for the purposes of the

2   constitutional argument; (2) that cross-sex hormones were

3   medically necessary as part of the overall management of

4   this serious medical need for Michelle Kosilek while an

5   inmate.  Those are the two most important findings that I

6   can recall.  I don't recall if access to female

7   undergarments, electrolysis, and female canteen items, all

8   of which she has had -- I don't recall if that was a direct

9   decision of that case or not.  But I do know that another

10  outcome of the first case was in Massachusetts.  The

11  Department of Corrections was required to revisit their

12  policies statewide applying to all inmates with gender

13  identity disorder in the state of Massachusetts and to

14  re-write that policy in ways that would pass constitutional

15  muster.

16      Q.   And there is a No. 20 on your CV as well, which

17  is another *Kosilek* case, which you have listed as

18  Kosilek I.  How was that different than the No. 5?

19      A.   Let's see.  Different defendants.  The defendants

20  are essentially the head of the Department of Corrections

21  in Massachusetts.  Let's see.  You know, I have been there

22  three times to interview her, and some of these cases do

23  tend to blend together, again, without resorting to the

24  source documentation.  But there were also long periods of

25  time between various aspects of this case that involved

1   everything from cross-sex hormones to female canteen items

2   to sex reassignment surgery.  So a variety of treatments

3   were involved in each of these cases, and where the

4   boundaries of which particular treatment, it's hard for me

5   to recall, particularly that middle case.  I have a much

6   better memory of the last case, chronologically, in terms

7   of the details.

8       Q.   Is the last case, chronologically, No. 37 on your

9   list which you label or define as Kosilek II?

10      A.   Let's see.  There are actually three *Kosilek*

11  cases, which I do accurately have written here with the

12  dates, but I think that they should be -- again, the

13  designations of I, II's, and III's are not legal or medical

14  designations.  They are more for a matter of shorthand in

15  recalling particular cases in time.  So in theory I suppose

16  you could call the first case "I", the second case "II",

17  and the third case "III".

18      Q.   Okay.

19      A.   So what I have listed as No. 20 really

20  should -- if you want to use that shorthand, that would be

21  Kosilek II.

22      Q.   Okay.

23      A.   And then if you want to continue with that

24  shorthand, No. 37 would be Kosilek III, which is why that

25  one says "to present."

1     Q.   And Kosilek I started -- at least your

2  involvement started in 2001, and it is still going in 2017?

3     A.   Well, my trial testimony was in 2001, so I feel

4  fairly safe in saying my involvement started substantially

5  prior to 2001 at trial.

6     Q.   Correct.  And it is ongoing today as we sit here?

7     A.   Again, I am not privy to all the inner workings

8  of the court, but I have not been formally discharged from

9  the Kosilek III complaint, so as it stands now, I've

10  retained it as present on my CV.

11     Q.   Okay.  And what does the Kosilek III complaint

12  allege?

13     A.   The Kosilek III complaint involves the

14  interruption of electrolysis that Michelle Kosilek had been

15  receiving paid for through the Department of Corrections in

16  Massachusetts, and it was partially completed and then for

17  reasons unclear was discontinued.  So Kosilek III is a

18  complaint on the inmate's part to complete the electrolysis

19  that was begun under the auspices of the Department of

20  Corrections.

21     Q.   Has sexual reassignment surgery been any issue in

22  I, II, or III of the *Kosilek* cases?

23     A.   Yes.  In No. II.

24     Q.   Okay.  And what was the result of that case?

25     A.   Again, this is over a 75-page opinion written by

1    Judge Wolf in the district court, so for specific details,

2    that's readily available to all, but there were more than

3    one result.  The first result was that sex reassignment

4    surgery was found to be medically necessary by a

5    three-judge panel on the appeals court.  That was appealed

6    by the state of Massachusetts and went to an en banc,

7    meaning all five judges, and was overturned by a

8    three-to-two vote in the en banc decision.

9         Q.   And that's the first circuit?

10        A.   I don't know.

11        Q.   It is the first circuit.

12        A.   It was from Boston, circuit from Boston.

13        Q.   Yeah.  So the determination by the district judge

14   that -- never mind.  The opinion is what the opinion is.

15   And then it went back to the district court in -- are you

16   still involved in that case, or has that case concluded,

17   the one that involves sexual reassignment surgery?

18        A.   It's -- it's --

19        Q.   "Is your involvement concluded?" would be a

20   better way of saying that.

21        A.   I don't know if I have any further involvement,

22   because I have not been formally discharged from the case.

23        Q.   And the --

24        A.   But I have not been active in the case.

25        Q.   Are you active in Kosilek III involving the

1    interruption of the electrolysis?

2         A.   I haven't been active in a while, but I don't

3    know the current status of the case.

4         Q.   Did you have any reason to meet Stephen Levine in

5    any of the *Kosilek* cases or court proceedings?

6         A.   When you say "meet" --

7         Q.   Well, let's break that down in person.

8         A.   In person in the context of sitting in a

9    courtroom or --

10        Q.   Well, you tell me how you met.  It sounds like

11   you did, just may not be in a room?

12                  MS. COOPER:  Object to form.

13                  MR. REID:  That's fine.  I'll tell you what.

14        It's a good objection.

15        Q.   Did you meet in a courtroom?

16        A.   Let's see.  To the best of my recollection, I was

17   not allowed to be present for the testimony of other

18   experts.  He was actually an expert for the judge, not an

19   expert for the plaintiff or the defendant.

20        Q.   He was a court-appointed expert?

21        A.   Correct.

22        Q.   Okay.  Did you ever have reason to talk to

23   Dr. Levine throughout this 16-year Kosilek period?

24        A.   I don't believe so.

25        Q.   Have you ever exchanged correspondence with

1  Dr. Levine, whether by e-mail, old-fashioned letter?

2      A.   About these cases?  No.

3      Q.   About anything other than these cases, have you

4  had an opportunity to exchange correspondence with

5  Dr. Levine?

6      A.   In my whole life?

7      Q.   Well, yes, in your whole life.  I was going to

8  say at least in your professional life.

9      A.   Oh, I have had -- I have had --

10     Q.   Any reason before?

11     A.   I have had many correspondences with Dr. Levine,

12  and I have spent many hours with Dr. Levine if you want to

13  include my whole professional life.

14     Q.   Tell me, let's break those down.  What were the

15  many hours you have spent with Dr. Levine and why?

16     A.   Okay.  In the 1980s when I was training as a

17  psychiatry resident, I was very interested in learning more

18  about gender identity disorder, and I will use the term

19  appropriate to the chronological period in time.  And I

20  actually took it upon myself to go around the country and

21  work with people who were known to know something about

22  this field that had a limited number of people working in

23  it, and he was at Case Western Reserve.  I specifically

24  went there to work with Dr. Leslie Lothstein, and

25  Dr. Levine was one of the people who was also working at

1   Case Western Reserve, so when I went there to work with

2   Dr. Lothstein, I also had hours with Dr. Levine as part of

3   my training experience at Case Western.

4        Q.   Did you get any degree from Case Western?

5        A.   No.

6        Q.   Were these post-doctoral, post-medical,

7   post-residency meetings with him?

8        A.   They were during my residency training on

9   elective time.

10       Q.   Okay.  About how many hours would you say you

11  would have spent with Dr. Levine during this time period?

12       A.   Well, again, we are talking about approximately

13  1986 or 1987 over the course of a month, you know, as a

14  full-time elective.  I would be guessing.

15       Q.   Understanding that, during that time, did you

16  form any opinion about Dr. Levine?

17       A.   I am unclear on what the question is asking me.

18       Q.   Did you form any opinion about Dr. Levine's

19  expertise in gender identity disorder, meaning, did you

20  find him to be knowledgeable?  Did you find him to be

21  totally unknowledgeable?  Did you find yourself agreeing

22  with him?

23            MS. COOPER:   Object to form.

24       Q.   Those are open-ended questions where I am just

25  asking your views at that time.

-28-

1      A.   Right.  So again, my position at that time was as

2  a resident in psychiatry, so a trainee.  So I think it

3  would be difficult for me to say that I had an opinion

4  regarding his level of expertise from my perspective as

5  somebody who was developing expertise but was clearly not

6  an expert at that time in this particular field.  But I

7  certainly enjoyed working with him, as I did with the

8  others at Case Western in terms of learning everything that

9  I could about gender and sexuality both.

10      Q.   And how long did your stay at Case Western last?

11      A.   About a month.

12      Q.   What other times after that month have you spoken

13  with Dr. Levine?

14      A.   Okay.  We had extensive contact during the

15  creation of revision of Version No. 5 of the WPATH

16  standards of care, and do you want me to spell all that

17  out, since we are just mentioning it for the first time?

18      Q.   Do it for the first time, and then we will know

19  what we are talking about.

20      A.   Okay.  So actually the precursor organization was

21  called "Harry Benjamin International Gender Dysphoria

22  Association," and it is currently called the "World

23  Professional Association for Transgender Health."  And

24  these organizations, which are the same organization,

25  publish the internationally utilized and recognized

1   standards of care for evaluation and treatment of

2   transsexual, transgender, and gender nonconforming people,

3   and this document is an iterative living, breathing

4   document that goes through changes over time.  So for

5   Version 5, Dr. Levine was the chair of that revision

6   committee and I was a committee member, so I had worked my

7   way up in the scale of becoming an expert to be appointed

8   to the committee to develop the internationally used

9   standards of care by the time Version 5 was being revised.

10  So in the course of that in many, many committee meetings,

11  the majority of which were held by teleconference -- this

12  was before Skype and before videoconferencing -- held by

13  teleconferences and there was a small group of us that are

14  listed as the authors on Version 5.  I was a very active

15  participant in that process that was being overseen by

16  Dr. Levine, so I can't even begin to tell you how many

17  hours that was, but many, many hours.

18       Q.   And what was Dr. Levine's role again in that?

19       A.   He was the chairman of the Version 5 revision

20  committee.

21       Q.   In what year was the Version 5 revision?

22       A.   The revision committee did its work over a

23  two-to-three year time frame in the '90s, and I can't

24  remember what specific years those were.

25       Q.   And the current version of WPATH is what?

1          A.    Version 7, on which I am also a coauthor.

2          Q.    And when was that promulgated?

3          A.    It was actually released at our annual

4    international meeting in 2011 and published in 2012.

5          Q.    Is there another iteration in the works?

6          A.    Yes.  And I am on that committee as well,

7    Version 8, anticipated for release sometime in 2018.

8          Q.    Other than the WPATH involvement with Dr. Levine

9    and the elective residency training --

10         A.    Uh-huh (affirmative).

11         Q.    -- if that's fair enough, any other times,

12   meeting and talking with Dr. Levine?

13         A.    Oh, I am sure that we had conversations at

14   professional meetings, for example, Harry Benjamin meetings

15   while he was still a member.  He hasn't been a member in

16   years and hasn't come to the meetings in years, many years,

17   at least probably ten.  But prior to that, if we were both

18   at the same meeting, I would usually have conversations

19   with him at those meetings along with many other colleagues

20   that I would only see at such meetings.

21         Q.    Do you know why Dr. Levine stopped attending the

22   meetings?

23         A.    I guess you would have to ask him.

24         Q.    That was my question.  Do you know?

25         A.    I heard rumors, but I have no direct knowledge.

                              -31-

1      Q.   What rumors have you heard?

2      A.   Rumors I heard was that he no longer wanted to

3  continue to be a member of the organization, because he was

4  unhappy about something in the organization and I don't

5  know the details.

6      Q.   That's all you know?

7      A.   Yeah.

8      Q.   No one told you what those details may or may not

9  be?  Even if it's rumor, it's fine.

10     A.   The firsthand recollection that I am thinking of

11 now is when he was presenting publicly Version 5, in the

12 process of working through the revision as a spokesperson

13 for the committee at a meeting, that there were people in

14 the organization who were not happy with certain aspects of

15 the revision and, again, I am going back 20 years probably

16 at this point.  I don't remember what details those were,

17 but I do recall him being upset about how that public

18 presentation went.  So it could be related to that.

19     Q.   That's your best memory, looking back some

20 20 years possibly?

21     A.   Correct.

22     Q.   Okay.  And you never asked Dr. Levine personally

23 or directly?

24     A.   I can't recall.

25     Q.   On the CV portion -- or actually, it's really the

1   addendum portion of your report on page 30 -- you list only

2   one case --

3        A.   30, okay.

4        Q.   -- where you testified as an expert at trial or

5   by deposition at the *Fuller v. Massachusetts Department of*

6   *Corrections*, is that in addition to *Kosilek* and these

7   others, or is the four-year period -- you have only

8   testified at that trial or by deposition in the last four

9   years in this one case?  Is that the limiting factor?

10       A.   I was asked to provide a list of cases, which

11  during the previous four years, I testified as an expert at

12  trial or by deposition.

13       Q.   And this is the only one, this *Fuller* case?

14       A.   Within that four-year period with the

15  stipulations that I was asked to provide?

16       Q.   Correct.

17       A.   However, I provided a complete list, an

18  exhaustive list, of all cases that I have been involved

19  with in my career.

20       Q.   But during the past four years, you have only

21  been deposed -- well, let me ask you this.  Were you

22  deposed in *Fuller*?

23       A.   Yes.

24       Q.   And did you testify at trial in *Fuller*?

25       A.   I don't believe it went to trial.

1       Q.    That's what I am asking.   So it's just a

2  deposition?

3       A.    Correct.

4       Q.    Okay.  And so this is the first time you have had

5  this pleasure in four years?

6       A.    Yes.

7       Q.    Okay, good.   Well, what was *Fuller* concerning?

8       A.    Fuller is a transwoman, again, in the Department

9  of Corrections in Massachusetts, who was eligible for

10  female canteen items including makeup; could grow her hair

11  as long as she wanted, was eligible for cross-sex hormones,

12  based on the prior wins in the *Kosilek* cases; had access to

13  all of that, but due to her advanced years and her physical

14  considerations regarding cross-sex hormones, she opted to

15  not have cross-sex hormones and preferred instead to

16  self-treat her gender dysphoria with a state-issued

17  brassiere, and by taking socks or underwear or whatever

18  else that the state issued to her to simulate breasts so

19  that the state-issued bra would not be just floppy on her

20  chest.   However, the state of Massachusetts considered the

21  use of those state-issued items to be contraband when not

22  used for the intent that they were issued, so socks worn in

23  the bra was considered a contraband use of socks.   So the

24  lawsuit, amazing as it is to me, involved whether it was

25  medically necessary or important for her to relieve her

1   gender dysphoria using breast forms of some sort, given

2   that she was not really medically okay with taking

3   cross-sex hormones which she was eligible for.

4       Q.   And what was your expert opinion in that case?

5       A.   Well, having interviewed her and having read

6   hundreds and hundreds of pages of documentation, and

7   assessing her individualized situation and her gender

8   dysphoria -- and the record was quite complete about what

9   happened when she had access to something to put in her bra

10  and when they would take that away, and then I would add

11  because prisons are wonderful laboratories if you want to

12  see what bad things happen to people when you take certain

13  things away from them.  You get to see that and document

14  that, unlike in the free world.  And it was pretty clear to

15  me that it was medically necessary for her to have some

16  type of breast form or breast prosthesis of some type,

17  whether it's a no-cost solution of socks, which is all she

18  was asking for, or whether that involved something more

19  custom if they were interested in doing something different

20  and, in fact, that was the outcome and, in fact, the

21  opposing expert agreed with me.

22      Q.   That case concluded with plaintiff being allowed

23  to use socks in the way that she wished to?

24      A.   No.  That case concluded with the state providing

25  custom-fitted silicone breast prostheses, two sets, that

-35-

1   would be similar to what a patient had undergone a

2   mastectomy would receive as a breast simulator in a

3   state-issued bra, and it resolved her crises with gender

4   dysphoria.

5       Q.   Also on the addendum portion on page, I think,

6   36, you have a list of -- starting on 35 where you have a

7   list of taped --

8           MS. COOPER:  I'm sorry.  I don't see the

9       addendum going past page 30.

10          MR. REID:  Excuse me.  It's the CV portion.

11      You are right.  The addendum is on page 30 and then

12      the CV portion does start separately on page 1 and I'm

13      at 35 of that.

14          MS. COOPER:  Uh-huh (affirmative).

15          MR. REID:  You are correct.  That's right.

16  BY MR. REID:

17      Q.   And on 36, you mentioned something called "Cruel

18  and Unusual" documentary on transgender health care issues

19  in the prison setting.  Can you tell me what that was?

20      A.   Yes.  This was a documentary that Janet Baus,

21  whose e-mail is listed on my CV, was developing to

22  essentially describe what life is like for transgender, and

23  particularly transwomen, inmates in America's prisons.

24      Q.   Let me ask you, were you a speaker, was it in

25  interview form, the documentary, if you recall?

1          **A.    The documentary was predominantly about the lives**

2    **of, I believe, five different transwomen in five different**

3    **prisons, I think most of whom had been involved in**

4    **litigation regarding medically necessary care and had won**

5    **their cases, and I have been an expert witness in one or**

6    **more of those cases, and my involvement was limited to some**

7    **brief interview-like snippets regarding what is gender**

8    **identity disorder, and what is medically necessary care,**

9    **basically giving some definitions to add as a context to**

10   **the documentary itself.**

11         **Q.    About how many minutes total were you featured?**

12         **A.    Oh, boy.  I would say no more than one and a half**

13   **minutes added up.**

14         **Q.    Okay.  Let me ask you about one more case on**

15   **page 11 of your forensic psychiatry activities, just the**

16   **last case, *Dunn v. Dunn*.**

17         **A.    The last case.**

18         **Q.    It's No. 44 on page 11 of the CV.**

19         **A.    Yes.**

20         **Q.    And it's 2016 to present.  Is that an ongoing**

21   **case?**

22         **A.    It is an ongoing case to the best of my**

23   **knowledge.**

24         **Q.    And you list your services as an expert**

25   **consultant for plaintiff.  Have you given any deposition in**

1    that case?

2          A.    I have not.

3          Q.    Have you provided any expert report in that case?

4          A.    I have not.

5          Q.    Have you been asked to?

6          A.    I was asked to interview inmates and at this

7    point, I have not been asked to enter a report.

8          Q.    And who retained you in this case, meaning what

9    lawyer or firm?

10         A.    Southern Poverty Law Center.

11         Q.    And what is the subject matter broadly in the

12   *Dunn v. Dunn* case?

13         A.    My understanding of this case is that it is a

14   very large case that involves in general the medical,

15   dental, and mental health care of inmates throughout the

16   Alabama Department of Corrections.

17         Q.    And have you interviewed any inmates?

18         A.    Yes.

19         Q.    Roughly how many?

20         A.    Two.

21         Q.    Okay.  And do you anticipate doing further or

22   having further services in this case?

23         A.    I have not been asked to at this point.

24         Q.    Okay.  And do you know the status of the case at

25   all?

1       A.    Only what I have heard on NPR.

2       Q.    And what is that?

3       A.    The it's an ongoing case that involves the

4  medical, mental health, and dental care of inmates through

5  the state, and that it's, the last I heard, an active case.

6       Q.    On page 34 of your CV, you have a note on a

7  symposium that you participated in, "Orange is not the new

8  black -- yet."  And that's a symposium on prison

9  transgender mental health care, an update on recent court

10  cases.  Is that something that you have published in any

11  written form, or is that simply a presentation made at a

12  symposium?

13      A.    I was one of a panel of clinicians on that

14  symposium.  I believe it was a 90-minute symposium held at

15  an international meeting in the Netherlands describing some

16  of the psychiatric aspects of gender dysphoria in the

17  prison setting.  But to answer your question, there is

18  nothing published from that except possibly an overview

19  abstract of what the symposium planned to do in a small

20  paragraph in the proceedings of this meeting.

21      Q.    Is that the last meeting of WPATH, June 20, 2016?

22      A.    Yes and no, because WPATH now also has a

23  U.S. Path, so if you go to page 35 -- let me see.  Wait a

24  minute.  Well, no, you won't have it, because it's on the

25  new CV.

1     **Q.   Good, because I didn't see it.**

2     **A.   So on my new CV, which is dated April 22, 2017,**

3     **it's actually after the last one that you have.   It's**

4     **September 25th, 2016, that ends there.**

5     **Q.   Okay.**

6     **A.   Then there is transgender inmates in prison**

7     **perspectives from expert witnesses symposium chair and**

8     **presenter at the United States Professional Association for**

9     **Transgender Health first scientific meeting, Los Angeles,**

10    **California.   Also, Category 1 continuing medical education**

11    **program held on February 3rd, 2017.**

12    **Q.   And I will get the updated CV.**

13    **A.   Okay.   And there are several other continuing**

14    **medical education programs on transgender health that I**

15    **provided that are new since the last CV.**

16    **Q.   Okay.   What was the reason for the -- what's the**

17    **right word.   You tell me -- split?   Not in any negative**

18    **connotation, but why two organizations or why does the**

19    **U.S. have its own?**

20    **A.   Historically, WPATH and Harry Benjamin, before it**

21    **was dominated by American membership and the issues of**

22    **transgender health care and treatment in litigation,**

23    **including things like this, are not present uniformly**

24    **throughout the world where people are treated quite**

25    **differently in Europe for example.   So the Europeans didn't**

1  really want to hear about litigation issues in the United

2  States and insurance issues in the United States, which

3  didn't have any bearing on how they treat transgender

4  people in Europe, so it wasn't a split.  It was a decision

5  by WPATH's leadership to have chapters.  So there is an

6  EPATH, a European Path.  There is a CPATH, Canadian

7  version, and they are all under the umbrella of WPATH, and

8  as such, there is a WPATH international meeting every other

9  year, the next one to be in South America, and then now

10  effective in 2017, a U.S. version only that deals

11  predominantly with U.S.-centric issues regarding

12  transgender care.

13      Q.   At the symposium that is listed on June 20, 2016,

14  on prison transgender mental health care, were there any

15  prison officials on the panel?

16      A.   No.  This was a purely clinical meeting.

17      Q.   Were there any prison mental health care

18  officials on the panel?

19      A.   By that, you mean people who are employed by the

20  Departments of Corrections?

21      Q.   And/or their private contractors.

22      A.   No.

23      Q.   Were the participants all psychiatrists?

24      A.   No.  There was an internist.  There was a

25  psychologist, myself; there were, I believe, two attorneys

1  from California.  I am trying to think if there was anyone

2  else.  We basically invited people in the organization who

3  were knowledgeable about the subject.  If they were

4  Department of Corrections employees who are in WPATH, we

5  would have invited them to participate.

6      Q.  Well, are there any Department of Corrections

7  employees, officials, officers, et cetera, in WPATH?

8      A.  Not to my knowledge.

9      Q.  How about in USPATH?

10     A.  I haven't seen a membership list for USPATH, so I

11  don't know.

12     Q.  How is membership -- and tell me if this is the

13  wrong word -- obtained, or how is one invited, if one is

14  invited, to become a member of WPATH?  And that's a bad

15  question, but do you know what I am trying to get at?

16     A.  I think so.  There is somewhere between 1,000 and

17  1,200 members.  It's a very growing organization, a moving

18  target, so there may be 1,300 by the end of this

19  deposition, but it does involve multi-disciplinary

20  professionals, because the treatment or evaluation of

21  gender dysphoria is a multi-disciplinary endeavor, and

22  traditionally a member of the organization would sponsor a

23  prospective member of the organization in various

24  categories of membership of which there are probably five

25  or six categories all the way up to emeritus member and

1   down to student or supporting member, somebody who is in

2   training and interested in the field but not necessarily

3   accomplished.  And so then there is a membership committee

4   that renders a determination regarding that person's

5   application.

6        Q.   And when was it started, if you know?

7        A.   When was Harry Benjamin started?

8        Q.   Is Harry Benjamin -- there is a name change --

9   it's the same organization?

10       A.   That's correct.  In fact, I was at the meeting

11  and had a lot of input into the name change decision in New

12  York City as a board member of the organization.

13       Q.   And what year was the name change?

14       A.   Again, it's in the '90s and I can't recall

15  specifically when I was in New York for that meeting.

16       Q.   And prior to that, Harry Benjamin, how long had

17  that entity or organization been in existence?

18       A.   Since the 1980s.  I certainly can recall in 1977,

19  I think, was when I saw my first transsexual patient that a

20  mentor had handed me proceedings of -- I don't even think

21  it was the first meeting of the Harry Benjamin

22  International Gender Dysphoria Association, so it would

23  have had to have been even earlier than that.  So I revise

24  my guess and say that it's somewhere in the 1970s.

25       Q.   And you graduated medical school in '83?

-43-

1          **A.    I graduated medical school in 1983.  I got into**

2   **medical school two years after I enrolled as an**

3   **undergraduate.**

4          **Q.    Okay.  So sometime in that time frame, you think**

5   **that Harry Benjamin started?**

6          **A.    It would be in the 1970s and I don't recall the**

7   **date.**

8          **Q.    And what is its precise stated purpose, if it has**

9   **one?**

10         **A.    Yeah, there's --**

11         **Q.    Like a mission statement?**

12         **A.    Right.  There is in fact a mission-envisioned**

13  **statement that I can recall as a board member being**

14  **involved in the development of those, and they are posted**

15  **on the WPATH.org website, and those statements tend to be**

16  **very concise and words are carefully chosen, so I would do**

17  **an injustice to paraphrase those mission-envisioned**

18  **statements right now, not having reviewed them in some**

19  **time.**

20         **Q.    And why did you join?**

21         **A.    Why did I join?  I joined in approximately 1986**

22  **while I was on active duty in the U.S. Air Force, and part**

23  **of what I was doing was caring for and evaluating gender**

24  **dysphoric active duty troops, and this was and still is the**

25  **only organization of people considered to be knowledgeable**

1  and expert in this specialized area of

2  medicine/surgery/psychiatry, and I was able to be around

3  other colleagues that I could learn from.

4       Q.   Can you have a specialty or be expert in

5  transgender, transsexual issues and not be a member of

6  WPATH?

7       A.   Yes.

8       Q.   And do you know anyone specifically you could

9  name as "Yes, Dr. Smith is an expert but is not a member of

10 WPATH," or is it just a general, yes, you are not required

11 to be a member of this?

12      A.   You are not required to be in it, but this is a

13 very rapidly evolving and changing field from everything

14 from terminology to surgical techniques to medical

15 techniques, and to not be a member, I think, does oneself a

16 disservice to not -- to stay abreast of the significant

17 changes in this very rapidly evolving field.

18      Q.   And how is it rapidly evolving?

19      A.   When I started in this field, it was not

20 considered a good career choice, shall we say.  It was

21 stigmatized -- the patients were stigmatized and the people

22 who worked with the patients were stigmatized, and that is

23 still the case in some places around the world, including

24 in the United States.  And then as things have changed, I

25 think, socially and otherwise, and the internet has become

1  available, is probably the most important change since the

2  beginning of the field, and that people have access to more

3  information and have the ability to interact with each

4  other professionally and socially, that the field has

5  become more out of the closet, if you will, and that more

6  people know about transgender issues generically, and I

7  think the stigma has declined in general regarding working

8  in this field.  So as a result, many more people are doing

9  research, so like in where I am at the V.A., which is the

10  largest health care system in the country, we have done the

11  largest studies of transgender health in the world, and

12  that would have been unthinkable when I began my career in

13  the Department of Defense.

14      Q.    And is this a published study?

15      A.    I have published many studies that are the

16  largest studies ever done on transgender health.

17      Q.    And these are the ones listed on the CV?

18      A.    Correct.  And there's additions to the

19  publication list as well that you will get as the

20  April 22nd revision.

21      Q.    Why don't we take a break now?

22                    *** OFF THE RECORD ***

23  DIRECT EXAMINATION (CONTINUED)

24  BY MR. REID:

25      Q.    Dr. Brown, you, on page 2 of your report, mention

-46-

1   that you authored the section addressing the treatment of

2   incarcerated persons suffering from GD in Versions 5, 6,

3   and 7, referring to the WPATH versions.  Correct?

4        A.   Correct.

5        Q.   Tell me how you came to author that section.  I

6   think it's Section 14 of the current version that I am

7   familiar with, but if it's 15 or 13, forgive me.

8        A.   I can't recall what section it is, so I can't

9   confirm or deny that it's 13 or 14, but within the

10  organization, there are a subgroup of us.  We are actually

11  on a committee, incarcerated persons committee or

12  institutionalized persons committee.  Actually, I broadened

13  it from incarceration to institutionalization in general.

14  But historically, it's been a small cadre of people who are

15  clinically active in the field and who have on occasion

16  been asked to render opinions, professional opinions, in

17  one or more legal processes.  So as one of the people

18  involved in the cases that you have a list of in the

19  process of developing these versions, it was pointed out,

20  "Well, you know, you have experience in this area.  We want

21  to have a section on this.  Can you put something

22  together?"

23       Q.   And before that is published or included within

24  WPATH, is it peer-reviewed?  Who looks over it?

25       A.   Right.  So the way the revision committees at

1   least work since Version 5, so with Version 6 and

2   Version 7, the process has been very different than it was

3   in Version 5.  But in Versions 6 and 7, many more people

4   are involved, much larger committee, a lot more input from

5   the organization and from a much larger committee, and that

6   a subgroup of people are authors of particular sections,

7   then all of that is reviewed by the group and then

8   ultimately approved by the board of directors and the

9   executive committee of WPATH, so yes, extensive review by

10  other people.

11         Q.   And is it all people within WPATH?

12         A.   Actually, I believe there is a section of people

13  that were consulted as part of WPATH Version 7 that there

14  are people in organizations that are not necessarily

15  members of WPATH who also had the opportunity to review or

16  to provide input to the document.  Now, that's new in

17  Versions 6 and 7.  I think there was less involvement of

18  outside people in prior versions.  At least, that's the

19  best of my recollection.

20         Q.   And it is Version 7; that is the current version?

21         A.   That's correct.

22         Q.   And that was 2011?

23         A.   2011, published 2012.

24         Q.   In your section that you personally authored on

25  institutionalized persons, what did you rely on to draft

1  that section, meaning what data, what experience,

2  et cetera?

3      A.   What went into that was a review of the existing

4  literature, such as it is; anything relating to transgender

5  health in institutionalized settings, which can be prisons

6  or other institutions; experiences of members of the

7  institutionalization committee regarding their diverse

8  experiences around predominantly the United States.   So

9  reading the literature, personal experience, experiences

10 and input from other people knowledgeable in this area, and

11 then combining that together to write a draft, and then

12 have other people review the draft and develop a final

13 product.

14     Q.   In gathering the information that you relied on

15 to draft the section, did you ever talk to any prison

16 officials?

17     A.   Let's see.  I can't remember whether my

18 discussions with prison officials were -- what the timing

19 was with that, but I talked with prison officials in

20 California as part of the development of some of the

21 concepts and ideas, including the lead attorney for the

22 California equivalent of the Department of Corrections.   I

23 think they call it something else:   CDHR, California

24 Department of Rehabilitation or something.

25     Q.   Do you remember his name or her name?

1          **A.    I can't remember.  It's a him, and I can't**

2     **remember his name.  I met him at a National Commission on**

3     **Correctional Health Care meeting, which is a national**

4     **meeting of predominantly prison employees, wardens,**

5     **administrators, and prison employee clinicians, at which I**

6     **presented my work on several occasions.**

7          **Q.    And do you recall what exactly you spoke with the**

8     **California attorney about that was informative of what was**

9     **included in your section on institutionalized persons?**

10              **MS. COOPER:  Object to form.**

11         **Q.    Did you follow that?**

12         **A.    Can you repeat the question?**

13         **Q.    Yeah.  It was a rambling question.  I want to**

14    **know kind of specifically what you talked about with the**

15    **California attorney that you mentioned that informed what**

16    **ultimately was included in your section on**

17    **institutionalized persons?**

18              **MS. COOPER:  Object to form.  Go ahead.**

19         **A.    Again, we are talking about conversations from**

20    **five to ten years ago that I don't have a clear memory of**

21    **in their entirety, but I can recall talking to him about**

22    **California policies regarding the management of transgender**

23    **inmates in California, and some of the issues from the**

24    **state's perspective that had come up over the years in**

25    **dealing with this population of inmates and the needs that**

1   they have, and how they had managed it and some of the

2   challenges, some of the difficulties that they were

3   addressing.  I can remember those parts of the

4   conversation.

5       Q.   Were there any other prison officials, other than

6   the one in California, the attorney in California that you

7   mentioned, that you spoke with?

8       A.   Yes.  I spoke with the people who were employed

9   to work in the prison system who did this on a full-time

10  basis.

11      Q.   In which prison system?

12      A.   Let's see.  The two that I can recall now were

13  physicians in the California system and, of course, they

14  had lots of information from multiple states' prison

15  systems as to my involvement in cases where I was allowed

16  access to hundreds and hundreds of pages of documents from

17  a number of states and their officials.

18      Q.   And in those cases that you are talking about,

19  you were always representing the plaintiff or the litigant

20  against the Department of Corrections, whatever state that

21  department may be?

22      A.   Or including also the federal department, Federal

23  Bureau of Prisons.

24      Q.   Have you ever done any expert work on behalf of

25  any Department of Corrections?

-51-

1      **A.**   I have done, and currently am, a privileged

2 provider for the Carswell Federal Bureau of Prisons Women's

3 Facility in Fort Worth, Texas, on the side of the Federal

4 Bureau of Prisons.

5      **Q.**   Other than the California attorney for the

6 department and the physicians, who else did you speak to?

7      **A.**   During my going to meetings of the National

8 Commission on Correctional Health Care, I would meet with

9 wardens, administrators of various prison systems, other

10 clinicians who work in the prisons.  It's a really good

11 place to meet with people who do this on a full-time basis

12 and listen to some of their concerns and challenges.

13      **Q.**   Did any of those individuals, wardens,

14 administrators, commissions, provide you any feedback on

15 the section on institutionalized persons?

16      **A.**   Feedback in the sense did I provide them a draft

17 for them to look at it?

18      **Q.**   Correct.

19      **A.**   That would not have been appropriate.

20      **Q.**   Okay.  Informally, did they provide you any

21 feedback, "Hey, Dr. Brown, this doesn't seem right.  You

22 ought to say this or think about this"?  Anything like that

23 in the hall, on the phone, wherever?

24      **A.**   You know, these were informal conversations for

25 the most part.  They weren't in structured meetings, and I

1    just frankly don't remember.

2        Q.   Have you ever spoken with anyone from the Florida

3    Department of Corrections in any capacity?

4        A.   I am sure I had passing conversations with people

5    coming in and out of the Department of Corrections

6    facilities, like the person taking my I.D. or escorting me

7    back to a cell.

8        Q.   The time you met with Ms. Keohane, that was the

9    only time you had visited any facility within the Florida

10   Department of Corrections?

11       A.   That's not correct.

12       Q.   Okay.  Tell me why that is not correct.

13       A.   Because I also went to death row outside of

14   Jacksonville.  I believe it's Sparks or Spark, Florida.  I

15   may be misspelling the town, but it's approximately an hour

16   drive west from Jacksonville.

17       Q.   And when did you do that?

18       A.   When did I do that?  I am referring to my CV now,

19   because it's, I am sure, on there.  It would have been

20   approximately September of 2016.

21       Q.   And it may very well be on here, and it would

22   have been understandable to overlook it.  There is a lot on

23   here.

24       A.   Right.

25       Q.   I just didn't see it, but it could be, and it's

-53-

1  not important whether it is or is not.  But what is the

2  reason for your visit to the Florida death row?

3       A.    I was asked to interview an inmate there by the

4  Federal Public Defender's office from Tallahassee.

5       Q.    Do you remember that person's name?  The Federal

6  Public Defender's attorney, I mean.

7       A.    I am really bad with names.  I think his first

8  name is Billy, and he is the lead attorney in that office.

9       Q.    This is a state death row inmate that you were to

10  visit?

11      A.    It's a state death row inmate that I believe also

12  has a federal sentence, which is why the Federal Public

13  Defender's office was involved.

14      Q.    Okay.  Did you meet with the inmate?

15      A.    I did not meet with the inmate.  I went there to

16  meet the inmate.

17      Q.    And were not allowed to?

18      A.    The inmate chose not to be seen.

19      Q.    Did you know how you came to be contacted to

20  visit the inmate or have a planned visit with the inmate?

21      A.    I recall getting either a telephone call or an

22  e-mail -- I don't recall which -- from that office asking

23  me if I would be interested in reviewing the case.

24      Q.    Did you review the case at all?

25      A.    I reviewed the paperwork involved in the case,

1    and I was prepared to interview the inmate.

2        Q.   Did it have anything to do with transgender
3    issues?

4        A.   It may have.

5        Q.   Can you explain that further?

6        A.   Not having interviewed the inmate, I don't know
7    what condition or conditions the inmate had.

8        Q.   Did the officer or the attorney that asked you to
9    do this -- did they tell you, "This involves transgender
10   issues with a transgender inmate," anything of that nature?

11       A.   There was a question regarding the psychiatric
12   status of the inmate, generally, and whether it's possible
13   that gender dysphoria could have been a component of the
14   inmate's mental problems.

15       Q.   And you were unable to make any determination
16   because the inmate chose not to see you?

17       A.   That's correct.

18       Q.   Did the paperwork provide you any guidance or
19   insight into that question?

20       A.   Insufficient guidance.

21       Q.   So you would not have been comfortable trying to
22   render any opinion on the limited information you had?

23       A.   Definitely uncomfortable without interviewing the
24   patient.  By patient, I mean inmate.

25       Q.   Inmate.  Can you render an opinion or

1    evaluation/diagnosis without meeting the individual

2    personally?

3         A.   Yes.

4         Q.   Okay.  And that's accepted within the American

5    Psychiatric Association's standards?

6         A.   Yes, within an area of e-mental health and other

7    forms of video conferencing, Skype, telemental health,

8    there are ways that you can interact with people that don't

9    require you to be physically in person with them.

10        Q.   You would still be -- through the Skype and

11   telemedicine or e-medicine, still be able to have

12   videoconferencing and presence with the patient, and if

13   that's the case, then you could render a diagnosis?

14        A.   Well, I mean, having video would be more ideal

15   when that's available, but sometimes telephone

16   conversations in conjunction with a substantial amount of

17   records can be adequate as well.

18        Q.   And that is accepted by the American Psychiatric

19   Association standards?

20        A.   I'd have to look at the standards that you are

21   referring to.

22        Q.   Are there standards for the American Psychiatric

23   Association?

24        A.   The standard that I am familiar with is that

25   regarding rendering psychiatric diagnoses on people based

1  on what you have heard in the press, or getting thirdhand

2  information about someone.

3       Q.   And that would not be allowed?

4       A.   That would not be allowed.

5       Q.   In drafting your section on institutionalized

6  persons -- and correct me if I'm wrong -- do you think that

7  an inmate should be allowed to socially transition within

8  the prison context?

9       A.   I think if that person is appropriately diagnosed

10  with gender dysphoria and as part of their individualized

11  treatment plan, that social transition may be a component

12  of that, that it can and does occur in prison settings.

13       Q.   And what if there are institutional rules that

14  would prohibit what an inmate wants, meaning Plaintiff

15  Keohane would prefer long hair.  The rule says, "No long

16  hair."  Can you -- what then?

17            MS. COOPER:  Object to form.

18       Q.   I mean, is it your opinion you should still be

19  allowed to override the rule and socially transition as the

20  inmate desires?

21            MS. COOPER:  Object to form.

22       A.   There are ways to socially transition in all

23  environments.  They may not be exactly the same, but there

24  are ways that it can be done and is done, including in

25  other prisons.

1      Q.   How can it be done in the Florida Department of

2  Corrections?

3             MS. COOPER:  Object to form.

4      A.   So that I understand your question, you are

5  saying -- you are asking me, can a person socially

6  transition in the Florida Department of Corrections as

7  unique from another Department of Corrections?

8      Q.   Yes.  I am asking since the plaintiff is in the

9  Florida Department of Corrections, and you are rendering

10 opinions about this plaintiff and the Florida Department of

11 Corrections, how would the social transition component that

12 you mention in your section on institutionalized persons --

13 how would that be accomplished within the Florida

14 Department of Corrections in your view?

15            MS. COOPER:  Object to form.

16     A.   Well, it's certainly not in my purview to rewrite

17 policies and procedures unless I am asked to participate in

18 that, which I have not.  But conceptually, there is no

19 reason why someone cannot transition in a prison setting,

20 including FDOC as it clearly has been done in other DOCs

21 with similarly situated inmates with similar diagnoses.  So

22 I believe it is possible within the Florida Department of

23 Corrections.

24     Q.   Do the other institutions, the other Departments

25 of Corrections, have any type of grooming policy specific

1  to hair, if you know?

2      A.    Well, I'd have to review, particularly California

3  and Massachusetts, because I am certainly aware of

4  transsexual inmates in Massachusetts who have hair at least

5  to the middle of their upper arm or to the middle of their

6  back, and who are living full-time in a men's prison.  But

7  I would not be able to guess what the policy in

8  Massachusetts states regarding hair specifically without

9  reviewing it.

10     Q.    If the hair is not allowed to grow to the middle

11 of the arm or in a longer fashion, is it your opinion that

12 a person could still adequately socially transition within

13 the prison?

14     A.    Depending on what the policy is, it could render

15 it much more difficult.

16     Q.    What if the policy is as it is in Florida?

17     A.    I think it renders it much more difficult.

18     Q.    And how so?

19     A.    As I understand the policy for the female inmates

20 in Florida, there is no hair length policy, first of all.

21 My understanding of hair length policy for the male side of

22 the prison, based on the documentation that I have

23 reviewed, the hair has to be in a typically male pattern

24 above the ear and off the collar, much like yours is today,

25 which communicates in our culture and our society a male

1    presentation traditionally.

2        Q.   So within that rule, you would not be able to

3    socially transition?

4        A.   I would say that that rule regarding hair makes

5    it very difficult for people to present themselves as a

6    transitioned female in our culture.

7        Q.   In your professional experience, what is the

8    percentage, if you can give me one, where you are treating

9    transgendered females meaning, at least in my

10   understanding, biologically assigned males transitioning to

11   females?  What is the percentage of that group as against

12   biologically females assigned at birth transitioning to

13   males?

14       A.   Okay.  So birth-sex males transitioning to

15   females, we would call transwomen.

16       Q.   Uh-huh (affirmative).

17       A.   Birth-sex females.

18       Q.   If you are a transgender female?

19       A.   Right.  So the question you are asking me, is

20   that specific to what practice setting?

21       Q.   In your however many years?  Thirty years?

22       A.   More.

23       Q.   And I think you said you have treated more than

24   500 patients with gender identity disorder.  Of those 500,

25   how many were transgender females?

1    **A.   Right.   And there is an addition 5- or 6,000 that**
2    **I have had involvement with from a research perspective, as**
3    **distinct from --**

4    **Q.   Treated, right?**

5    **A.   -- treated.   Because I had practiced in a federal**
6    **setting, either in the Department of Defense or in the**
7    **V.A., both of those settings are predominantly enriched**
8    **with birth-sex males, right, because military is currently**
9    **15 percent female and that's a high in history.   The**
10   **likelihood of me seeing birth-sex females transitioning to**
11   **male is correspondingly reduced.   So my experience is**
12   **different than it would be in a community setting in the**
13   **sense that I have had far more birth-sex males transwomen**
14   **than I would have transmen.**

15   **Q.   Of those 500 patients, were all of those within**
16   **V.A. and/or Department of Defense?**

17   **A.   No.   Some were also part of my part-time private**
18   **practice years ago.   They were not active-duty military or**
19   **veterans, but that's a smaller number of that group.**

20   **Q.   I think that was a couple of years, early '90s?**

21   **A.   Correct.**

22   **Q.   And it's on your CV?**

23   **A.   Correct.**

24   **Q.   How many transgender patients did you treat**
25   **during that window of time if you recall, a guesstimate?**

1      A.    You know we are talking 27 years ago.  I don't

2  know.

3      Q.    Not holding you to it.

4      A.    Under 50 would be in that group probably.

5      Q.    And of those, how many transgender female

6  patients?

7      A.    I would, again, guess at the proportion.   The

8  proportion probably eight or nine to one, birth-sex males.

9      Q.    And of the, let's say, 450 others that would have

10 been Department of Defense and/or V.A. patients, that would

11 be an extremely high percentage of transgender females

12 because of the unique circumstances of the military?

13     A.    Correct.

14     Q.    Okay.  How about of those that you were aware of,

15 just your research, not treated personally?  What kind of

16 percentages exist in that population?

17     A.    In my research group, we are talking over 5,135

18 transgender veterans.

19     Q.    So they are still veterans?

20     A.    They are still veterans, but you know, within

21 that group it's as high as a third are birth-sex females.

22     Q.    Is there a percentage that is an accepted

23 understanding of WPATH members where either transgender

24 female or transgender male is one more predominant than the

25 other?

1        A.    In the answer to that, there is -- it depends on

2   who you ask and what country and what population you are

3   looking at.  So on one extreme, for example, with Asian

4   populations and some Eastern European studies, the ratio is

5   either one to one or actually one plus a decimal point

6   higher for birth-sex females, where as in the United

7   States, historically, a three to one ratio in favor of, if

8   you will, birth-sex males is usually reported.  So it

9   depends on where you are, what that answer is.

10       Q.    And why is that and why that difference,

11  depending on where one is born?

12       A.    Well, first of all, our knowledge on the

13  epidemiology of transgender identity and its subsets is

14  very poor, because we don't go door-to-door, like we do

15  with some things actually, and assess how many people live

16  in this household who are transgender.  And of that, how

17  many of those people are birth-sex males?  Of that, how

18  many are birth-sex females?  We don't actually -- "we"

19  meaning our culture and our research mechanisms, don't

20  actually do that.  There are some minor exceptions that

21  were -- Massachusetts did a telephone study, but my point

22  is, the quality of the epidemiology is very poor.  So as a

23  result, the data that I have just reported to you is also

24  questionable in terms of how much it reflects reality.

25       Q.    And what exactly do you mean by "epidemiology"?

1     **A.    Understanding the counting of people and all the**

2  **demographics, age, marital status, birth sex, gender**

3  **identity, sexual identity.   All the different demographics**

4  **that you can describe a person within a particular**

5  **population would be under the realm of epidemiology.**

6     **Q.    And how do you define gender dysphoria?**

7     **A.    So gender dysphoria is both a symptom complex and**

8  **when capitalized, I believe that's the convention that I've**

9  **used in my report when capitalized, is a DSM-V psychiatric**

10  **diagnosis.   So do you want me to go into the differences**

11  **between the two?**

12     **Q.    That was my next question.**

13     **A.    So gender dysphoria, the symptom complex, was**

14  **originally described by Norman Fisk, F-i-s-k, who was a**

15  **psychiatrist in 1973.   And what was described was a rich**

16  **amalgam of anxiety, depression, and irritability in the**

17  **context of a person feeling a significant incongruence**

18  **between their birth-sex anatomy and how they experience**

19  **their gender internally, subjectively.   And that still is a**

20  **legitimate way to describe the symptom complex.   It has**

21  **many other components, but for the sake of brevity, that's**

22  **the essence of what the symptom complex of gender dysphoria**

23  **was originally described as.**

24     **Q.    The incongruity between one's assigned sex and**

25  **one's expressed?**

1        A.    The incongruity plus, importantly, the distress

2   associated with it, and that distress takes the form of

3   dysphoria which is kind of a mixture of anxiety,

4   depression, irritability, discomfort.  So the term

5   "dysphoria" is really a very three-dimensional rich term,

6   which is why I believe it has been both retained and

7   elevated to a diagnosis, so when DSM-V was created, gender

8   identity disorder was revised out of the diagnostic term in

9   recognition that a person's gender identity is really not

10  disordered, per se, but a subset of people who have this

11  incongruity experience the symptom complex that's

12  distressing enough to result in a diagnosis that we can

13  better understand as Gender Dysphoria, capital "G", capital

14  "D", 302.85 in DSM-V.

15       Q.    So why exactly the change from gender identity

16  disorder to gender dysphoria?  Was it what you just said,

17  that it was a recognition that it was not a disorder?

18       A.    No.  And there are actually papers written about

19  why this change occurred, so this isn't just my personal

20  opinion.  But my understanding from those papers and from

21  talking to people who were involved in the committee on

22  deliberations, is that as this field has rapidly evolved,

23  as I mentioned earlier, and more people's ideas are input

24  into it and there is more understanding of the condition,

25  there was the recognition that it's -- a person's gender

1    identity is their gender identity, and everyone has a

2    gender identity.  It may or may not be congruent with the

3    anatomy that a person is born with, and to the extent that

4    it is not, there can be degrees of gender dysphoria, which

5    may or may not be severe enough to merit the diagnosis of

6    capital "G", capital "D", Gender Dysphoria, but many times

7    is.  And then, of course, there are criteria that would

8    describe the diagnosis of gender dysphoria listed as

9    Code 302.85 in the DSM-V Manual.

10        Q.   How does one test, for lack of a better word, for

11   gender dysphoria?  In other words, how does one test for

12   the capital "G", capital "D" that you mentioned, so as to

13   give a diagnosis for gender dysphoria?

14        A.    There is no test for gender dysphoria, as there

15   is no test for most psychiatric disorders.

16        Q.   How is the diagnosis then arrived at with no

17   test?

18        A.    So similar to most other psychiatric disorders,

19   the diagnosis is based on a person who has sufficient

20   training and experience in the field assessing all the

21   information that's available to him or her, including

22   medical records, other collateral history, whatever

23   information is available combined with an overall

24   assessment of the patient and an interview.  Again, the

25   training and experience of the person doing the clinical

1  interview is rather important.  With psychiatry, I would

2  venture to say, with many diagnoses not specific to gender

3  dysphoria, but in the rarer and more uncommon diagnoses,

4  the importance of training and experience goes up

5  considerably.

6       Q.   Within the gender dysphoria context or --

7       A.   With gender dysphoria being --

8       Q.   When you said it went up, I missed what you said.

9  Why don't you just repeat that?  I didn't follow you.

10      A.   Okay.  What I am trying to say is that the

11 importance of training and experience in rendering a

12 diagnosis for the more uncommon or rare conditions like

13 gender dysphoria is relatively more important than it is

14 for common conditions like depression.

15      Q.   What is another more rare condition like gender

16 dysphoria?

17      A.   Eating disorders are more common, but not

18 everyone has expertise in understanding eating disorders

19 and the various types of eating disorders.  That would be

20 another example.

21      Q.   Would any psychiatrist -- licensed psychiatrist

22 be able to diagnose gender dysphoria?

23      A.   I think any licensed psychiatrist can write down

24 any diagnosis from DSM-V, but whether it's grounded in the

25 appropriate level of training and experience is another

matter altogether.

Q.   And how is that -- who makes that determination

whether it's grounded in a proper diagnosis?  In other

words, can you just wildly disagree to a psychiatrist --

A.   I didn't hear the question.

Q.   Can two psychiatrists just completely disagree

with the same patient as to a diagnosis?  And I am not

talking about gender dysphoria, just in general.

A.   Are you asking me that as a hypothetical

question?

Q.   What I want to get at is how important is the

person making the diagnosis?

         MS. COOPER:  Object to form.

A.   I think the level of training and expertise that

a person has with the rare or uncommon condtions is an

important determination in the confidence that others would

have regarding making that diagnosis.  So for example, if I

have no training and no experience in gender dysphoria, yet

nonetheless, I see my very first patient and say, "Well,

this patient has gender dysphoria," and then whether they

do or not, the confidence that others who read that

diagnosis, knowing that context have in that diagnosis, it

goes down.  And contrariwise, if they say they don't have

gender dysphoria, that's a diagnosis as well.  Right?  So

if the person comes to that decision with limited to no

1    training and experience in an uncommon condition, one would

2    be wary of those conclusions.

3         Q.    Could two experienced psychiatrists come to

4    different diagnoses?

5         A.    So another hypothetical.  Does this hypothetical

6    involve people having access to the same background

7    information and records?

8         Q.    Uh-huh (affirmative).  The same everything, just

9    two different people, two different psychiatrists

10   evaluating a patient.

11        A.    Okay.  So in this hypothetical, both of these

12   people have adequate information, not just the same

13   information, but adequate information to render a

14   diagnosis, not just sketchy --

15        Q.    Sure.  We will go with adequate information.

16        A.    Okay.  So given all of those hypotheticals --

17   which I might add is a rare condition at best that all

18   those hypotheticals would be a reality -- is it possible

19   that two people could arrive at a different diagnosis?

20        Q.    Two psychiatrists arrive at --

21        A.    Two psychiatrists?

22        Q.    Yes.

23        A.    Yes, it is possible.

24        Q.    Is it rare, given those assumptions?

25        A.    It depends on the diagnosis.

1      Q.   When would it be more rare, depending on the

2   diagnosis?

3      A.   In the uncommon and rare diagnoses where people

4   have relatively less experience, so they could be

5   adequately trained psychiatrists with an inadequate level

6   of training and experience in these particular conditions.

7   That increases the chance that there will not be

8   inter-rater agreement.

9      Q.   What was the word agreement -- prior to

10   agreement, inter- --

11      A.   Inter-rater, i-n-t-e-r-r-a-t-e-r, inter-rater

12   agreement.

13      Q.   Have you ever given a diagnosis of gender

14   dysphoria that another psychiatrist disagreed with?

15      A.   Yes.  I am sure that in some of these cases on my

16   CV, there were psychiatrists who did not concur with the

17   diagnosis that I made after I had the opportunity to

18   interview the patient, the inmate or the patient or both.

19      Q.   Have you ever evaluated a patient who said,

20   purported -- and I don't mean that in a negative way -- who

21   said they had gender dysphoria, and you disagreed and you

22   said, "No, you don't," and then refused the recommended

23   course of treatment?

24             MS. COOPER:   Object to form.

25      A.   So again, I am struggling a little with the

-70-

1   question.

2       Q.   Let me -- it was one that was compound and

3   probably a bit confusing.  Has a patient ever come to you

4   and said, "Dr. Brown, I have gender dysphoria."  You

5   evaluated the patient and concluded, "No, you do not."  Has

6   that ever happened?

7       A.   Yes.  In fact, I wrote a whole paper about the

8   diagnosis and assessment of gender dysphoria.

9       Q.   How frequently does that scenario present itself,

10  when someone thinks they have gender dysphoria and you, as

11  the doctor, say, "No, you don't"?

12      A.   Well, again, I want to distinguish between the

13  patient's personal experience of gender dysphoria versus "I

14  have the diagnosis of gender dysphoria," because those are

15  two different things.  So if someone's experience is the

16  symptoms of gender dysphoria, it's fairly difficult to

17  argue with the person's inner experience, but in terms of

18  whether that reaches a threshhold for a formal diagnosis is

19  that that's another matter altogether.  So there are times

20  when I have seen historically in my career, people who

21  believe they have gender dysphoria but had something

22  similar to it or related to it on a list of other

23  possibilities, but in my situation where I am kind of a

24  tertiary-level referral source at this point, I don't

25  usually get as many people just walking in off the street.

1 I am usually getting people referred to me who have been

2 seen by other people, you know, much like if you are the

3 heart surgeon at Mayo Clinic, you are going to see the

4 tough cases.  It's like there is no question that the

5 person has a problem with their heart by the time they get

6 to you.  So versus much earlier in my career where it's all

7 comers, at this point in my career, by the time someone

8 gets to me, it's less common that someone says, "I

9 experience gender dysphoria," and in fact, that's not the

10 case, but it does happen.

11     Q.   If I experienced gender dysphoria, how do I not

12 have gender dysphoria?  I mean, how can I not be diagnosed

13 with it if I had these feelings of dysphoria that are, I

14 think, central to at least the diagnostic elements?

15     A.   Okay.  So I didn't go through the specifics of

16 the gender dysphoria, capital "G", capital "D" diagnosis.

17 There is an "A" criteria where you have to have at least

18 six months of gender dysphoria, so there is a time element

19 involved of incongruence in the sense of incongruence, and

20 there are six criteria under Category A, of which two of

21 six have to be met.  And then there is Criteria B, which is

22 the clinical significance criteria wherein not only do you

23 have gender dysphoria as a set of symptoms that is causing

24 you significant distress or disability in your

25 professional, occupational, personal life or is causing you

1  to do things that are likely to lead to some negative

2  outcomes including incarceration.  So there is a threshhold

3  level that you must reach for all psychiatric diagnoses.

4  So a person could come in and say, for example, "I am

5  depressed."  Well, depression is a pretty universal human

6  feeling and human experience, but do you actually have

7  major depressive disorder?  I believe it's 296 in DSM-V.

8  You would have to reach that clinical significance

9  criterion with the same exact thing for gender dysphoria as

10  a diagnosis.

11     Q.   What, if anything, if you know -- and if this is

12  the wrong word, just tell me -- causes gender dysphoria?

13     A.   What causes gender dysphoria?

14     Q.   Uh-huh (affirmative).

15     A.   Well, that's the subject of quite a bit of

16  research and quite a bit of interest in a variety of

17  settings these days.  I don't know how much into the

18  literature you want me to go.

19     Q.   I want you to go as deeply as you can, and I want

20  you to express your opinion as well of the literature.

21     A.   Okay.  First, I want to state that you will note

22  that the things that I reviewed for this deposition did not

23  include the etiology of gender dysphoria or any references

24  related to the question you just asked me.  So, of course,

25  my answer would be better had I had access to that

1    literature to review.

2         Q.   But don't you have access to that literature as a

3    psychologist -- excuse me -- psychiatrist specializing in

4    the treatment and diagnosis of gender dysphoria?

5         A.   Not here in this room with me today.

6         Q.   Outside of this room?

7         A.   In my office.

8         Q.   Right.  And as a professional psychiatrist with a

9    specialty in gender dysphoria, what causes gender

10   dysphoria?  And if that's not the right word, tell me when

11   it's the wrong word.  And I understand you didn't review it

12   for the actual report.

13        A.   And I say that only because I don't want to

14   mischaracterize my colleagues' research, which is very

15   well-described in their publiations.

16        Q.   Okay.

17        A.   So, for example, there are a number of

18   publications from colleagues in Spain, for example, that

19   have looked at functional magnetic resonance imaging, FMRI,

20   at various aspects of the brain, looking at birth-sex

21   females, birth-sex males, transwomen, transmen, before

22   hormones, after hormones; and looking at the sexually

23   dimorphic nuclei of the brain, and those are sections of

24   the brain that are unknown to be different in size in

25   particular, possibly in function but certainly in size

between birth-sex women and birth-sex men, and although the
literature -- and there are many papers on this -- although
the literature is not a hundred percent consistent, there
is certainly trends that suggest that there are certain
nuclei in the brain that can be measured with MRI
techniques, while the person is still alive.  That suggests
that the sizes of these sexually dimorphic areas of the
brain are different in transwomen and transmen, and are
more consistent with the gender expressed as opposed to the
birth-sex assigned.  So there is that set of literature
which suggests some sort of, if you will, biological
etiology which doesn't necessarily mean genetic or
in utero, but speaks to one or the other in general.  There
are also studies done in Canada that look at sibships,
s-i-b, sibships and birth order, and there is at least one
study that shows the likelihood of identical twins having
gender dysphoria or transgender identity -- I am not sure
how they express it exactly in that paper -- was
substantially more common than fraternal twins when studied
under similar conditions, which leads to a suggestion of
some genetic aspect of transgender identity.  Then there is
a line of hormonal reasoning that suggests that there may
be critical period effects in the developing fetal brain
in utero somewhere in the first trimester during a specific
week or two of fetal brain development wherein the hormonal

1   milieu, m-i-l-i-e-u, is potentially altered such that even

2   though the baby is born with a particular set of

3   identifiable genitals, that the development of the brain is

4   a separate issue from the development of the genitals, such

5   that the incongruence can be present from the first

6   trimester going forward.  That was originally hypothesized

7   by Dr. John Money and he used the first, to my knowledge,

8   the term "critical period effects," which many people

9   still, who work in this field and who know quite a bit

10  about this condition, ascribe to today.

11       Q.   Do you ascribe to any one of those theories?

12       A.   Based on all the literature available to me and

13  all of the experiences that I have had with patients over

14  three decades, it's my professional opinion that

15  transsexual people are born and not made.

16       Q.   Is there any cultural societal component to it at

17  all?

18       A.   I think that culture and society play a big role

19  in everybody's development in terms of how they view

20  themselves, how they present themselves in terms of their

21  gender role, which is the public presentation of one's

22  gender.  I think that there societal influences for all

23  people in all cultures.

24       Q.   But regardless of the culture, the transsexual

25  individual will be born transsexual?

1      **A.    In my opinion based on all the information**

2  **available to me, they may not own that from earliest days,**

3  **because it's still a highly stigmatized identity even under**

4  **the best of circumstances, so it may be many, many years**

5  **before there is an acknowledgment of that.**

6      **Q.    If an acknowledgment at all?**

7      **A.    I have treated patients who were not open about**

8  **their trans-identities until they were in their late 70s.**

9      **Q.    Can you be transsexual/transgender and not**

10  **dysphoric?  Is the diagnosis of transgender separate and**

11  **apart from the diagnosis of gender dysphoria?**

12           **MS. COOPER:   Object to form.**

13      **A.    I will go back to my original statement when we**

14  **distinguished between transgender and transsexual and**

15  **repeat that transgender is not a diagnosis.  It's an**

16  **umbrella term of identity, probably the majority of whom**

17  **have no diagnosis.**

18      **Q.    Should we call plaintiff transsexual, as opposed**

19  **to transgender?**

20      **A.    So underneath transgender are the people with**

21  **gender dysphoria and I am using the term "transsexual," not**

22  **because it's currently a diagnostic term as it was in**

23  **DSM-III, but because those of us who work in this field**

24  **still find the term useful.  So I am using it with the**

25  **acknowledgment that transsexual is no longer a diagnosis.**

1    Gender dysphoria is, but I am using it because I think it

2    has utility in understanding the difference between

3    transgender people and those with severe gender dysphoria,

4    who were previously and still at times known as transsexual

5    people.

6        Q.    Okay.  So can you be transgender and not be

7    dysphoric?

8        A.    You can have a transgender identify, which is not

9    a diagnosis, and not have gender dysphoria as a diagnosis.

10   Yes.

11       Q.    Would only the diagnosis of gender dysphoria lead

12   to the hormone therapy and that path of treatment?

13       A.    Any diagnosis does not necessarily dictate

14   treatment.  Treatment is an individualized situation and

15   there are often an array of treatment possibilities for any

16   given diagnosis.  So having a diagnosis of gender dysphoria

17   or depression or burst appendix, does not dictate the next

18   treatment step.

19       Q.    How often does a diagnosis of gender dysphoria

20   not lead to a treatment that includes hormone therapy, CSH

21   in your terminology?

22       A.    It definitely occurs and it occurs more commonly

23   in community clinic settings where you have patients

24   presenting earlier in the course of their recognition,

25   earlier in the course of their transition, than it would be

1    for people that I generally see.  So my --

2         Q.   You would age earlier?

3         A.   Age earlier, for example, severity, and there's

4    levels of severity of gender dysphoria within a given

5    person as well as within the diagnosis.  So there are some

6    people who would have a diagnosis gender dysphoria, who

7    experience gender dysphoria as a set of symptoms, who may

8    or may not want or need cross-sex hormones.

9         Q.   How would they not need --

10        A.   They say, "I don't need them."  For example, in

11   this case that we discussed earlier in Massachusetts --

12        Q.   Kosilek?

13        A.   No.

14        Q.   Fuller?

15        A.   Fuller.

16        Q.   Okay.

17        A.   Although perfectly legitimate for her to get

18   cross-sex hormones for a variety of reasons, which she

19   interpreted as medical and due to the side effects of the

20   medications, as an older individual, chose not to have

21   cross-sex hormones, and desired other treatment pathways

22   and interventions to relieve her gender dysphoria.  So I

23   can't emphasize enough the importance of individualized

24   treatment.

25        Q.   In your experience, how common is gender

1   **dysphoria relative to the general population?**

2   **A.   Gender dysphoria, the diagnosis?  Unfortunately,**

3   **we get back to the same epidemiological and demographic**

4   **problems, and that we don't really know -- no one knows the**

5   **answer to that.  There are recent publications.  The most**

6   **recent that I am aware of by Dr. Maddie Deutsch, and that's**

7   **D-e-u-t-s-c-h, I believe, the first name Maddie; University**

8   **of California, San Francisco, published in, I believe, LGBT**

9   **Health in 2016 that gave the best answer to the question**

10  **you have just asked that I have seen in the literature of**

11  **late with the references ranging from one in 10,000 all the**

12  **way down to 1.4 million people in the United States depends**

13  **on how you define gender dysphoria, whether you are looking**

14  **at just transgender people that don't have a diagnosis, or**

15  **whether you are looking at transsexual people who do have a**

16  **diagnosis, and one of the papers she references is that**

17  **epidemiology within the V.A. which I published, where there**

18  **are far more than you would expect by chance transgender**

19  **people who have served in the military than who have not.**

20  **Q.   And how many is that that have served in the**

21  **military?**

22  **A.   About twice what you would expect in the**

23  **population.**

24  **Q.   The population being at one in --**

25  **A.   This is diagnosed people, not transgender people**

1    who identify as transgender but don't have a diagnosis that

2    can be determined in a medical chart.  So if we are using

3    the one in 10,000 birth-sex males, which is an old

4    statistic and has some challenges associated with it, but

5    nonetheless, it's a Western European number that's quoted

6    in the DSM.  It's at least twice that probability in a

7    population who has served in the U.S. Military.

8         Q.   And how old are the patients that you treat in

9    the Veteran's Affairs Administration?

10        A.   I am an adult psychiatrist, so I only treat

11   adults.  In my whole career, I don't treat anybody under

12   the age of 18.

13        Q.   And have you ever done any pediatric gender

14   dysphoria diagnoses?

15        A.   I don't evaluate or treat anybody under the age

16   of 18 for any condition.

17        Q.   Do the veterans, do they run the gambit from

18   Vietnam veterans to current Iraqi war veterans, or is there

19   specific age groups that you focus on or are presented to

20   you?

21        A.   The V.A. has changed dramatically since 9/11,

22   2001, in terms of our veteran population, so we actually

23   have a bimodal distribution of age within the V.A.  So the

24   first bump in this bimodal distribution is probably between

25   25 and 30 years of age, and then the second bump is around

1    65 years of age with lesser amounts of people between those

2    two higher prevalences.  So, yes, we have a group of

3    veterans who range the gambit from age, I'd say, probably

4    18 -- although I think 19 was the youngest that I have

5    recently seen -- all the way through 100.  And about

6    15 percent of those are birth-sex women.

7         Q.   Of the two groups, age-wise 25 to 30, that age,

8    65 and older, is there any defining percentage that you can

9    point to that says gender dysphoria is a higher percentage

10   for this group, or is it evenly spread out amongst age

11   groups?

12        A.   In the manuscript that I published on the 5,135

13   transgender veterans, it has tables of the demographics

14   that we got, and that was published in LGBT Health last

15   year and it's on my CV.  But in the tables, you will

16   not -- I don't believe you will see a subanalysis by age in

17   our control group we had.  Over 15,000 veterans were

18   control group veterans, and I don't believe we subdivided

19   by age, to answer the question you just asked me.

20        Q.   Do you have any opinion on that, leaving aside

21   that you didn't publish one, just in your personal anecdote

22   and experience?

23        A.   So is -- if I -- just rephrase the question,

24   because I am not sure I understand it.

25        Q.   Yeah.  Understanding that you did not publish any

1  data, any subgroups on age, I am just wondering if you in

2  your experience have noticed the diagnosis and presence of

3  gender dysphoria to be more prevalent among the younger

4  veterans than the older veterans?

5      A.    Yeah, which gets to the larger question of

6  whether it's more prevalent in general in society in the

7  veteran population reflecting a subset of that.

8      Q.    Right.

9      A.    My opinion is that there probably is not a

10  greater prevalence of gender dysphoria as a diagnosis now

11  than in the past.  It's just that case finding is far

12  better than it was in the past, and that people are more

13  likely to share their gender dysphoria with themselves and

14  with families and with clinicians than they were in the

15  past.

16      Q.    Did you say in the early 70s was the first

17  recognition of gender identity disorder?

18      A.    No.  It's been recognized way before that, I mean

19  many, many decades.  What I said was 1973 was when

20  Dr. Norman Fisk coined the term "gender dysphoria," but it

21  was recognized well before that.  I mean, surgeries were

22  being done in the United States in the 1960s.

23      Q.    Was it recognized as a recognizable psychiatric

24  condition prior to the '60s, or when was the first

25  recognition of gender identity disorder which is now --

1    **A.    The first formal recognition within the American**

2    **Psychiatric Association was in 1980 with DSM-III, and the**

3    **diagnostic term was "transexualism," and which by the way**

4    **is still a diagnostic term in the international**

5    **classification of diseases, which is the World Health**

6    **Organization's diagnostic listing for medical and mental**

7    **health conditions.**

8    **Q.    Well, is transexualism a disease?**

9    **A.    Well, it's listed as a -- in the manual,**

10   *Statistical Manual of Mental Disorders*, **so if you want to**

11   **call it a disease or disorder, some people would make those**

12   **terms the same.**

13   **Q.    Do you?**

14   **A.    I think that the diagnosis of gender dysphoria is**

15   **a severe condition that often warrants serious treatments.**

16   **Q.    Let's take a break now.**

17                    **\*\*\* OFF THE RECORD \*\*\***

18   **DIRECT EXAMINATION (CONTINUED)**

19   **BY MR. REID:**

20   **Q.    Dr. Brown, in rendering your expert report and**

21   **opinion, you met with the plaintiff, Ms. Keohane.  Correct?**

22   **A.    Correct.**

23   **Q.    And do you recall when you met with her?**

24   **A.    I don't have my report in front of me, but --**

25   **Q.    Well, I'm sure you do.**

-84-

1          **A.   Oh, I apologize.  I do.  I didn't have it open to**
2     **the correct page.  Let's see the specific date.**
3     **January 9th, 2017.**
4          **Q.   And you met her at Everglades Correctional**
5     **Institution in or around Miami?**
6          **A.   Correct.**
7          **Q.   How did she appear to you at that -- and I will**
8     **call it an evaluation, or would you prefer another word:**
9     **meeting, conference?**
10         **A.   I think evaluation is fair.**
11         **Q.   Okay.  How did she appear to you at that**
12    **evaluation?**
13         **A.   When you say "appear to me" --**
14         **Q.   I mean, psychologically, mentally, what was**
15    **her -- how did she outwardly present to you?**
16         **A.   And the complete answer to that begins on page 16**
17    **in that report and goes on to page 17 under "mental status**
18    **examination," and do you want information that I have**
19    **already documented on that?**
20         **Q.   Did she appear at all in any alarming distress to**
21    **you?**
22         **A.   Alarming distress?**
23         **Q.   Meaning something you would have taken note of,**
24    **like this patient is suicidal, this patient has self-harm**
25    **tendencies that seem to be present, or did she seem more,**

1  for lack of a better word, normal in a prison setting?

2          MS. COOPER:  Object to form.

3      Q.    In other words, how was she doing, just in lay

4  terms?

5      A.    I mean, alarming distress for me would connote

6  somebody who is in emergent need for psychiatric or medical

7  or both intervention.  I wouldn't use the term "normal" as

8  applied to my work hardly ever, whether it's gender

9  dysphoria or any other diagnosis, but I did not find her to

10  be in emergent need for psychiatric or medical care when I

11  saw her.

12      Q.    Okay.  Back to page 7, and I know we jumped

13  forward to your answer to how did she appear to you, you

14  answer is on 16 and 17, but back on page 7, you mentioned

15  the use of the name Reiyn, R-e-i-y-n.  What did she tell

16  you about that name change, if anything?

17      A.    As I recall, she told me that she had actually

18  used three names throughout her life:  Brendan; her middle

19  name was James, and then later used a conversion of the

20  middle name from James to Jamie, and then settled on Reiyn

21  as her name, and legal name change was accomplished in her

22  late teen years to that as her legal name.

23      Q.    Did she tell you how she came about the name

24  "Reiyn"?

25      A.    I believe she said it was a Celtic word that

1   meant warrior princess and that she liked the connection

2   with her known family heritage.

3        Q.   Anything else about the name that she mentioned?

4        A.   That's what I recall.

5        Q.   You took notes at the evaluation, or no?

6        A.   I probably had some notes that would lead to this

7   report.

8        Q.   Did anything she'd say make it into the report,

9   or did you leave things out?

10            MS. COOPER:  Object to form.

11       A.   Well, over three hours and twenty minutes, she

12  did most of the talking.  I am sure there are things that

13  she said that are not in the report.

14       Q.   Was there anything you intentionally left out?

15       A.   Intentionally left out?

16       Q.   Yeah.  Anything you intentionally left out, like

17  "I'm not going to put that in the report"?

18       A.   I don't recall thinking to myself, "Well, I'd

19  better leave that out of the report."

20       Q.   So the answer -- so it would be no?

21       A.   I am sure there are things that were said to me

22  that are not in the report, but going to the next level of

23  intending consciously to leave it out for some purpose, I

24  don't recall doing that.

25       Q.   And anything that would be not specifically in

1  the report from those three and a half hours, is the -- for

2  lack of a better word -- the gist of it in the report.

3  Even if not quoted verbatim from what she said is the

4  context of what was being said or the topic in the report?

5      A.   Yes.  And I do use a fair number of quotes,

6  because that is the original data in terms of the

7  psychiatric interview what a patient says to you.

8      Q.   And were those taken down by hand?

9      A.   Yes.

10     Q.   You took no -- you didn't take any recording

11 device with you?

12     A.   No.

13     Q.   On page 8 of the report, the last sentence prior

14 to past psychiatric history, "She has been incarcerated

15 since 9/23/13 with a sentence of 15 years and a potential

16 release date of 8/4/28," did you talk with Ms. Keohane

17 about the circumstances of her incarceration?

18     A.   I talked some about it, but not in any great

19 detail.

20     Q.   And if you remember, what was discussed?

21     A.   Let's see.  I believe that she told me what I had

22 already read in the records, for the most part, regarding

23 the event that led to her arrest and what she did from her

24 perspective, why she did from her perspective, and

25 ultimately what happened to her through that process.  What

1   she was reporting to me was consistent with what I had read

2   in the records, so in terms of putting things in the

3   records when I do make a comment regarding things that are

4   reported to me are consistent with what was already known

5   in the records, I often do not repeat what is already

6   documented.

7        Q.   Did she give you any details about the night of

8   the incident that you feel were not in the records that you

9   reviewed?

10       A.   I don't recall her saying anything that was not

11  consistent with what I had already read in the records.

12       Q.   Do you have any recollection of what led to the

13  incarceration?  I mean, what was the incident?  As we sit

14  here today, do you recall?

15       A.   I recall what is in the records, and I did not

16  have access to all of the police records, of trial records

17  from her incarceration.  I didn't have access to those

18  records, which you already know because I have listed what

19  I have reviewed.

20       Q.   Did she mention anything to you about the plea

21  deal, plea agreement, that was reached?

22       A.   She may have, but I don't recall.

23       Q.   Is the reason for incarceration relevant to your

24  opinion at all?

25       A.   The reason for incarceration is independent of

1   medical decision-making.

2        Q.   Let's go to page 10.  In the first full

3   paragraph, you mention that she has "fashioned bras and

4   panties (or hired that work to be completed by other

5   inmates)."  Do you see that?

6        A.   Yes.

7        Q.   Did you ask who completed that work?  In other

8   words, who were the "other inmates"?

9        A.   She mentioned that it was other inmates during

10   the time that she had been in, and I didn't ask for

11   specific names.  No.

12        Q.   And did she say how long that she had been

13   wearing -- let's take them separately.  Had she been

14   wearing the bra when you met her?

15        A.   I did not see her in a disrobed condition.

16        Q.   Did she say, "I am currently wearing a bra that I

17   am fashioning out of other items and other inmates are

18   making for me"?

19        A.   What she did say was that all of that was

20   considered contraband and it had been confiscated from her

21   on more than one occasion.

22        Q.   And did she say that she would continue to use

23   them anyway, even if they had been previously confiscated?

24        A.   I believe she told me that if she didn't get

25   access to proper female underwear from the female inmates'

1   canteen, that she would strive to do it the best she could

2   on her own, in spite of the fact that she knew that it was

3   contraband.

4   **Q.**   Do you know if she has any medical pass or

5   medical note from the facility for a bra?

6   **A.**   I did not see one in the records given to me.

7   **Q.**   And the same question for panties.  You didn't

8   see anything like that in the records either?

9   **A.**   I didn't see anything in the records that would

10  permit her to wear female undergarments.

11  **Q.**   In the context of hiring that work to be

12  completed by other inmates, did she mention anything about

13  a fiancé to you?

14  **A.**   She mentioned something about a fiancé, but it

15  was not -- as I recall, not in the context of people

16  sewing.

17  **Q.**   Do you recall the context that she mentioned a

18  fiancé to you?

19  **A.**   Somewhere in the discussion, she brought it up

20  that she was involved in a relationship with somebody that

21  she called a fiancé, who was obviously a male inmate.

22  **Q.**   And what did she tell you about that

23  relationship?

24  **A.**   She said that she found it to be a helpful and

25  supportive relationship, one that she could be her female

1   self -- a person she could be her female self with, who

2   wasn't judging her and accepted her as a female.

3        Q.   Did she tell you the name of the fiance?

4        A.   I don't think she did.

5        Q.   Do you recall about how long you may have spoken

6   about the fiancé with her?

7        A.   Of three hours and twenty minutes I had with her,

8   I don't know, maybe one minute, two minutes at the most.

9        Q.   Did she mention anything about the fiancé being a

10  protector or a deterrent for other inmates, meaning a

11  deterrent for other inmates harassing and/or assaulting

12  her?

13       A.   I don't recall her saying that.

14       Q.   Did you talk about at all her fear, if any, of

15  sexual violence from other inmates?

16       A.   Sexual --

17       Q.   Violence visited upon her by other inmates?

18       A.   Yes, I did.

19       Q.   And in that conversation, a fiancé as a deterrent

20  did not come up?

21       A.   No.  As I recall the conversation, she said, "No

22  matter what I do in here, I am a target and that's true for

23  corrections officers as well as other inmates," and related

24  her reports of verbal, mostly verbal, sexual harassment

25  from both corrections officers and other inmates during the

1    time that had been incarcerated.

2         Q.   And is there anything else?  Did she say how she

3    was going to deal with that threat?

4         A.   Yes.  She also mentioned something about PREA and

5    having been to -- and that's capital P-R-E-A -- had been to

6    training sessions about PREA, and one of the things she

7    took from that was that she would be better equipped to

8    deal with any potential sexual harassments of any type if

9    she were living her authentic self, than if she were not

10   able to express herself as a female in the prison.

11        Q.   Are you familiar with PREA?

12        A.   I am familiar with it.

13        Q.   And PREA, Prison Rape Elimination Act?

14        A.   Yes.

15        Q.   And how have you become familiar with that act?

16        A.   I am familiar with it from having done

17   presentations at the National Commission on Correctional

18   Health Care.  I am familiar with it by being asked to

19   consult on a PREA training, extensive PREA training modules

20   from the Federal Bureau of Prisons as a consultant for a

21   training program that they are developing to be used

22   nationally.  I have read sections of it, again, not on my

23   list of what I reviewed in last five days, but I am

24   familiar with PREA.

25        Q.   Also, on page 10 in the second paragraph, you

1   say, "It is important to her to be able to grow her hair

2   into a longer, feminine style, but she is prohibited from

3   doing so," and what did she tell you about that

4   prohibition?  I mean, did she tell you why she was

5   prohibited from doing so?

6       A.   Well, she told me a lot of things about hair

7   length and her experiences with it in multiple facilities,

8   which were not consistent from one facility to the other,

9   but in general, told me that the longest she could grow her

10  hair was above the top of the ears and above the collar,

11  although she had been forcibly -- had to be -- had her hair

12  cut forcibly to a much lower standard than that, meaning a

13  buzz cut, and when I asked her what buzz cut meant, she

14  said where your hair is approximately a quarter of an inch

15  out from the scalp.

16      Q.   And did she say why the hair was buzz cut?

17      A.   She related that she had refused to cut her hair

18  when it got apparently to the top of the ear, or had

19  reached a level of violation of the male hair length

20  policy, and that she had refused to cut her hair because it

21  was not consistent with her gender identity, and as a

22  result of that, a group of officers apparently descended

23  upon her, handcuffed her, and forcibly shaved her head in a

24  public area in front of other inmates.

25      Q.   Do you know if any other inmates were also having

-94-

1   their hair cut during that time?

2       A.   As related to me, this was approximately at one

3   o'clock in the morning, so I don't know if that's standard

4   prison policy to do haircuts at 1:00 a.m., so I don't know

5   the answer to that.

6       Q.   And sticking with hair, but on page 14, you note

7   that Ms. Keohane said to you that "Hair -- it's a life or

8   death issue for me."  But kind of going back to page 10

9   where you say, "It is important to her," it's that

10  important to her in your evaluation of her?

11      A.   She was certainly discussing the importance of it

12  to her, both in a literal sense and also in importantly in

13  a symbolic sense, that this is a very obvious outward

14  marker in our culture and in this prison of myself, either

15  as a female or not being perceived as a female, either by

16  myself or by the people around me.  So it was a literal

17  statement as well as she was using it figuratively that

18  "This represents my gender identify."

19      Q.   And what is your opinion about hair length in

20  this plaintiff?

21      A.   What is my opinion about hair length in this

22  plaintiff?

23      Q.   Uh-huh (affirmative).

24      A.   Well, my opinion is that transwomen should be

25  allowed the same standards as other women in a prison, so

1   that there shouldn't be three standards or a special

2   standard.  There should be -- if there's going to be

3   standards at all, there should be a male standard and a

4   female standard, and that it's not necessary to develop a

5   third standard, and that hair length and the ability to

6   express one's gender identity whether that's male or

7   female -- for example, if you made male inmates wear their

8   hair down to the middle of their backs, there are going to

9   be a number of inmates who are going to be very

10  uncomfortable with being forced to wear a gender-

11  inappropriate hair style also.  So for this particular

12  inmate in this particular circumstance that I am familiar

13  with, based on my records review and personal interview, I

14  think it is medically necessary that she be allowed to wear

15  her hair as any other female in the Department of

16  Corrections.

17       Q.   What is the third standard that you referenced?

18       A.   I am bringing that up as if there were a

19  hypothetical third standard that you have male, female, and

20  then for somebody who is transgender, I would not support

21  that.  I don't think you need a third standard.  And I

22  raise that because in some other situations, people have

23  suggested that.

24       Q.   As in some other situations, meaning as part of

25  your WPATH participation?

-96-

1        A.    Or in other cases.

2        Q.    Okay.  Has that ever been adopted by any

3   department that you are aware of, a third standard?

4        A.    No.

5        Q.    Okay.  Tell me how hair length is life or death?

6        A.    Life or death for this inmate or --

7        Q.    Yeah, let's start with this inmate.

8        A.    I think that the most outward projection of

9   somebody in an environment where expression of gender

10  identity of any type is obviously limited, because you

11  can't choose to wear a tie.  You can't choose to wear

12  colorful dresses or choose to wear a variety of other

13  things, whether you are a male or a female.  The hair takes

14  on an even greater importance than it necessarily would in

15  the free world, because it is probably the most obvious

16  outward expression of your gender identity, and if forced

17  to wear the other gender, the perceived other gender's

18  style, then that is inconsistent with the person's gender

19  identity and their presentation to themselves in the

20  mirror, as well as how they are viewed by other people.  So

21  it's an enhanced symbol that might be of even greater

22  importance in an incarceration environment than it is in

23  the free world.  But as a symbol, it can represent all of

24  the negative emotions and all the gender dysphoria that a

25  person experiences who has this diagnosis.  It's not the

1   only thing.  Obviously, undergarments and other things that
2   go with a gender identity are important, too, but this is
3   the thing that is most obvious and visible all the time in
4   a public way.

5       Q.   Would hair length also be "life or death" for
6   religious reasons, or for inmates claiming a religious
7   reason or rationale for having long hair?

8       A.   So this is a hypothetical question?

9       Q.   Meaning, does your analysis of the need for long
10  hair also apply equally to persons claiming that right
11  under a religious entitlement?

12      A.   In this hypothetical, I can say that I have never
13  had the request or the opportunity to interview anybody
14  under those conditions.

15      Q.   Do you have any opinion in general about that,
16  even if you haven't clinically evaluated any inmate or
17  other individual claiming that need?

18      A.   Frankly, I haven't given it any thought.  The one
19  thing that I would distinguish is that a religion is not a
20  medical diagnosis, so I would have to ponder the
21  significant differences between your hypothetical and
22  somebody who has a serious medical diagnosis.

23      Q.   Is long hair the medical diagnosis?

24      A.   No.

25      Q.   If Ms. Keohane wanted short hair, could she have

1   short hair and yet still be female?

2       A.   If Ms. Keohane wanted to express her gender

3   identity through short hair, yes, that's possible.  But

4   that's not the case here.

5       Q.   Do other females express their femaleness, for

6   lack of a better word, through short hair?

7       A.   Yes.  There are women who choose to express their

8   gender identity and their sense of themselves as a gendered

9   female through a variety of hair styles, as well as hair

10  lengths.

11      Q.   There a lot of women with short hair.  Correct?

12      A.   There are by choice.

13      Q.   And it's just that Ms. Keohane doesn't want to

14  have short hair?  She chooses to have long hair?

15      A.   She doesn't view being forced to have her hair in

16  either a buzz cut or in a stereotypically male fashion as

17  consistent with her gender identity.

18      Q.   Can you have a feminine cut, yet still be

19  compliant with the FDOC hair length policy?

20      A.   I am not a cosmetologist, so I am going to offer

21  no response to that.

22      Q.   Okay.  If other females can remain female with

23  short hair, why can't Ms. Keohane remain or express herself

24  as female with short hair?

25      A.   I think that the main issue is that for women who

1   choose to wear their hair short, the point is choice.  So

2   they are choosing to express not only again through hair

3   length, but through hair style, a particular length and

4   style by choice.  This is how they view themselves,

5   consistent with their gender identity.  That's not

6   everybody.  In fact, that's not the majority, and this

7   inmate has not worn her hair short in the years that she

8   presented herself publicly as a female, to be best of my

9   knowledge, and does not view either a buzz cut with a

10  quarter inch of hair on the top of her scalp, or hair that

11  is within the male regulations for the Department of

12  Corrections as consistent with female gender identity.

13      Q.   Do you know the FDOC hair length policy, other

14  than as you have said, which is above the ear and not to

15  the collar?  Do you know any other variation within those

16  parameters?

17      A.   That's the primary parameters that I can recall.

18      Q.   What did Ms. Keohane's hair look like when you

19  saw her?

20      A.   I believe when I saw her that it was above the

21  ear and above the collar.

22      Q.   How about the sides?

23      A.   It had some waviness to it, but was frankly

24  consistent with what other men in the prison presented as.

25      Q.   And did you see other inmates as well?

1      A.   Just in passing.  I didn't interview any inmates,

2 but I visually saw people walking around.

3      Q.   Okay.  If, again, other females can choose to

4 have short hair, how can hair length then become a -- how

5 can long hair become medically necessary?

6      A.   Again, I think the point is that the ability to

7 express one's gender identity is part of the social

8 transition process, which is part of the standards of care

9 for transition and for treatment for gender dysphoria.  And

10 being forced, not by choice, to have stereotypical male

11 hair length or even shorter -- and I would consider a

12 quarter of an inch to be a very, very short hair length and

13 inconsistent with virtually all females who are not

14 receiving chemotherapy in our culture to be inconsistent

15 with the expression of female gender identity.

16      Q.   Is the quarter inch, is that the standard?  In

17 your mind, is that the standard FDOC haircut applicable to

18 male prisoners?

19      A.   That's not my understanding.

20      Q.   Is it longer?

21      A.   My understanding is it can be down to the top of

22 the ear and above the collar, but that it has been forced

23 upon her to be much shorter than that against her will.

24      Q.   All the time, or as a result of an infraction

25 and/or refusal to abide by a rule?

1      **A.    I can respond to not all the time, since it**

2  **wasn't that short when I interviewed her in January of '17,**

3  **but as to how much of the time she has spent with hair that**

4  **long, I can't -- I don't know.**

5      **Q.    Okay.   The same questions regarding**

6  **undergarments, which you also mentioned on page 14, just so**

7  **you'll -- I'm not trying to not show you where you talk**

8  **about this.   If you kind of rate them or she rates them for**

9  **you, and "Hair," as she said, "is a life or death issue for**

10  **me," then you go into female undergarments.   What was her,**

11  **for lack of a better term, desire level for the**

12  **undergarments?**

13      **A.    Also very high and unlike the hair situation, she**

14  **was able to devise some adaptive approach, as we have**

15  **mentioned, for various points along the way along the way,**

16  **although not consistently with these modifications to male**

17  **undergarments as an, at least, partial adaptation.   But a**

18  **tent is not a house, but it keeps you out of some of the**

19  **weather would be the analogy that I would make based on my**

20  **understanding of how she expressed things to me, and that**

21  **they were very important in particular since she has been**

22  **on cross-sex hormones and reported breast growth but**

23  **without having the ability to have a female undergarment**

24  **consistent with the development of female breasts, which to**

25  **me seems pretty logically inconsistent.**

1      Q.   Do you know whether Ms. Keohane has been provided

2  a bra because of the breast growth?

3      A.   Based on the records available to me up to today,

4  I don't have any evidence of that.

5      Q.   And when was the last record that you saw?  And I

6  assume you mean medical records.  What was the date is what

7  I am asking.

8      A.   The only records that I have obtained since the

9  report was her most recent declaration.

10      Q.   The one you say was dated April 11th or 12th,

11  something --

12      A.   Correct.  So I have no other records from the

13  date of my report to the present time, and also a period of

14  time prior to my report, and I don't know how many weeks or

15  months that might have been off the top of my head.

16      Q.   So you don't know if there were a medical pass or

17  a medical reason provided by a health care professional for

18  a bra.  You don't know if that's been granted or not?

19      A.   Since the time of my report?

20      Q.   Sitting here right today.

21      A.   I wouldn't know.  No.

22      Q.   Okay.  And what about the panties or underwear?

23  What is Ms. Keohane's issue with the male-issued underwear?

24      A.   I think her issue is similar to what other women

25  would say if they were required to wear men's boxers or

1   men's briefs, that they would be uncomfortable with that,

2   would not find it appropriate, would find it humiliating,

3   would find it inconsistent with their view of their own

4   bodies, and their gender.

5        Q.   And how is it humiliating to wear boxers?

6        A.   I guess the best analogy is if you take cisgender

7   men and make them wear female panties, they would give you

8   a pretty good answer to how humiliating that is.

9        Q.   Is that because of cultural norms we place upon

10  the article of clothing, or are there medical reasons?

11  Europeans wear Speedos.  Most Americans don't on the beach.

12  I mean, why is that a medical issue and not just a cultural

13  issue?

14       A.   I can say that in our culture, being forced to

15  wear the underwear of the other, anatomically other sex, is

16  in general experienced as a humiliating experience,

17  although there are some people who have fetishes, but

18  that's not the majority of people in our culture by any

19  stretch, and it's another piece of the whole pie regarding

20  the ability or inability to express one's gender identity.

21  So you have the hair, you have no bra while developing

22  breasts, and no access to female underwear, all of those

23  things that are available to similarly-situated women in

24  the women's side of the prison.  Being now available, all

25  of those things as a package, our experience -- contribute

1  to the experience of gender dysphoria not being treated

2  adequately.

3    Q.   Can you treat the gender dysphoria adequately

4  without providing what I think you called the whole

5  package, or must it be hair, undergarments, hormone

6  therapy, makeup; the complete package?

7    A.   Yeah.   I don't to mischaracterize what I said

8  before or might say now as a complete package, because a

9  complete package of care may involve many things that have

10  not been discussed here today.   So I may have chosen my

11  words improperly when I said the whole package, because

12  that really refers to a much larger array of treatments and

13  social transition issues.   So I'd like to retract the term

14  "whole package."

15    Q.   Yeah.   I was going to say that's fine, and we are

16  not here to put words in your mouth at all.

17    A.   Okay.

18    Q.   I wanted you to actually back up and tell me what

19  other things would be entailed, and then we can get to my

20  question about whether you need the "what we once called

21  the whole package."

22    A.   Okay.   So the first point I would make is that

23  treatment is an individualized matter for every diagnosis

24  including this one.   So some patients with gender dysphoria

25  will need some types of interventions and treatments that

1    maybe the next patient, who has the same diagnosis, doesn't

2    necessarily need.  Similar to a patient with hypertension,

3    one patient may need simply a lifestyle change.  Eat less

4    salt, your blood pressure goes down.  Then the next person

5    who has the same exact diagnosis and the same blood

6    pressure parameters, you do a diet intervention and it

7    happens to be that their genetics are such that they have

8    hypertension that doesn't go away with a dietary

9    intervention.  They need a medication.  Then the third

10   patient with the same diagnosis may need two or three

11   medications in addition to dietary changes, and they may

12   just say, "You know, the dietary changes aren't even that

13   important in your case, because you have this genetic form

14   of hypertension.  It doesn't matter if you eat salt or

15   not."  So the analogy is actually a fair one with respect

16   to gender dysphoria in that there are a number of

17   treatments, and social transition involves a number of

18   things like changing your identity documents, living in the

19   gender that you experience yourself as, which in this case

20   is opposite to that of the assignment of sex at birth.  It

21   involves presenting yourself publicly and to yourself,

22   consistent with your gender identity, which includes things

23   like hair length, which includes being able to wear female

24   undergarments, particularly when you are growing breasts.

25   It may include, as in other prisons, access to makeup,

1   similar to other women in corrections settings.   And then,

2   of course, we have talked about hormones, and then some

3   people go on to get surgical interventions and, again,

4   those are individualized treatment decisions.

5        Q.    Then to limit it, can Ms. Keohane be treated for

6   gender dysphoria without allowing, for lack of a better

7   word, her complete package, limiting it and understanding

8   the individualized treatment plan?  As to this particular

9   plaintiff, is it all or nothing, or is there something that

10  would be in your opinion proper treatment that did not

11  include everything that she asked for?

12       A.    All or nothing, she --

13       Q.    And you know what I mean by --

14       A.    Yeah.  I know what "all" is and I know that this

15  inmate is not asking for anything close to what I would

16  consider or other treatment providers would consider "all",

17  not even close.

18       Q.    And what would be "all"?

19       A.    For appropriately-selected patients.

20       Q.    For this patient?

21       A.    Well, for this patient --

22       Q.    We are trying to leave it to this patient to not

23  get into the problem of the individualized treatment plan

24  that you mentioned.

25       A.    I think she expressed it quite well in her

1  records that doing supportive psychotherapy was essentially

2  doing nothing, and I would agree with that, and access to

3  appropriate cross-sex hormone treatment -- and I don't know

4  if she is receiving appropriate cross-sex hormone

5  treatment, because the records I received were not

6  consistent with appropriate cross-sex hormone treatment

7  following any medical standard that I am familiar with or

8  that I teach, because I also have prescribed hormones for

9  many patients in my career.  So I can't assume that just

10 because she is getting some hormones, that they are

11 appropriate in dose or appropriate in type or that her

12 monitoring is consistent with efficacy of those drugs.  But

13 it is my considered opinion that appropriate cross-sex

14 hormone treatment is medically necessary and would be part

15 of adequate care for gender dysphoria for this inmate.  In

16 addition to that social transition, which is discussed in

17 the WPATH standards of care and the medical necessity

18 statements that we have discussed earlier, and in most

19 other documents that I am familiar with regarding the

20 treatment of gender dysphoria, the social transition

21 including the ability to present oneself as a female in the

22 culture that they are in for a transwoman, as Reiyn is,

23 would be part of adequate medical care as part of social

24 transition to include female grooming standards, female

25 undergarments, access essentially to the same things that

1    any other woman in the Department of Corrections has access

2    to.

3        Q.   So absent all of those things being provided, you

4    would say the care would be inadequate?

5        A.   As I understand the case now, I am not going to

6    speak to the case down the road or in the future, because

7    we could talk about surgery.  We could talk about a number

8    of other things that patients with gender dysphoria are

9    sometimes treated with.  I am not even going to address

10   that, but in terms of January 2017, which is when I last

11   saw the patient, that access to female grooming standards

12   and female canteen items like any other woman, is part of

13   adequate care for a transwoman in the Florida Department of

14   Corrections.

15       Q.   And you mentioned she needs supportive psycho --

16   did you say psychotherapy treatment?

17       A.   Actually, I mentioned that only in the sense that

18   she mentioned that she had been receiving it and I have

19   read some notes about it, and her perception of it was it

20   was essentially like no treatment at all, that she did not

21   find that to be really part of treatment for her gender

22   dysphoria at all.

23       Q.   Do you recall the dates of those notes that you

24   saw or the time frames that she was referring to?

25       A.   I don't recall.

1    Q.   And do you know whether the -- can I call it

2 mental health counseling?  Is that -- or psychotherapy

3 treatment?  Which one do you prefer?

4    A.   I would probably characterize it, from what I

5 read, as counseling and not as psychotherapy.

6    Q.   Okay.  So in her mental health counseling

7 received now, do you know if she has the same concerns, or

8 has she become more, let's say, agreeable to it, but is she

9 okay or better with it now?

10    A.   As I recall in my interview with her, it wasn't

11 the concept of counseling.  It was the content and the way

12 it was being utilized.  She didn't find it to be of a lot

13 of value, because the person she was in counseling with or

14 persons that she was in counseling with did not, in her

15 view, seem very knowledgeable or helpful regarding her

16 diagnosis.

17    Q.   Did she mention any names to you?

18    A.   I don't recall her saying any names.  I am sure I

19 saw names in the written records, some of which were

20 legible and some of which were not.

21    Q.   But you don't recall if Reiyn, Ms. Keohane

22 herself, gave you any names?

23    A.   She may have.  I don't recall.

24    Q.   And you don't recall as of today, April 25th,

25 whether she shares the view she shared in January, or if

1   she has a different view of her counseling?

2       A.   Correct.   I have had no contact with her since

3   the time I interviewed her.

4       Q.   The same questions -- type of questions on

5   makeup.   You have also said that makeup would be an

6   integral part of her social transitioning.   Why is makeup a

7   medical necessity?

8       A.   And actually, I mentioned makeup, because it's

9   usually part of the social transition in other prisons,

10  including Massachusetts, and it's access to the female

11  canteen and whatever is available in the female canteen.

12  Having said that, I don't believe that I spent really much

13  time with her talking about makeup, so I don't want to

14  mischaracterize her views of makeup specifically, because I

15  did not spend a lot of time talking about that as a

16  specific issue in the female canteen.

17      Q.   And why was that not discussed in any more

18  detail?

19      A.   The focus of the conversation was on hair, hair

20  length, female undergarments, and the rest of my diagnostic

21  assessment, and there was less of a focus on makeup.   I am

22  sure it came up, but it was not a focus of our discussion.

23      Q.   In your view, is makeup something that is

24  medically necessary?

25      A.   I would say that as with all decisions regarding

1   medical necessity that it's taken in the context of

2   individualized assessment of an individual patient.  So I

3   can't respond to that as a generic --

4        Q.   It would always depend on the individualized

5   treatment plan?

6        A.   Always depends on the individualized -- that's

7   true for all medical necessity questions.

8        Q.   Do you know if the Florida Department of

9   Corrections issues makeup products to female inmates?

10       A.   I do not know.

11       Q.   Did Ms. Keohane tell you how she had access to

12   alternative makeup products?

13       A.   Yes.  Thank you for jogging my memory about our

14   discussion.  We did discuss -- I asked her whether she used

15   makeup and whether she had access to makeup.  She said she

16   did not have access to makeup, but there were times that

17   she did prison-made makeup, which is typical of other

18   inmates that I have interviewed, and I believe one of the

19   approaches was to take the colors from M&M's and use them.

20   And there were times when she chose to use homemade makeup,

21   and there were times when she chose not to, and I believe

22   she said something to the effect that when she does that,

23   she becomes a greater target of harassment by the guards,

24   by the corrections officers.

25       Q.   Because of using a product for a purpose that it

-112-

1  is not intended, or because it's makeup?

2        A.    She didn't distinguish between whether it was a

3  contraband issue, or whether it was another provocation.

4  But she did say that she largely abandoned using it,

5  because it caused her more trouble than without it.

6        Q.    On page 15 of your report, next to the last

7  paragraph showing physical changes, you mention as a result

8  of -- and this is all in the section of "Effects of

9  Cross-Sex Hormone Treatments to Date."   You mention

10 improvement in sexual sensations.   What exactly are you

11 referring to there?   Well, I guess I should say, What did

12 she mean when she told you that?

13       A.    Okay.   When birth-sex males are placed on

14 anti-androgens and/or estrogens, there are usually

15 negative -- stereotypically considered negative effects on

16 sexuality.   So for example, inability to achieve and

17 maintain an erection would be an expected outcome of

18 cross-sex hormone treatment, and sometimes, sexual

19 sensation as a result also decreases or goes away.   So one

20 of the things you ask when you are assessing the effects of

21 hormones are questions regarding sexual functioning and

22 sexuality.   Having said that, she reported -- and this is

23 not the first I have heard this from transwomen -- that her

24 sexuality was enhanced in her view by the medications that

25 she was on at the time and that she did not experience that

1  as a negative side effect of the treatment.

2       Q.   How did the sexuality express itself?

3       A.   She discussed that she had this fiancé and that

4  she was having a relationship with the fiancé in that

5  context.

6       Q.   Did she describe the sexual acts that were

7  improved?  In other words, was -- well, I will leave it at

8  that.  Did she describe what sexual acts were enhanced or

9  improved?

10      A.   As I recall her saying, is that sexual feelings

11 in terms of bodily sensations felt better on the cross-sex

12 hormones than off.

13      Q.   Are you referring to erections?

14      A.   Not erections; specifically did not have

15 erections.

16      Q.   Did she say she does not have erections?

17      A.   Yes.

18      Q.   What were the other improvements, or what was the

19 other improvements that she was referring to?

20      A.   The sensitivity of her breasts, and I mean

21 specifically erogenous, erotic sensation of the breasts

22 were increased on hormones, again, a very typical

23 description from transwomen who are treated with estrogens.

24      Q.   Did she mention erections at all or the inability

25 to have one?

1      A.   I did ask about that as a typical question, and
2  she was not having erections.

3      Q.   And you said that was typical?

4      A.   It is typical.  She actually did not describe any
5  results of cross-sex hormones that I heard as atypical or
6  unusual.

7      Q.   She also said in your paren on page 15, "I think
8  more clearly, express myself more accurately."  First, in
9  general, is a more clear thought process a typical effect
10  of cross-sex hormones?

11      A.   I have had, not all, but many people describe
12  that when they are on cross-sex hormones, they get some
13  improvement from gender dysphoria, even if it's a little,
14  like in this case, their perception is that they are
15  thinking more clearly, and I think part of that is because
16  they are not as burdened all the time by gender dysphoria,
17  but it gives them at least some windows where they can
18  think a little differently.  And she did describe a 10
19  percent improvement up to this point on hormones.

20      Q.   How do the hormones cause, or how are they linked
21  to this lessening of dysphoria?

22      A.   Right.  So two ways that we know, and we don't
23  necessarily know all the answers to this, but I will tell
24  you what we believe to be the case.  There are receptors in
25  the brain for testosterone and estrogen that are linked to

1    our gender identity and to our sexual identity as two

2    separate issues clinically for the most part, although

3    there are overlapping elements.  The brain is the largest

4    sex organ, obviously, and when testosterone is reduced,

5    there is a change in libido, there is a change in the view

6    of oneself, and as estrogen increases, there are central

7    nervous system changes in mood.  As any ciswoman,

8    post-menopausal ciswoman, who has been treated with

9    Premarin will tell you, there are clearly mood components

10   and identity components associated with taking exogenous

11   hormones even in the cisgender state, meaning birth-sex

12   women taking female hormones.  Then the second issue is the

13   physical components where there are visible as well as felt

14   changes in the body itself.  So as we discussed here,

15   changes in hip fat, changes in facial hair, which can be

16   very distressing if you are a transwoman to be growing a

17   beard; development of breasts being a very visible and

18   obvious and sought-after change, and that's present both in

19   terms of seeing them and feeling them change; fat

20   distribution changes, muscle strength changes and, of

21   course, you know, a shrinking of the size of the testicles

22   over time, and a shrinking of the size of the penis over

23   time, and essentially, a permanent -- while on hormones at

24   least -- a permanent erectile dysfunction state.  And all

25   of those things combined together in fairly short order in

1   many patients, lessened gender dysphoria, because they can

2   see themselves, both internally how they are feeling and

3   physically how they are changing in the wanted direction.

4        Q.    And did Ms. Keohane relate that to you --

5        A.    Yes.

6        Q.    -- that she saw those things in her outward

7   appearance?

8        A.    Yes.  The beginnings.  I mean, it was early in

9   treatment, but yes, the beginnings were there.

10        Q.    You would anticipate these to be ongoing four

11   months later than when you saw her?

12        A.    Depending on the hormone regimen that she is on

13   and whether it has been interrupted or abruptly

14   discontinued.

15        Q.    If not discontinued and appropriate in your

16   views, this type of outward transformation would continue?

17        A.    For people who are consistently treated with an

18   appropriate hormone regimen, it takes about two years to

19   reach maximum physical changes.

20        Q.    What do you do at the end of two years?  Do you

21   maintain that level?  Do you, you know, cease taking the

22   hormones, or do you --

23        A.    If you discontinue feminizing hormones, there is

24   a fairly rapid reversal of the benefits accrued from the

25   female hormones.  First, in terms of the psychological

1    benefits which can be devastating for transwomen who are

2    abruptly discontinued on estrogens and androgen blockers,

3    but there is also a physical reduction in the breast growth

4    that's already happened.  So there will be a gradual

5    reversion to the male phenotype or the male body habitus

6    over time.

7        Q.   So you would stay on the prescribed hormones,

8    even though after two years maximum bodily change has been

9    effected?

10       A.   Right.  Because at that point, it's maintenance

11   treatment, so you are maintaining the femininity, and

12   unless you have removal of the gonads, which happens as

13   part of sex reassignment surgery, at that point you would

14   reduce the hormones by about 50 percent in the dose as a

15   guide.  But even after sex reassignment surgery, there is

16   usually a need for at least low dose continuation of

17   feminizing hormones.

18       Q.   You also say on this page when describing the

19   intensity that this could vary, not just in points of one's

20   life, but even within the same day.  Can you walk me

21   through that?

22       A.   Right.  So gender dysphoria, we talked about, has

23   the complexity of depression, anxiety, irritability, and

24   it's not as simple as the regular experience of depression,

25   for example.  So people who are depressed, it's something

1  that maybe those of us who are not transgender can more

2  relate to.  If you are depressed, you are not the same

3  level of depressed all the time.  If you see something that

4  reminds you of your dead child or your dead parent that you

5  are grieving or depressed about, your level of depression

6  may instantly go up based on that reminder.  So similarly

7  or analagously to gender dysphoria, you could be at a

8  certain level of gender dysphoria sitting in your cell

9  without anybody harassing you, without any mirrors in front

10 of you, without any reminders that are in your face about

11 the fact that you have fully transitioned -- or not

12 transitioned to the way you want to be, and then five

13 minutes later you walk past a mirror or somebody says a

14 disparaging thing to you regarding your appearance or uses

15 an inappropriate pronoun, that's often a trigger for

16 transgender people to experience a significant increase in

17 the sensation of gender dysphoria that they didn't have

18 five minutes before.

19     Q.   These would all be external stimuli that would

20 cause this fluctuation?

21     A.   Those are the most observable ones to somebody

22 like me looking from the outside.  The patients will tell

23 you that even internally based on their own thought

24 processes that it can fluctuate based on what they are

25 thinking about, but I am giving common triggers that I have

1    seen clinically.

2        Q.   On 17, just a couple of things, and here is where

3    you do describe the hair and all of that.   Perhaps somewhat

4    off the subject but maybe not, "Cognitive functioning was

5    grossly intact."   What does that mean in medical, in

6    layman's term, that "grossly intact"?

7        A.   Right.   So that's just a standard mental status

8    examination comment that many psychiatrists make when you

9    do a cognitive assessment, and you ask questions about who

10   is the president of the United States, who is the governor

11   of the state you are living in, and you ask a variety of

12   knowledge-based things, and their orientation to person,

13   place, and time.   All of those things are cognition, so

14   without going to a level of neuropsychiatric testing, you

15   know, where you could potentially find some minor things

16   that are off in a person's cognition, the statement that it

17   is grossly intact means that I didn't find anything with

18   the level of bedside testing that I did or that typical

19   psychiatrists do.

20       Q.   And what is the Serial 7?

21       A.   Serial 7's is one of the assessments of cognitive

22   functioning.   You just start with 100 and subtract

23   backwards by 7's in your head.

24       Q.   Does the patient then verbalize what those --

25       A.   Right.   Then the patient will say, okay, 100, 93.

1      Q.    And what if you can't do that?

2      A.    If you can't do that, that's just one suggestion

3   that there might be something wrong, but --

4      Q.    And is it also the 20 fruits in 60 seconds, that

5   this is a standard diagnostic -- not diagnostic --

6   assessment tool?

7      A.    Some people use animals.  Sometimes I use

8   animals.  Animals and fruits are pretty standard.

9      Q.    And then you go to say, "Abstracting abilities

10  were excellent," and again, I am just going to get you to

11  explain these in medical terms.  What are abstracting

12  abilities?

13     A.    So it's an assessment of the ability to go from

14  concrete thinking to abstract thinking.  So for example, if

15  I asked you what does the expression mean that the grass is

16  always greener on the other side of the fence?  And if

17  somebody said, "Well, if I am in this farm and he is using

18  fertilizer, his grass may be greener," that's not an

19  abstraction.  That's just a concrete statement.  If, on the

20  other hand, a person says, "Well, you know, things as an

21  attorney in Mobile don't seem nearly as good if I was an

22  attorney in Atlanta," suggesting that it's not about grass.

23  It's about their status in life.

24     Q.    And those abilities in Ms. Keohane were

25  excellent?

1          **A.    Yes.**

2          **Q.    And then the next part of the sentence says,**

3     **"Insight into her current situation was quite apparent."**

4     **What is "Insight into her current situation was quite**

5     **apparent"?  What did you mean by that?**

6          **A.    Sure.  So insight is the ability to step outside**

7     **yourself and look at yourself and say, "How did I get in**

8     **this jam?" or "How did I get in this situation?"  And then**

9     **explain it to me as a second party.  All right?  "I**

10    **understand that I am in prison because they say I did X, Y,**

11    **Z and that's why I am here," or "This outcome happened to**

12    **me because I did this and they did that," whatever.  So**

13    **there is an understanding on a less-than-shallow level of**

14    **how things happened, whatever the thing happens to be.**

15         **Q.    And that ability was -- how did you phrase it --**

16    **intact?**

17         **A.    Intact, meaning you would expect that somebody**

18    **would say, "Well, I am in prison because of this, this, and**

19    **this.  I don't agree with it," or "I didn't do it, but I**

20    **understand that I am in prison because of that."  If**

21    **somebody on the other hand says to me, "I have no idea why**

22    **I am in prison.  I don't have a clue," they would have no**

23    **insight, or they were psychotic.  They have no insight.**

24         **Q.    Right.  Okay.  On 20 and 21, you talk about the**

25    **treatment and it starts with the incorrect pronoun usage**

1   and mental health providers.  Are you aware -- we have

2   already talked about this, and I think you are aware of

3   any -- well, I will just call it current or present

4   treatment team at Everglades by name or otherwise for

5   Ms. Keohane?

6        A.    I don't even know if she has a current treatment

7   plan.

8        Q.    Okay.  Or if she is even at Everglades?

9        A.    Right.  Anything that isn't in that last

10  declaration, I have no other knowledge.

11       Q.    So you don't know one way or another whether the

12  mental health providers are using incorrect or correct

13  pronouns?  You don't know the status of that today?

14       A.    I don't know the status of that today, but I had

15  ample evidence of it in the written records available to me

16  prior to this report.

17       Q.    Right.  Which you said and, again, I asked you

18  this.  I think you said you didn't know.  Did she tell you

19  who was on the treatment team and you don't recall or just

20  have no recollection one way or the other of discussing

21  that?

22       A.    I generally don't ask for clinicians' names,

23  because I have the medical record.  So we may have

24  discussed it, but I don't recall.  The exceptions would be,

25  obviously, things that I have included in my report with

1   people's names that I could read from the record.   Not all

2   names are legible, but for example, M. Meredith, mental

3   health specialist, I referred to on the page that you have

4   in front of you, page 21.   That would be an example, but I

5   derived that from the records.

6           Q.   From the paper itself?

7           A.   Yes.

8           Q.   And that's dated in July of 2014?

9           A.   That particular quote, yeah.

10          Q.   Okay.   And there is also one, S. Struthers, on 22

11  and that's dated October 2014?

12          A.   Correct.

13          Q.   Okay.   In your last couple of lines in the first

14  paragraph that starts on page 21, "all of which were

15  avoidable," these are the "suicide attempts, potentially

16  life-threatening autocastration attempts, all of which were

17  avoidable by simply following the WPATH standards of care

18  and appropriately treating RK for her serious medical

19  condition with an individualized treatment plan."   And is

20  it your opinion that that is not happening today, as we sit

21  here today?

22          A.   Again, I have no knowledge of what is or is not

23  happening as we sit here today.

24          Q.   If Ms. Keohane does not have female panties or an

25  exception to the hair-length policy, would that be

1    violating these WPATH standards of care?  And I will also

2    include no makeup.

3        A.   The WPATH standards of care speak to the

4    standards of care applying in all environments, including

5    incarceration environments, and refer to social

6    transitioning but do not specifically state makeup or the

7    components of social transitioning, although maybe identity

8    documents are mentioned specifically.  But social

9    transitioning, which means all of the things we have been

10   talking about and more, but at least those things, is

11   mentioned in the standards of care.

12       Q.   Okay.  Let's go to page 24.  You have mentioned a

13   couple of times, the National Committee on Correctional

14   Health, NCCH.  What -- and that is at the bottom of this

15   first full paragraph.

16       A.   Uh-huh (affirmative).

17       Q.   What is that body or entity, however you want to

18   call it?

19       A.   It's a national organization that includes a

20   variety of disciplines from clinicians through wardens and

21   administrators in the corrections environment that not only

22   has a number of professional meetings every year, but also

23   promulgates position statements regarding a variety of

24   relevant things within the corrections environment.  So for

25   example, there is a position statement from NCCHC regarding

1   dealing with transgender inmates, which is quite detailed,

2   recently updated, and in a prior version in which I

3   actually was asked to provide some input into, but I am not

4   a coauthor of their position statement.

5      Q.   Is the Footnote 3 -- did you have any involvement

6   in the link to that position statement?

7      A.   This position statement is the one I am referring

8   to and its updates as of 2009 and a 2015 version.  But as I

9   said, I am not a coauthor of that Footnote 3.

10     Q.   Okay.  Do you know if state Departments of

11  Correction are members of the NCCH, or is it simply a

12  policy-advisory-type body?

13     A.   I can tell you that I have done workshops and

14  presented original research at three of their national

15  meetings, and that I met wardens and administrators; I

16  think even occasionally corrections officers, as well as

17  clinicians in the corrections environment, but I don't know

18  if they have a membership category for an entire Department

19  of Corrections.  I just don't know.

20     Q.   State Departments of Corrections would not be

21  members of NCCH?

22     A.   I actually don't know the answer to that, one way

23  or the other.

24     Q.   Okay.  So you don't know if the Florida

25  Department of Corrections -- let me back up.  Do you know

1   the degree, if any, of the participation of the Florida

2   Department of Corrections, or any of its officers, in NCCH?

3      A.   I have never seen a membership list for the

4   organization, so I can't comment.

5      Q.   And it does not accredit or some accrediting

6   agency -- if that's even the right analogy -- for state

7   prison systems, if you know?

8      A.   I know that they do offer accreditations on a

9   variety of levels, both administrative and clinical.

10   Whether those are binding on anyone, I don't know the

11   answer to that.

12      Q.   On 25, four or five lines up on this first full

13   paragraph, starting, "While hormones are important, they do

14   not, on their own, cure or adequately manage RK's gender

15   dysphoria."  Why doesn't the hormone therapy and counseling

16   "adequately" manage Ms. Keohane's gender dysphoria?

17      A.   Well, as with other psychiatric diagnoses, it's

18   an individual treatment plan that's most important to

19   determine what adequate care is, and at the point that I

20   saw her, again, with, in my view, a questionable hormone

21   regimen at the time that I looked at it, it was abundantly

22   clear to me that she wasn't adequately treated because she

23   was still in substantial distress, still had an active

24   diagnosis of gender dysphoria that could increase in

25   severity or decrease in severity, as we have talked about,

1   but nonetheless, was not being provided with adequate

2   treatment to resolve her serious medical need up to that

3   point.

4        Q.   And is that based on your view of the inadequate

5   hormone therapy?  Let's assume that the hormone therapy is

6   adequate in your mind.  Let's assume she is receiving that

7   today and is receiving mental health counseling.  You would

8   still say that that does not "adequately manage"

9   Ms. Keohane's gender dysphoria?

10       A.   Given this patient, without social transition as

11  a component of her medically necessary care, I would say

12  that counseling and hormones alone would not be considered

13  adequate care.

14       Q.   And if you had another patient, a Ms. Jones that

15  was receiving adequate hormone therapy and counseling, and

16  that individualized patient may not need or warrant long

17  hair or female undergarments, then would she be adequately

18  treated?

19       A.   That's theoretically possible.

20       Q.   In other words, it depends on the individual?

21       A.   It depends on the individual, but I have yet to

22  see a patient who grew breasts that was not also allowed to

23  wear female undergarments in any prison that I have worked

24  at.

25       Q.   And you don't know if and when Reiyn develops

1    breasts -- excuse me -- Ms. Keohane develops breasts,

2    whether she will be precluded from wearing a bra?  You have

3    no knowledge of that, one way or the other?

4        A.    I just know that up to the point that I had seen

5    her, that she was precluded.

6        Q.    And did she have breasts at that time?

7        A.    She reported that to me.  I did not do a physical

8    examination.

9        Q.    With your experience of about four months on the

10   therapy, what stage of breast development would that

11   typically result in?

12       A.    It's, again, genetically-based and highly

13   individual based on a number of receptors in the breast

14   tissue, but anywhere from Tanner Stage 2 to 4 in that

15   range.

16       Q.    Do you know other prisons that maintain a hair

17   length policy for men?

18       A.    Yes.

19       Q.    And which ones would they be that you are aware

20   of?

21       A.    Leavenworth Military Prison where Chelsea Manning

22   was held.

23       Q.    How about any state --

24       A.    Well, is held until next month.

25       Q.    How about state Departments of Corrections that

1   have a hair-length policy as does Florida?

2        A.    This is the first time this issue has come up in

3   any of the cases I have been involved with.  So while they

4   may have existed in other states I have been in, it wasn't

5   a focus of litigation nor a document provided to me to

6   review.

7        Q.    And I think you said previously -- I just want to

8   make sure -- you are not familiar with the challenges to

9   hair-length policies brought by religious groups or

10  religious prisoners, meaning either Native American,

11  Hawaiian, Rastafarian, Muslim, Hasidic Jew, Orthodox Jew;

12  any of that plethora of cases, you haven't been called to

13  testify in any of those cases?

14       A.    It's not a medical issue, so I don't have any

15  direct familiarity.  The only direct familiarity I have is

16  I know that people in men's prisons and other prisons have

17  hair as long as the middle of their backs.

18       Q.    In which prisons?

19       A.    All the prisons in Massachusetts, for a fact.  I

20  think the Virginia Department of Corrections has some

21  allowance for longer hair.  I don't know how long.  But

22  certainly, what stands out to me is Massachusetts, because

23  it is so obvious.

24       Q.    And is it also because you have spent a lot of

25  time in 15 or 16 years on Kosilek I, II, and III?

1       A.   That, but other inmates in Massachusetts.  I have

2  ended up in Massachusetts a number of times.

3       Q.   Well, that's what I meant.  Did that case pull

4  you there a lot of times, or were there other reasons to

5  go?

6       A.   Other cases.

7       Q.   Was Fuller?  Fuller was a Massachusetts case?

8       A.   I'm sorry?

9       Q.   Fuller, the one you mentioned?

10      A.   Fuller was in Massachusetts.  She has quite long

11 hair.  Battista had shoulder-length hair, as best as I can

12 recall.

13      Q.   Do you ever in talking to the prisoners

14 themselves or simply touring, visiting the facility for

15 whatever reason -- do you ever talk to the security

16 officers, officials, about what they think about hair

17 length?

18      A.   It's been such a non-issue in every other prison.

19 I mean, the inmates in the male prisons are growing the

20 hair length they want, and I have never had a -- I have

21 never had a transgender inmate in any other case complain

22 about hair length as an issue.  This is the first time.

23      Q.   No, I am asking have you ever spoken to the

24 security officers at the facility about what they thought

25 about hair length policy?  And I think the answer is no to

1    what you just said.  I just want an answer to --

2         A.    I wouldn't have any reason to ask them that.

3         Q.    That's what I thought, so your answer is no?

4         A.    So that would be no.

5         Q.    That's what I thought.  I think you just

6    misunderstood.  Let's take a break now -- it's 2:30 --

7    because we have been going about an hour and a half almost.

8                      *** OFF THE RECORD ***

9    <u>DIRECT EXAMINATION (CONTINUED)</u>

10   <u>BY MR. REID</u>:

11        Q.    Dr. Brown, on page 26, we were on your report,

12   Defendant's Exhibit 3.  At the very bottom of the page, you

13   have a paren, referring to the modern definitions of

14   medically necessary.  What did you mean by "modern

15   definitions of medically necessary"?

16        A.    I didn't mean anything other than if you look at

17   definitions within the last five or ten years in a search,

18   as opposed to going back 50 years.

19        Q.    And how has the term changed in that 40-year

20   period?

21        A.    I don't know.

22        Q.    So you use it just to mean current?

23        A.    Current.

24        Q.    Without having an idea of what an archaic or

25   older definition may or may not have been?

1      A.   Right.   Because whatever the definition is in

2  1940, it may or may not apply to where we are in 2000 plus.

3  So I didn't mean anything more than that.

4      Q.   Okay.   Well, what is the definition of medically

5  necessary?

6      A.   Okay.   Well, of course, there is more than one

7  definition of medically necessary in the literature, but

8  what seems to be -- and I have included one in my report --

9  so for one of those, it's earlier in my report.   But I

10 think that the common theme throughout the definitions that

11 are out there promulgated by the federal government and its

12 various agencies, insurance companies, professional

13 organizations, is that medically necessary refers to

14 interventions or services necessary to evaluate, diagnose,

15 treat conditions, disorders, or injuries, or to prevent

16 deterioration or decompensation of a person's health

17 status.   And the context of that is generally put in an

18 individualized way.   So while what I just said is an

19 overarching definition, that's applied as an individual

20 treatment decision or treatment decisions or evaluation

21 decisions in the context of an individual.

22     Q.   You said you defined it previously in this

23 report.   Do you recall where that was?

24     A.   It may be previously or subsequently.   I am not

25 sure where.   It's got to be previously.

1      Q.   Let me show you this.  I am going to mark this

2  rebuttal as Defendant's Exhibit 4.

3          (DEFENDANT'S EXHIBIT 4:  Rebuttal to Defense

4          Expert Report of Dr. Levine regarding Reiyn

5          Keohane; marked by the court reporter.)

6  BY MR. REID:

7      Q.   And if you look on page 4 of Exhibit 4, let me

8  know if that is where you were referring to.

9      A.   Yes.  That is what I am referring to.

10     Q.   So not in the initial report, but in the

11 rebuttal, Exhibit 4, you refer to, I think, the

12 Medicare.gov definition which is what you referred just

13 then?

14     A.   That's correct.  That's one example of many, and

15 what I gave as my response is an amalgam of many

16 definitions of which that's one.

17     Q.   Where does the coverage, insurance coverage,

18 component to that definition on Medicare play into that

19 definition?

20          MS. COOPER:  Object to form.

21          MR. REID:  It's a bad question.

22     Q.   In other words, Medicare would be about insurance

23 coverage.  Would that definition be different than a

24 strictly medical definition where insurance coverage

25 wouldn't be in play or wouldn't form the analysis at all or

1  the definition at all?

2       A.    Well, in general, the definitions of medical

3  necessity are from organizations like the federal

4  government or insurance organizations or professional

5  organizations related to what will be covered, meaning what

6  is paid for or allowed, depending on the system.  So if you

7  are, say, a woman with breast cancer, Centers for Medicare,

8  Services, CMS, says that it's medically necessary that you

9  have breast reconstruction and you have access to wigs, for

10 example, as medically necessary coverages for this disease

11 or illness.  That's one example.

12      Q.    I think you mentioned that example as well. Are

13 there any other definitions, other than the ones that you

14 referenced in your rebuttal report, that you can

15 articulate?

16      A.    Some definitions include the terms "evidence

17 based" or "community standard," although the terms

18 "evidence based" are generally not included in definitions

19 of medical necessity.  Occasionally, there may be one out

20 there, but community standards or intervention of services

21 that are consistent with recognized community standards are

22 some of the phraseologies that are associated with what I

23 have already stated.  But it doesn't necessarily have to be

24 evidenced based.

25      Q.    And I was going to ask you, what do you mean by

1  evidence based?

2      A.    Well, again, another largely insurance-related

3  term, evidence basis would be if someone did a research

4  study looking at treating an inflamed appendix with

5  medicine, a certain medicine versus only surgery, and then

6  if they did a big study that doctors could agree, "Oh, this

7  is an important finding," that would be evidence that

8  surgery is better than medicine, or medicine is better than

9  surgery.   There's no difference between the two.   But there

10  are so many things to study, obviously, if you include

11  evidence based and you are going to by definition, probably

12  rejects most of what we do in medical care, because it's

13  impossible to do all the studies.

14      Q.   On 28 of the initial report, your opinions are

15  summarized on pages 27 and 28.   Correct?

16      A.    Correct.

17      Q.    No. 6, which is on page 28, it is your opinion

18  that the plaintiff has "a serious medical need to access

19  female grooming standards and female undergarments and

20  canteen items available to other female inmates."   That is

21  still your opinion today, I assume?

22      A.    Yeah.   It's my opinion and it's pretty much

23  consistent with the WPATH standards of care and medical

24  necessity statements from 2016.

25      Q.    And the medical necessity definition in the WPATH

1  standards, where was that gleaned from, or was it created

2  by the WPATH members?

3       A.   Yes.   The medical necessity statement was

4  essentially taking the Version 7 of the WPATH standards of

5  care and the board and executive committee of the

6  organization at that time, which was five months ago, four

7  months ago; put that together as a specific position

8  statement, among many other position statements that WPATH

9  has published on their website.

10      Q.   In the rebuttal report, also still on page 6,

11  which is the Defendant's 4, you mentioned that -- I think

12  it's on the rebuttal report -- where you mentioned that you

13  have worked as a psychiatrist in -- I think you say two

14  prisons?

15      A.   Correct.

16      Q.   Which two prisons were those?

17      A.   Lima, Ohio -- it's a maximum-security prison --

18  and the name of the other prison escapes me, but it was

19  just outside of Cleveland.  I can't recall the name of the

20  facility, but it was a medium-security, medium-and-maximum

21  security prison outside of Cleveland.

22      Q.   What were the time frames for those two?

23      A.   I know that's on my CV somewhere, but roughly it

24  was around 1990-91, in that time frame.

25      Q.   And in your rebuttal, you are responding to the

1    report of Dr. Levine?

2         A.    Correct.

3         Q.    This is the same Dr. Levine that you -- I think

4    you said you would call it "trained under" or knew

5    in -- how did you frame it -- post-graduate residency?

6                   MS. COOPER:   Object to form.

7                   MR. REID:   Yeah, I bungled the question.

8         Q.    But this is the same Dr. Levine that we discussed

9    earlier in your deposition?

10        A.    Stephen B. Levine.

11        Q.    The same person you discussed earlier?

12        A.    The same person.

13        Q.    Okay.  And just so we get it clear, what was your

14   relationship with Dr. Levine at the time you studied with

15   him in --

16                   MS. COOPER:   Object to form.

17        A.    For the month elective that I spent at Case

18   Western Reserve, I worked predominantly with Dr. Leslie

19   Lothstein and also with Dr. Levine in my capacity as a

20   senior psychiatry resident.

21        Q.    Dr. Levine disagrees with you over what is

22   medically necessary, I think you point out in the rebuttal,

23   and do you know how he disagrees with you?

24        A.    Well, as I mentioned in my report, I think

25   Dr. Levine basically agrees with me that access to female

                              -138-

1  **grooming standards and female undergarments is important**

2  **for this patient.**

3      **Q.   Does he say they are medical necessary is what I**

4  **am asking.**

5      **A.   We arrive at the same conclusion in different**

6  **ways.**

7      **Q.   What does he say that you take issue with?**

8      **A.   Well, he essentially just wants to take the term**

9  **"medically necessary" out of the lexicon altogether, I**

10 **think from what I can read, the same documents that you**

11 **have.  He doesn't like the term.**

12     **Q.   In your view, is where you quote "psychologically**

13 **helpful or psychologically pleasing to the inmate," is that**

14 **tantamount to medical necessity?  Are those the same thing**

15 **to you?**

16     **A.   It's hard to know, because he made the terms up.**

17     **Q.   What about for you?**

18     **A.   I can see them as being the same thing.**

19     **Q.   Do you think --**

20     **A.   It's not terms that I would use, and they are not**

21 **standard terms.  They are his personal terms.**

22     **Q.   Are there any other psychiatrists, physicians,**

23 **other than psychiatrists, included that you know of, that**

24 **let's say oppose the WPATH standards -- or oppose isn't the**

25 **right word -- that just don't think they are the proper**

1  standards?  In other words, you invite people differing in

2  contrary opinions to your symposium?

3      A.    Sure.  Paul McHugh comes to mind.

4      Q.    Is McHugh a psychiatrist?

5      A.    He is a retired Professor Emeritus from Johns

6  Hopkins, who has gained his notoriety from publishing

7  contrary views regarding many matters related to gender

8  dysphoria and the conservative Christian press

9  predominantly and has been famously disinvited from some

10 professional meetings, because some people believe that

11 what he is promoting is hate speech.

12     Q.    Did you ever attend any meetings or a symposium

13 at which Dr. McHugh spoke?

14     A.    I may have, and if I have, it's been many years.

15 But I did spend elective time at Johns Hopkins in the

16 sexual behaviors consultation unit.

17     Q.    Did you study under Dr. McHugh?

18     A.    I believe he was chairman at the time.

19     Q.    Did you study under him directly, or was he just

20 chairman?

21     A.    I did not study under him directly.  I studied

22 under Dr. Tom Wise, who is the vice chair.

23     Q.    Are there any other names that come to mind,

24 other than Dr. McHugh?

25     A.    Possibly Dr. Chet Schmidt, also from Hopkins;

-140-

1    also Professor Emeritus.  And we understand, by emeritus,

2    that they are no longer active as professors in an academic

3    environment and are retired.

4        Q.   Is there any reason you know of why there seems

5    to be a concentration of Hopkins psychiatrists?

6        A.   Yes, because Hopkins traditionally has had, since

7    1979 to last year, in that time frame, has historically

8    been known to not view transsexualism and gender identity

9    issues similar to most other organizations.  And having

10   said that, I have been a consultant with their current new

11   clinic, which has just opened this year, where they will be

12   offering a full set of services for the treatment of gender

13   dysphoria, including once again, sex reassignment surgery.

14   So it's come full circle from 1979 to 2017.

15       Q.   Nothing further.

16                      CROSS-EXAMINATION

17   BY LESLIE COOPER, ESQ.:

18       Q.   I just have a couple of questions I'd like to do.

19   Dr. Brown, you were asked some questions about how growing

20   hair can be medically necessary -- growing hair at a

21   certain length or beyond a certain length can be medically

22   necessary, given that some cisgender women choose to

23   express themselves with short hair.  So I have a few

24   questions I want to ask you about that.  First of all, for

25   cisgender women, is expression of their gender identity a

1  medical need, as you described for transwomen with gender

2  dysphoria?

3      A.    This is cisgender women who don't have gender

4  dysphoria?

5      Q.    Right.

6      A.    No, it would not be.

7      Q.    And for cisgender women who have more

8  traditionally feminine-length hair, would it affect their

9  gender expression if they were forced to have their hair

10  cut to a traditionally male length?

11     A.    I would think for the vast majority of women,

12  that would be yes.

13     Q.    And why?  Why do you say that?

14     A.    Again, in our culture, the presentation of one's

15  gender is firmly based on how we present, and hair, hair

16  length, and hair style being one of those things, and

17  having your hair forcibly cut actually has been used as a

18  humiliation.  I am reminded of female collaborators in

19  World War II who had their hair forcibly buzz cut to

20  humiliate them in public and essentially take their gender

21  away from them, and also, of course, the concentration camp

22  experiences which we are all familiar with.

23     A.    Uh-huh (affirmative).  What about women who lose

24  their hair because of chemotherapy?  Does that affect how

25  they view themselves or their gender expression?

1    Q.   Yeah.   That's another example that I use in my

2  report, and when women lose their hair due to chemotherapy,

3  commonly for breast cancer but not exclusively, it's

4  considered -- it becomes a medical necessity, such that the

5  government and TRICARE and other funding organizations do

6  provide for wigs for their ability to present themselves as

7  women and to bolster their flagging female identities while

8  they are in treatment.

9    Q.   Uh-huh (affirmative).   So is it true, there may

10 be some women who are fine being bald?   Sinead O'Connor?

11   A.   Sure.   There are women who are fine being bald,

12 or choose to be bald, but not being forced to be bald.   It

13 would be a personal choice, uncommon but it certainly does

14 happen.

15   Q.   Uh-huh (affirmative).   For those who don't make

16 that choice to be bald, if they were forced to be, how

17 would it affect them?

18   A.   Yeah.

19        MR. REID:   Object to form.

20   Q.   Would it affect them?

21   A.   I would think that for the majority of cisgender

22 women without gender dysphoria, having to have your hair

23 forcibly cut to a male length or a buzz-cut style, again,

24 it would be a humiliating, possibly devastating experience

25 for them.

1      Q.   Uh-huh (affirmative).   That's not a medical issue

2  for them, is it?

3      A.   Not on a basis of a medical reason.   It's

4  identity reasoning.

5      Q.   Okay.   Now, I want to switch gears for a question

6  or two about undergarments.   Is the medical need for

7  women's undergarments, that you have discussed, a need that

8  Reiyn has because she is a woman?   In other words, do all

9  women have a medical need to wear female undergarments?

10     A.   I don't think cisgender women need to have female

11 undergarments because of a medical need, but they don't

12 have gender dysphoria.   So the medical need arises, not

13 from being a woman, but from having a medical diagnosis, a

14 psychiatric diagnosis in this case, of gender dysphoria.

15     Q.   I don't have anything further.

16               MR. REID:   No questions.

17               THE REPORTER:   Did you say you want to read

18     and sign?

19               THE WITNESS:   I do want to read and sign.

20     Yes.

21               MS. COOPER:   Yes.

22     AND FURTHER THE DEPONENT SAITH NOT.

23

24

25

## CERTIFICATE OF WITNESS

STATE OF TENNESSEE:

COUNTY OF WASHINGTON:

    I, DR. GEORGE R. BROWN, hereby certify that I have read the foregoing transcript of my deposition taken on April 25, 2017, commencing at approximately 10:02 a.m., at the DoubleTree by Hilton Hotel, pursuant to the applicable *Federal Rules of Civil Procedure*, and that the foregoing one hundred forty-four (144) pages of transcript are in conformity with my testimony given at that time, with the exception of any corrections made by me on the Errata Sheets located in the front of this deposition.


                                      _____
                                        DR. GEORGE R. BROWN

    SWORN TO and SUBSCRIBED before me on this the _____ day of _____, 2017.


                                        _____
                                        Notary Public

My Commission Expires:

_____

DEFENDANT'S EXHIBIT 3:  Expert Report of Dr. George R.

Brown, MD, DFAPA, executed on January 13, 2017,

concerning Reiyn Keohane.

(Ref. Page 14)

**DEFENDANT'S EXHIBIT 4:  Rebuttal to Defense Expert Report**

**of Dr. Levine regarding Reiyn Keohane.**

**(Ref. Page 134)**

REPORTER'S CERTIFICATION

STATE OF TENNESSEE:

COUNTY OF SULLIVAN:

I, Mildred Anne Fletcher, LCR #580, Licensed Court Reporter and Notary Public in and for the State of Tennessee, do hereby certify that the above deposition of DR. GEORGE R. BROWN was reported by me and that the foregoing one hundred forty-four (144) pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 16th day of May, 2017.

_____
MILDRED ANNE FLETCHER, LCR #580
Expiration Date 6/30/18
Notary Public Commission Expires:
10/23/2018

Fletcher Court Reporting
Post Office Box 7003
Kingsport, TN  37664

-148-