UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

Reiyn Keohane,

       Plaintiff,

v.                                  Case No. 4:16-cv-511-MW-CAS

Julie Jones,
*in her official capacity as*
Secretary of the Florida Department of Corrections,

       Defendant.

_____

## Plaintiff's Proposed Findings of Fact and Conclusions of Law

For purposes of trial, Plaintiff proposes the following findings of fact and conclusions of law:

## Proposed Findings of Fact

The Parties

1. Plaintiff is currently 23 years old. Pretrial Stipulation (ECF 133) Part F ¶ 1.

2. Plaintiff was 19 years old when she entered the custody of the Florida Department of Corrections ("DOC"). Pretrial Stipulation (ECF 133) Part F ¶ 2.

3. Plaintiff is serving a 15-year sentence in DOC custody. Pretrial Stipulation (ECF 133) Part F ¶ 3.

4. Plaintiff will have 15 years of probation following her release from DOC custody.

5. Plaintiff is currently housed at Jefferson Correctional Institution ("CI") in Monticello, Florida. Pretrial Stipulation (ECF 133) Part F ¶ 4.

6. Jefferson CI is a facility for male inmates. *See* http://www.dc.state.fl.us/orginfo/facilitydir.html.

7. Plaintiff was housed at Everglades CI at the time she filed the Complaint in this action. *See* Plaintiff's June 2017 Overall Inmate Record (Plaintiff's Trial Exhibit 25).

8. Every DOC facility that Plaintiff has been housed at is a facility for male inmates. *See* http://www.dc.state.fl.us/orginfo/facilitydir.html.

9. Julie Jones is the Secretary of the DOC. Pretrial Stipulation (ECF 133) Part F ¶ 14.

10. The current DOC total inmate population is around 98,000. *See* http://www.dc.state.fl.us/about.html.

<u>The DOC's Medical Contractors</u>

11. The DOC's medical contractor for Jefferson CI is Centurion of Florida, LLC ("Centurion").

12. The DOC's medical contractor for Everglades CI is currently Wexford Health Sources, Inc. ("Wexford").

13. The DOC's medical contractor for the South Florida Reception Center ("SFRC"), Desoto CI (the Desoto Annex and Work Camp), Charlotte CI, Dade CI, and Everglades CI, during the time Plaintiff was at each facility, was Wexford.

14. On or before August 19, 2017, the DOC's sole medical contractor for all of its facilities in Florida will be Centurion. 30(b)(6) Dep. (Reimers) (ECF 129-1) at 89.

<u>Plaintiff's Gender Identity and Gender Dysphoria</u>

15. Plaintiff's gender identity is female.

16. Plaintiff is a transgender woman.

17. Plaintiff has been diagnosed with gender dysphoria.

18. Prison medical and mental health officials have diagnosed Plaintiff with gender dysphoria.

19. Plaintiff has gender dysphoria. Pretrial Stipulation (ECF 133) Part F ¶ 7.

20. Gender dysphoria was previously known as gender identity disorder. Pretrial Stipulation (ECF 133) Part F ¶ 8.

<u>Plaintiff's Pre-Incarceration History</u>

21. Plaintiff has known she has female gender identity since age 12. Keohane Decl. (ECF 3-1) at 2 ¶ 3.

22. At age 13 (around November 27, 2007), Plaintiff began seeing a psychiatrist, Omar Rieche, M.D., of Fort Myers, along with a therapist in Dr. Rieche's practice, MaryAnn Rocco, LCSW. Keohane Decl. (ECF 3-1) at 2 ¶ 4.

23. At age 16 (around March 2010), Plaintiff was diagnosed with gender identity disorder. Pretrial Stipulation (ECF 133) Part F ¶ 9.

24. At age 17 (around June 2011), Plaintiff legally changed her name from a traditionally male name to her current name. Keohane Decl. (ECF 3-1) at 2 ¶ 6.

25. Dr. Rieche referred Plaintiff to a pediatric endocrinologist, Dr. Cayce T. Jehaimi, M.D., of Fort Myers.  Keohane Decl. (ECF 3-1) at 2 ¶ 7.

26. In early August 2013, at age 19, Plaintiff began hormone therapy—Estrace (estradiol) and Aldactone (spironolactone)—under the care of Dr. Jehaimi. Pretrial Stipulation (ECF 133) Part F ¶ 10.

27. On September 22, 2013, Plaintiff was charged with attempted second-degree murder and was taken into the custody of the Lee County Jail. Keohane Decl. (ECF 3-1) at 2 ¶ 8.

28. At the Lee County Jail, Plaintiff requested to continue her hormone therapy, but the Lee County Jail refused. Keohane Decl. (ECF 3-1) at 2 ¶ 8.

29. In July 2014, Plaintiff accepted a plea deal of 15 years. Keohane Decl. (ECF 3-1) at 2 ¶ 8.

30. On July 17, 2014, Plaintiff was committed to the custody of the DOC. Keohane Decl. (ECF 3-1) at 3 ¶ 9.

31. Plaintiff began her commitment with the DOC at the SFRC. Keohane Decl. (ECF 3-1) at 3 ¶ 9.

Plaintiff's Transfers After Entering DOC Custody

32. Plaintiff arrived at the SFRC on July 17, 2014. On August 26, 2014, she was transferred to the Desoto Annex. On September 30, 2014, she was transferred to the Desoto Work Camp. On October 10, 2014, she was transferred back to the Desoto Annex. On January 13, 2015, she was transferred to Charlotte CI. On January 27, 2015, she was transferred to the Charlotte County Jail, and then transferred back to Charlotte CI the

following day, January 28, 2015. On February 6, 2015, she was transferred

to Dade CI. On April 9, 2015, she was transferred to the Charlotte County

Jail, and she returned to Dade CI on December 16, 2015. On February 11,

2016, she was transferred to the SFRC, bound for Everglades CI. On

February 18, 2016, she was transferred to Everglades CI. On October 10,

2016, she was transferred to Jefferson CI. (FDOC-413) On October 21,

2016, Plaintiff was transferred back to Everglades CI. On April 6, 2017,

Plaintiff was transferred to the SFRC, bound for Jefferson CI. On April 13,

2017, she was transferred to R.M.C. – West Unit. On April 18, 2017, she

was transferred to Jefferson CI, where she remains today. *See* Plaintiff's

June 2017 Overall Inmate Record (Plaintiff's Trial Exhibit 25).

The DOC's Failure to Treat Plaintiff's Gender Dysphoria

33. Plaintiff has been requesting treatment for her gender dysphoria since

shortly after her arrival at the SFRC. Keohane Decl. (ECF 3-1) at 3 ¶ 10.

34. From the first conversations Plaintiff had with DOC and DOC-contracted

officials concerning her need for treatment, Plaintiff made clear both her

need for hormone therapy and her need to be able to live as female in the

DOC. Keohane Decl. (ECF 3-1) at 3 ¶ 10.

35. Through to the present day, in numerous conversations Plaintiff has had with mental-health and medical officials at the DOC in which her transgender status and need for treatment for her gender dysphoria were discussed, she raised both her need for hormone therapy (when that treatment was not being provided) and her need to access female clothing and grooming standards. Keohane Decl. (ECF 3-1) at 3 ¶ 10.

36. At the SFRC, Plaintiff filed an informal grievance on August 11, 2014 (Request No. 08-060-14), stating:

> I need my hormone therapy resumed. I had it as a result of a legitimate, documented diagnosis and prescription when I was arrested and was then unjustly denied this treatment while in Lee County Jail. This treatment is absolutely necessary to my ability to mentally function. Without it I consider self-harm and suicide every single day. It is the only thing that matters in my life in this moment – that I have been taken off of such critical medication is cruel and unusual punishment in that it causes needless suffering. This is not an issue that is any way complicated – I need the medication. I was wrongfully refused treatment in a way which is irresponsible, discriminatory, and unconstitutional, and continue to be refused in the same manner by the DoC. The answer should be both obvious and simple – stop refusing to give me my prescription medication before I have to take any legal action.

> Keohane Decl. (ECF 3-1) at 3 ¶ 11; Selected Pre-Litigation Grievances (ECF 3-6) at 1.

37. This informal grievance was "returned" dated August 21, 2014, on the grounds that the DOC needed to obtain Plaintiff's outside medical records. The response stated:

> I met with you on 08/21/14 and discussed inmate orientation procedure 601.210 regarding your aforementioned complaints. As discussed the next step in the process is to obtain previous/existing health information from your provider. You signed a Release of Information on 08/21/14 consenting to this action. My team will confer with your provider and obtain health information to channel to our provider to review and determine the best course of action.

> Keohane Decl. (ECF 3-1) at 3-4 ¶ 12; Selected Pre-Litigation Grievances (ECF 3-6) at 1.

38. As of September 1, 2014, Plaintiff filed another informal grievance requesting again that she be placed back on hormone therapy. This was denied the next day on the grounds that she allegedly canceled an appointment with Dr. Jehaimi the previous year.  Keohane Decl. (ECF 3-1) at 4 ¶ 13; Selected Pre-Litigation Grievances (ECF 3-6) at 2.

39. In another informal grievance filed September 12, 2014, Plaintiff explained that she was unable to show up for the appointment because she was in jail

at the time. Keohane Decl. (ECF 3-1) at 4 ¶ 14; Selected Pre-Litigation Grievances (ECF 3-6) at 3.

40. On September 24, 2014, Plaintiff received a denial of the September 12, 2014, informal grievance, which stated that "you will not be placed on hormonal therapy while incarcerated in the Florida State Dept. of Corrections. If you are having mental health concerns, please write a request to our Mental Health Dept. for an appointment to be seen." Keohane Decl. (ECF 3-1) at 4 ¶ 15; Selected Pre-Litigation Grievances (ECF 3-6) at 3.

41. On October 6, 2014, Plaintiff filed an appeal (No. 14-6-33110) of the informal grievances filed on September 1 and 12, 2014. In that appeal, Plaintiff stated:

I am transgender and was receiving Hormone Replacement Therapy when I was arrested (Sept 23 2013). I have not rec[ei]ved it since. I have provided medical records that prove I was receiving this treatment, but the DeSoto medical staff refuses to give me this prescribed medication. The first denial was given on the grounds that "you canceled your appointment in November 2013". They are unable to provide documented proof that I canceled – it was canceled because I was in jail, not of my own accord. I wrote them again so that they may correct this, as it may have been a mistake. (see attached) The second denial (attached) is a flagrant example of their willful indifference to the needless suffering I face every day. I have been fighting to get my treatment back for this entire year – the only reason I have not received it since 2013 is because the state has refused to

give it to me the entire time I have been in custody. This is not and never was a voluntary denial. . . .

Keohane Decl. (ECF 3-1) at 4 ¶ 16; Selected Pre-Litigation Grievances (ECF 3-6) at 4.

42. Around October 14-17, 2014, while in administrative confinement, Plaintiff attempted to hang herself. Keohane Decl. (ECF 3-1) at 5 ¶ 17; 10/17/14 Discharge Summary (ECF 3-10) (attempted to hang herself on day of DR hearing)

43. Plaintiff attempted to hang herself because of the DOC's refusal to provide her with transition-related care. Keohane Decl. (ECF 3-1) at 5 ¶ 17.

44. On a document dated October 21, 2014, Plaintiff's appeal (No. 14-6-33110) of the informal grievances filed on September 1 and 12, 2014, was returned without action on the grounds that "[y]ou did not provide this office with a copy of the formal grievance filed at the institutional level as required by rule or the reason you provided for by-passing that level of the grievance procedure is not acceptable." Keohane Decl. (ECF 3-1) at 5 ¶ 19; Selected Pre-Litigation Grievances (ECF 3-6) at 5.

45. On October 31, 2014, Plaintiff filed a formal grievance with the warden at the Desoto Annex. In that grievance (Grievance No. 1411-564-003), Plaintiff expressed her desire for hormone treatment:

I have a legal right to receive it . . . . since I have documented proof that I was receiving it. To deny it is to <u>cause</u> depression and suicidal tendencies, which I must face on a daily basis. Statistically speaking, transgendered people literally have the highest suicide rate of any group of people – there is no counseling that can ever substitute for the medical treatment that I require. My mind violently rejects my own body, telling me that it is wrong, that parts of me are missing – to suggest that I receive counseling only is to do nothing to treat this at all. No amount of counseling can ever make who I am on this most fundamental level change . . . . .This treatment is literally necessary for me to have a future – there is no possible chance that I could endure the absolute agony of waking up every day to my own body forcing me to hate myself, to the point where I struggle not to hurt or kill myself every day, getting by only on the hope that it will not always be like this. To take my medication from me is to force this misery upon me – hormone therapy is necessary for me to live on a daily basis, and to complete my time in a positive and productive manner. I would like to use my time to better myself, and I try to, but this is the most important thing that can possibly be done to improve my future. Without it, I have no will to have a future at all – one where I can go on hating myself forever and ever, where I can never be truly happy no matter what I do, is not a future worth having at all. This is, essentially, the reasoning as to why it is cruel and unusual punishment – a basis in reality to better understand why the law is supposed to protect my right to my hormone therapy.

Keohane Decl. (ECF 3-1) at 5-6 ¶ 20; Selected Pre-Litigation Grievances (ECF 3-6) at 6.

46. On a document dated November 20, 2014, the formal grievance (Grievance

No. 1411-564-003) was denied by Dr. Trung Van Le, M.D., who stated:

> UPON REVIEW OF YOUR MEDICAL RECORDS RECEIVED
> FROM DR. CAYCE JEHAIMI, YOU HAD CANCELLED YOUR
> LAST APPOINTMENT IN NOVEMBER OF 2013 WITH NO
> FURTHER SCHEDULED APPOINTMENTS. DR. JEHAIMI THEN
> NOTED THAT YOUR PRESCRIPTION FOR THE HORMONE
> REPLACEMENT THERAPY WOULD BE SUSPENDED AS IT
> WOULD BE DANGEROUS TO CONTINUE WITHOUT ANY
> CLOSE ENDOCRINE SUPERVISION. AT THIS TIME THERE IS
> NO CONSIDERATION TO RESTART YOUR HORMONE
> REPLACEMENT THERAPY. YOU ARE CURRENTLY BEING
> SEEN BY OUR MENTAL HEALTH STAFF WITH AN
> INDIVIDUALIZED SERVICE PLAN IN PLACE IN ORDER TO
> PROVIDE YOU A MEANS TO DISCUSS YOUR PROBLEMS
> WITH A MENTAL HEALTH PROFESSIONAL. IF YOU HAVE
> FURTHER CONCERNS OR QUESTIONS, YOU MAY ACCESS
> SICK-CALL AND ADDRESS THEM WITH THE HEALTH CARE
> STAFF. ALSO, AT ANY TIME YOU MAY SEEK MENTAL
> HEALTH SERVICES AND OUR STAFF WILL RESPOND AS
> PROMPTLY AS POSSIBLE TO YOUR REQUESTS.

Keohane Decl. (ECF 3-1) at 6 ¶ 21; Selected Pre-Litigation

Grievances (ECF 3-6) at 7.

47. In her appeal of the denial of Grievance No. 1411-564-003 to the DOC

Secretary (appeal labeled as Grievance No. 14-6-39574) dated December 3,

2014, Plaintiff explained that she did not cancel her appointment with Dr.

Jehaimi, but rather that she did not attend her appointment because she was

in jail. She wrote:

I am transgender, and was receiving Hormone Replacement Therapy at the time of my arrest; Sept. 23rd, 2013. The medication I was receiving was Spironolact[one], and also Estradiol; the dosages are in my medical records but I do not remember, and the staff has declined to tell me the exact amounts. According to statute 3.48 of the Inmate Rights Handbook, a transgender inmate who was receiving Hormone Therapy is supposed to continue receiving hormone therapy. The staff at the Desoto Annex are well acquainted with the records that prove I was rec[ei]ving treatment for hormone therapy, but refuse to reinstate this medication; by statute 3.48 this can be grounds for cruel and unusual punishment, as it demonstrates willful indifference to a very serious medical and psychological condition that <u>cannot</u> be treated with counseling alone. The reason given by the DeSoto staff is invalid; I did not cancel my appointment, as I was incarcerated in Lee County Jail and was unable to make any such cancellation. There is no documentation which I have signed which would negate this treatment – in fact the only documentation is of my struggle to have this treatment which has been unlawfully suspended restored . . . . It is absolutely necessary to me that I have my treatment restored to me; it is a severe breach of the constitutional ban on cruel and unusual punishment to refuse a treatment plan that was determined to be necessary by a team of doctors prior to my incarceration solely on the basis of being arrested; the necessity of this treatment has not changed in the past year, and it never will – I will always need it. Therefore the burden of providing close endocrine supervision to accompany the treatment falls to the DoC. There is no lawful way for my treatment to be denied; this means that the DoC must provide all parts of this hormone therapy, as it is cruel and unusual punishment to forbid it, and the fact that it requires close supervision is neither here nor there; the burden of care falls to the DoC and it is wholly unconstitutional to deny treatment solely because the DoC does not want to pay for it.

Please see to it that this unconstitutional denial of treatment is not allowed to continue.

Keohane Decl. (ECF 3-1) at 6-7 ¶ 22; Selected Pre-Litigation

Grievances (ECF 3-6) at 8.

48. On December 9, 2014, Plaintiff filed a grievance directed to Dr. Sicilia,

stating:

I would like to schedule an appointment to discuss the psychological necessity of myself dressing as a female, and the availability of a pass for this way of dressing. I have, for the past 6 years consecutively, always dressed in a way that presents me as female in appearance through the use of padded bras, etc. For me, this is a necessary facet of my life, and deeply ingrained in my personality. In the treatment of a trangendered person, this behavio[r] is not only encouraged, but required as a prerequisite for the prescription of hormone replacement therapy [and] sexual reassignment surgery – I have lived my entire life past the age of 13 as female, and it is extremely detrimental to my mental health to forbid this practi[c]e; it is also well documented as a legitimate and proper treatment for a person who is transgender. As I am transgender, I should rec[ei]ve a pass to allow me to continue this behavior for my wellbeing. This is part of who I am – it is not the place of the DoC to try to change the fact that I am transgender. That is not able to be changed. It is the job of the government to accommodate the needs of all persons in their care.

Keohane Decl. (ECF 3-1) at 7 ¶ 23; Selected Pre-Litigation

Grievances (ECF 3-6) at 9.

49. On January 8, 2015, Plaintiff cut her scrotum with a razor, creating a 3 centimeter deep laceration. *See* 1/8/15 Emergency Room Record (ECF 3-11) (self-inflicted 3cm laceration of scrotum); Keohane Decl. (ECF 3-1) at 7 ¶ 24.

50. A healthcare note dated the day Plaintiff cut her scrotum stated: "Plaintiff's self-report: 'I'm upset because officer asked me to take off my bras, I cut my testicle'." 1/8/15 Healthcare Note (ECF 33-1).   A Transfer Summary for Inpatient Mental Health Care dated a few days later stated: "The inmate was placed on SHOS from open population after conflict with security staff over stuffing his breast area to mimic breasts. The inmate was sent back to the dorm and also told to get a haircut. Upon return to the dorm, the inmate cut the base of his testicles." 1/13/15 Transfer Summary for Inpatient Mental Health Care (ECF 129-24).

51. After Plaintiff's transfer to Charlotte CI, she regularly met with mental-health staff, and the main topic of discussion in those meetings was her transgender status and need for medical treatment. Keohane Decl. (ECF 3-1) at 7-8 ¶ 25.

52. In March 2015, Plaintiff received a denial (dated January 23, 2015) of her appeal (Grievance No. 14-6-39574), with no reason given other than an affirmation of the response from Dr. Le on November 20, 2014. Keohane Decl. (ECF 3-1) at 8 ¶ 26; Selected Pre-Litigation Grievances (ECF 3-6) at 10.

53. In February 2015, Plaintiff was transferred from Charlotte CI to Dade CI. In April 2015, Plaintiff was transferred from Dade CI to the Charlotte County Jail. She had been charged with tampering with a security device following events that occurred during her stay at Charlotte CI. After a jury trial in December 2015, she was acquitted and was sent back to Dade CI. Keohane Decl. (ECF 3-1) at 8 ¶¶ 27-28.

54. On December 29, 2015, Plaintiff filed a formal grievance directed to the "chief medical officer" at Dade CI (Grievance No. 1601-463-009), stating:

I suffer from Gender Dysphoria, a recognized neurological condition in which a person's gender identity is not consistent with the biologically assigned sex. The standard treatment is as follows: 1) the patient must be able to live and dress as the gender with which they identify[,] 2) hormone therapy, 3) gender confirmation surgeries [and] procedures[.] [F]ailure to provide full treatment for this medical issue is unconstitutional, in violation of the 8th amendment. This is a serious medical need that has been properly diagnosed and brought to the attention of medical staff numerous times. To continue the refusal of any and all treatment is unacceptable and unconscionable, with no

excuse – my symptoms include severe depression, anxiety, fatigue, and eating disorders. Additionally, other symptoms that can occur are self-injury, rage, addiction, and suicide, in the most severe instances. Furthermore, I suffer from an extremely low testosterone count, which compounds my symptoms and would also be remedied by the hormone therapy part of treatment. Further denial of treatment will constitute willful negligence to my medical needs.

Keohane Decl. (ECF 3-1) at 8 ¶ 29; Selected Pre-Litigation

Grievances (ECF 3-6) at 11.

55. On December 31, 2015, Plaintiff filed an informal grievance (No. 463-1601-

0062) at Dade CI, stating:

On 12-16-15, when I arrived at Dade CI TCU, I had 2 personal sports bras and 3 set of female undergarments that were confiscated unjustly and removed from my property as contraband. I am a transgender female and am not comfortable wearing male underwear—it is discrimination on the basis of sex or gender to force a person to act in a certain way because of their sex, and therefore it is unconstitutional for me to be forced to wear men's underwear. There is no valid safety concern as the female underwear is made of the same materials as the male sort and is the same as the underwear issued in female prisons, where it clearly cannot be a safety concern; therefore the basis for it being confiscated was "disciplinary", in that I am classified as male and must therefore do what males "are supposed to do." This is unconstitutional in nature, and I request that either my personal clothing be returned or that proper female underwear be issued in its place.

Keohane Decl. (ECF 3-1) at 8-9 ¶ 30; Selected Pre-Litigation

Grievances (ECF 3-6) at 12.

Page 17

56. On a document dated, January 5, 2016, this informal grievance (No. 463-1601-0062) was denied in an unsigned response that contains the stamp of the Assistant Warden of Programs and states: "At a male institution only T-Shirts, Boxers, Pants, and Blue Shirts are authorized. Any other clothing is unauthorized." Keohane Decl. (ECF 3-1) at 9 ¶ 31; Selected Pre-Litigation Grievances (ECF 3-6) at 12.

57. On a document dated January 19, 2016, Dr. Carmelo Berrios, M.D., medical director of Dade CI, denied Plaintiff's formal grievance from December 29, 2015 (Grievance No. 1601-463-009), stating:

> Your formal grievance has been received and reviewed. You will be called out to sign a release of information for the endocrinologist that was seeing you before incarceration to obtain the medical records to get the full history of treatment. Once records are received Dr. Berrios will review and determine the necessary treatment plan.

Keohane Decl. (ECF 3-1) at 9 ¶ 32; Selected Pre-Litigation Grievances (ECF 3-6) at 13.

58. After entering DOC custody, Plaintiff didn't see an endocrinologist until September 2016, after the lawsuit was filed in August 2016.

59. On February 11, 2016, Plaintiff was transferred from Dade CI to the SRFC, and on February 18, 2016, she was transferred to Everglades CI. *See* Plaintiff's June 2017 Overall Inmate Record (Plaintiff's Trial Exhibit 25).

60. Around February 29, 2016, Plaintiff met with the medical director of Everglades CI at the time, Dr. Teresita Dieguez, M.D. Keohane Decl. (ECF 3-1) at 9 ¶ 34.

61. In that meeting, when Dr. Dieguez told Plaintiff that she needed Plaintiff's medical records documenting her gender dysphoria, Plaintiff had the records and offered to provide them immediately. Dr. Dieguez refused to look at them. Plaintiff also informed Dr. Dieguez that records documenting her gender dysphoria were already in her green medical file, which was in the room. Dr. Dieguez refused to look at those records as well. Dr. Dieguez refused to discuss Plaintiff's transgender status with her. Instead, Dr. Dieguez said, "you are only here so I can determine the state of your genitals." Keohane Decl. (ECF 3-1) at 9-10 ¶ 34.

62. Plaintiff has a penis. Pretrial Stipulation (ECF 133) Part F ¶ 19.

63. Before the meeting with Dr. Dieguez, Plaintiff had been housed alone at Everglades CI. After the meeting with Dr. Dieguez, Plaintiff was assigned a

roommate. The housing sergeant told Plaintiff that this was because "medical" said that Plaintiff was not transgender. Keohane Decl. (ECF 3-1) at 10 ¶ 35.

64. On March 2, 2016, a few days after Plaintiff's meeting with Dr. Dieguez, the Health Services Administrator for Everglades CI, wrote an email to DOC officials that Plaintiff did "not classify under the transgender criteria." *See* Plaintiff's Trial Exhibit 27 (FDOC-5943 email from Janine Hills).

65. Around March 15, 2016, Plaintiff met again with Dr. Dieguez. Dr. Dieguez told Plaintiff that she could not do anything for her regarding her request for treatment for Gender Dysphoria, that all she could do is refer Plaintiff to the mental-health department. Dr. Dieguez also told Plaintiff that she would refer her to the regional medical director. Keohane Decl. (ECF 3-1) at 10 ¶ 36.

66. Around March 21, 2016, Plaintiff met with Andre Rivero in the mental-health department of Everglades CI. Mr. Rivero told Plaintiff that he agreed with the diagnosis of Gender Dysphoria and recommended hormone therapy, but he said that her symptoms could only be treated by the medical

department. He thus referred the matter back to the medical department. Keohane Decl. (ECF 3-1) at 10 ¶ 37.

67. The following day, Plaintiff met with her mental-health counselor, Sonele Baute, who agreed with the diagnosis and the appropriateness of hormone therapy for her. Ms. Baute told Plaintiff that a meeting between the medical and mental-health departments would take place on March 24, 2016, to discuss the issue. Keohane Decl. (ECF 3-1) at 10 ¶ 37.

68. That same week, Dr. Arnise Johnson, Plaintiff's psychologist at Everglades CI, also told Plaintiff that she agreed with the diagnosis and the appropriateness of hormone therapy for her. Keohane Decl. (ECF 3-1) at 10 ¶ 37.

69. On May 4, 2016, Plaintiff filed a formal grievance (Grievance No. 1605-401-009) directed to the "chief medical officer" at Everglades CI, stating:

I am transgender, with a formal diagnosis of Gender Identity Disorder by Dr[.] Omar Rieche, and was prescribed Hormone Replacement therapy through him and one Dr[.] Cayce Jehaimi for this condition. Specifically, I was prescribed Estradiol [and] Spironolactone, and rec[ei]ved both prior to my incarceration. While incarcerated, I have not rec[ei]ved this treatment, or any treatment whatsoever for my Gender Identity Disorder, despite the fact that it has been clearly established in my medical records and confirmed as my diagnosis by psychiatric doctors Arnise Johnson [and] Andre Rivera at this institution. This is a violation of the 8th amendment, which prohibits

cruel and unusual punishment by means of willful negligence towards a person's medical needs, and a violation of Federal Inmate Rights Statute 3.48 which specifically names Gender Identity Disorder as a medical condition requiring treatment, and states that a person who was rec[ei]ving Hormone Replacement therapy for Gender Identity Disorder must have that treatment continued while incarcerated. I experience severe depression, fatigue, anxiety, body-image disorders, fear, eating disorders, persecution, a constant state of unease, and self-harming behaviors, including a history of genital mutilation, as a result of this lack of treatment. The standard treatment, which I require, is as follows; 1) the ability to live as the gender I identity as (female) in all aspects of life[;] 2) Hormone therapy (aforementioned)[;] 3) Gender-confirmation Surgery[.] Continued failure to provide all of the above constitutes a willful indifference to the constant, daily suffering I experience, and is a clear violation of my 8th amendment right to rec[ei]ve medical care.

Keohane Decl. (ECF 3-1) at 10-11 ¶ 38; Selected Pre-Litigation

Grievances (ECF 3-6) at 14.

70. On a document dated May 18, 2016, Dr. Dieguez denied this grievance

(Grievance No. 1605-401-009), stating:

Your request for administrative review has been received, reviewed and evaluated. In order to be diagnosed for Gender Dysphoria treatment evaluations of your pre-incarceration treatment records including but not limited to: a. hormone therapy; b. completed or in-process surgical procedures; c. life experiences consistent with the inmate's gender identity; and d. mental health history. [*sic*] Please submit a request to medical records to sign an authorization ('Consent and Authorization for Use and Disclosure Inspection and Release of Confidential Information,' DC4-711B) for the release of information for all pertinent outside medical and mental health records related to

Page 22

your Gender Dysphoria. Based on the above information, your grievance is DENIED.

Keohane Decl. (ECF 3-1) at 11 ¶ 39; Selected Pre-Litigation Grievances (ECF 3-6) at 15.

71. Plaintiff signed the referenced release form for the DOC at least twice. One such release form was dated 8/21/14. Another, signed by Plaintiff while shewas at Dade CI, is dated 1/7/16. Before signing that release, Plaintiff was told by a records custodian at Dade CI that the DOC already had the relevant records but that she needed to sign the release again so that the DOC could continue to access them. Keohane Decl. (ECF 3-1) at 11 ¶ 40.

72. On May 24, 2016, Plaintiff filed an appeal of the denial of Grievance No. 1605-401-009 to the DOC Secretary (appeal labeled as Grievance No. 16-6-23873), stating:

I am transgender and face serious, needless suffering on a daily basis. The reason given for denial of medical treatment (that I must submit my medical records) is blatant and false. All of my relevant medical history has already been submitted to the staff of ECI, and I have also previously signed this release of medical records. My records show that I was formally diagnosed with Gender Identity Disorder, and as the result of that I had begun hormone therapy. This diagnosis has also been confirmed by the mental health staff at this facility. Considering that I have this diagnosis as well as very clear records that show I was prescribed hormone therapy and had lived as female

for the majority of my life, this denial is based on no actual issue, and therefore is a case of willful indifference to my serious medical need for treatment. The treatment I require is as follows: 1. The ability to live as the gender I identify as (female)[;] 2. Hormone therapy[;] 3. Gender-confirmation Surgery. By not providing the necessary treatment, I am subjected to extreme discomfort, fear, depressions, fatigue, body image issues. As the records prove I was diagnosed and began treatment, this facility is in violation of Federal Inmate's Rights Statute 3.48, and in violation of the 8th amendment right not to be punished in a cruel or unusual manner. Refusal to provide medical treatment is a clear violation of both of these laws, as it is an obvious case of willful indifference.

Keohane Decl. (ECF 3-1) at 12 ¶ 41; Selected Pre-Litigation Grievances (ECF 3-6) at 16.

73. Plaintiff's appeal was "returned without action" with a date of July 1, 2016.

The response states:

Appeal Returned without Action: Your administrative appeal has been received and found to be in non-compliance with Rule 33-103, Inmate Grievance Procedure. This grievance presents the same issue as grievance log #14-6-39574. Per Rule 33-103.014(1)(q), grievances may be returned to the inmate without further processing if the inmate has filed more than one appeal of a grievance. Records reviewed indicate that you are still being followed by mental health. Based on the above information, your appeal is returned without action.

Keohane Decl. (ECF 3-1) at 12 ¶ 42; Selected Pre-Litigation Grievances (ECF 3-6) at 17.

74. This lawsuit was filed on August 15, 2016, along with a motion for preliminary injunction. *See* ECF 1; ECF 3.

75. After the lawsuit was filed, the DOC referred Plaintiff to an outside endocrinologist, Dr. Eugenio Angueira-Serrano, M.D., of Miami, Florida. Pretrial Stipulation (ECF 133) Part F ¶ 20.

76. Dr. Angueira first saw Plaintiff on September 2, 2016. Pretrial Stipulation (ECF 133) Part F ¶ 21.

77. Dr. Angueira evaluated Plaintiff's need for hormones. He concluded that she had gender dysphoria and prescribed her hormones to treat it. Pretrial Stipulation (ECF 133) Part F ¶ 22.

78. Female hormones will cause a transgender woman to have breast development, reduction in body hair, and changes in body shape. Pretrial Stipulation (ECF 133) Part F ¶ 18; *see also* Angueira Dep. (ECF 129-2) at 30-31.

79. Dr. Angueira prescribed Arimidex, Estradiol, and Aldactone. Pretrial Stipulation (ECF 133) Part F ¶ 23; FDOC-1216.

80. At that time, Plaintiff began receiving hormone therapy in DOC custody. She did not receive hormone therapy in DOC custody prior to that time. Pretrial Stipulation (ECF 133) Part F ¶ 24.

81. On September 14, 2016. Dr. Angueira stopped the Arimidex and also prescribed Lupron and medroxyprogesterone for Plaintiff. Pretrial Stipulation (ECF 133) Part F ¶ 25; FDOC-1102.

82. It was a mistake for Dr. Angueira to prescribe Arimidex. Angueira Dep. (ECF 129-2) at 37-38.

83. Around September 13, 2016, Plaintiff's hair was forcibly cut to less than a quarter inch all around. Keohane Decl. (ECF 33-3) at 4 ¶ 6.

84. As a result, Plaintiff could not stand to look at herself in the mirror and punched the mirror several times, causing her hand to swell up; Plaintiff very strongly considered many ways to hurt or kill herself. Keohane Decl. (ECF 33-3) at 5 ¶ 7.

85. Plaintiff wrote a grievance about her forced haircut, explaining that it was traumatic. Keohane Decl. (ECF 33-3) at 5 ¶ 8.

86. In January and February 2017, Plaintiff missed several doses of her hormone medication because of mismanagement by DOC and Wexford staff.

87. On February 20, 2017, at Everglades CI, Plaintiff submitted a grievance

(1702-401-099) concerning her hormone medication:

Chief Medical Officer

The pharmaceutical staff has been grievously mismanaging my medication, which has caused me serious stress, put me at risk of bodily harm, and resulted in my being placed in confinement due to security staff's refusal to acknowledge the medical emergency resultant from  my medication not being refilled. Twice within the past month I have turned in refill slips, well in advance, informed medical/nursing staff repeatedly that I am running low, and yet I was still not issued medication until after I totally ran out and had to declare a medical emergency.

The first instance was on 1/31/17, when I totally ran out of spironolactone, despite the fact that I turned in the refill paper on 1/17/17. I was never placed on any call out to pick up my refill. When I ran out, I had to declare a medical emergency; the multiservice lobby officer refused to acknowledge the emergency, Ofc. Lachande Thompson, in violation of policy as it is not security's job to make that call; she then falsified a DR and had me placed in confinement. This should never have been possible, as medical staff should never have allowed me to run out of my medication in the first place. Furthermore, though I did receive the refill for spironolactone, I never signed for it or received the paper to turn in for the next refill date 2/22/17 and am therefore unable to properly request this next necessary refill.

The second instance was on 2/12/17, when, despite turning in the refill slip on 2/4/17, attending a medical call-out on 2/9/17 in which I explained the imminent need for the refill, and advising nursing staff for three days pror every time I could, I still ran out of medroxyprogesterone and had to declare a medical emergency. Warden Acosta had to personally call medical staff around 11:30am that date to ensure that I received the needed refill, hours after the time when I am supposed to take my a.m. dose.

Furthermore, my medication is being issued in a totally irresponsible and improper manner; I am issued medroxyprogesterone in amounts of 100, when at 5mg each, my dosage is 12 pills per day, only giving 8 full days of medication at a time. The refill issued 2/10 (which I did not receive until 2/12) has its refill date at 2/19, which is impossible to meet when I have only

Page 27

8 days of medication; the estradiol, I am issued in amounts of 100, which I take 4 tabs of per day, obviously only lasts 25 days, but the refill dates are 30 days apart, as on the most recent refill, issued 1/31/17 which has a refill date of 3/1/17. This is absurd, negligent, irresponsible, and needs to be fixed immediately!

Selected Post-Litigation Grievances (ECF 129-23) at 2.

88. The response to this grievance (1702-401-099), signed February 23, 2017,

states:

Your request for administrative remedy or appeal has been received and reviewed.

This office cannot corroborate your allegations against the pharmacy department mismanaging your medication. On 01/27/2017 a call was placed to your dorm to pick up your Spiro lactone [sic] medication with the Nursing Supervisor and you were a no show. On 01/31/2017 you reported to medical and were advised that the Nursing Supervisor was in a meeting and you were instructed by the Multi Service Officer to return after lunch; at that time you refused to acknowledge the Officer's order and declared a medical emergency. You were placed in confinement for violating **Rule 33-601.314 Rules of Prohibited Conduct and Penalties for Infractions;** specifically *6-1 disobeying verbal or written order- any order given to an inmate or inmates by a staff member or other authorized person.*

Due to your hand restraints and confinement housing you did not sign for the Spiro lactone [sic] however, the Nursing supervisor submitted the refill slip to pharmacy on your behalf. The Medroxyprogesterone is dispensed by the pharmacy in a factory sealed bottle and is received in quantities of 100 only. This is out of our control at the Institution as your medication does not follow the standard quantity, refill and dispensing guidelines of the pharmacy and you do not have the authority to dictate how medication is prescribed.

To avoid any delays in your treatment a recommendation is being submitted to the provider for DOT (direct observation therapy) medication orders for administration at the pill line window.

Based on the above information, your grievance is DENIED.

Selected Post-Litigation Grievances (ECF 129-23) at 3.

89. On March 8, 2017 (stamped received on March 10), at Everglades CI, Plaintiff submitted a grievance (1703-401-064) concerning her need for social transition:

Chief Medical Officer
I am a transgender woman with a diagnosis of gender dysphoria which has been repeatedly admitted and confirmed by DoC medical employees and for counsel representing the DoC in federal court (Keohane v. Jones Case no. 4:16cv511-MW/CAS). I require access to all clothing and canteen items restricted to female inmates, as it is a medical necessity that I be able to socially transition and live as a female inmate. As it is mandatory to socially transition before one can be prescribed hormones for the second phase of transition, as I have lived my entire life as female from the age of 14 until my incarceration in part because it was required to receive the hormone therapy I later began, and as I have currently been on hormone therapy for a little over six months, it is clear that social transition is necessary medical care, yet I have been repeatedly been [sic] ignored and denied this medical care, which I repeat is a mandatory prerequisite for the hormone therapy I am currently receiving to be prescribed. Any prescription of hormone therapy therefore includes the admission that social transition is the necessary first step of transition.
Being unable to wear gender-conforming clothing, especially underwear, causes me severe physical discomfort that at times makes me ill, unable to eat, and is the source of depression, anxiety, feelings of hopelessness, and suicidality. Having makeshift female clothing removed by officers directly led to my suicide attempt in 2014 at the DeSoto Annex, and the self-castration attempt at the same facility in January 2015. It is torturous to be forced to wear men's underwear when you are a woman, and being unable to maintain the sort of feminine appearance I have throughout my entire

adolescent and adult life because I cannot purchase any cosmetics and am forced to comply with male standards for hair length compounds the problem. Additionally, I now have breast development that makes a bra not only an issue of treating my dysphoria, but also in that it is necessary for my own health (as I have scoliosis and can exacerbate my back problems without the support) and privacy, as the issued white tee-shirts are not a sufficient covering, and leave me feeling discomfort.

Selected Post-Litigation Grievances (ECF 129-23) at 6.

90. On March 12, 2017, at Everglades CI, Plaintiff submitted a grievance concerning her hormone medication:

The medical staff at ECI has grievously mismanaged my hormone therapy medication, placing my health at risk consistently by allowing my KOP refills to go unfilled, which has caused me to run out of medication which I must take on a daily basis. The attached response provides evidence of this malpractice; I allege that I was never placed on a pharmacy callout to pick up my medication, and that to this date I never have been. The response admits the first allegation and states that instead, a call was made to the dormitory, which is a violation of DoC policy for the pickup of medication in that no proper notification was given. At the time the call was allegedly made I was in a program, yet no call was made to that location, or on a subsequent date, despite the fact that the response admits I did not receive my medication and they were aware of this fact. The response also admits that I was given a DR for refusing to leave medical after declaring a medical emergency, which is a clear violation of medical emergency policy and demonstrable as retaliation, in that the DR was upheld at the institutional level. Furthermore, the response claims that institutional staff has no control of how the central pharmacy distributes the medication; this is a blatant lie, as they can simply order more than one sealed bottle at a time to ensure a supply is available at the institution, and can make any issues known to the central pharmacy, but the staff has refused to do either of these things. Additionally this response completely fails to address the second instance which I ran out of medication, and offers absolutely no explanation or

mitigation for how this happened, but does not contend that it did not happen and thereby accepts the allegation as true. Since I have received the response to this grievance, as of 3-12-17, I have run out of medroxyprogesterone again and have, at this time, missed one day's dose, despite having turned in the refill on time, and having both my mother and lawyer directly notify the warden and DoC attorney. Yet again, I was not even placed on a call-out. This denial proves that the entire institution is willfully indifference to my medical care, as they allowed the exact same problem to occur again by doing nothing.

Selected Post-Litigation Grievances (ECF 129-23) at 1.

91. The response to Plaintiff's grievance concerning female clothing (1703-401-

064), dated March 23, 2017 (stamped March 27), states:

Your request for administrative remedy or appeal has been received and reviewed.

We acknowledge receipt of our grievance dated 03/08/17 and received 03/10/17.

Your request for a bra is currently being discussed with the Florida Department of Corrections. This request is being considered due to your being on hormone therapy treatment and as a result of said treatment, you are developing breasts although not at the level that you have described in your grievance.

Your request for access to "all" clothing and canteen items restricted to female inmates is being denied as same has not been determined to be medically necessary. Further, it is our understanding that your request for these items is the subject of a pending lawsuit.

In addition, this grievance addresses more than one issue or complaint which is found to be in non-compliance with Rule 33-103, Inmate Grievance Procedure and can be returned. In the future only one issue or complaint must be addressed.

Based on the above information, your grievance is DENIED.

Pretrial Stipulation (ECF 133) Part F ¶ 26; Selected Post-Litigation Grievances (ECF 129-23) at 5.

92. On March 28, 2017 (stamped received on April 5), Plaintiff appealed this grievance response (appeal number 17-6-13882), stating:

There are several key problems with the denial of the grievance (1703-401-064), which are as follows: firstly, the assertion that the grievance addresses more than one issue is false – the issue is that I require access to all clothing and canteen items restricted to female inmates in order to socially transition, which is a serious medical need. That the respondents arbitrarily single out a bra from this grouping of items, all of which fall under the same category and are required to treat my gender dysphoria, does not allow them to claim it as a separate issue, as it is not. Furthermore, I have never met with any member of the medical staff to evaluate whether or not any social transition is necessary or not; in the same manner, no member of the medical staff of ECI has in any way evaluated any aspect of my development. This illustrates the blatant negligence and willful indifference of the aforementioned staff, as it is clearly irresponsible to make any medical determination about a person without evaluating them for the issue raised. Additionally, this response demonstrates the ineptness of the respondent in that, without ever making any medical evaluation of my development, the respondent nevertheless claims it is "not at the level [I] described in [my] grievance" – when in fact I did not describe the development as being at any level whatsoever, but have only described the actual problems I have faced because I have been denied gender-appropriate clothing.

The fact of my breast development is due to my taking hormone therapy; I take hormone therapy as treatment for my gender dysphoria; therefore it is impossible to separate out a bra from the sole issue that I raise, which is that it is medically necessary for me to receive all clothing and canteen restricted to female inmates as it is all necessary to treat my gender dysphoria. It is the duty of the medical staff to evaluate me for social transition in all its aspects and make a determination – "has not been determined" does not suffice after the repeated raising of this issue.

Pretrial Stipulation (ECF 133) Part F ¶ 27; Selected Post-Litigation Grievances (ECF 129-23) at 4.

93. En route to Jefferson CI, Plaintiff was transferred to the SFRC on April 6, 2017. Before she left Everglades CI, she had her hair trimmed by a barber at Everglades CI so that her hair would not be in violation. Immediately upon her arrival at the SFRC, Plaintiff was told that she needed get a haircut, and she was placed in confinement for refusing to get her haircut after explaining that her hair was not in violation. Keohane Decl. (ECF 105-1) at 1 ¶ 2.

94. For three days, from April 7-9, 2017, Plaintiff did not receive her medication, and she twice attempted suicide as a result. On April 8, 2017, Plaintiff attempted to hang herself with a sheet from her bunk. On the morning of April 10, 2017, Plaintiff attempted suicide again by tying a pants leg around a door handle, tying the other leg around her neck, and sitting down on the floor to cut off the blood flow. Later that morning, Plaintiff received her medication. Keohane Decl. (ECF 105-1) at 2-4 ¶¶ 3-9.

95. Because Plaintiff had not received her medication (medroxyprogesterone, spironolactone, and estradiol) the three previous days, she suffered

withdrawal symptoms that included depression, fatigue, hot flashes, cold flashes, stomach cramps, diarrhea, and loss of appetite. Keohane Decl. (ECF 105-1) at 4 ¶ 9.

96. During this stay at SFRC, Plaintiff never spoke to any doctor. Keohane Decl. (ECF 105-1) at 4 ¶ 10.

97. On April 11, 2017, at SFRC, Plaintiff's hair was forcibly cut again. When she was taken out of the "psych dorm," she was slammed against the wall by Sergeant Jackson. Plaintiff was sat down on a bench while Officer Jones called for a barber. Plaintiff explained the lawsuit and how her hair wasn't in violation of DOC policy because it wasn't touching her ears or collar, and Officer Jones told her that he was going to cut her hair anyway. He said, "while you're in a male prison, you're going to look and act like a man." The barber arrived, and the other two officers, Officers Ellis and Viera, held Plaintiff against a wall while Officer Jones cut her hair. Plaintiff asked that if they were going to cut it that that they just trim it off the ears and collar. Plaintiff's head was then shaved. Keohane Decl. (ECF 105-1) at 4-5 ¶ 10.

98. Plaintiff's most recent appeal concerning social transition (17-6-13882) was denied on May 1, 2017 (stamped May 3), and stated:

Page 34

Appeal Denied:
Your request for administrative remedy was received at this office and it was carefully evaluated. Records available to this office were also reviewed.
Reviewed records indicate that you received and signed for the bras (4) on 5/2/17. You were issued a pass for the bras by medical.
It is the responsibility of the mental health care staff to determine the appropriate treatment regimen for the condition you are experiencing. You will need to address any concerns with social transitioning with your mental health counselor.
Should you experience medical/mental health problems, sick call is available so that you may present your concerns to your health care staff.

Pretrial Stipulation (ECF 133) Part F ¶ 28; Selected Post-Litigation

Grievances (ECF 129-23) at 11.

99. Plaintiff's most recent appeal concerning her medication (17-6-11695) was

denied on May 1, 2017 (stamped May 3), and stated:

Appeal Denied:

Your request for administrative remedy was received at this office and it was carefully evaluated. Records available to this office were also reviewed.

Reviewed records indicate that you are currently at Jefferson Cl and you are receiving your medications as prescribed.

Please be advised that it is an inmate's responsibility to turn your refill slips in a timely manner. If you have problems receiving your prescribed medications, then it is your responsibility to access sick call to address it with the medical staff.

Pretrial Stipulation (ECF 133) Part F ¶ 29; Plaintiff's Trial Exhibit 6.

100.    Around May 2, 2017 (FDOC-6639), a physician at Jefferson CI determined that is was medically necessary for Plaintiff to have a bra because of her breast development resulting from her hormone treatment. Pretrial Stipulation (ECF 133) Part F ¶ 13.

101.    Plaintiff's providers at Everglades CI knew that social transition, including dressing and grooming in accordance with one's gender identity, was part of the standards of care for gender dysphoria. *See* Johnson Dep. (ECF 129-7) at 52:8 – 53:3; Rivero Dep. (ECF 129-11) at 23:8-15 (but prison is not the "best setting"); Baute Dep. (ECF 129-3) at 17:4-8.

102.    Plaintiff's providers at Everglades CI did not evaluate whether she had a need to access female clothing and grooming standards because DOC policy does not permit access to female clothing and grooming standards in male facilities. Baute Dep. (ECF 129-3) at 39, 52, 65, 66:9-18; Rivero Dep. (ECF 129-11) at 45:2 – 47:7; 73:4-11; Johnson Dep. (ECF 129-7) at 95-96, 98, 116; *see also* Dieguez Decl. (ECF 27-1) ¶ 9; Hernandez Decl. (ECF 24-1) ¶ 8.

103.    Plaintiff's providers at Everglades lacked the competence to assess treatment needs for gender dysphoria. *See, e.g.*, Rivero Dep. (ECF 129-11)

at 79; *id.* at 22-23; Johnson Dep. (ECF 129-7) at 103-04. The same is true of medical staff who saw Plaintiff or reviewed her records. *See* Hernandez Dep. (ECF 42-1) at 46; Dieguez Dep. (ECF 40-1) at 42, 49.

104.    Plaintiff has requested the ability to socially transition—specifically, access to female underpants and grooming standards—from the mental-health staff at Jefferson CI, but she has not been permitted access to female underpants and grooming standards in that facility either.

105.    Even if a psychologist or therapist did believe they could request an exception to the grooming and clothing standards for a gender dysphoric patient who has a need to socially transition, it is clear that Dr. Timothy Whalen, the DOC's Chief Clinical Officer, would not grant it. *See* 30(b)(6) Dep. (Whalen) (ECF 128-1) at 106-112 (stating that it would be an "uphill battle" and "a hard sell" for him).

## Dr. Santeiro's Assessment for Litigation

106.    The only purported evaluation for Plaintiff's need for access to female undergarments and grooming standards was by Dr. Jose Santeiro, M.D.

107.    Dr. Santeiro was asked by Wexford counsel to evaluate Plaintiff because of this lawsuit. Pretrial Stipulation (ECF 133) Part F ¶ 30.

108.     Dr. Santeiro was specifically asked to evaluate Plaintiff's need for access to female clothing and grooming standards. Pretrial Stipulation (ECF 133) Part F ¶ 31.

109.     Dr. Santeiro is the regional psychiatrist for Wexford, Region IV (which includes Everglades CI). Pretrial Stipulation (ECF 133) Part F ¶ 32.

110.     Dr. Santeiro's role is limited to management of psychiatric medications. Santeiro Dep. (Vol. I) (ECF 129-12) at 21:7-9.

111.     Plaintiff has not been on any psychiatric medications since entering DOC custody. Pretrial Stipulation (ECF 133) Part F ¶ 33.

112.     Dr. Santeiro is not part of Plaintiff's treatment team.  Santeiro Dep. (Vol. I) (ECF 129-12) at 64.

113.     Dr. Santeiro was asked to do the evaluation because Plaintiff's treating psychologist, Dr. Johnson—Plaintiff's treating psychologist—refused to do it. Santeiro Dep. (Vol. I) (ECF 129-12) at 68.

114.     Dr. Santeiro met with Plaintiff on September 27, 2016, to evaluate her. Pretrial Stipulation (ECF 133) Part F ¶ 32; Santeiro Dec. (ECF  45-1) ¶ 7.

115.    Dr. Santeiro concluded that Plaintiff did not have a "medical need" for access to female clothing and grooming standards. Pretrial Stipulation (ECF 133) Part F ¶ 35.

116.    Dr. Santeiro's conclusion that Plaintiff did not have a "medical need" for such access is based on his understanding that that phrase relates only to physical-health needs, not mental-health needs. Santeiro Dep. (Vol. I) (ECF 129-12) at 91:2-10, 93:1-4.

117.    Dr. Santeiro's conclusion that Plaintiff did not have a need for access to female clothing and grooming standards was also based on his conclusion that Plaintiff was not in distress and had dealt with only mild stress. Santeiro Decl. (ECF 45-1) at 2 ¶¶ 5, 8-9; Santeiro Dep. (Vol. I) (ECF 129-12) at 98:2-3.

118.    Dr. Santeiro only had limited information about Plaintiff when he evaluated her and formed his conclusions. He did not read most of her medical records (only those portions related to psychiatric medication, which Plaintiff was not on).  Santeiro Dep. (Vol. I) (ECF 129-12) at 80:20 – 83:1. He was not aware that she had a past suicide attempt in prison or that one was related to denial of female undergarments and forced haircuts; nor

was he aware that the incident where she cut her scrotum was also related to the denial of treatment for gender dysphoria.  Santeiro Dep. (Vol. I) (ECF 129-12) at 83:7-17, 108:3-19. He did not ask Plaintiff how it affected her to be denied access to female clothing and grooming standards; it was barely discussed. Santeiro Dep. (Vol. I) (ECF 129-12) at 116:25 – 117:9; Santeiro Dep. (Vol. II) (ECF 129-13) at 31, 52-53.

119.    Dr. Santeiro's conclusion that Plaintiff did not have a need for access to female clothing and grooming standards was also based on the fact that she was in prison. *See* Dr. Santeiro's 9/27/16 handwritten evaluation (Santeiro Dep. Exhibit 8) (Plaintiff's Trial Exhibit 38) at 1 ("No indication for female clothing or long hair in this environment"); Santeiro Dep. (Vol. I) (ECF 129-12) at 99-100 (testifying that social transition is very appropriate in the community and that if he had evaluated Reiyn outside of the prison setting, he "would probably agree with" her socially transitioning).

120.    Dr. Santeiro said that Plaintiff's treatment team concurred in his conclusions, Santeiro Dep. (Vol. I) (ECF 129-12) at 12, but he did not have any meaningful discussion with them. Dr. Santeiro met for only 1-2 minutes with 2 of the 3 members of Plaintiff's treatment team (Ms. Baute and Mr.

Rivero-Guevara). *Id.* at 12-16. He said they indicated their concurrence only by nodding their head when he asked if they agreed. *Id.* at 15. There was no discussion. *Id.* at 13-16. Dr. Santeiro never met with Plaintiff's treating psychologist, Dr. Johnson.  *Id.* at 13.

121.    Dr. Santeiro lacks the qualifications to assess treatment for gender dysphoria. Not only was he unaware of the protocols for the treatment of gender dysphoria, he was unaware that such protocols even exist. Santeiro Dep. (Vol. I) (ECF 129-12) at 44:25 – 45:7.

122.    However, Dr. Santeiro was aware that social transition is part of treatment and that if Plaintiff were in the community (as opposed to in prison), he would support her dressing and grooming as a woman. Santeiro Dep. (Vol. I) (ECF 129-12) at 99-100.

123.    Dr. Santeiro did not believe access to female clothing or grooming standards could be permitted in prison.  He said he is "not authorized to enforce or make an exception to the [DOC's policies on hair and clothing standards]," Santeiro Decl. (ECF 45-1) at 2 ¶ 9; and there is no such thing as a psychological (as opposed to medical) pass, Santeiro Dep. (Vol. II) (ECF 129-13) at 59, 60.

<u>The Impact on Plaintiff of the Failure to Reasonably Treat Her Gender Dysphoria</u>

124.      Plaintiff has suffered significant anguish and distress due to the failure
to access treatment for gender dysphoria while in custody. *E.g.*, Keohane
Decl. (ECF 3-1) ¶¶ 11, 20, 23-25, 29, 38, 41, 44-45; Keohane Decl. (ECF
33-3) ¶¶ 2-5, 7-8, 11; Keohane Decl. (ECF 105-1) ¶¶ 4, 8-10.

125.      Plaintiff has attempted suicide on several occasions and attempted to
self-castrate due to the lack of treatment for her gender dysphoria. *See*
Keohane Decl. (ECF 105-1) ¶¶ 4, 8; 1/8/15 Healthcare Note (ECF 33-1)
(Plaintiff's self-report: "I'm upset because officer asked me to take off my
bras, I cut my testicle"; notes self-inflicted 3cm-deep laceration of scrotum);
1/8/15 Emergency Room Record (ECF 3-11) (self-inflicted 3cm laceration
of scrotum); 1/13/15 Transfer Summary for Inpatient Mental Health Care
(ECF 129-24) ("The inmate was placed on SHOS from open population after
conflict with security staff over stuffing his breast area to mimic breasts. The
inmate was sent back to the dorm and also told to get a haircut. Upon return
to the dorm, the inmate cut the base of his testicles.").

126.      Plaintiff's suicide attempts involved efforts to hang herself by cutting
off the blood flow to her brain while allowing herself to breathe because she

feared that the drive to breathe would prevent her from going through with it.

127.   One of her suicide attempts resulted in ligature marks on her neck and vital signs showing that she was in shock (she was tachycardic and hypotensive). *See* Plaintiff's Trial Exhibits 8, 10, 12.

128.   When Plaintiff attempted to self-castrate, she cut a 3cm-deep incision in her scrotum to try to remove her testicles, but she was unable to continue because the pain was too severe.

129.   While Plaintiff began receiving hormone therapy after filing this lawsuit, and eventually began receiving bras, the DOC continues to deny her access to female underpants and female grooming standards, which causes her continued distress.

130.   The inability to wear female underpants and groom as a woman— including growing her hair longer than the male facility rules permit—has contributed to a number of these instances of self-harm.

131.   Her attempted hanging in October 2014 occurred because she was not being provided with transition-related care. *See* Keohane Decl. (ECF 3-1) at 5 ¶ 17.

132.    Her attempted hanging in April 2017 occurred after Plaintiff was ordered to get her hair cut and didn't have access to her hormones. *See* Keohane (ECF 105-1) ¶¶ 2-8.

133.    Her attempted self-castration occurred after officers threatened to confiscate female underwear if they caught her with it again, and after they also threatened to cut her hair. 1/8/15 Healthcare Note (ECF 33-1) (Plaintiff's self-report: "I'm upset because officer asked me to take off my bras, I cut my testicle"; notes self-inflicted 3cm-deep laceration of scrotum); 1/8/15 Emergency Room Record (ECF 3-11) (self-inflicted 3cm laceration of scrotum); 1/13/15 Transfer Summary for Inpatient Mental Health Care (ECF 129-24) ("The inmate was placed on SHOS from open population after conflict with security staff over stuffing his breast area to mimic breasts. The inmate was sent back to the dorm and also told to get a haircut. Upon return to the dorm, the inmate cut the base of his testicles.").

134.    When Plaintiff was forced to have a buzz cut in September 2016, she couldn't stand to look at herself in the mirror and punched the wall and mirror several times until her hand swelled and strongly considered ways to kill or hurt herself. Keohane Decl. (ECF 33-3) at 5 ¶ 7.

135.    For a period of time, Plaintiff stopped going to breakfast because an officer there told her she better have her hair cut or he was going to give her one and she feared what he would do. Keohane Dep. (ECF 129-8) at 83.

136.    The well-accepted standards of care for treating gender dysphoria include social transition, which involves living one's life consistently with one's gender identity, including dressing and grooming accordingly. *See* Brown Dep. (ECF 129-4) at 101:6-9; Brown Report (ECF 105-2) at 24; Angueira Dep. (ECF 129-2) at 18:3-5; Johnson Dep. (ECF 129-7) at 52:8 – 53:3; Rivero Dep. (ECF 129-11) at 23:8-15; Baute Dep. (ECF 129-3) at 17:4-8; Santeiro Dep. (Vol. I) (ECF 129-12) at 43:13-15; Levine Dep. (ECF 129-9) at 167:21 – 168:1.

137.    The DOC does not purport to follow the community standards of care for gender dysphoria. 30(b)(6) Dep. (Whalen) at 179; Santeiro Dep. (Vol. I) (ECF 129-12) at 99-100; Baute Dep. (ECF 129-3) at 19-20.

138.    Suicidality and attempted self-treatment through self-castration (to eliminate the source of testosterone) are common and predictable consequences of lack of appropriate treatment for gender dysphoria in prison. *See, e.g.*, Brown Report (ECF 105-2) at 22-23.

Page 45

139.    Plaintiff's treating endocrinologist, Dr. Angueira, testified that inadequate treatment of gender dysphoria can lead to depression, anxiety and suicidal ideation. *See* Angueira Dep. (ECF 129-2) at 34-35.  He further testified that some transgender women can have significant distress if unable to present as a female, *id.* at 23-24, and that if Plaintiff is not permitted to grow her hair out or access female undergarments, there is a risk that she could self-harm again, *id.* at 32. Dr. Angueira told the Regional Medical Director of the region covering Everglades CI, Dr. Hernandez, that he thought the ability to grow her hair and wear a bra would be helpful for Plaintiff and was surprised when Dr. Hernandez told him that the psychiatrist said it wasn't necessary. *Id.* at 19-20.

140.    Plaintiff is surviving on the hope that she will get the relief she seeks through this litigation.  If she does not prevail, there is a significant risk that self-harm will resume. *See* Brown Report (ECF 105-2) at 28.

141.    Defendant's expert, Dr. Levine, agreed that it could be psychologically or psychiatrically helpful for Plaintiff to have access to female undergarments and grooming standards, including longer hair.  *See*

Levine Report (ECF 105-4) at 11; Levine Dep. (ECF 129-9) at 88, 107, 108, 110.

142.    The Massachusetts Department of Corrections Gender Identity Disorder program, which Dr. Levine recommended the creation of and which he consults with, Levine Dep. (ECF 129-9) at 31-34, provides inmates with gender dysphoria access to female undergarments and grooming standards and supplies, *id.* at 34, 50-52, 135; *see also* Massachusetts Department of Correction Gender Identity Disorder Policy (ECF 129-25) at 12 (PDF p.14).

143.    Dr. Levine disagrees with the use of the term "medically necessary" to refer to social transition (including accessing female undergarments and grooming standards) because his understanding of that term is limited to things that physically affect the body and require a doctor to prescribe it. Levine Dep. (ECF 128-9) at 105-108.

144.    Dr. Levine opined that if Plaintiff is denied access to the hair length and clothing that she is seeking, she could be vulnerable to "acute decompensation," Levine Dep. (ECF 128-9) at 89-90, and would have "a suicidal ideation and crisis," *id.* at 265.

The DOC's Clothing and Grooming Standards

145.     The DOC's hair-length policy for men's facilities requires that hair be
above the ear and collar. *See* Fla. Admin. Code r. 33-602.101(4); 30(b)(6)
Dep. (Kirkland) (ECF 129-1) at 197.

146.     Inmates at male facilities must cut their hair with the clippers and
clipper guards provided by the DOC. Scissors may not be used. Pretrial
Stipulation (ECF 133) Part F ¶ 36; 30(b)(6) Dep. (Kirkland) (ECF 129-1) at
202, 212, 215.

147.     The DOC does not provide clipper guards larger than a size 4, *see id.*
at 202, which cuts the hair to half an inch.

148.     The DOC's clippers and guards do not permit the hair to be cut any
longer than 1.5 inches, *see id.* at 212, and maybe as little as a half inch.

149.     The DOC will not permit Plaintiff to have a feminine hairstyle, even if
her hair is above the ear and collar. 30(b)(6) Dep. (Kirkland) (ECF 129-1) at
203-08.

150.     There is essentially no restriction on hair length in DOC women's
facilities. *See* Kirkland Dep. (ECF 37-1) at 24:25 – 25:4.

151.    Inmates at women's facilities are not required to maintain one consistent hair length; if a new hair length drastically changes an inmate's appearance, she would get a new ID card. Kirkland Dep. (ECF 37-1) at 30.

152.    The DOC clothing policy for men's facilities does not permit bras or panties. Nevertheless, a medical exception is made for an inmate's need for the physical support of a bra. *See* Fla. Admin. Code r. 33-602.101(2); 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 236:8-20.

153.    The DOC clothing policy for women's facilities includes state-issued bras and panties. A sports bra is available in women's facilities. 30(b)(6) Dep. (Prisk) (ECF 129-1) at 40.

154.    Makeup is available for purchase in the canteen in women's facilities but not in men's facilities. Pretrial Stipulation (ECF 133) Part F ¶ 37; 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 229.

155.    Inmates at men's facilities are not permitted to wear makeup. Pretrial Stipulation (ECF 133) Part F ¶ 38; 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 229.

The DOC's Policies Concerning Treatment of Gender Dysphoria

156.     DOC policy once included a provision that prohibited the DOC from initiating hormone therapy for transgender inmates. This policy was reflected in the immediately previous version of Procedure Number 602.053. The policy was the first sentence of Specific Procedure 2(a)5.: "Inmates who have undergone treatment for GD will be maintained only at the level of change that existed at the time they were received by the Department." This language was added to written DOC policy in December 2013. *See* Former Procedure 602.053 (ECF 3-15) at 6.

157.     The provision that "[i]nmates who have undergone treatment for GD will be maintained only at the level of change that existed at the time they were received by the Department" was deleted in the replacement Procedure Number 602.053 that was issued on October 14, 2016. *See* Current Procedure 602.053 (ECF 129-22).

158.     Dr. Timothy Whalen is the DOC's Chief Clinical Officer. Pretrial Stipulation (ECF 133) Part F ¶ 39; Whalen Dep. (ECF 129-16) at 8.

159.     Dr. Whalen has the final say on all medical and mental-health matters in the DOC. 30(b)(6) Dep. (Whalen) (ECF 129-1) at 111:24-112:15; *see also* Pretrial Stipulation (ECF 133) Part F ¶ 40 ("Dr. Whalen, in consultation with

other health care officials, has the final say on all medical and mental-health matters in the DOC.").

160. Dr. Whalen believes that mental-health counseling is the most appropriate treatment for a transgender female inmate who is at significant risk of suicide if she is not permitted access to female grooming standards. 30(b)(6) Dep. (Whalen) (ECF 129-1) at 108:6-18; 114:21-25.

161. Dr. Whalen is not sure whether social transition diminishes the effects of gender dysphoria. 30(b)(6) Dep. (Whalen) (ECF 129-1) at 113:23 – 114:20.

162. Dr. Whalen is not fully convinced that hormone therapy lessens the effects of gender dysphoria. *See* 30(b)(6) Dep. (Whalen) (ECF 129-1) at 118:14-18.

163. Dr. Whalen believes gender dysphoria "probably" exists but is not 100% sure. 30(b)(6) Dep. (Whalen) (ECF 129-1) at 119:2 – 120:23.

164. In the DOC, the WPATH standards of care must be considered by medical and mental-health providers ("have to be looked at"), but they are not implemented in the DOC at this time. 30(b)(6) Dep. (Whalen) (ECF 129-1) at 178-79.

165.     No inmate in the DOC has been permitted an exception to the hair-length requirement for DOC male facilities. Pretrial Stipulation (ECF 133) Part F ¶ 41; 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 233.

<u>Policies of Other Prison Systems</u>

166.     The Federal Bureau of Prisons ("BOP") is the largest prison system in the country.

167.     The BOP does not restrict hair length for inmates in male facilities, including transgender female inmates. *See* BOP Program Statement, Grooming at 1,2, https://www.bop.gov/policy/progstat/5230_005.pdf; *see also* BOP Transgender Offender Manual at 11, https://www.bop.gov/policy/progstat/5200.04.pdf (clothing policy).

168.     The California Department of Corrections and Rehabilitation ("CDCR") is the third-largest prison system in the country, after the BOP and the Texas system.

169.     The CDCR does not restrict hair length for inmates in male facilities, including transgender female inmates.

170.     Many other prison systems allow transgender female inmates at men's facilities to access female clothing and grooming standards and canteen

items. *See* Subia Rebuttal (ECF 129-19) at 3; 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 217; Upchurch Dep. (ECF 129-15) at 8-9, 77 (a "good number of [DOCs] don't restrict [hair length]," including Ohio and Utah).

Prison Safety

171.    Transgender women are targeted for abuse even without access to female clothing and grooming standards.

172.    The DOC can maintain the safety of transgender women even if provided access to female clothing and grooming standards.

173.    Apart from segregation of the inmate, the means the DOC has to protect that inmate include "overall security" ("[s]taffing, observations, checks, video monitoring equipment"), presence of staff, institutional transfer, different housing placement within the facility, or the segregation of another inmate. 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 252.

174.    Pursuant to the Prison Rape Elimination Act, the DOC assesses transgender inmates biannually to determine whether there are any safety issues that need to be addressed. 30(b)(6) Dep. (Prisk) (ECF 129-1) at 34.

175.    It is FDOC's position that if having longer hair or female undergarments or makeup were deemed to be medically necessary for an

inmate with gender dysphoria, then the accommodation would be provided. 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 218-220, 225, 227, 230; Upchurch Dep. (ECF 129-15) at 60-62, 70-71.

176.     Numerous inmates are provided with various forms of special treatment for medical reasons. These forms of special treatment—not available to every inmate—include access to specific diets, relief from certain types of physical exertion, relief from work assignment, access to sunglasses and hats to protect against the sun, cotton blankets (for wool allergy), and special footwear. 30(b)(6) Dep. (Whalen) (ECF 129-1) at 129-143; Medical Passes (ECF 129-21).

177.     Restricting access to these forms of special treatment based on medical need has not led to security problems within the DOC.

178.     The DOC's security expert opined that security issues could arise due to perceived preferential treatment in the granting of religious diets. Upchurch Dep. (ECF 129-15) at 76-77.

179.     The availability of special meals for inmates who follow particular religious diets has not led to security problems within the DOC. *Cf.* Kirkland

Dep. (ECF 37-1) at 63 (does not consider the provision of a kosher meal to be preferential treatment).

180.     Panties don't pose much of a security issue because inmates are supposed to keep their undergarments covered up.  30(b)(6) Dep. (Kirkland) (ECF 129-1) at 223-24.

The DOC's Classification, Identification, and Housing of Transgender Inmates

181.     The DOC classification code "TIM" refers to a transgender female inmate with a penis (i.e., Transgender Inmate with Male genitalia). 30(b)(6) Dep. (Prisk) (ECF 129-1) at 35.

182.      The DOC classification code "TIF" refers to a transgender male inmate without a penis (i.e., Transgender Inmate with Female genitalia). 30(b)(6) Dep. (Prisk) (ECF 129-1) at 36.

183.      An inmate receives a TIF or TIM designation if a DOC medical contractor or subcontractor conducts an assessment and determines that the inmate has gender dysphoria. 30(b)(6) Dep. (Prisk) (ECF 129-1) at 48-49.

184.     Between February 29 and March 2, 2016, the DOC or Wexford determined that Plaintiff did "not classify under the transgender criteria." *See* Plaintiff's Trial Exhibit 27 (FDOC-5943 email from Janine Hills).

185.    The DOC believes that, currently, approximately 25 inmates have self-identified as transgender. 30(b)(6) Dep. (Reimers) (ECF 129-1) at 66.

186.    Approximately 15 current inmates in the DOC have been diagnosed with gender dysphoria. 30(b)(6) Dep. (Reimers) (ECF 129-1) at 66.

187.    Housing placements of transgender inmates are not based just on genitals; rather, they are determined on a case by case basis based on safety of the inmate and other inmates.  30(b)(6) Dep. (Prisk) (ECF 129-1) at 26-27.  A transgender woman could be placed at a female facility.  *Id.*

188.    Dr. Dieguez and Mr. Kirkland believe that housing of transgender inmates is based on genitals. *See* Kirkland Dep. (ECF 37-1) at 52:4-18, 53:12 – 54:17; *cf. also* Dieguez Dep. (ECF 40-1) at 52:24 – 53:8.

189.    Currently, no inmate with a penis is housed in a DOC women's facility. 30(b)(6) Dep. (Prisk) (ECF 129-1) at 28.

190.    The only inmate with a penis ever to be housed in a DOC women's facility was an intersex inmate with an "under-formed," non-"functioning" penis. 30(b)(6) Dep. (Prisk) (ECF 129-1) at 29-30.

191.    A transgender female inmate who has breasts is allowed to have a sports bra. 30(b)(6) Dep. (Prisk) (ECF 129-1) at 39-40.

192.    A transgender inmate with a TIM or TIF classification is permitted to shower separately, and pat-down searches are always conducted by female staff members. 30(b)(6) Dep. (Prisk) (ECF 129-1) at 43-44.

193.    Hormone therapy for transgender females diminishes erections and ejaculation because very little testosterone is present. Over time—about six months, or in some cases up to a year—if the hormone therapy is working correctly, there is a complete suppression of testicular functioning that would prevent an individual from having an erection. Angueira Dep. (ECF 129-2) at 35-36.

## Proposed Conclusions of Law

1. This Court has subject-matter jurisdiction over the parties' disputes.

2. Plaintiff has a serious medical need for treatment for her gender dysphoria.

3. A claim for access to female clothing and grooming standards to treat gender dysphoria is cognizable as an Eighth Amendment medical-necessity claim.

4. Because the DOC and its contracted medical providers applied the DOC's male clothing and grooming standards to Plaintiff without regard to her medical need for access to the female standards, the DOC was deliberately

indifferent, within the meaning of the Eighth Amendment, to Plaintiff's serious medical need for treatment for her gender dysphoria.

5. Because the DOC and its contracted medical providers lacked the competence to assess Plaintiff's treatment needs for her gender dysphoria, the DOC was deliberately indifferent, within the meaning of the Eighth Amendment, to Plaintiff's serious medical need for treatment for her gender dysphoria.

6. Because the DOC and its contracted medical providers so significantly departed from the community standards of care for treating gender dysphoria with respect to Plaintiff, the DOC was deliberately indifferent, within the meaning of the Eighth Amendment, to Plaintiff's serious medical need for treatment for her gender dysphoria.

7. The doctrine of voluntary cessation applies with respect to Plaintiff's claim for injunctive relief concerning the provision of hormone therapy.

8. Plaintiff is entitled to past nominal damages for the denial of hormone therapy and access to female clothing and grooming standards, including access to a bra.

9. The provision in former Procedure 602.053 stating that "[i]nmates who have

undergone treatment for GD will be maintained only at the level of change

that existed at the time they were received by the Department" is

unconstitutional.

<u>Date</u>: Thursday, June 29, 2017

Respectfully submitted,

**/s/ Daniel B. Tilley**
**Daniel B. Tilley**
Florida Bar No. 102882
**Nancy G. Abudu**
Florida Bar No. 111881
ACLU Foundation of Florida
4343 West Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
nabudu@aclufl.org

**Leslie Cooper***
ACLU Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2627
LCooper@aclu.org
*Admitted to the N.D. Fla.

**Matthew D. Grosack**
Florida Bar No. 073811
DLA Piper LLP (US)
200 S. Biscayne Boulevard, Suite 2500
Miami, Florida 33131
(305) 423-8554
matthew.grosack@dlapiper.com

**Elizabeth C. Akins****
DLA Piper LLP (US)
1201 W. Peachtree Street, NW
Suite 2800
Atlanta, Georgia 30309
(404) 736-7812
liza.akins@dlapiper.com
**Admitted pro hac vice

**ATTORNEYS FOR PLAINTIFFS**