# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

Reiyn Keohane,

        Plaintiff,

v.                                Case No. 4:16-cv-511-MW-CAS

Julie Jones,
*in her official capacity as*
Secretary of the Florida Department
of Corrections,

        Defendant.

_____

## **<u>Plaintiff's Trial Brief</u>**

        Plaintiff, by and through undersigned counsel, files this trial brief pursuant to this Court's Order for Pretrial Conference, which requires such a brief "with citation of authorities and arguments in support of that side's position on all disputed issues of law." ECF 94 at 4 (IV.B.). Plaintiff will thus discuss the following issues: (1) the deliberate-indifference standard; (2) the cognizability under the Eighth Amendment of claims for access to female clothing and grooming standards; (3) nominal damages; and (4) voluntary cessation.

## I.      **<u>Deliberate indifference can be satisfied in several ways.</u>**

Under the Eighth Amendment's "evolving standards of decency," in a medical-necessity case "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Defendant (the "DOC") cites case law for the proposition that establishing deliberate indifference requires that relevant officials be "informed" or otherwise actually know that without the sought-after treatment, the inmate would be placed at substantial risk of suffering serious harm. Def. Mot. for Summ. J. ("Motion") (ECF 124) at 14 (citing *Chatham v. Adcock*, 334 F. App'x 281, 289 (11th Cir. 2009)). That is certainly one way to satisfy the deliberate-indifference standard.[1] As explained below, an inmate can also establish deliberate indifference—without explicitly identifying specific knowledge on the part of a particular person

---

[1] *Chatham* itself was a damages cases involving defendants sued both in their official and individual capacities, *see Chatham v. Adcock*, No. 3:05-cv-127-JTC, 2007 WL 2904117, at *1 n.1 (N.D. Ga. Sept. 28, 2007) (noting claim for injunctive relief was moot because the plaintiff was no longer incarcerated). It says nothing about an institution's historical indifference in an injunctive-relief case. *See LaMarca v. Turner*, 995 F.2d 1526, 1542 (11th Cir. 1993) (in case involving—in relevant part—injunctive-relief claim against current warden sued in his official capacity, rejecting current warden's argument—in the court's words—"that the court should have focused on his deliberate indifference, instead of the institution's historical indifference").

concerning a particular risk—in a number of other ways, including by showing (1) that the denial of care was not based on a medical judgment about the individual's needs but rather a blanket policy against the provision  of particular treatment, or (2) that the providers lacked competence to provide the treatment or assess the need for treatment, or that the treatment is otherwise not provided in accordance with community standards.[2]

### A. Blanket prohibition against providing the requested treatment

The Eighth Amendment requires that prisoners be provided with adequate medical care "based on an individualized assessment of an inmate's medical needs in light of relevant medical considerations." *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 242 (D. Mass. 2012).  Given this need for individualized assessment, blanket bans on certain forms of medical treatment regardless of medical need violate the Eighth Amendment. *See, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1063, 1068 (9th Cir. 2014) (holding that the "blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy that one eye is good enough

---

[2] Contrary to the DOC's assertion, Motion (ECF 124) at 15, expert testimony *is* relevant to assessing deliberate indifference in these contexts because it hinges on questions of what care is appropriate and who is qualified to make that determination.

for prison inmates is the paradigm of deliberate indifference") (quotation marks omitted); *Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005) (denial of hepatitis C treatment to a prisoner based on a policy that a particular drug could not be administered to inmates with recent history of substance abuse could constitute deliberate indifference if relied upon without consideration of individual medical need); *Mahan v. Plymouth Cty. House of Corr.*, 64 F.3d 14, 18 & n.6 (1st Cir. 1995) (suggesting that "inflexible" application of prescription policy may violate Eighth Amendment); *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 & n.32 (3d Cir. 1987) (by virtue of a blanket policy, "the County denies to a class of inmates the type of individualized treatment normally associated with the provision of adequate medical care"); *Jorden v. Farrier*, 788 F.2d 1347, 1348-49 (8th Cir. 1986) (citing with approval case holding that application of prison medication policies must be instituted in manner that allows individualized assessments of need); *see also Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (deliberate indifference can be established by showing that "necessary medical treatment has been delayed for non-medical reasons").

This principle encompasses treatment for gender dysphoria: as numerous courts have recognized, automatic exclusions of certain forms of treatment for gender dysphoria violate the Eighth Amendment. *See Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011) (state law that barred hormone therapy and gender-confirming surgery as possible treatments for prisoners with gender identity disorder facially violated the Eighth Amendment); *De'lonta v. Angelone* (*De'lonta I*), 330 F.3d 630, 634-35 (4th Cir. 2003) (prisoner with gender identity disorder stated a claim for deliberate indifference where the Department of Corrections withheld hormone therapy pursuant to a categorical policy against providing such treatment rather than based on individualized medical judgment); *see also Allard v. Gomez*, 9 F. App'x 793, 795 (9th Cir. 2001) ("[T]here are at least triable issues as to whether hormone therapy was denied Allard on the basis of an individualized medical evaluation or as a result of a blanket rule, the application of which constituted deliberate indifference to Allard's medical needs."); *Soneeya*, 851 F. Supp. 2d at 249, 253 (holding that a prison policy that "removes the decision of whether sex reassignment surgery is medically indicated for any individual inmate from the considered judgment of that inmate's medical providers" violated Eighth Amendment); *Houston v. Trella*, No. 2:04-cv-1393, 2006 WL 2772748, at *8

(D.N.J. Sept. 22, 2006) (claim that prison doctor's decision not to provide hormone therapy to prisoner with gender identity disorder based not on medical reason but policy restricting provision of hormones stated viable Eighth Amendment claim); *Barrett v. Coplan*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003) ("A blanket policy that prohibits a prison's medical staff from making a medical determination of an individual inmate's medical needs [for treatment related to gender identity disorder] and prescribing and providing adequate care to treat those needs violates the Eighth Amendment."); *Brooks v. Berg*, 270 F. Supp. 2d 302, 312 (N.D.N.Y. 2003) (prison officials cannot deny inmates medical treatment for gender identity disorder based on a policy of limiting such treatments to inmates who were diagnosed prior to incarceration), *vacated in part on other grounds*, 289 F. Supp. 2d 286 (N.D.N.Y. 2003).

Here, through its clothing and grooming policies, the DOC has a blanket ban on inmates in male facilities being permitted to dress and groom in accordance with their female gender identity pursuant to the accepted protocols for treating gender dysphoria.  The DOC's grooming policy imposes no limits on hair length in female facilities but requires that inmates in male facilities have their hair above the ear and collar and of uniform length. *See* Fla. Admin. Code r. 33-602.101(4)

Page 6

("Male inmates shall have their hair cut short to medium uniform length at all times with no part of the ear or collar covered.").[3] The hair-length policy provides for no medical exception. *See id.* Similarly, the DOC's clothing policy does not permit female bras or underpants for inmates in male facilities, and it does not provide for a medical exception. *See* Fla. Admin. Code r. 33-602.101(2)(a)1., 2., 4.c. In practice, the DOC permits inmates in male facilities to have bras if they are needed for physical support, but the DOC does not permit them for mental-health needs. 30(b)(6) Dep. (Reimers) (ECF 129-1) at 81-82 ("Q. And so my question is – let's say that a transgender female inmate doesn't need a bra for physical reasons, but there is an impact on her mental health and requests the exception, then do you

---

[3] Moreover, despite the contrary contention by the DOC, the policy does not permit Plaintiff or any other inmate at a male facility to have a more feminine hairstyle even within the strict length limits of the DOC grooming policy. *See* 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 203-08 (204, 205: can't be "styled"; 208: "certainly if [a transgender female inmate's haircut] separated that inmate and accentuated a female -- more of a female look, then that could certainly pose some concerns for security and the safety of that inmate who's being housed at a male facility with other male inmates, and making themselves stand out and to look more as a female could certainly be problematic). Such styling would not in any be possible, given that the clipper guards available require the hair to be cut very short. *See* 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 202, 212 (available guards "maybe" go up to a four guard, which "maybe" cuts to an "inch to an inch-and-a-half"); *but see, e.g.*, https://www.buzzcutguide.com/hair-clipper-sizes/ (four guards cut to half an inch); 30(b)(6) Dep. (Kirkland) (ECF 129-1) at 212 (DOC uses standard clipper guards, not proprietary ones).

have that same answer, that that's a question resolved by security? A. From a Health Services -- yes, because from a Health Services' perspective we would look at it in terms of the medical need, which would be support. And if it were other than a medical need, then, you know, this would be covered by security, but -- and, again, goes back to the rule."); 30(b)(6) Dep. (Whalen) (ECF 129-1) at 181 ("Q. And for the bra, you would support it for the physical support, but not as a mental health need? A. Correct."). Makeup is similarly permitted in female facilities and prohibited in male facilities, and there is no medical exception. *See* 30(b)(6) Dep. (Reimers) (ECF 129-1) at 77-81 (Director of Health Services testified that access to longer hair, women's underpants, bras (other than for physical support) and makeup are security issues, not medical issues).

The individuals responsible for Plaintiff's care at Everglades CI understood that they had no authority to make exceptions to DOC policy to allow Plaintiff to obtain female undergarments or access female grooming standards. *See* Pl. Resp. to Def. Mot. for Summ. J. (ECF 128) at 15-17. The regional medical director for Wexford in the region covering Everglades CI, Dr. Marlene Hernandez, also acknowledged the inability to get medical exceptions to the DOC's clothing and grooming policies. Hernandez Decl. (ECF 24-1) at 2 ¶ 8 ("At no time was I

authorized to enforce or make an exception to any Department of Corrections policy."); Hernandez Dep. (ECF 42-1) at 32:18-33:6 ("it's up to security" whether to grant an exception to DOC policy).[4] Moreover, even if a psychologist or therapist did believe they could request an exception to the grooming and clothing standards for a gender dysphoric patient who has a need to socially transition, Dr. Timothy Whalen, the DOC's Chief Clinical Officer, Whalen Dep. (ECF 129-16) at 8, who would have the final decision, 30(b)(6) Dep. (Whalen) (ECF 129-1) at 112-13, made clear he would not grant it. *See* 30(b)(6) Dep. (Whalen) (ECF 129-1) at 106-112, 118-119; *see also* Whalen Dep. (ECF 129-16) at 30:15-23 (exceptions for hair length and female clothing "would be an extremely tough sell" for him.

   B. <u>Lack of competent providers and failure to meet community standards</u>

   Deliberate indifference can also be found by showing that the providers were simply not competent to provide the care, *Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991) (Eighth Amendment violation "could well be present if the care received by the prisoners, when measured against general professional standards,

---

[4] Even Dr. Santeiro, who was brought in to evaluate Plaintiff for purposes of defending this litigation, stated that he is "not authorized to enforce or make an exception to the [FDOC's policies on hair and clothing standards]." Santeiro Decl. (ECF 45-1) at 2 ¶ 9; *see also* Santeiro Dep. (Vol. II) (ECF 129-13) at 59, 60 (there's no such thing as a psychological pass).

rose to such a level of gross incompetence that it manifested deliberate indifference"), or that an inmate has been "denied access to medical personnel capable of evaluating the need for treatment," *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (quotations omitted); *see also Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989) ("[P]rison officials have an obligation to take action or to inform *competent* authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care.") (emphasis added).

The Eighth Amendment guarantees medical care "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *United States v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987); *see also Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001) (Medical treatment may not "so deviate from the applicable standard of care as to evidence a physician's deliberate indifference.").

The well-accepted standards for treatment of gender dysphoria include social transition, which involves living in accordance with one's gender identity by, among other things, dressing and grooming accordingly. *See* Brown Dep. (ECF 129-4) at 101:6-9; Brown Report (ECF 105-2) at 24; Angueira Dep. (ECF 129-2) at 18:3-5; Johnson Dep. (ECF 129-7) at 52:8 – 53:3; Rivero Dep. (ECF 129-11) at

23:8-15; Baute Dep. (ECF 129-3) at 17:4-8; Santeiro Dep. (Vol. I) (ECF 129-12) at 43:13-15; Levine Dep. (ECF 129-9) at 167:21 – 168:1.

The DOC does not even purport to follow the community standards of care for gender dysphoria. *See* 30(b)(6) Dep. (Whalen) (ECF 129-16) at 179 ("Q. Are the WPATH standards of care implemented in the Department of Corrections? A. Not at this time."); Santeiro Dep. (Vol. I) (ECF 129-12) at 99-100 (recognized that social transition is part of treatment for gender dysphoria and "very appropriate" in the community but "not as easy" in prison); Baute Dep. (ECF 129-3) at 19-20 ("Q. Sure. Are the WPATH standards of care applicable in prisons? A. There are rules in the prison systems that don't allow for social transition.").

In addition, some members of the treatment team simply lacked any significant knowledge of community standards for treating gender dysphoria. *See* Pl. Resp. to Def. Mot. for Summ. J. (ECF 128) at 17 n.11.

## II.   Claims for female clothing and grooming standards to treat gender dysphoria are cognizable as Eighth Amendment medical-necessity claims if shown to be medically necessary.

The DOC maintains that claims by inmates with gender dysphoria for access to cross-gender clothing and grooming standards are—categorically—not cognizable under the Eighth Amendment, Motion at 12 ("It is well established,

however, that restrictions on a prisoner's hair, clothing, or grooming standards are not sufficiently serious deprivations to trigger Eighth Amendment protections."). But the cases relied on by the DOC do not assess asserted needs for social transition as Eighth Amendment claims for access to medical care.[5] These courts did not evaluate whether access to female clothing or grooming standards for prisoners with gender dysphoria constituted medically necessary treatment. Indeed, many of the cases did not even involve transgender prisoners,[6] and the ones that

---

[5] Only one of the litany of cases cited by the DOC addresses a claim for access to makeup in the context of an Eighth Amendment medical-necessity claim. *See* Motion (ECF 124) at 21 n.3 (citing *Arnold v. Wilson*, 2014 WL 7345755 at *3, 7 (E.D. Va. Dec. 23, 2014)). In *Arnold*, however, the court considered only one variant of the deliberate-indifference standard and found no deliberate indifference where the prison had implemented the WPATH standards. 2014 WL 7345755 at *6. Here, the DOC does not even purport to follow community standards for treating gender dysphoria. *See* 30(b)(6) Dep. (Whalen) (ECF 129-16) at 179 ("Q. Are the WPATH standards of care implemented in the Department of Corrections? A. Not at this time."). And while the *Arnold* court relied on the familiar rule that a simple disagreement between an inmate and a prison medical provider is not alone sufficient to establish an Eighth Amendment violation, *id.*, in this case, Plaintiff's treatment team did not make any judgment about the need for female undergarments and grooming standards because they understood that to be prohibited by DOC policy, *see* Pl. Resp. to Def. Mot. for Summ. J. (ECF 128) at 15-17.

[6] *LaBranch v. Terhune*, 192 F. App'x 653-54 (9th Cir. 2006); *Larkin v. Reynolds*, 39 F.3d 1192, 1994 WL 624355, at *2 (10th Cir. 1994) (Table); *Blake v. Pryse*, 444 F.2d 218, 219 (8th Cir. 1971); *Taylor v. Gandy*, No. 11-cv-27, 2012

did either addressed clothing and grooming claims outside of the Eighth Amendment—for example, First Amendment or Equal Protection claims[7]—or Eighth Amendment claims where clothing and grooming standards were not part of medical-necessity analyses.[8] Here, however, the issue is the denial of medically necessary care.

---

WL 6062058, at *4 (S.D. Ala. Nov. 15, 2012); *Casey v. Hall*, No. 2:11-cv-588-FTM-29SPC, 2011 WL 5583941, at *2 (M.D. Fla. Nov. 16, 2011); *Star v. Gramley*, 815 F. Supp. 276, 278 & n.2, 279 (C.D. Ill. 1993); *Jones v. Warden of Stateville Corr. Ctr.*, 918 F. Supp. 1142, 1145-46 (N.D. Ill. 1995).

[7] *Hood v. Dep't of Children & Families*, No. 2:12-CV-637-FTM-29, 2014 WL 757914, at *8 (M.D. Fla. Feb. 26, 2014); *Smith v. Hayman*, No. 09-cv-2602, 2010 WL 9488822, at *12-13 (D.N.J. Feb. 19, 2010).

[8] *Praylor v. Texas Dep't of Criminal Justice*, 430 F.3d 1208, 1208-09 (5th Cir. 2005), involved an Eighth Amendment claim, and the court denied the plaintiff's motion for a preliminary injunction seeking "hormone therapy and brassieres," but the court's medical-necessity analysis addressed only hormone therapy. In *Long v. Nix*, 877 F. Supp. 1358, 1365 (S.D. Iowa 1995), the court held that the inmate did not have a serious medical need for treatment for gender identity disorder, and thus the court did not address whether access to female clothing or grooming standards was medically necessary. In *DeBlasio v. Johnson*, 128 F. Supp. 2d 315, 325 (E.D. Va. 2000), and *Murray v. U.S. Bureau of Prisons*, 106 F.3d 401, 1997 WL 34677, at *2-3 (6th Cir. 1997) (Table), the Eighth Amendment claims related to grooming were not about medical care.

Moreover, other courts have indicated that social transition can be medically necessary. In *Konitzer v. Frank*, 711 F. Supp. 2d 874, 908 (E.D. Wis. 2010), which involved a transgender prisoner's medical-necessity claim for access to female clothing and grooming standards, the court denied the prison's motion for summary judgment, holding that "a reasonable jury could find that the defendants were deliberately indifferent to [the inmate's] serious medical need when they failed to provide . . . the real-life experience . . . ."[9] *See also Soneeya v. Spencer*, 851 F. Supp. 2d at 246, 248 (recognizing transgender inmate's medical need for female undergarments and female canteen items such as cosmetics).[10]

In any event, it does not matter whether another court has held that the particular medical treatment sought by Plaintiff here was or was not deemed

---

[9] The "real-life experience" is a term used to refer to the social-transition component of treatment for gender dysphoria. *See* Levine Dep. (ECF 129-9) at 16.

[10] The DOC distinguishes *Konitzer* by saying that "plaintiff's hormone therapy and mental health counseling is alleviating, not exacerbating, plaintiff's distress," and distinguishes *Soneeya* by saying that rather than rejecting the recommendations of their own treating physicians, "FDOC is *following* the advice of its treatment providers." Def. Reply in Supp. of Mot. for Summ. J. (ECF 130) at 4-5 (emphasis in original). "But just because [the DOC] ha[s] provided [Plaintiff] with *some* treatment consistent with the … Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (*De'lonta II*) (alterations added; emphasis in original).

medically necessary *for someone else*. Plaintiff has offered evidence demonstrating that access to female clothing and grooming standards are medically necessary *for her*. If particular care is medically necessary, it is obviously cognizable as an Eighth Amendment medical-necessity claim.

### III.   An inmate can receive nominal damages against a state department of corrections if injunctive relief is provided.

While the Eleventh Amendment generally precludes actions in federal court against States and State agencies, an exception is provided for suits "challenging the constitutionality of a state official's action in enforcing state law," which are not deemed to be against the State. *Green v. Mansour*, 474 U.S. 64, 68 (1985) (citing *Ex parte Young*, 209 U.S. 123, 159-160 (1908)). The Eleventh Amendment "insulates a defendant from all claims for legal damages, but it does not shield a defendant from claims for equitable relief." *Hopkins v. Saunders*, 199 F.3d 968, 976-77 (8th Cir. 1999). However, "[t]he fact that a remedy may require one party to pay money to another is not a sufficient reason to characterize the remedy as 'legal relief.'" *Id.* at 977 (citing *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990)).

Under *Terry*, a monetary award may be equitable in nature if it is (1) "restitutionary, such as in actions for disgorgement of improper profits," or (2)

"incidental to or intertwined with injunctive relief." *Terry*, 494 U.S. at 570-71 (alterations and quotation marks omitted). In *Hopkins*, the Eighth Circuit found that nominal damages were inappropriate because they did not meet either of the *Terry* exceptions. *Hopkins*, 199 F.3d at 977. The court specifically focused on the fact that the district court had not awarded any injunctive relief. *Id.* In contrast, if Plaintiff prevails here in obtaining any of the requested injunctive relief, the court may award Plaintiff an equitable award of nominal damages under the *Terry* framework since the monetary award is intertwined with injunctive relief.

Previously dismissed defendants in this case contended that Eleventh Amendment immunity applies even in the context of nominal damages. ECF 22 at 4 (citing *Simmons v. Conger.* 86 F.3d 1080, 1084 (11th Cir. 1996)). In *Simmons*, the Eleventh Circuit, in dicta, held that damage awards against state officials are barred by sovereign immunity, reversing an award of nominal damages of $100. *Id.* at 1085. This statement was dicta because it was unnecessary to the ultimate decision: the court held that the permanent injunction should be vacated because the plaintiffs failed to state a claim upon which relief could be granted. *Id.* at 1085-86. Because the plaintiffs had failed to state a claim, they would obviously have been unable to obtain an award of damages, irrespective of any official's

immunity, thus rendering unnecessary the court's discussion of damages. Because no injunctive relief was awarded, the court had no need to examine the narrow exceptions to the general rule barring damages in suits in federal court against state officials under the *Terry* framework as discussed in the Eighth Circuit's opinion in *Hopkins*. As in *Hopkins*, no injunctive relief remained for the *Simmons* plaintiffs following the Eleventh Circuit's ruling on the substantive claim asserted. Because of this, the *Terry* principle of nominal damages as equitable rather than legal in nature if they are "intertwined with injunctive relief" was not in issue. 494 U.S. at 571. Here, by contrast, injunctive relief has been requested and, if awarded, makes proper an additional award of nominal damages of $1. *Cf. Brooks v. Warden*, 800 F.3d 1295, 1308 (11th Cir. 2015) ("the availability of nominal damages serves a symbolic function"); *cf. also Alexander v. Primerica Holdings, Inc.*, 819 F. Supp. 1296, 1309-10 (D.N.J. 1993) (jury trial unavailable because damage award was equitable in nature rather than legal in nature because it was "incidental to the overriding equitable relief sought").

IV. **The doctrine of voluntary cessation applies, and the policy stating that "[i]nmates who have undergone treatment for GD will be maintained only at the level of change that existed at the time they were received by the Department" is unconstitutional.**

The DOC's voluntary cessation of the unlawful two-year denial of Plaintiff's hormone therapy does not moot Plaintiff's injunctive-relief claim for that treatment. "[T]he doctrine of voluntary cessation provides an important exception to the general rule that a case is mooted by the end of the offending behavior[.]" *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1183 (11th Cir. 2007) (emphasis and quotation marks omitted). Without this exception, courts would be forced to release a defendant from potential liability while leaving the defendant free to resume its allegedly unlawful behavior. *See id.* A defendant bears a "heavy burden" to overcome the voluntary-cessation exception and show that the controversy is moot. *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1265 (11th Cir. 2010).

A government actor will be extended a rebuttable presumption that the complained-of behavior will not recur, but only if it can establish an *unambiguous* termination. *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014). The Court must determine whether the ceased behavior is unambiguously terminated by considering "(1) whether the termination of the offending conduct was ambiguous; (2) whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction; and (3)

whether the government has consistently applied a new policy or adhered to a new course of conduct." *Id.* at 1323.

The timing of the termination of the offending conduct is important to this analysis. A termination of behavior that occurs well before litigation has commenced will be viewed with favor by the Court, whereas a termination that occurs "late in the game" will cause the Court to view the change with suspicion. *Harrell*, 608 F.3d at 1266; *accord Doe*, 747 F.3d at 1325 ("[T[he BOP suddenly changed its position days before Mr. Doe's trial . . . . This timing suggests a change was made simply to deprive the District Court of jurisdiction."); *Rich v. Sec'y, Florida Dep't of Corr.*, 716 F.3d 525, 532 (11th Cir. 2013) (citing *Jager v. Douglas Cty. Sch. Dist.*, 862 F.2d 824, 833-34 (11th Cir.1989) (finding that a claim was not mooted by the school district's voluntary cessation of the challenged activity in part because the change was only made when there was an "imminent threat of [a] lawsuit")); *see also Doe*, 747 F.3d at 1325 (finding no evidence of substantial deliberation because defendant did not explain why the change happened during litigation, but not earlier). In addition, a one-off change or a change that appears targeted to just the Plaintiff will not support a finding that the change is applied consistently. *See Rich*, 716 F.3d at 532 ("Notably, Florida

implemented the plan at the prison where Mr. Rich is incarcerated, and only at that prison . . . .”). Where the termination is not consistently applied and appears to manipulate the Court’s jurisdiction, the claims will not be considered moot. *See id.*

Here, the DOC’s post-litigation provision of hormone therapy falls squarely within the voluntary-cessation exception to mootness. First, it is actually not even clear that the termination with respect to the freeze-frame policy has been unambiguous, even though the policy has been removed, *see* 30(b)(6) Dep. (Prisk) (ECF 129-1) at 21-23-24; Procedure 602.053 (ECF 129-22) at 6 (not containing the former provision). Indeed, in at least one instance—two months following the formal deletion of the policy in October 2016—Dr. Dieguez herself has continued to cite language strikingly similar to the policy in denying a transgender inmate hormone therapy. *Compare* Former Procedure 602.053 (ECF 3-15) at 6 (freeze-frame policy: “Inmates who have undergone treatment for GD will be maintained only at the level of change that existed at the time they were received by the Department.”); *with* 12/20/16 Grievance Denial (not Plaintiff) (Plaintiff’s Trial Exhibit 26) (“Your treatment will be maintained at the level that existed at the time you were received by the Department of Corrections.).

Second, there was no substantial deliberation. Plaintiff sought treatment for her gender dysphoria for over two years before receiving any, *see* Keohane Decl. (ECF 3-1) at 12 ¶ 43, and the DOC only allowed Plaintiff to meet with an endocrinologist and begin a hormone regimen after this lawsuit was filed, *see* Keohane Decl. (ECF 33-3) at 2 ¶ 3. Although the DOC has deleted the freeze-frame policy from its security policy, it is clear that the decision to provide Plaintiff with hormone therapy and delete the freeze-frame policy was the result of the litigation at hand, not substantial deliberation. The 30(b)(6) deponent's testimony that it was removed based on "case law" that appeared between the December 2013 date that the freeze-frame policy was added and the October 2016 date that it was removed, 30(b)(6) Dep. (Prisk) (ECF 129-1) at 24:3-12, is preposterous. In this litigation, Plaintiff has relied upon numerous medical-necessity cases addressing claims for gender dysphoria to support her position, and not one of them was issued after December 2013. The DOC's contentions concerning the reasons for its change cannot be credited. *Cf. Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1286 (M.D. Ala. 2012) ("The ADOC has provided no information about the department's deliberation process and has provided only vagaries about the basis for its decision to alter its policies."); *Prison Legal News*

*v. Chapman*, 44 F. Supp. 3d 1289, 1309 (M.D. Ga. 2014) ("[T]he Court has no means of determining whether any of the aforementioned changes were the result of substantial deliberation. Defendants did not provide any insight into their deliberation process; they offered only vague explanations for their policy changes.").

For these reasons, Plaintiff's contentions concerning the freeze-frame policy and her need for hormone therapy are thus not moot. And on the merits, there is no dispute that Plaintiff has a medical need for hormone therapy. As for the freeze-frame policy itself, that is unconstitutional as a blanket ban on medically necessary care. *See supra* pp. 3-6.

## V.   Conclusion

For the reasons above, the Court should enter judgment for Plaintiff.

Date: Thursday, June 29, 2017

Respectfully submitted,

/s/ Daniel B. Tilley
**Daniel B. Tilley**                              **Matthew D. Grosack**
Florida Bar No. 102882                       Florida Bar No. 073811
**Nancy G. Abudu**                            DLA Piper LLP (US)

Page 22

Florida Bar No. 111881
ACLU Foundation of Florida
4343 West Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
nabudu@aclufl.org

**Leslie Cooper***
ACLU Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2627
LCooper@aclu.org
*Admitted to the N.D. Fla.

200 S. Biscayne Boulevard, Suite 2500
Miami, Florida 33131
(305) 423-8554
matthew.grosack@dlapiper.com

**Elizabeth C. Akins****
DLA Piper LLP (US)
1201 W. Peachtree Street, NW
Suite 2800
Atlanta, Georgia 30309
(404) 736-7812
liza.akins@dlapiper.com
**Admitted pro hac vice

**ATTORNEYS FOR PLAINTIFFS**