## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**REIYN KEOHANE,**

        **Plaintiff,**

**v.**                                **Case No. 4:16cv511-MW/CAS**

**JULIE JONES, in her official capacity as Secretary of the Florida Department of Corrections,**

        **Defendant.**

_____/

## <u>ORDER ON THE MERITS</u>

"The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Trop v. Dulles*, 356 U.S. 86, 100 (1958).

This case involves an individual immersed in the process of transitioning gender roles when she[1] found herself in jail after a violent argument with her roommate. Reiyn Keohane was born anatomically male, but she began identifying as female around age eight. She says she's always had an "internal sense" of being

---

[1] Out of respect for Ms. Keohane, this Court uses female pronouns when referring to her—a courtesy not all of Defendant's agents have extended, though Defendant is endeavoring to remedy this slight (among others).

female.[2] Since age fourteen, Ms. Keohane has worn women's clothing, makeup, and hair styles, adopted a feminine name, and used female pronouns at school and with family and friends. In short, she's lived as a woman in all aspects of her life since her early teens.

Ms. Keohane was formally diagnosed with gender dysphoria at age sixteen, and as soon as she was permitted—and it was safe to do so—she began a hormone therapy regimen to ease her dysphoria and feminize her body. But shortly thereafter, she was arrested and cut off from the treatment she needed, including hormone therapy and the ability to dress and groom as a woman.

Ms. Keohane continuously grieved her denial of care during the first two years in Defendant's custody, but she faced roadblocks every step of the way.[3] At times, her untreated dysphoria caused such extreme anxiety that she says she's attempted to kill herself and to castrate herself to rid her body of its testosterone source.

Ms. Keohane's testimony at trial demonstrates the lengths to which she'll go to feel better in her own skin. On one occasion, she said she tied a rubber band around her scrotum to reduce circulation and cut down the center line in a place she

---

[2] "I know who I am, and have always felt this is who I am. I am a girl, female." ECF No. 145 at 22.

[3] The Defendant in this case is Julie Jones, sued in her official capacity as Secretary of the Florida Department of Corrections. "Since official-capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent," *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978), this Court refers to Secretary Jones and the Florida Department of Corrections interchangeably as "Defendant" throughout this order.

estimated would lessen the chance of excessive blood loss. After breaking the skin, she said she tried to squeeze one of her testicles out of her body in what she perceived to be an attempt at self-castration, but her hands were shaking so badly from the pain that she couldn't finish the job.[4] No matter though for Defendant. Even this deafening call for help didn't cause a reevaluation in the way it was treating Ms. Keohane.

It wasn't until Ms. Keohane found a lawyer willing to take her case that things changed for the better. Defendant was staring down the barrel of a federal lawsuit when it suddenly changed course by securing hormone therapy and amending its policy formerly prohibiting new treatment for inmates with gender dysphoria—all within a matter of months after Ms. Keohane filed her complaint.

This case has been a moving target from the beginning, morphing with Defendant's shifting explanations for the denial of hormone treatment and access to female clothing and grooming standards. But the essential issues before this Court can be distilled down to these; namely, was Defendant deliberately indifferent to Ms. Keohane's gender dysphoria—which both sides agree is a serious medical need—when it denied her hormone therapy for two years? Should this Court enter an

---

[4] Defendant disputes whether Ms. Keohane actually intended to remove her testicles. Instead, Defendant contends she made only a superficial cut to gain attention. But even so, this doesn't change the fact that Ms. Keohane took a razor to her scrotum because she was denied treatment for her gender dysphoria—some of which even Defendant now concedes is medically necessary.

injunction ordering Defendant to provide the requested treatment? Part and parcel to this second inquiry is whether Defendant's provision of hormone therapy and amendment to its policies has sufficiently remedied Ms. Keohane's injuries. And lastly, is the parallel treatment for gender dysphoria—namely, social transitioning through access to Defendant's female clothing and grooming standards—necessary to treat Ms. Keohane's gender dysphoria such that Defendant's refusal to provide treatment amounts to deliberate indifference?

When it comes to medical care in prison, reasonable minds may differ. One can be negligent, even grossly negligent, when treating an inmate without offending the United States Constitution. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). But while the standard for establishing deliberate indifference is high, it is not impossible to meet. And if Ms. Keohane's treatment in Defendant's custody isn't deliberate indifference, then surely there is no such beast. Ultimately, this case is about whether the law, and this Court by extension, recognizes Ms. Keohane's humanity as a transgender woman. The answer is simple. It does, and I do.

## I

Ms. Keohane is a transgender woman. Her assigned sex at birth was male— she was born with and still has male genitalia—but she identifies as a woman. ECF No. 133 at ¶¶ F. 5, 19. When she was fourteen years old, Ms. Keohane told her parents about her gender identity. ECF No. 145 at 24. Thereafter until her

incarceration at age nineteen, Ms. Keohane wore girls' or women's clothing and makeup, and grew her hair to a longer, traditionally feminine length. *Id*. at 25. She adopted a feminine name—Jamie—and preferred using female pronouns. *Id*. Later, Ms. Keohane legally changed her first name to Reiyn "to bring [it] into conformity with [her] gender identity." ECF No. 3-1 at ¶ 6. And at age sixteen, Ms. Keohane was formally diagnosed with gender identity disorder—now known as gender dysphoria. ECF No. 133 at ¶ F. 8, 9.

## A

Gender dysphoria generally "refers to discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth." ECF No. 3-16 at 4. It is a psychiatric diagnosis in the Diagnostic and Statistical Manual for Mental Disorders published by the American Psychiatric Association, and manifests as "a set of symptoms that include anxiety, irritability, depression, and this sense of incongruence or mismatch between one's sex of assignment at birth and internally felt[] gender identity." ECF No. 145 at 144.

Ms. Keohane's expert at trial, Dr. George R. Brown, identified three criteria for a gender dysphoria diagnosis. First, a patient must have "experienced a significant incongruity between their sex of assignment at birth, their anatomy, and their internal sense of their gender for a minimum of six months." *Id*. at 145. Second, a patient must meet a combination of several specific criteria such as "having a

strong disgust or repulsion of one's own genitals, a desire to be rid of those genitals, [or] a desire to have treatment to approximate the other gender." *Id*. The third requirement considers whether the first two criteria are "distressing enough or . . . cause enough dysfunction in your life and important areas of your functioning that they are clinically relevant." *Id*. at 146. "[I]t's important that people have a level of distress . . . or dysfunction . . . otherwise the diagnosis is not legitimate." *Id*.

In short, transgender people may feel some dysphoria, or anxiety, about their bodies and their gender identity. But not all transgender people are formally diagnosed with gender dysphoria—indeed, this Court recognizes that many transgender people may be perfectly at ease and even rejoice in their own skin. A formal diagnosis of gender dysphoria results only if a person's symptoms of dysphoria are severe enough and persist for so long that they become "clinically relevant." ECF No. 145 at 146. Pursuant to their pretrial stipulation, the parties agree and this Court finds that Ms. Keohane has been diagnosed, and is currently diagnosed, with gender dysphoria—a serious medical need. ECF No. 133 at ¶¶ F. 6-7.

B

At trial, this Court heard testimony about established standards of care for treating gender dysphoria, including those published by the World Professional Association for Transgender Health ("WPATH"), "an international,

6

multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, advocacy, public policy, and respect in transsexual and transgender health." ECF No. 3-16 at 2. WPATH has published standards of care ("WPATH Standards") for treating gender dysphoria in its "Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7." *See generally id*. These standards are "intended for worldwide use," *id*. at 3, and are recognized by the American Medical Association, American Psychiatric Association, American Psychological Association, and the American College of Obstetricians and Gynecologists. ECF No. 145 at 157. Accordingly, this Court finds the WPATH Standards authoritative in the treatment of gender dysphoria.

The WPATH Standards "are intended to be flexible in order to meet the diverse health care needs of transsexual, transgender, and gender-nonconforming people." ECF No. 3-16 at 2. They confirm that treatment requires an individualized approach. "The number and type of interventions applied and the order in which these take place may differ from person to person." *Id*. at 7. Defendant's own expert, Dr. Stephen Levine, generally agrees with this approach, opining at trial that determining the proper treatment for a person with gender dysphoria should be a deliberate and thoughtful process. ECF No. 146 at 90.

Dr. Brown explained at trial that several treatment options can alleviate a person's gender dysphoria. They primarily include psychotherapy, "hormonal

management," and "surgical interventions . . . like genital confirmation surgery or sex reassignment surgery." *Id*. at 146-47. And aside from these "three main domains," social transitioning is another option for treating gender dysphoria. ECF No. 145 at 147.

Social transitioning can include "changing identity documents, changing one's name, [and] changing one's gender role presentation."[5] *Id*. at 147-48. For purposes of this order, "social transitioning" refers only to Ms. Keohane's request for access to Defendant's clothing and grooming standards for female inmates. To be clear, Ms. Keohane is not requesting permission to wear stiletto heels or costume jewelry while in Defendant's custody. Instead, she's only ever sought to be treated like any other female inmate in this state. This includes the ability to possess and wear the same bras, panties, hairstyles, and makeup items permitted in Defendant's female facilities. *See, e.g.*, ECF No. 129-1 at 40 (female inmates have access to bras and sports bras); *id*. at 229 (female inmates may possess makeup and purchase it through their commissary); *see also* Fla. Admin. Code R. 33-602.101(2)(a) (female inmate uniforms include a "bra or athletic bra" and "panties"). All inmates, male and female, are severely limited when it comes to self-expression. For Ms. Keohane, aside from using the appropriate pronouns, the *only* way she can express her gender

---

[5] The WPATH Standards also include "[c]hanges in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity)," as an option for treating gender dysphoria. ECF No. 3-16 at 7.

identity in prison is by wearing women's undergarments and grooming like a woman.

Hormone therapy involves taking prescribed male or female hormones consistent with one's gender identity. In male-to-female patients like Ms. Keohane, hormone therapy can cause physiological changes including the redistribution of body fat to create a more feminine physique, erectile dysfunction, and the development of breasts. ECF No. 145 at 72-73, 151; *see also* ECF No. 133 at ¶ F. 18. In addition, hormone therapy may have beneficial psychological effects including a perceived reduction in the patient's anxiety or depression. ECF No. 145 at 152.

Treatment for gender dysphoria is multimodal. That is, the WPATH Standards recognize "[s]ome patients may need hormones, a possible change in gender role, but not surgery; others may need a change in gender role along with surgery but not hormones." ECF No. 3-16 at 7. But while some patients benefit from fewer than all primary treatment options, Dr. Brown opined that providing hormone therapy while denying the ability to socially transition is not only "medically and logically inconsistent," but also "potentially harmful." ECF No. 145 at 164-65. Moreover, Defendant's own expert, Dr. Levine, opined at trial that allowing "a person to express themselves outwardly as a female" is a "compassionate accommodation," if that person "is on hormones, and growing breasts, and shedding hair, and physically

9

changing." ECF No. 146 at 71. Though Dr. Levine generally takes exception to the term "medically necessary" for semantic reasons, he agreed that social transitioning is a beneficial component for Ms. Keohane's individual treatment plan.

C

Around September 22, 2013, Ms. Keohane was charged with attempted second-degree murder and was taken into custody at the Lee County Jail. ECF No. 3-1 at ¶ 8. Only about six weeks earlier, she had started hormone therapy under the care of her pediatric endocrinologist to treat her gender dysphoria. *Id*. at ¶ 7. But when she was taken into custody in September, the jail refused her request to continue treatment. *Id*. at ¶ 8. Ultimately, in July 2014, she pled no contest to the charge and was sentenced to fifteen years in Defendant's custody. *Id*.

After ten months in jail without hormone therapy, Ms. Keohane was transferred to Defendant's custody on July 17, 2014. *Id*. at ¶ 9. She began her commitment at the South Florida Reception Center. *See* ECF No. 137-12 at 2. Over the next three years, Ms. Keohane was transferred to various facilities throughout the state. *Id*. During this time, Ms. Keohane persistently requested treatment for her gender dysphoria, including hormone therapy, access to female undergarments including bra and panties, and access to female grooming standards including longer hair and makeup. *See* ECF No. 3-6. Her efforts have been largely unsuccessful.

Ms. Keohane was in Defendant's custody for less than a month when she filed her first grievance requesting to resume hormone therapy. *See id.* at 1. Her grievance was returned on August 21, 2014, noting that medical would consult with Ms. Keohane's outside provider and obtain her health information to determine the best course of action. *Id*. She filed her second grievance on September 1, 2014, noting she had not yet received hormone treatment. *Id*. at 2. This grievance was denied the following day because Ms. Keohane had apparently canceled a November 2013 appointment with her pediatric endocrinologist. *Id*. Ms. Keohane filed a third grievance on September 12, 2014, explaining that she couldn't show up for her November 2013 appointment because she was *in jail* at the time. *Id*. at 3. On September 24, 2014, Defendant again denied this grievance. At this point, Defendant showed its hand. The September 24 denial stated that "You have not received hormone treatment since 2013. You will not be placed on hormonal therapy while incarcerated in the Florida State Dept. of Corrections." ECF No. 3-6 at 3. Following this denial, Ms. Keohane grieved her medical treatment at every new facility to which she was transferred with similar results. *See generally id.* at 1-17.

This denial of care—premised on the notion that Ms. Keohane would not receive hormone therapy because she wasn't *already* receiving hormone therapy when she arrived in Defendant's custody—flows from the legally untenable "freeze-frame policy" in place at the time. *See* ECF No. 3-15 at 6. The policy provided in

11

part that "[i]nmates who have undergone treatment for [gender dysphoria] will be maintained only at the level of change that existed at the time they were received by the Department." *Id*. Ultimately, Defendant did not permit Ms. Keohane to resume hormone therapy until September 2016, more than *two years* after she was committed to Defendant's custody and, notably, shortly after she filed her complaint and preliminary-injunction motion in this case. ECF No. 133 at ¶¶ F. 20-21.

D

For purposes of this litigation, Defendant's medical vendor, Wexford, arranged for an evaluation of Ms. Keohane's need for access to female clothing and grooming standards after she filed her complaint. *Id*. at ¶¶ 30-31. Wexford's regional psychiatrist, Dr. Jose Santeiro, evaluated Ms. Keohane on September 27, 2016, specifically to determine whether she had a medical need to socially transition in prison. *Id*. at ¶¶ 31-32, 34. He concluded that Ms. Keohane had no medical need for access to female clothing and grooming standards. *Id*. at ¶ 35. But this Court finds Dr. Santeiro's conclusions suspect for several reasons, including his admitted lack of experience treating gender dysphoria in prison, his lack of knowledge about the standards of care, and the limited information upon which he based his conclusion.

Dr. Santeiro's opinion helps Defendant not one bit, for his testimony is offered neither as an expert nor as a treating physician. Moreover, like all of Defendant's witnesses, Dr. Santeiro's testimony focuses on the infeasibility of transitioning in

12

prison based on security concerns instead of articulating any medical opinion as to whether social transitioning should be part of Ms. Keohane's treatment plan in addition to hormone therapy and counseling.

As far as this Court can discern from the record before it, nobody on Ms. Keohane's treatment team (composed of medical personnel employed through Wexford) has made a final treatment decision regarding access to female clothing and grooming standards. The primary rationale for not recommending such treatment or seeking an exception to Defendant's security policies is that those same policies—namely, Defendant's clothing and grooming standards—preclude social transitioning in prison. But Defendant's own expert witness, Dr. Levine, testified that *it is* appropriate or "psychologically helpful" to allow a transgender woman who is taking hormones—like Ms. Keohane—to outwardly express herself as a woman. ECF No. 146 at 71-72, 117-18. Dr. Levine went so far as to describe social transitioning as a "*minor accommodation* to ease some of the unfortunate distress of the transgender person." *Id*. at 72 (emphasis added).

Without access to female clothing and grooming standards, Ms. Keohane must conform to Defendant's security policies for male inmates. These policies require inmates housed in male facilities to wear their hair above the ears and shirt collar. ECF No. 133 at ¶ F. 16. Inmates are not permitted to purchase or wear makeup in Defendant's male facilities, though they are permitted to do so in Defendant's

13

female facilities. *Id.* at ¶¶ 37-38. And female undergarments, including bras and panties, are provided to inmates in male facilities only if a medical professional determines they're medically necessary. ECF No. 129-1 at 218-19.

On several occasions, Defendant forcibly shaved Ms. Keohane's head after she protested Defendant's hair-length policy. ECF No. 145 at 48-50. And Defendant has confiscated Ms. Keohane's self-made bras and panties, labeling those items as contraband. *Id.* at 33-34. These disciplinary actions have almost always contributed to the feelings of anxiety, disgust, and hopelessness accompanying Ms. Keohane's gender dysphoria, leading her to consider or attempt to harm herself.[6]

## II

As a preliminary issue, Defendant asserts now that Ms. Keohane is receiving hormone therapy and Defendant has amended its policies to drop the "freeze-frame" language for the treatment of inmates with gender dysphoria, Ms. Keohane's claims for injunctive relief are moot to the extent they address both the old policy and the denial of hormone therapy. But in so doing, Defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Doe v. Wooten*, 747 F. 3d 1317, 1322 (11th Cir.

---

[6] For example, Ms. Keohane's self-described castration attempt promptly followed the confiscation of her female undergarments and a suicide attempt. ECF No. 145 at 36-37; *see also id.* at 51 (describing feelings after forced haircuts as "[t]errible. Extremely depressed. Suicidal. Extremely . . . angry, upset that this could happen. I felt . . . disgusted with myself every time I would look at myself.").

2014) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)). Considering the circumstances of this case, this Court finds Defendant has failed to meet its burden. Ms. Keohane's claims pertaining to the provision of hormone therapy and Defendant's "freeze-frame" policy are not moot.

"Because of the unique characteristics of public defendants," courts "often give[] governmental actors 'more leeway than private parties in the presumption that they are unlikely to resume illegal activities.'" *Wooten*, 747 F. 3d at 1322 (citations omitted). The Eleventh Circuit has labeled "this leeway that we extend to government actors a 'rebuttable presumption,' or a 'lesser burden.'" *Id*. (citations omitted). The "presumption is particularly warranted in cases where the government repealed or amended a challenged statute or policy—often a clear indicator of unambiguous termination." *Id*. But "the government actor is entitled to this presumption only *after* it has shown unambiguous termination of the complained of activity." *Id*. "[O]nce a government actor establishes unambiguous termination of the challenged conduct, the controversy 'will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated.'" *Id*. (quoting *Troiano v. Supervisor of Elections*, 328 F. 3d 1276, 1285 (11th Cir. 2004)).

In its proposed order following the bench trial in this case, Defendant turns the voluntary cessation standard on its head. Defendant asserts Ms. Keohane must

"overcome the rebuttable presumption necessary to establish the voluntary cessation doctrine." ECF No. 150 at 19. Not quite. Though courts have described Defendant's burden as a "rebuttable presumption," it's still *Defendant's burden* to show it's "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Wooten*, 747 F. 3d at 1322. Moreover, it bears repeating that Defendant, as a government actor, is only entitled to a "lesser burden" or "rebuttable presumption" once it's established an "unambiguous termination" of the challenged activity. This Defendant has not done.

In evaluating whether an unambiguous termination has occurred, this Court may consider several non-exhaustive factors, including "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction," and "whether the government has 'consistently applied' a new policy or adhered to a new course of conduct." *Wooten*, 747 F. 3d at 1323 (quoting *Rich v. Sec'y, Fla. Dep't of Corrs.*, 716 F. 3d 525, 531-32 (11th Cir. 2013)). In addition, "[t]he timing and content of the cessation decision are relevant in evaluating whether the defendant's stopping of the challenged conduct is sufficiently unambiguous." *Id*. This Court may be "'more likely to find a reasonable expectation of recurrence when the challenged behavior constituted a continuing practice or was otherwise deliberate.'" *Id*. (quoting *Atheists of Fla., Inc. v. City of Lakeland*, 713 F. 3d 577, 594 (11th Cir. 2013)). But again, "[t]hese factors

16

are not exhaustive," and this Court's analysis may change "depending on the facts and circumstances of a particular case." *Id*. (citing *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

The challenged practice in this case is Defendant's refusal to provide hormone therapy based on a "freeze-frame" policy stating that inmates who've been treated for gender dysphoria "will be maintained only at the level of change that existed at the time they were received by [Defendant]." ECF No. 3-15 at 6. When Ms. Keohane originally entered Defendant's custody, Defendant denied her request for hormone therapy because she had "not received hormone treatment since 2013." ECF No. 3-6 at 3.  Citing this gap in treatment, the denial further noted Ms. Keohane "will not be placed on hormone therapy while incarcerated in the Florida State Dept. of Corrections." *Id*. Her additional requests for treatment continued to be denied or slow-walked until she filed her complaint in this case. Within a month of filing suit, Defendant finally arranged for Ms. Keohane to see an outside endocrinologist and began providing the long-sought-after hormone treatment. And within about two months, Defendant formally amended its policies to remove the "freeze-frame" provision.

As evidence that Defendant has inconsistently applied its amended policy, Ms. Keohane points to the fact that at least one other inmate has been denied hormone treatment apparently based on the "freeze-frame" policy after it was

amended in October 2016. *See, e.g.*, ECF No. 137-13. But this Court is hard pressed to find that evidence of one mistake in applying old policies—or, perhaps, one rogue doctor acting contrary to protocol—is sufficient to prevent Defendant from overcoming its burden. Nonetheless, this drop of evidence only adds to the tidal wave of other circumstances crashing down on Defendant's mootness argument.

While often a clear indicator of an unambiguous termination, the change in official policy is little help for Defendant given the other circumstances before this Court. Defendant's rationale for the amended policy is simply that it was "[b]ased on case law . . . of practices . . . and by review of the general counsel[.]" ECF No. 129-1 at 24. Defendant asserts the "case law" supporting the change had apparently come about after the "freeze-frame" language was added in December 2013. *Id.* Defendant cites no additional evidence detailing who may have suggested or initiated the change or what the "case law" necessitating the change entailed. There are no minutes, memoranda, or testimony from any person knowledgeable about the change to show Defendant engaged in substantial deliberation in amending this policy. Zero. None. Moreover, the law has *never* been that Defendant can have a blanket ban on medically necessary treatment if an inmate didn't receive that treatment before entering the state's custody. If that were the case, the law would essentially permit a de facto death sentence to any inmate diagnosed with cancer after incarceration.

Defendant also fails to provide *any* explanation for the swift course correction regarding Ms. Keohane's visit to an outside endocrinologist and subsequent provision of hormone therapy soon after she filed her complaint. Though some witness testimony indicates a referral to an endocrinologist was in the works as early as February 2016, Defendant has not explained why it took more than *eighteen months* to reach this point. Nor does Defendant provide an explanation as to why it took Defendant at least *another five months* to show some urgency in finalizing the referral for Ms. Keohane to be evaluated for hormone therapy. The timing of the referral to the endocrinologist, the provision of hormone therapy, and the amended policy, was "late in the game" and only "creates ambiguity," ultimately weighing against a finding of unambiguous termination. *Rich*, 716 F. 3d at 532 (quotation marks omitted) (quoting *Harrell v. The Fla. Bar*, 608 F. 3d 1241, 1266-67 (11th Cir. 2010)).

Defendant's actions are too little too late to moot Ms. Keohane's claims. Defendant chose to right some wrongs only *after* it was faced with a lawsuit in federal court. Even with this course correction, Defendant isn't automatically entitled to the rebuttable presumption that it's unlikely to resume its illegal activities. Instead, this Court finds Defendant's voluntary cessation was an attempt to manipulate jurisdiction—certainly *not* the result of substantial deliberation. Indeed, in its motion to dismiss (filed shortly after Ms. Keohane was referred to the outside

19

endocrinologist), Defendant asserted in summary fashion that Ms. Keohane's claims for relief regarding the denial of hormone therapy were rendered moot by its provision of hormone therapy. ECF No. 21 at 5-6.

Though Defendant asserts it intends to allow Ms. Keohane to continue hormone therapy as long as it's not contraindicated, Defendant has never promised not to re-enact its "freeze-frame" policy following the termination of this litigation. What's more, Defendant has argued at length throughout its papers that hormone therapy isn't even constitutionally required for treating gender dysphoria, *see, e.g.*, *id*. at 19; ECF No. 44 at 9; ECF No. 124 at 30-31.

Given that Defendant's "freeze-frame" policy and denial of Ms. Keohane's hormone therapy constituted a deliberate practice during her first two years in Defendant's custody, the late-in-the-game timing and content of Defendant's decision to amend its policy and provide for hormone treatment, the lack of any evidence of "substantial deliberation" giving rise to the policy amendment, and at least one instance of inconsistent application of the new policy, this Court finds Defendant has failed to establish an "unambiguous termination" of the challenged "freeze-frame" policy and the denial of hormone treatment. As such, Defendant is *not* entitled to the rebuttable presumption that it's unlikely to resume its challenged conduct. And based on these same circumstances, it's plain to this Court that Defendant has failed to meet its "formidable burden" to show it's "absolutely clear

20

the allegedly wrongful behavior could not reasonably be expected to recur." *Wooten*, 747 F. 3d at 1322. Accordingly, Ms. Keohane's claims for injunctive relief based on the denial of hormone therapy and Defendant's "freeze-frame" policy aren't mooted by Defendant's voluntary cessation of the challenged conduct.

## III

Ms. Keohane seeks, among other relief, a permanent injunction prohibiting Defendant from enforcing its "freeze-frame" policy limiting treatment for inmates diagnosed with gender dysphoria. As this Court just explained, this claim wasn't mooted by Defendant's amendment to the policy language or by Defendant's after-the-fact provision of hormone therapy. Indeed, Defendant has failed to demonstrate there's no reasonable basis to believe its challenged policy is likely to recur—i.e., nothing limits Defendant from adding the "freeze-frame" language back to its policies following termination of this case.

To start, this Court recognizes hormone therapy is only one of many options available for treating gender dysphoria. But in this case, Defendant agrees, and this Court finds, that hormone therapy is necessary to treat Ms. Keohane's serious medical need. *See* ECF No. 133 at ¶¶ F. 20-23; ECF No. 145 at 9 ("We have no plans for discontinuing the hormone therapy treatment whatsoever."); *see also* ECF No. 129-11 at 60 ("She should [have been receiving hormone therapy]. First of all, she

21

was getting the hormone therapy, according to her, before she came in. And according to what we read and researched, she should have continued.").

Both sides' experts and members of Ms. Keohane's treatment team agreed at trial that treatment plans for inmates with gender dysphoria must be individually tailored to each patient. But Defendant's "freeze-frame" policy effectively prevented this. The policy states:

> Inmates who have undergone treatment for [gender dysphoria] will be maintained only at the level of change that existed at the time they were received by the Department. Access to necessary physical and mental health evaluations and treatment will be provided to assist an inmate with suspected [gender dysphoria] in adaptive functioning and preparation for re-entry upon release.

ECF No. 3-15 at 6.

On its face, the policy proscribed treatment options unless an inmate was receiving such treatment at the time they came into Defendant's custody. And Ms. Keohane's own treatment team leader understood the policy to mean if inmates "come in on hormone treatment, they are afforded hormone treatment. If they're not, they're not supposed to get it. Yada, yada, yada." ECF No. 129-7 at 103.

This Court finds Defendant applied this "freeze-frame" policy to Ms. Keohane when it denied her requests for hormone therapy during her first two years in Defendant's custody. From the start, Defendant cited the fact that Ms. Keohane was not receiving hormone therapy upon entering Defendant's custody as a basis for denying her grievances seeking such care. *See* ECF No. 3-6 at 3 ("You have not

received hormone treatment since 2013. You will not be placed on hormone therapy while incarcerated in the Florida State Dept. of Corrections."). And, again, the leader of her mental health treatment team, Dr. Arnise Johnson, testified that she understood DOC policy on this issue to mean that if Ms. Keohane received hormone therapy prior to incarceration, she should have received it during incarceration and vice versa. ECF No. 129-7 at 62.

Other courts have found similar policies banning specific treatments for inmates with gender dysphoria—often hormone therapy or certain surgical procedures—to be facially invalid. *See, e.g.*, *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011) (holding state-law ban on hormone therapy and sexual reassignment surgery for inmates with gender dysphoria unconstitutional and comparing it to a hypothetical law allowing only therapy and pain killers to treat inmates with cancer); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 247 (D. Mass. 2012) ("[T]he policy is flawed in that it creates blanket prohibitions on some types of treatment that professional and community standards indicate may sometimes be necessary for the adequate treatment of [gender dysphoria] . . . [and] is exactly the type of policy that was found to violate Eighth Amendment standards in other cases both in this district and in other circuits."). *See also Kosilek v. Spencer*, 774 F. 3d 63, 91 (1st Cir. 2014) ("DOC has specifically disclaimed any attempt to create a blanket policy [banning sexual reassignment surgery]. We are confident that the DOC will abide by this

assurance, as any such policy would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs.").

In this case, rather than targeting a specific treatment option (like hormone therapy or surgery), Defendant's policy banned any new treatment not already prescribed to an inmate upon landing in Defendant's custody. Defendant's reason for enacting the policy was grounded only in a review of recent "case law"—essentially the same reason Defendant provided for its amendment after the start of this case. But it bears repeating. The law has *never* been that the state can impose a blanket ban on medically necessary treatment for inmates, regardless of the diagnosis.

Like the Seventh Circuit found in *Fields* (a case involving gender dysphoria that preceded Defendant's enactment and subsequent amendment of the "freeze-frame" policy *and* Ms. Keohane's incarceration), Defendant's policy equates to a hypothetical rule prohibiting an inmate with cancer from receiving medically necessary chemotherapy or radiation treatments if that inmate wasn't already receiving such treatment upon entering Defendant's custody. Absurdly, had Defendant applied this policy to all ailments instead of singling out gender dysphoria, inmates diagnosed with HIV, cancer, or pneumonia after entering custody might not be allowed treatment at all. That Defendant targeted only inmates diagnosed with gender dysphoria doesn't mitigate the absurdity of such an approach

24

to medical care. Indeed, this targeting only reinforces this Court's suspicion that bigotry and ignorance swayed Defendant's decision making for treating (or, rather, not treating) Ms. Keohane's gender dysphoria. This Court unsurprisingly concludes that Defendant's "freeze-frame" policy is unconstitutional as a blanket ban on medically necessary care.

## IV

Turning to the denial of hormone treatment, this Court previously considered whether Defendant's decision to provide hormones mooted Ms. Keohane's claim for injunctive relief. During the bench trial, Defendant's counsel assured this Court that Defendant will continue to provide Ms. Keohane's hormone therapy so long as it's deemed necessary to treat her serious medical condition. But perched against a backdrop of Defendant's deliberate policy to deny such treatment, a two-year delay in care, and the late-in-the-game decision to finally arrange for a referral to an outside endocrinologist, this Court finds such assurances insufficient to moot Ms. Keohane's claim.

Which leads this Court to conclude that the denial of Ms. Keohane's hormone therapy based on reasons divorced from medical judgment constitutes deliberate indifference to her serious medical need in violation of the Eighth Amendment. This Court again recognizes that hormone therapy is one of many treatment options for individuals diagnosed with gender dysphoria. Not everyone diagnosed with gender

dysphoria wants or needs hormone therapy. Defendant's expert, Dr. Levine, whose testimony this Court credits, noted as much during trial. *See* ECF No. 146 at 57-58.

But for individuals like Ms. Keohane, for whom mental health counseling is not enough to treat their dysphoria, hormone therapy can be effective in diminishing the distress and anxiety associated with the diagnosis. Even members of Ms. Keohane's treatment team conceded as much. ECF 129-7 at 52-53, 86, 90-91; *see also* ECF No. 40-1 at 81 ("Q. Do you believe that it's medically necessary for plaintiff to be provided hormone therapy? A. At this moment I think so. Yes, I agree.").[7]

Ms. Keohane's own testimony, which this Court credits, provides a first-hand account of what life was like for her without access to hormone treatment. After a few months in Defendant's custody, Ms. Keohane attempted suicide, *see* ECF No. 3-1 at 5, and continued to experience "significant distress" every day without hormone therapy, *id*. at 13.

---

[7] Another member of Ms. Keohane's treatment team, Mr. Andre Rivero-Guevara, testified about negative outcomes for patients whose gender dysphoria is left untreated. According to him, "[s]ome people work hard at it and do change it, and some people want to do it but they can't do it, and they suffer through life because they can't do it." ECF No. 129-11 at 35. As to the kind of suffering an individual may face, Mr. Rivero added, "Well, you're talking about a person that is uncomfortable with who they are and they want to be somebody else and they can't do it, for whatever reason, and those are the ones who are going to suffer the most because they can't do anything about it. They can't do it. So yes, I would think that it's very uncomfortable for them." *Id*.

At trial, Ms. Keohane testified in detail about her suicide attempts and her attempt to castrate herself to remove her body's testosterone source. On one occasion, Ms. Keohane informed her escorting officer that she was going to kill herself, so he placed her in a shower cell wearing nothing but boxer shorts and with her hands cuffed behind her back. ECF No. 145 at 34. Ms. Keohane managed to get her hands out of the cuffs and fashioned a noose from her shorts. *Id*. Her escorting officer was able to cut her down before she suffered injuries beyond bruises and abrasions on her neck. *Id*. at 34-35. She was subsequently placed on suicide observation. *Id*. at 35. And after this attempt, Ms. Keohane says she informed nursing staff, security officers, and the psych staff that she tried to kill herself because she wasn't getting treatment. *Id*.

Thereafter, Ms. Keohane testified that she attempted to castrate herself to remove her body's source of testosterone. This Court already noted that Defendant disputes whether Ms. Keohane actually intended to cut out her own testicles. But even so, she still took a razorblade to her own scrotum to either "treat" herself by removing a part of her body that causes her such extreme anxiety *or* to gain some attention in an effort to obtain treatment from Defendant.

After Defendant began providing hormone therapy, Ms. Keohane experienced a short disruption in receipt of her medication. *See* ECF No. 105-1 at 2. Due to this disruption, she again attempted suicide twice in three days. *Id*. at 2-3. Ms. Keohane

27

also suffered "severe withdrawal symptoms," including "depression, fatigue, hot flashes, cold flashes, stomach cramps, diarrhea, and [loss of appetite]." *Id*. at 4.

It's beyond dispute—in fact, Defendant stipulates—that Ms. Keohane has been diagnosed with gender dysphoria, a serious medical need. ECF No. 133 at ¶¶ F. 6-7, G. 2. More importantly, *nobody* is arguing anymore that hormone therapy isn't necessary to treat her gender dysphoria. Indeed, Ms. Keohane testified to the benefits that she's personally experienced from her hormone treatment, including changes in fat distribution, body hair loss, and breast development—physical changes that have feminized her body—and improved mental clarity and mood. ECF No. 145 at 72-73; *see also* ECF No. 129-8 at 73-75.  But Defendant's newfound recognition of the medical necessity for hormone treatment doesn't explain or absolve the denial of care for Ms. Keohane's first two years in Defendant's custody. Indeed, nobody has provided a sufficient explanation for this delay in treatment.

The leader of Ms. Keohane's treatment team, Dr. Johnson, testified that she met Ms. Keohane on August 6, 2014, and signed off on an initial diagnosis of gender identity disorder on August 13, 2014. ECF No. 129-7 at 57. She was aware of Ms. Keohane's request for hormone treatment as early as August 2014, *id*. at 58-59, but the only discussions she had at that point about treatment concerned whether Ms. Keohane met Defendant's criteria for receiving hormone therapy in prison—including documentation of prior treatment, an apparent reference to the "freeze-

frame" policy in effect at the time. *Id.* at 86. From that point, nobody from the mental health side discussed anything with the medical team about Ms. Keohane's hormones until February 2016—*eighteen months after Ms. Keohane entered Defendant's custody*. *Id.* at 85.

Of course, Defendant could not have forgotten about Ms. Keohane's request for treatment during the interim with all the grievances she was filing. *See, e.g.*, ECF No. 3-6. Defendant's inertia on hormone treatment ended temporarily in February 2016, when Ms. Keohane was transferred to the Everglades facility and a referral to an outside endocrinologist was noted in her medical records. *See* ECF No. 129-11 at 67. But, again, nothing happened with this referral until *six months later*—that is, *after* Ms. Keohane filed this lawsuit.

The testimony of the Everglades facility's medical director, Dr. Dieguez, only goes to show how uncomplicated this process could have been had Defendant shown some urgency earlier. *See* ECF No. 40-1 at 81 ("After the lawsuit, I, you know, I talk to them and before I has been talking to them, but we are, you know, working in the process to do what we can do for the person. Then . . . I listen [to] the opinion of the endocrinologist that recommended the hormones. I think that, why not? So that's it. So I agree that the hormones will be helping him to feel a little better."). So, *why not?* Defendant has no answer for this delay in treatment.

29

The Eighth Amendment prohibits the government from inflicting "cruel and unusual punishments" on inmates. *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991). The Supreme Court has interpreted this prohibition to encompass "deprivations . . . not specifically part of [a] sentence but . . . suffered during imprisonment." *Id.* at 297. Accordingly, an inmate who suffers "deliberate indifference" to her "serious medical needs" may state a claim for a violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

It's well established in this circuit that "an official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *McElligott v. Foley*, 182 F. 3d 1248, 1255 (11th Cir. 1999) (quoting *Lancaster v. Monroe Cty. Ala.*, 116 F. 3d 1419, 1425 (11th Cir. 1997)). Delaying treatment, "even for a period of hours," can amount to deliberate indifference. *Id.* (listing cases). And "deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment." *Id.*

Despite Defendant's knowledge of Ms. Keohane's gender-dysphoria diagnosis, her continued requests for treatment, her self-harm, and her suicide attempts, Defendant initially denied, then delayed, treatment for two years— treatment which it now agrees is medically necessary. This Court finds this prolonged denial of hormone treatment under Defendant's "freeze-frame" policy

constitutes deliberate indifference to Ms. Keohane's gender dysphoria. Defendant's decision to deny hormone therapy was based on an unconstitutional rule with no foundation in medical judgment. Moreover, the minimization of Ms. Keohane's condition and the slow-walking of her treatment by those in charge of her care only goes to show how inexperience and ignorance can needlessly prolong an inmate's suffering. Accordingly, so long as Ms. Keohane's hormone therapy is not medically contraindicated, Defendant is enjoined to continue providing her with hormone therapy as prescribed by her treating endocrinologist.

V

Defendant's policies (and the resulting approach its medical personnel have taken to treatment) have essentially, and needlessly, denied Ms. Keohane medically necessary care—including hormone therapy[8] *and* access to female clothing and grooming standards.[9] A lot can explain the denial of care in this case, starting at the top with ignorance and bigotry.[10] But medicine does not yield to ignorance or

---

[8] Treatment Defendant now concedes is medically necessary.

[9] Treatment Defendant's own expert opined would be "psychologically helpful" in alleviating Ms. Keohane's gender dysphoria.

[10] For example, at trial, Defendant's expert witness on prison security, Mr. James. R. Upchurch, was downright baffled over the differences between transgender people, gay people, and people diagnosed with gender dysphoria. *See* ECF No. 146 at 164 ("I've heard more in the last two days about differentiating between transgender, homosexual, gender dysphoria. It's been very educational. But I don't think there are a lot of people out there who know or would know who is what, and I don't think there are a lot of inmates out there who really know if they are one or the other."); *see also id.* at 165 ("There's homosexual activity in prison. That I assume involves— would involve transgender inmates, but also involves non-transgender, assuming that—

31

bigotry. And while differences in medical judgment often serves as a valid defense to a claim of deliberate indifference, ignorance and bigotry is no defense—nor, for that matter, is blind deference to security policies in the absence of any exercise in medical judgment. As to Ms. Keohane's request for access to female clothing and grooming standards, this Court finds Defendant's denial of care based on "security concerns" constitutes deliberate indifference to her gender dysphoria.

## A

The WPATH Standards note that each patient should be assessed and provided treatment for their gender dysphoria according to their individual needs. *See* ECF No. 3-16. Defendant's own expert, Dr. Levine, agrees, testifying at trial that "[t]he treatment of gender dysphoria in the community is driven by the patient . . . . So there are people who have gender dysphoria who do not want hormones[, and t]here are people who have gender dysphoria who do not want to have sex reassignment surgery." ECF No. 146 at 57-58. Ultimately, Dr. Levine opined that "the hallmark of good treatment [is] that it varies from person to person." *Id*. at 64.

---

depending on what that definitional line cutoff is."). Mr. Upchurch also admitted he had "never heard of gender dysphoria" before this case, and he assumed "a number of inmates who are homosexuals . . . would like to have long hair," which might result in further litigation if Ms. Keohane succeeds in this case. *Id*. at 163-64; *see also* ECF No. 129-15 at 31 ("Quite honestly I'm not real clear on the relationship between gender dysphoria and transgender and homosexuality, a lot of these kinds of things."); *id*. at 32 ("I couldn't give you an estimate on transgender women only because that would mean I would have to make a distinction between effeminate homosexual males as defined as—transgender category. I've never—that's not something that I have—that I would be able to quantify.").

The WPATH Standards recommend several treatment options, including social transitioning. These standards *theoretically* should apply *inside* prisons as well as outside. But according to Defendant's chief medical officer, Dr. Timothy Whalen, Defendant isn't currently implementing the WPATH Standards in its prisons. ECF No. 129-1 at 179; *see also* ECF No. 146 at 9.

At trial, Dr. Whalen wasn't shy about his qualms with the WPATH Standards or some of the mainstream medical organizations that find these standards authoritative in the treatment of gender dysphoria. ECF No. 146 at 46 ("It's the only process that I'm aware of where we go against nature to help somebody. And while I'm trying to grasp that, I still have trouble making that leap."); *see also* ECF No. 129-1 at 170 ("I don't know what [the American Medical Association and American Psychiatric Association] would believe. They are basically political arms . . . [o]f physicians and psychiatrists.").

When pressed, Dr. Whalen admitted he was "evolving" on the issue of whether hormone therapy is proper treatment for gender dysphoria, though he once flippantly compared it to "offering diets to anorexics." ECF No. 146 at 48. What's more, Dr. Whalen thinks there's a possibility gender dysphoria just doesn't exist at all. ECF No. 129-1 at 119-20. And Dr. Whalen says he's "sure that [his] religion enters into" his views concerning transgender people in general, but he claims he temper[s] that with what [he] see[s] and deal[s] with on a day-to-day basis." *Id*. at

33

163. But this Court finds this claim dubious based on some of Dr. Whalen's other unenlightened comments.[11]

Luckily for Ms. Keohane, Dr. Whalen is not a member of her treatment team. ECF No. 146 at 25. But as Defendant's chief medical officer, Dr. Whalen is the "final decision-maker" when it comes to granting exceptions to Defendant's policies for medical reasons. ECF No. 129-1 at 148. His testimony makes plain that he sees no reason to grant such exceptions for inmates with gender dysphoria.

Dr. Whalen testified that, in his view, the only proper treatment for gender dysphoria is psychotherapy and psychiatric medication. *Id*. at 119; ECF No. 146 at 15. In addition, he testified that if a mental-health clinician came to him requesting a pass for Defendant's hair-length policy for an inmate with gender dysphoria, it would be a "hard sell" for him to grant an exception based on a finding of medical necessity. ECF No. 129-1 at 111. This is so even though Dr. Whalen admittedly doesn't know one way or the other if social transitioning is helpful in treating gender dysphoria. *Id*. at 116.

Dr. Whalen also testified at trial that it's *Defendant's* opinion that longer hair, access to makeup, and access to female undergarments is not medically necessary

---

[11] For example, though Dr. Whalen thinks treating gender dysphoria by encouraging the transition of gender roles "goes against nature," he doesn't think we should also medically try to convert gay people to straight people because "[t]hat's a sexual preference . . . . That is their choice[.]" ECF No. 146 at 47.

for treating gender dysphoria. ECF No. 146 at 14-15. He explained that to him, based on his experience as an emergency room doctor, "[m]edical necessity . . . is somewhat limited." *Id*. at 21. Accordingly, Dr. Whalen "break[s] things down according to loss of life, limb, or one of the senses for emergencies, and then urgent, and nonurgent." *Id*. For Dr. Whalen, social transitioning falls into the "nonurgent category" of medical treatment. *Id*.

Of course, the Constitution doesn't command only the provision of emergency treatment to avoid violating an inmate's Eighth Amendment rights. Dr. Whalen is sorely mistaken if he believes "nonurgent" treatment cannot also be "medically necessary" in a constitutional sense. *See, e.g.*, *Sands v. Cheesman*, 339 F. App'x 891, 894-96 (11th Cir. 2009) (unpublished) (finding severe periodontitis, or gum infection, constituted serious medical need though it was not an emergency condition).

Dr. Whalen's opinion regarding medically necessary treatment raises one of many red flags contributing to this Court's finding that Defendant has a blanket policy of denying social transitioning for inmates diagnosed with gender dysphoria. Moreover, Dr. Whalen's admitted lack of knowledge concerning accepted standards of care and his limited experience in treating gender dysphoria further contributes to this Court's finding that Defendant denied Ms. Keohane access to minimally competent medical personnel capable of determining her treatment needs.

B

The chronology of Ms. Keohane's treatment in Defendant's custody is marred with delays, rigidities, and shifting explanations regarding her request for social transitioning. To start, as this Court already noted, the leader of her mental health team, Dr. Johnson, met Ms. Keohane as early as August 2014—within a few weeks of Ms. Keohane's transfer to Defendant's custody. ECF No. 129-7 at 53. At that point, Dr. Johnson testified that Ms. Keohane wasn't requesting social transitioning yet, but she signed off on a treatment plan diagnosing Ms. Keohane with gender identity disorder. *Id*. at 53, 57; *see also id*. at 82 (conceding Ms. Keohane was diagnosed with gender dysphoria as early as August 2014).

On December 11, 2014, Ms. Keohane filed her first grievance requesting "an appointment to discuss the psychological necessity of . . . dressing as a female, and the availability of a pass for this way of dressing." ECF No. 3-6 at 9. A few days after filing this grievance, Ms. Keohane had two personal sports bras and three sets of female underwear confiscated as contraband. *Id*. at 12. She filed a grievance concerning their confiscation, but Defendant's response was only that "[a]t a male institution only T-shirts, Boxers, Pants and Blue shirts are authorized. Any other clothing is unauthorized." *Id*. Similarly, on May 4, 2016, Ms. Keohane filed another grievance requesting, among other things, hormone therapy and the ability to socially transition. ECF No. 3-6 at 14. This grievance was denied. *Id*. And a

36

subsequent, similar grievance was returned without action a few weeks later. *Id*. at 16-17.

Almost *two years* after entering Defendant's custody, Dr. Johnson signed off on Ms. Keohane's March 2016 treatment plan, which noted that Ms. Keohane had indicated a desire to socially transition. ECF No. 129-7 at 63-64. But Dr. Johnson testified that she wasn't aware of this request because she didn't read that part of the plan before she signed it. *Id*. According to Dr. Johnson, Ms. Keohane's treatment team didn't discuss her request to grow out her hair until August 2016 and didn't discuss other aspects of social transitioning until after Ms. Keohane filed suit. *Id*. at 82-83, 94-95. This is so despite: (1) Dr. Johnson's knowledge of Ms. Keohane's attempts at suicide and self-harm, and (2) her general knowledge that *any* patient whose gender dysphoria is left untreated may be at increased risk of suicide and self-harm. *See* ECF No. 129-7 at 30-31, 95.

Another member of Ms. Keohane's treatment team, Ms. Sonel Baute, testified that she doesn't think *anyone* has made a final decision regarding Ms. Keohane's request for social transitioning. ECF No. 129-3 at 30. Ms. Baute became Ms. Keohane's mental health counselor in March 2016 after Defendant transferred Ms. Keohane to the Everglades facility. *Id*. at 26-27. From the beginning, Ms. Keohane notified Ms. Baute of her grievances requesting access to female clothing and grooming standards. *Id*. at 27-28. And like Dr. Johnson, Ms. Baute is well aware of

Ms. Keohane's history of self-harm. ECF No. 129-3 at 18-19, 50-51. Indeed, Ms. Baute testified that she believes Ms. Keohane attempted suicide because of the hopelessness she felt from "[b]eing in prison and not having what she felt like she needed," with respect to her gender dysphoria. *Id*. at 51.

But even with this knowledge, Ms. Baute has never assessed whether Ms. Keohane has a mental-health need for longer hair or access to female undergarments because, she says, Defendant's policies prohibit these things. *Id*. at 66. Nor does she think Defendant would permit a medical pass for social transitioning. *Id*. at 65 ("I don't think there's a medical pass for social transition."). Instead, her therapy with Ms. Keohane is focused on coping *without* access to this particular treatment. *Id*. at 61 ("For now, yeah. It's how she can be okay with what she has at the time.").

The third member of Ms. Keohane's mental health team, Mr. Andre Rivero-Guevara, testified that at some point, the team did discuss whether Ms. Keohane should have access to female clothing. But they concluded "it is out of our hands, that we understand, but there's nothing we can do," because Defendant makes that decision. ECF No. 129-11 at 73. But Mr. Rivero now agrees Ms. Keohane needs a bra—though, he thinks it's only because her breasts are growing from hormone therapy, not because she has a psychological or psychiatric need for female undergarments. *Id*. at 69. In addition, Mr. Rivero admitted he's also aware of Ms. Keohane's history of attempted suicide while in Defendant's custody. *Id*. at 69.

What's clear from the treatment team's testimony is that everybody knows Ms. Keohane has harmed herself and attempted suicide, but still, *nobody* has requested *any* exceptions to Defendant's male grooming and clothing policies to treat her gender dysphoria. *See* ECF No. 129-7 at 99. Moreover, the mental health team never evaluated whether Ms. Keohane has a medical or mental-health need for access to female clothing and grooming standards—despite Ms. Keohane's persistent requests—because they believe Defendant's security policies prohibit such treatment. The treatment team failed to make this assessment despite their shared knowledge that treatment for gender dysphoria includes social transitioning[12] and the failure to treat can lead to self-harm and suicide.[13]

---

[12] Ms. Baute testified that she understands treatment can include individual therapy, social transitioning, hormones, and surgery. ECF No. 120-3 at 17. She further testified that social transitioning is part of treatment because "[i]t allows you to express yourself in the gender that you feel yourself to be . . . . [and i]t helps with self-esteem, it helps with expression, [and] it helps with . . . emotions." *Id*. at 18. Dr. Johnson similarly testified that she understands "appropriate treatment protocols" for gender dysphoria include "anything from psychotherapy to hormone treatment to surgery . . . . [a]nd assistance from the . . . clinician with the individual's social transitioning." ECF No. 129-7 at 52. Mr. Rivero also understands treatment includes social transitioning—even though he admitted he's not familiar with the WPATH Standards. ECF No. 129-11 at 23. But he also thinks it's more appropriate "in a different setting," and not in prison because "there's a lot of men [in prison] that are violent and . . . you have this person that is, you know, more feminine and more fragile[.]" *Id*.

[13] Dr. Johnson acknowledged that an individual with untreated gender dysphoria might hurt themselves or attempt suicide because of their dysphoria. ECF No. 129-7 at 30-31. Ms. Baute was aware of the same. ECF No. 129-3 at 19-20. Mr. Rivero, on the other hand, recognized that patients whose gender dysphoria is left untreated may "become unglued and . . . suffer for little things," while others may be "stoic," but "it depends on the person." ECF No. 129-11 at 35-36.

The mental health team's testimony also raises several red flags over Ms. Keohane's medical treatment. For example, at least two of the mental health team members, including the team leader, were entirely inexperienced in treating inmates with gender dysphoria before they met Ms. Keohane.[14] Though Mr. Rivero testified to having some experience with transgender patients during his time in private practice, his patients had already fully transitioned at the time. ECF No. 129-11 at 11-12. Granted, everyone seems to have taken a continuing education course about gender dysphoria that Wexford offered in the spring of 2016. *See* ECF No. 129-3 at 22; 129-7 at 15, 48-49; 129-11 at 25-26. But this course only goes so far in compensating for an otherwise complete lack of training and experience.

Another red flag is the team's confusion about whether they could request exceptions or "passes" to Defendant's security policies concerning hair length and female undergarments. Nobody seems to think providers on the mental health side can request or recommend exceptions to Defendant's policies. *See* ECF No. 129-3 at 65 ("I don't think there's a medical pass for social transition."); ECF No. 129-7 at 98 (An inmate "would not be able to have [access to female clothing and grooming standards]," under DOC policy.). Instead, only providers on the medical side have

---

[14] Neither Ms. Baute nor Dr. Johnson had ever treated someone for gender dysphoria before Ms. Keohane.

this authority. ECF No. 129-11 at 46 ("Like I said, we do not give passes. Passes are given by medical.").

The treatment team's understanding of Defendant's policies belies Dr. Whalen's testimony that any physician or licensed clinician—on the medical *or* mental health side of things—can request exceptions to Defendant's policies for medically necessary care. ECF No. 129-1 at 151 ("[A] clinical psychologist would know that they can do that, because in the mental health world the licensed clinical psychologists are on an even par with the physicians."). Even so, Dr. Whalen's testimony that a request for social transitioning would be a "hard sell" for him leads this Court to infer and ultimately conclude that he wouldn't grant such an exception as a matter of policy. But even setting this aside, it's clear Dr. Whalen has never decided this issue, nor has he been presented with any medical request for any exceptions to security policies to allow for social transitioning. But still—he's prejudged the matter. This Court suspects Dr. Whalen's prejudgment is born of his ignorance of gender dysphoria and bigotry toward transgender individuals in general. This is especially clear in light of Defendant's own expert's opinion that social transitioning would be psychologically helpful for Ms. Keohane while she's undergoing hormone therapy in Defendant's custody.

Lastly, some members of Ms. Keohane's treatment team arbitrarily differentiate between "wants" and "needs" when it comes to her medical treatment.

Dr. Johnson testified that "[p]er [her] definition" of "medical necessity," social transitioning is not necessary because it's not a "life and death medical intervention." ECF No. 129-7 at 94-95. She also testified that she doesn't know if Ms. Keohane *needs* access to female clothing and grooming standards, nor does she think she's capable of making such a determination, though she knows Ms. Keohane *wants* those things. *Id*. at 104. Mr. Rivero similarly testified that he thinks a "[n]eed is when you need something to live, to be able to continue, you know[.]" ECF No. 129-11 at 16. "Anything else is something you want, which is okay, too." *Id*.

But again, the law does not require an inmate to be at death's door before the failure to provide medical treatment constitutes deliberate indifference. "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (citing *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999)).

And though it may "not rest on any established sinister motive or 'purpose' to do harm," Defendant's provision of *some* treatment "is undercut by a composite of delays, poor explanations, missteps, changes in position and rigidities—common enough in bureaucratic regimes but here taken to an extreme." *Battista v. Clarke*, 645 F.3d 449, 455 (1st Cir. 2011). These red flags support this Court's conclusion that the care Defendant afforded Ms. Keohane was based on unreasonable

professional judgment—that is, ignorance to accepted standards of care and the concomitant blanket deference to Defendant's security policies over the exercise of medical judgment. Moreover, the treatment team's testimony concerning their failure to assess Ms. Keohane's need for social transitioning (despite their knowledge that social transitioning is an accepted treatment option *and* that Ms. Keohane had a history of self-harm) further contributes to this Court's conclusion that Defendant denied Ms. Keohane access to medical personnel capable of evaluating her treatment needs.

C

Apparently recognizing the gap in Ms. Keohane's medical record, Wexford's counsel arranged for its regional psychiatrist, Dr. Santeiro, "to evaluate Plaintiff's need for access to female clothing and grooming standards," after she filed her lawsuit. ECF No. 133 at ¶ F. 30. Dr. Santeiro testified that he met with Ms. Keohane for "a little over an hour" to evaluate her. ECF No. 129-12 at 17. After the meeting, the doctor concluded that Ms. Keohane has gender dysphoria but didn't presently have a need for access to female clothing or grooming standards. *Id*. at 14, 33.

Remarkably, this was the first time Dr. Santeiro evaluated anyone in prison to determine a medical need for access to clothing or grooming standards to treat gender dysphoria. *Id*. at 78. Dr. Santeiro typically only evaluates inmates for psychiatric medications. *Id*. at 77. But Ms. Keohane hasn't been on *any* psychiatric

medications while in Defendant's custody, nor did Dr. Santeiro conclude that she needed to be. *Id*. He even admitted recommending access to social transitioning is something that would typically be left for Wexford's psychologists to make—not for a psychiatrist like himself. *Id*.

This Court finds Dr. Santeiro's conclusions about Ms. Keohane's treatment needs unhelpful—both to this Court and for Defendant's case—for several reasons. To start, Defendant offers his testimony neither as an expert nor as a treating physician. Accordingly, his opinions aren't the sort of dueling-expert testimony that could demonstrate a difference-in-medical-opinion defense to Ms. Keohane's claim.

Curiously, Dr. Santeiro had very little discussion with Ms. Keohane about her request to socially transition despite Wexford's assertion that determining this need was the whole purpose of the evaluation. Dr. Santeiro testified that he didn't bring up the subject of the forced haircuts Ms. Keohane has experienced in Defendant's custody—that he "didn't open that can of worms"—and that they only briefly discussed Ms. Keohane's request for female clothing and grooming standards at the start of their meeting. ECF No. 129-12 at 117.

In addition, Dr. Santeiro testified that his conclusions were based on whether Ms. Keohane has a "physical" need to socially transition, not a "mental-health" need. *Id*. at 91-92. In distinguishing between mind and body, Dr. Santeiro conceded it may be beneficial to Ms. Keohane's mental health to socially transition, but her physical

body doesn't require such treatment. Based on this flawed conception of "medically necessary" treatment, Dr. Santeiro concluded Ms. Keohane had no medical need to access female clothing and grooming standards. *See Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996) ("In this circuit, it is established that psychiatric needs can constitute serious medical needs and that the quality of psychiatric care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference to those serious psychiatric needs.").

Dr. Santeiro is also aware that untreated gender dysphoria may lead to suicide and self-castration, but he concluded that Ms. Keohane just didn't seem psychologically distressed enough "to overwhelm the risk" of social transitioning in prison. ECF No. 129-12 at 57, 92. Had she shown "any kinds of imminent risks or severe distress," Dr. Santeiro testified that he "would have made some communications with the Department of Corrections to see what could be done." *Id*. at 101. But he made this observation without having fully reviewed Ms. Keohane's medical records and without knowledge of her past suicide attempts. *Id*. at 80-81, 83.

Indeed, Dr. Santeiro only reviewed the psychiatry notes in Ms. Keohane's medical chart before conducting the evaluation. *Id*. at 81 ("I only look at the psychiatry section and I only looked at the psychiatry provider. I did not even read most of the counseling notes 'cause there's too many notes to read."). But there

wasn't much to read since Ms. Keohane has never taken psychiatric medication while in Defendant's custody. *Id*. at 81-82.

Contrary to what the WPATH Standards recommend, Dr. Santeiro applied a separate treatment standard to Ms. Keohane because she's in prison. He recognizes social transitioning is a "very appropriate" way to treat gender dysphoria "in the community" but claims it's "not as easy" in prison. ECF No. 129-12 at 99-100. Had he evaluated Ms. Keohane as a patient in the community, he says he probably would have agreed with or encouraged social transitioning. *Id*. at 100. However, for "safety" reasons, he claims it's "extremely difficult" to allow an inmate to socially transition in the general population of a male prison. *Id*. at 101. Even so, Dr. Santeiro ultimately agreed that if Defendant was already providing Ms. Keohane with a bra, she might as well be provided female underwear too. ECF No. 129-13 at 50 ("Once they open that door, might as well have the other parts.").[15]

As the factfinder in this case, this Court places little, if any, weight on Dr. Santeiro's testimony. Defendant has offered his testimony not as an expert witness

---

[15] To be clear, although Dr. Santeiro's testimony alludes to some balance between security interests and an alternative form of treatment that can minimize security concerns, there has been no balancing in this case. That decision has never been made. Instead, Ms. Keohane's treatment team has limited her treatment in blanket deference to Defendant's security policies. In any event, Dr. Santeiro's opinion about security concerns is simply irrelevant given Defendant's stipulation that if such treatment is deemed medically necessary, it will be provided with added security measures taken. Ultimately, Defendant's constant injection of security concerns throughout this litigation is just another red herring—another example of how this case and Defendant's shifting explanations have been moving targets from the start.

nor as a treating physician, his "medical conclusions" are flawed in that they defer to security concerns and apply a separate standard to Ms. Keohane based on her status as an inmate, and he's internally inconsistent given his assumption that underwear may not, in fact, pose such a risk now that Ms. Keohane has access to a bra for breast support. Moreover, Dr. Santeiro's findings—grounded in large part on Ms. Keohane's status as an inmate—also raise grave doubts concerning his competency in evaluating and treating gender dysphoria. [16]

## D

Defendant's own expert's testimony is infinitely more persuasive than Dr. Santeiro's suspect findings and the treatment team's deference to Defendant's security policies. At trial, Dr. Levine offered his opinion as an expert on transgender issues and the treatment of gender dysphoria. After explaining the historical context for the term "medically necessary," and the reasons for his own hesitation in labeling treatment as such, Dr. Levine opined that he thinks the term "is a euphemism or . . . a cover term for . . . what might be psychologically pleasing to the patient, what

---

[16] Ms. Keohane's treating endocrinologist, Dr. Eugenio Angueira-Serrano, to whom Defendant eventually referred Ms. Keohane for hormone therapy even testified that he was "surprised" when he learned Dr. Santeiro decided social transitioning wasn't necessary while Ms. Keohane was taking hormones. Dr. Angueira opined that he thinks allowing Ms. Keohane to grow out her hair and wear female undergarments "is helpful for the patient," and he "would expect that to be something that would help the patient with transition." ECF No. 129-2 at 19; *see id*. at 19-20 ("I mean, once you're having body changes, I think it would be uncomfortable to have the breast developing and you couldn't wear a bra.").

might be psychologically helpful to the patient, and what may diminish the person's internal distress." ECF No. 146 at 74.

In Dr. Levine's opinion, which this Court credits, a compassionate part of treating an inmate with gender dysphoria who is taking hormones would include making certain "accommodations within [the prison] setting . . . to ease [the inmate's] anxiety." *Id*. at 75. Without hesitation, Dr. Levine opined that these accommodations should include providing a bra to an inmate who is growing breasts as a result of hormone therapy. *Id*. at 76. And he testified that allowing Ms. Keohane to wear female underwear and to grow out her hair would be both "psychologically comforting" and "psychologically pleasing" to her.[17] *Id*. at 117-18.

Dr. Levine believes if Ms. Keohane were to be taken off hormone treatment, she would be "very distressed." *Id*. at 118-19. And if Defendant continues to deny her access to female clothing and grooming standards, Dr. Levine opined that "[Ms. Keohane] could be vulnerable to acute decompensation." *Id*. at 119. Indeed, Dr. Levine agreed with this Court that it would be "readily apparent" to a similarly trained doctor that the failure to treat an inmate's gender dysphoria would cause the

---

[17] As to the benefits of social transitioning as a form of treatment, Dr. Levine testified that he thinks "it's a very useful phenomenon to see whether the fantasy that I am a woman can be translated into living or portraying myself as a woman and what problems will I have, what comfort and joy will I have in transforming what originally was a fantasy into a new partial sense of reality. That's why it's useful. And if you want to call that medically necessary to further ascertain in the mind of the patient whether this was a wise decision or not, it's useful." ECF No. 146 at 119-20.

inmate to suffer. *Id*. at 126. He testified that if he "treated this as though this wasn't a legitimate source of mental pain, then [he] would . . . be adding to the desperation of that person." *Id*. In Dr. Levine's opinion, "it's *destructive* to ignore this mental complaint of gender dysphoria." *Id*. at 129 (emphasis added).

But that's what Defendant has done from the start when it comes to providing constitutionally adequate treatment for Ms. Keohane. Defendant was subjectively aware of the risk of serious harm to Ms. Keohane because Defendant knew she was diagnosed with gender dysphoria as early as August 2014. Indeed, Defendant "wisely do[es] not deny" that Ms. Keohane has a serious medical need based on her diagnosis. *Brown v. Johnson*, 387 F. 3d 1344, 1351 (11th Cir. 2004) ("A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"). And Ms. Keohane put Defendant on notice of her continued suffering with each grievance, attempted suicide, and self-harm attempt during her first two years in custody. Even so, Defendant ignored Ms. Keohane's mental complaint of gender dysphoria and her parallel need to socially transition in prison, citing "security concerns," and later, Dr. Santeiro's suspect evaluation, to deny her care. [18]

---

[18] As this Court has described at length, Dr. Santeiro offers no competing medical opinion—nor is this Court weighing his opinion against that of Dr. Brown's or Dr. Levine's or any other qualified expert in this case. Defendant offers his testimony as neither an expert in the treatment

E

To establish deliberate indifference, Ms. Keohane must show Defendant was not only aware of a risk of serious harm, but also that Defendant disregarded the risk by conduct that is more than mere negligence. *See Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1299 (N.D. Fla. 2017) (citing *Goebert v. Lee Cty.*, 510 F. 3d 1310, 1326-27 (11th Cir. 2007)). As this Court noted in *Hoffer*, the Eleventh Circuit recognizes several examples of conduct that is considered more than mere negligence, including

> (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all.

*Baez v. Rogers*, 522 F. App'x 819, 822 (11th Cir. 2013). And just because Defendant provides some care, like counseling and hormones, doesn't mean this suffices as constitutionally adequate treatment. *De'lonta v. Johnson*, 708 F. 3d 520, 526 (4th Cir. 2013); *see also Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016) ("Although the Eighth Amendment is not violated merely because a prisoner receives less than ideal health care, the Eleventh Circuit has repeatedly recognized that even when some care is provided, 'deliberate indifference may be established

---

of gender dysphoria nor a treating physician, and this Court has given it the consideration it deserves.

by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment.'" (listing cases)).

Ms. Keohane asserts Defendant has been deliberately indifferent to her gender dysphoria because of its blanket denial to provide social transitioning based on Defendant's security policies, and because Defendant's medical providers lack competence in treating gender dysphoria or otherwise failed to meet community standards of care. This Court agrees. As set out above, the record at trial is replete with evidence to support this conclusion.

1

Experts on both sides agreed at trial that Defendant should allow Ms. Keohane access to female clothing and grooming standards to treat her gender dysphoria.[19] Accordingly, this Court finds such treatment is necessary to treat Ms. Keohane's serious medical need. Moreover, this Court finds Ms. Keohane's treatment team was aware of Ms. Keohane's serious medical need but ignored a substantial risk of harm to her mental and physical health in reliance on Defendant's clothing and grooming policies. For example, Ms. Baute testified that she's been focusing her counseling sessions with Ms. Keohane on coping *without* treatment rather than addressing her

---

[19] Plaintiff's expert, Dr. Brown, opined that "social transition in its elements, like the appropriate pronouns, like the ability to present within the confine of the prison environment, oneself as a female prisoner, is part of the medically necessary components for the treatment of gender dysphoria." ECF No. 145 at 169. Similarly, Defendant's own expert, Dr. Levine, "recognize[d] that if Reiyn wants to wear panties, then that would be psychologically pleasing to Reiyn," as would growing out her hair. ECF No. 146 at 117-18.

underlying diagnosis because she thinks she can't request exceptions to Defendant's security policies for social transitioning.

Defendant's contracted medical providers understand Defendant's security policies effectively ban social transitioning in prison without exception. And in light of Dr. Whalen's disingenuous testimony, this Court finds Defendant would not permit an exception even if a clinician sought one based on a sincere belief that her patient posed a substantial risk of harm to him or herself without the ability to socially transition in custody. As to Ms. Keohane, this denial of care only serves to prolong her mental suffering without any legitimate penological purpose.

The evidence at trial demonstrates that Ms. Keohane's treatment team clutches to Defendant's male clothing and grooming policies to explain their failure to even assess whether Ms. Keohane has a treatment need to socially transition in prison. In their minds, Ms. Keohane *simply can't transition* because Defendant does not permit inmates housed in its male facilities access to the clothing and grooming standards it applies to female inmates. The treatment team couldn't even fathom requesting an exception to those policies even if the inability to socially transition drives a patient to suicide.

Mr. Rivero's testimony illustrates this point. He testified that he would place a suicidal inmate diagnosed with gender dysphoria in special housing and provide psychiatric medication rather than request a pass for social transitioning. In effect,

Mr. Rivero would treat the inmate's depression and suicidal ideation—two devastating symptoms of gender dysphoria—instead of the underlying psychiatric diagnosis. ECF No. 129-11 at 47 ("I cannot do anything for the hair length. I, however, can put the patient in [special housing], so the patient will not harm themselves. And after a certain amount of time that the patient is in [special housing], if the patient wants to take medication, I would help them with medication."). Instead of addressing the underlying medical need, Mr. Rivero would simply medicate and isolate the inmate until they're momentarily talked down from the metaphorical ledge. As Dr. Brown testified at trial, this is like "putting a Band-Aid over a wound that requires significant intervention and the Band-Aid isn't sufficient." ECF No. 145 at 168.

Similarly, Wexford's Regional Medical Director, Dr. Marlene Hernandez, declared that she is not permitted to authorize any exceptions to Defendant's policies.[20] ECF No. 24-1 at ¶ 8. She did testify about requesting several medical exceptions to Defendant's policies for accommodations like low bunk passes, hats, long sleeves, and sunblock. ECF No. 42-1 at 32. But when it comes to exceptions to permit social transitioning, Dr. Hernandez testified that "[t]hat's a security question." *Id.* at 31.

---

[20] It's worth noting that Dr. Hernandez had no prior experience with treating gender dysphoria or knowledge of the standards of care for treating gender dysphoria before reviewing Ms. Keohane's medical records. ECF No. 42-1 at 46.

Other courts have found this approach to treating gender dysphoria constitutionally inadequate. *See Soneeya*, 851 F. Supp. 2d at 248 ("While the DOC has offered to treat any depression or anxiety that might occur as a result of the denial of [sexual reassignment surgery], treating the symptoms is not a substitute for treating Ms. Soneeya's underlying condition. The DOC cannot, therefore, claim that Ms. Soneeya is receiving adequate treatment for her serious medical needs because it has not performed an individual medical evaluation aimed solely at determining the appropriate treatment for her [gender dysphoria] under community standards of care."). This Court finds this summary deference to Defendant's clothing and grooming policies and asserted security concerns effectively functions as a blanket ban on Ms. Keohane's ability to socially transition—a form of medically necessary care to treat her gender dysphoria.

2

In addition, this Court finds the care Ms. Keohane received while in Defendant's custody has deviated from accepted standards of care for the treatment of gender dysphoria. Even Defendant's own expert, Dr. Levine, agrees that allowing Ms. Keohane to dress and groom as a woman would be "psychologically helpful" in treating her gender dysphoria. But Defendant doesn't recognize or permit social transitioning in its facilities—nor does it follow the WPATH Standards, which this Court finds authoritative in the treatment of gender dysphoria.

54

"Deliberate indifference to serious medical needs is shown when . . . an inmate is denied access to medical personnel capable of evaluating the need for treatment." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (quoting *Ramos v. Lam*, 639 F.2d 559, 575 (10th Cir. 1980)).  Defendant's own chief medical officer admitted he's not implementing the WPATH Standards in Defendant's facilities, nor would he grant an exception allowing an inmate to socially transition despite the substantial risks flowing from a denial of care. Moreover, Ms. Keohane's own treatment team has had little—if any—prior experience treating inmates with gender dysphoria. Their inexperience led them to apply a different, limited standard of care to Ms. Keohane because she's in prison, despite their knowledge of her serious medical need. *See Loosier v. Unknown Medical Doctor*, 435 F. App'x 302, 306 (5th Cir. 2010) (unpublished) (allegation of doctor's failure to treat plaintiff based on inmate status rather than medical judgment sufficient to state claim for deliberate indifference). But   "[m]inimally adequate care usually requires minimally competent physicians." *Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991). Indeed, "access to medical staff is meaningless unless that staff is competent and can render competent care." *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (internal quotation marks omitted) (quoting *Cabrales v. Cty. of Los Angeles*, 864 F.2d 1454, 1461 (9th Cir. 1988)).  In this case, Defendant denied Ms. Keohane access to medical personnel capable of determining whether she has a

55

treatment need for social transitioning. Ms. Keohane's team leader even admitted that she didn't know if she was capable of determining this need. ECF No. 129-7 at 104. Defendant's ignorance toward the treatment of gender dysphoria, its failure to implement accepted standards of care, and the resulting denial of access to minimally competent medical personnel has only served to prolong Ms. Keohane's suffering.

3

Finally, Ms. Keohane has demonstrated that Defendant has a causal connection to her alleged constitutional harm. *See Hoffer*, 290 F. Supp. 2d at 1303 (quoting *Goebert*, 510 F.3d at 1327)). Defendant is Secretary of the Florida Department of Corrections ("FDC") and "is ultimately responsible for FDC's policies and practices." *Id*. (citing § 20.315(3), Fla. Stat.). Accordingly, because Ms. Keohane's claim is based on FDC's policies and their implementation, she's satisfied the causation element. *Id*. (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[T]he causal connection may be established when a supervisor's custom or policy … result[s] in deliberate indifference to constitutional rights …." (alteration in original) (internal quotation marks omitted)).

4

This Court recognizes that no inmate is automatically entitled to the most state-of-the-art medical treatment while in the state's custody. But that's not what

56

Ms. Keohane is seeking. Though she truly sees herself as a warrior queen[21] in this fight, Ms. Keohane is not demanding that Defendant bow down with offerings of frilly dresses, fancy shoes, or other frivolous badges of stereotypical femininity. Given the severe constraints placed on self-expression for male *and* female inmates, the *only* way it's even feasible for Ms. Keohane to express her gender identity is through pronouns, undergarments, and grooming. She's simply asking Defendant to see her and treat her as she is; namely, a woman stuck in a male body that's stuck in a cage for the foreseeable future. Even Defendant's own expert agrees that allowing for social transitioning is a compassionate part of Ms. Keohane's treatment plan.

Now that Defendant is permitting hormone therapy, Ms. Keohane's body is changing, feminizing, and becoming more in tune with her internal sense of self. But still, Defendant is forcing Ms. Keohane to live outwardly as a man in ways that, though seemingly banal to some, strike at the heart of what it means to be perceived as a man or woman.[22] Ultimately, Defendant has chosen an easier course of treatment to maximize "uniformity," and ease "security concerns," by ignoring the

---

[21] At trial, Ms. Keohane aptly compared herself to Daenerys Targeryen—"a queen and a warrior who has been through hardship and has learned how to survive it, who not only stands up for herself, but for other people and who values . . . human dignity and believes that all people should be able to have it." ECF No. 145 at 95-96.

[22] For example, former Maricopa County Sheriff Joe Arpaio didn't overlook the power of gendered undergarments when he forced male inmates housed in his jail to wear pink underwear. *See Arizona pink underwear inmate case to be settled:lawyer*, REUTERS (Sept. 8, 2014, 7:47 PM), https://www.reuters.com/article/us-usa-arizona-underwear/arizona-pink-underwear-inmate-case-to-be-settled-lawyer-idUSKBN0H32GO20140908. "In 2012, the federal 9th U.S. Circuit Court

substantial risk of harm to Ms. Keohane's mental health that results from denying such "minor accommodations" as panties and access to Defendant's female grooming standards. This ends now.

Defendant has stipulated "that if having longer hair or female undergarments or makeup were deemed to be medically necessary for an inmate with gender dysphoria, then the accommodation would be provided, with additional security measures taken if necessary." ECF No. 133 at ¶ F. 17. This Court finds such treatment is medically necessary to alleviate Ms. Keohane's gender dysphoria, and Defendant's denial of such treatment constitutes deliberate indifference. Defendant's deliberate denial of care—that is, the denial of access to female clothing and grooming standards despite its knowledge of her diagnosis and her history and risk of self-harm—has caused Ms. Keohane to continue to suffer unnecessarily and poses a substantial risk of harm to her health. Accordingly, Defendant is enjoined to permit Ms. Keohane access to the same undergarments, hair-length policy, and makeup items available for inmates housed in Defendant's female facilities so that she can socially transition to treat her gender dysphoria.

---

of Appeals ruled that Arpaio's policy may be unconstitutional when applied to prisoners who had not been convicted of a crime." *Id.*; *see also* Gabrial Arkles, *Correcting Race and Gender: Prison Regulation of Social Hierarchy Through Dress*, 87 N.Y.U. L. REV. 859, 904-05 (2012) (describing use of "non-dominant gendering" of prison clothing "as a form of punishment, humiliation, and control").

## VI

In addition to seeking injunctive relief, Ms. Keohane requests nominal damages against Defendant. But Ms. Keohane hasn't demonstrated that such a monetary award is "incidental to or intertwined with" the injunctive relief granted in this case. *See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 571 (1990). And it certainly isn't "restitutionary" in any sense. Accordingly, Eleventh Amendment immunity bars this claim for damages against Defendant. *See Doe v. Univ. of Ala. in Huntsville*, 177 F. Supp. 3d 1380, 1395 (N.D. Ala. 2016) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989)).

## VII

Defendant misdirects this Court to one red herring after another to justify the denial of care in this case, including Dr. Santeiro's suspect evaluation, the suggestion that Ms. Keohane's narcissism is driving this case, several witnesses' commentary on what constitutes a feminine haircut, and even condemning Ms. Keohane for any security concerns that may arise from her transition in prison. But the fact remains that both Defendant's "freeze-frame" policy and its security policies governing clothing and grooming trumped the exercise of medical judgment when it came to treating Ms. Keohane's gender dysphoria.

While now recognizing Ms. Keohane's mental-health need for hormone therapy, Defendant persists in suggesting she is to blame for any victimization

coming her way based on her gender role presentation. But after denying treatment based on its security policies—and offering expert witnesses to testify to myriad security concerns—Defendant abandoned this red herring on the eve of trial with its stipulation that if the requested treatments are medically necessary, they'll be provided with added security measures. Having so stipulated, Defendant is now put to that task. Ms. Keohane is not an animal.  She is a transgender woman. Forthwith, Defendant shall treat her with the dignity the Eighth Amendment commands.

Accordingly,

**IT IS ORDERED:**

1. This Court declares that Defendant's "freeze-frame" policy, Former Procedure 602.053, ECF No. 3-15, is unconstitutional. Defendant is permanently enjoined from reenacting and enforcing this policy.

2. Defendant must provide Ms. Keohane with hormone therapy so long as it is not medically contraindicated while she remains in Defendant's custody.

3. To treat Ms. Keohane's gender dysphoria, Defendant must permit Ms. Keohane to socially transition by allowing her access to female clothing and grooming standards consistent with Defendant's security policies governing female inmates' hair length, possession and purchase of makeup, and possession of female undergarments including bras, sports bras, and panties.

4.  The Clerk is directed to enter judgment in favor of Plaintiff stating:

"This Court **DECLARES** Defendant's Former Procedure 602.053, ECF No. 3-15, is unconstitutional as a blanket ban on medical treatment for inmates diagnosed with gender dysphoria. Defendant is **PERMANENTLY ENJOINED** from reenacting and enforcing this policy. This Court further enters a **PERMANENT INJUNCTION** against Defendant requiring it to permit Ms. Keohane access to Defendant's female clothing and grooming standards and requiring Defendant to continue to provide Ms. Keohane with hormone therapy so long as it is not medically contraindicated and while Ms. Keohane remains in Defendant's custody."

5.  This Court reserves jurisdiction to entertain any motion for attorney's fees and costs.

6.  The Clerk shall close the file.

**SO ORDERED on August 22, 2018.**


<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**